**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THE BLACK & DECKER                )
CORPORATION,                      )
BLACK & DECKER INC. and BLACK     )
& DECKER (U.S.) INC.,             )
                                  )
            Plaintiffs,           )
                                  )        Case No. 11-cv-5426
      v.                          )
                                  )        Judge Robert M. Dow, Jr.
POSITEC USA INC.,                 )
                                  )
            Defendant.            )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs The Black & Decker Corporation, Black & Decker Inc., and Black & Decker (U.S.) Inc. ("Black & Decker") have sued Defendant Positec USA Inc. ("Positec") for infringement of United States Patent Nos. 5,604,954 ("the '954 patent"); 6,263,975 ("the '975 patent"); 6,612,376 ("the '376 patent"); and 6,926,090 ("the '090 patent"). On September 14, 2012, the Court held a claim construction hearing, at which time it took evidence and heard argument regarding the construction of various claim terms in the '954 patent, the '974 patent, the '376 patent, and the '090 patent. The claim construction issues also have been extensively briefed. Currently before the Court are Plaintiff's Opening Claim Construction Brief [43], Defendant's Claim Construction Brief and Response to Plaintiff's Opening Claim Construction Brief [47], and Plaintiff's Reply Brief on Claim Construction [51]. The Court's construction of the disputed claim terms is set forth below.

# I. Background

## A. The '954 Patent

The '954 patent, entitled "Blower-Vacuum Device," relates to a device that can be used to collect garden debris through, for example, sucking debris into the device (vacuum mode) or discharging a stream of air to blow the debris into piles (blower mode). '954 patent, 1:3-8. This device has a motor, a housing, a fan, and attachment members that can be used as either a blower to discharge air or a vacuum to take in air. '954 patent, 2:29-34, 2:56-3:24. The attachment member fits over the fan, but it is not fixed to the housing; that is, it can be detached from the housing to expose the fan. '954 patent, 2:61-62, 3:27-42, 3:61-62.

The '954 patent is aimed at providing an improved safety interlock. '954 patent, 1:39-40. The improved safety interlock does not allow the motor to run when the fan is exposed, *i.e.*, when the attachment member is not attached to the housing. '954 patent, 1:56-58. Thus, before the attachment member can be detached from the housing, the motor must be turned off, which protects the operator from a rotating fan. '954 patent, 1:58-60.

## B. The '975 Patent

The '975 patent, entitled "Lawn Edger Including Multi-Positionable Edge-Guide," is directed to a lawn edger that has a multi-positionable edge guide. '975 patent, 1:12-17. An edge guide provides a fixed surface to guide the edger as it is moved along a curb or other suitable surface. '975 patent, 1:12-15. Prior lawn edgers used either fixed edge guides or removable edge guides. Fixed edge guides had limited applications because they caused excess resistance with the ground, decreased maneuverability, and interfered with cleaning. '975 patent, 1:19-26. Removable edge guides, on the other hand, took significant time to remove and required storage

once they were removed. '975 patent, 1:27-30. Moreover, once an edge guide was removed, it was sometimes difficult to follow a desired cutting path. '975 patent, 1:31-33.

In the '975 patent, the edge guide can be positioned in two modes: trench mode (where the guide is out of the ground) and curb-edging mode (where the guide is in the ground). '975 patent, 1:45-56. In trench mode, the edge guide can provide a reference or sight-line for the user to follow and does not interfere with transport, trenching, or crevice cleaning. '975 patent, 1:46-51, 2:57-65. In curb-edging mode, the edge guide provides a physical directional or fixed surface that guides the edger and prevents contact between the cutting blade and the curb. '975 patent, 1:51- 56, 2:66-3:1.

Because the edge guide is multi-positionable, the user does not need to remove it from the edger to perform trench cutting or to transport the edger. '975 patent, 1:57-59, 3:2-5. When the user wants to switch the edger from curb-edging mode to trench mode (or vice versa), the user can manipulate a lever to move, rotate, or otherwise translate the edge guide into the desired mode. '975 patent, 1:59-65, 3:2-5.

### C. The '376 Patent and the '090 Patent

The '376 and '090 patents are titled "Hinged Edger Housing Having Improved Internal Debris Guard and Labyrinth Perimeter Seal". '376 patent, 1:1-4; '090 patent, 1:1-4. The '376 patent issued on September 2, 2003 from an application filed on October 16, 2001. '376 patent cover page. The '090 patent issued on August 9, 2005 from an application that was filed on May 2, 2003 and is a divisional of the '376 patent. '090 patent cover page.

Power edgers that use rotary blades require routine maintenance to, for example, replace or sharpen the blade and to remove grass and dirt that accumulates on the guard around the blade. '376 patent, 1:13-19. At the time of the inventions of the '376 and '090 patents, typical

3

housing assemblies for rotary edgers used screw-attached guard plates that had to inconveniently be removed to access the blade or to remove accumulated debris. '376 patent, 1:20-27. Moreover, typical housing assemblies at this time did not thoroughly prevent the unwanted infiltration of dirt and debris around the guard plate of the edger. '376 patent, 1:20-27.

The '376 and '090 patents are directed to an improved housing assembly for the cutting blade of a power edger. '376 patent, 1:8-10. The housing assembly of these patents claims to improve upon the prior known assemblies in multiple ways. First, the '376 and '090 patents disclose a guard that shrouds the blade and that increases smoothly from one end to the other. This configuration helps resist the build-up of dirt and debris that is directed at the housing assembly by the rotation of the blade, which reduces the frequency and duration of routine cleaning. '376 patent, 2:64-3:25, 3:39-45. Second, the '376 and '090 patents provide for a housing assembly with a door and structures called labyrinth members. When the door is closed, the labyrinth members form a labyrinth seal, which helps to prevent dust and debris from exiting the housing assembly or infiltrating other areas of the housing assembly. '376 patent, 6:1-18. Third, the housing assembly disclosed in the '376 and '090 patents includes a latch that is configured to automatically latch the door when it is pivoted from the open to the closed position. '376 patent, 5:42-67. Accordingly, the operator of the edger does not need to manipulate any portion of the latch to secure the door to the housing. '376 patent, 5:61-67.

## II.    Legal Standard

In a patent infringement case, a court must engage in a two-step analysis. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). First, the court determines the meaning and scope of the asserted patent claims. *Id.* Second, the court concludes whether the accused product or device infringes on the properly

construed claims.  *Id.*  The first step—claim construction—is a legal determination to be made by the court.  *Markman*, 517 U.S. at 391.  The Federal Circuit has explained that "[t]he construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).

Claims must be construed through the eyes of "the person of ordinary skill in the field of the invention."  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998); see also *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation.").  With that mindset, courts "look to the intrinsic evidence, including the claim language, written description, and prosecution history, as well as to extrinsic evidence" in construing claims.  *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1369 (Fed. Cir. 2008).

The Federal Circuit has directed courts to "look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The analysis begins with the words of the claims themselves, which are generally given their ordinary and customary meaning.  *Id.*  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips,* 415 F.3d at 1313.

The "'heavy presumption' in favor of the ordinary meaning of claim language * * * is overcome * * * where the patentee has chosen to be his own lexicographer."  *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc*., 262 F.3d 1258, 1286 (Fed. Cir. 2001).  A

patentee acts as his own lexicographer where he "has clearly set forth an explicit definition of [a claim] term different from its ordinary meaning." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002). The presumption in favor of the ordinary meaning is overcome only where the "special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582; *Phillips,* 415 F.3d at 1316 ("inventor's lexicography governs * * * [where] the specification * * * reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess"); *In re Paulsen*, 30 F.3d 1475, 1480-81 (Fed. Cir. 1994) (where inventor seeks to "define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision"). Even where the patentee acts as his own lexicographer, the court's focus remains on determining how a person of ordinary skill in the art would understand the claim terms. Thus, "the inventor's lexicography * * * must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology." *Multiform Desiccants, Inc.*, 133 F.3d at 1477.

The second place to which a court looks in construing claims is the specification, in part to determine whether the inventor has redefined any claim terms. *Vitronics*, 90 F.3d at 1582. The Federal Circuit has explained that, because claims "are part of 'a fully integrated written instrument,' * * * [they] 'must be read in view of the specification[] of which they are a part.'" *Phillips,* 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978-79). Therefore, "the specification is always highly relevant to the claim construction analysis." *Vitronics*, 90 F.3d at 1582. Indeed, the Federal Circuit has advised that the specification "is the single best guide to the meaning of a disputed term," and, therefore, "[u]sually, it is dispositive." *Id.*

Nevertheless, while "the claim language must be examined in light of the written description," the Federal Circuit repeatedly has admonished courts not to read "limitations * * * into the claims from the written description." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003). In the same vein, the Federal Circuit "has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed. Cir. 1986). The line between reading a claim in light of the specification, and reading limitations into the claim from the specification is a fine one. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). To "discern[ that line] with reasonable certainty and predictability[,] * * * the court's focus [must] remain[] on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips,* 415 F.3d at 1323. The third type of intrinsic evidence the court may consider is the prosecution history. *Phillips,* 415 F.3d at 1323.

If after reviewing the intrinsic evidence ambiguity remains regarding the meaning of disputed claim terms, the court may consider extrinsic evidence, including dictionaries, treatises, and expert testimony. *Phillips,* 415 F.3d at 1317; see also *Vitronics*, 90 F.3d at 1584 ("[o]nly if there [is] still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court * * * resort[] to extrinsic evidence"). However, extrinsic evidence generally is considered to be "less reliable" than intrinsic evidence and "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips,* 415 F.3d at 1318-19.

In addition, the court may not apply the ordinary meaning to the claim term where the patentee phrases the claim in means-plus-function format, 35 U.S.C. § 112 ¶ 6; *Allen Engr.*

*Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002). Claims may be written in the means-plus-function form according to 35 U.S.C. § 112, ¶ 6, which reads as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. "The use of the word 'means' 'triggers a presumption that the inventor used this term advisedly to invoke the statutory mandate for means-plus-function clauses' while the absence of the term 'means' triggers a strong presumption that the inventor did not mean to invoke a means plus function construction." *Allen Eng'g Corp.*, 299 F.3d at 1347 (citations omitted). This presumption that the word "means" was intended to invoke a means plus function construction may be overcome when the claim language either recites no function corresponding to the means or describes sufficient structure or material for performing the structure. *Id.* Construction of a means plus function limitation is a two-step process: first, the Court identifies and construes the claimed function; second, the Court identifies the corresponding structure that performs that function. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

## III.  Discussion

### A.  The '954 Patent

The parties dispute the construction of four terms in the '954 patent: "housing"; "attachment member which covers the fan and which is releasably attached to the housing"; "actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing"; and "locking means for locking the attachment member to the housing when the motor is switched on."

1. **"housing"**

Black & Decker proposes construing "housing" as a "structure in which the motor is located." Positec disagrees and proposes construing "housing" as "an enclosure containing the motor and from which the motor shaft extends." The parties agree that the motor is contained within the housing, but disagree as to whether the motor shaft, and therefore the fan, can also be contained within the housing. For the following reasons, this court construes the claim term "housing" of the '954 patent to mean "an enclosure containing the motor."

The Court begins by looking at the claim language itself, which is instructive of the proper construction of "housing." See *Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms."). Claim 1 of the '954 patent claims "a motor (10) operated by a switch (16) and located in a housing (4)." '954 patent, 5:42-43. Claim 1 further claims "a fan (14) drivable by a motor, at least one attachment member (6, 106) which covers the fan and which is releasably attachable to the housing." '954 patent, 5:44-46. Black & Decker correctly points out that while the claim language surrounding the disputed term indicates that the fan must be covered by an attachment member, it does not indicate whether that fan is located within the housing or outside of it. Positec contends that for the attachment member to cover the fan, the fan must be completely outside of the housing. The Court disagrees. The fact that the attachment member is releasably attachable to the housing does not limit the claim to a particular embodiment with the fan completely outside of the housing. The attachment member may cover a fan that is either partially outside of the housing or completely outside of it and still being releasably attachable to that housing.

Nor does the Court accept Positec's contention that the specification limits the invention to the described embodiment. After looking to the claims, a court should next look to the

patent's specification for guidance. See *Phillips*, 415 F.3d at 1315 (acknowledging that the specification is "always highly relevant" and usually dispositive). *Phillips* and other Federal Circuit cases instruct, however, that the district courts should not generally rely on preferred embodiments in the specifications to confine claims unless the embodiment defines the outer limit of the claim. *Phillips*, 415 F.3d at 1323. The patent specification provides that "the motor 10 rotatably drives a fan 14 via a drive shaft 12. A blowing involute 6 which is releasably attachable to the housing 4 fits over the fan 14." '954 patent, 2:60-62. Positec contends that because the attachment member fits over the fan, the drive shaft must extend from the housing. Yet there is nothing in the specification of the '954 patent to support defining the outer limit of the claim term housing to an enclosure containing only the motor but not any part of the fan. Positec's construction, however, would exclude an embodiment where the fan is partially within the housing and therefore the drive shaft does not extend from the housing. On the other hand, the Court's construction of housing to mean "an enclosure containing the motor" may include embodiments of either a fan outside the housing or partially within the housing.

Positec next contends that there are two different structures working together, a housing that contains the motor and an attachment member that covers the fan, and that the fan cannot be contained within the housing and covered by an attachment member because it would be part of two separate structures. For support, Positec cites to *Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*, which explains that when a claim lists elements separately, the claim language indicates that those elements are distinct and cannot be one and the same. 616 F.3d 1249, 1254 (Fed. Cir. 2010). The Federal Circuit's opinion, however, clearly indicates that separate elements cannot be combined into a single structure because these elements can and do interact with one another. *Id.* (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288

(Fed.Cir.2004)) ("where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention"). Claim 1 lists, among other elements, "a motor * * * a housing * * * a fan * * * [and] at least one attachment member" as separate and independent elements. '954 patent, 5:41-50. If the Court were to accept Positec's argument, it would have to also conclude that 1) the motor and housing and 2) the fan and attachment member are single elements or structures, something that the *Becton, Dickinson and Co.* panel rejected. Therefore, Positec has failed to persuade the Court that the fan cannot be placed partially within the housing.

### 2.  "attachment member which covers the fan and which is releasably attached to the housing"

Black & Decker proposes construing "attachment member which covers the fan and which is releasably attached to the housing" as a "structure that covers the fan and allows air to enter and exit and which is attachable to and detachable from the housing." Positec disagrees and proposes construing the above phrase as "a curved structure that fits around the fan, which can receive attachments such as a blower or suction duct, and that can be freely attached to, and detached from, the housing." For the following reasons, this court construes the claim term "attachment member which covers the fan and which is releasably attached to the housing" of the '954 patent to mean "a structure that fits around the fan and allows air to enter and exit and that is non-permanently attachable to the housing."

The parties have broken this phrase into three components: "attachment member," "covers the fan," and "releasably attached to the housing." The Court will take each of these components in turn.

### a. "attachment member"

The parties disagree on the construction of the first component "attachment member." Black & Decker proposes that it is a "structure that covers the fan and allows air to enter and exit and which is attachable to and detachable from the housing." Positec disagrees and instead proposes that an "attachment member" is a curved structure that can receive attachments. Both parties agree that the attachment member must be attached to the housing, but disagree whether the attachment member itself must accept other attachments.

Again, the Court begins its analysis by looking at the plain language of the claims themselves. See *Phillips*, 415 F.3d at 1314. Claim 1 of the '954 patent claims "at least one attachment member (6, 106) which covers the fan and which is releasably attachable to the housing." '954 patent, 5:46-47. Nothing in independent claim 1 requires that the attachment member accept another attachment itself. Further, dependent claim 11 claims "a blower vacuum according to claim 1 characterized in that the attachment member is a grill when the blower vacuum is in blower mode and a suction duct when the blower vacuum is in vacuum mode." '954 patent, 6:43-46. Once again, nothing in claim 11's claim language necessitates that the attachment member itself must accept attachments. Because dependent claim 11 does not require the attachment member to accept other attachments, and because claim 11 depends from independent claim 1, this Court will not read such a limitation into claim 1. *Wright Med. Tech.*, 122 F.3d at 1445 ("[W]e must not interpret an independent claim in a way that is inconsistent with a claim which depends from it.").

Even if the Court were uncertain looking only at the claim language, the specification confirms that this additional attachment limitation should not be read into the claims. See *Phillips*, 415 F.3d at 1315 (the specification is "always highly relevant" and usually dispositive).

The specification states that "the attachment member may be a grill when the blower vacuum is in blower mode and a suction duct when the blower vacuum is in vacuum mode." '954 patent, 2:32-34. The specification also explains that "[t]he involute [attachment member] has an inlet 22 which is located in front of the fan 14" and that it "has an outlet located radially of the fan 14 to which a blower duct 8 is attached." '954 patent, 2:62-66. These two statements describe different embodiments of the invention: the first being an attachment member that is a single piece (a grill or a suction duct), the second being an attachment member that can accept other attachments (an outlet which can accept a blower duct). The Federal Circuit has instructed district courts not to rely on preferred embodiments in the specifications to confine claims unless the embodiment defines the outer limit of the claim. *Phillips*, 415 F.3d at 1323. Therefore, the Court will not construe attachment member as being capable of accepting an attachment because other embodiments define a broader limit to the claim (not accepting an attachment).

Nonetheless, Positec next contends that the descriptor "attachment" as part of "attachment member" refers to the fact that the attachment member is capable of having something attached to it opposite the housing, not that the attachment member can be attached to the housing. Positec argues that only the phrase "releasably attachable to the housing" refers to the attachment member's ability to connect to the housing because the claim separately recites the phrase "attachment" ("at least one *attachment* member * * * is releasably *attachable* to the housing"). '954 patent, 5:46-47 (emphasis added). Positec cites *Bicon, Inc., v. The Straumann Co.* for the idea that claims are interpreted with an eye toward giving effect to all terms in the claim. 441 F.3d 945, 950 (Fed. Cir. 1991). In *Bicon*, however, the Federal Circuit was faced with a claim that required an abutment to have "a frusto-spherical basal surface portion" and the court refused to deem this descriptive phrase meaningless. The Federal Circuit reasoned that

allowing physical structures and characteristics specifically described in a claim to be merely superfluous would render the scope of the patent ambiguous. *Bicon*, 441 F.3d at 950. *Id*. at 950-51. That is not the case here; Positec is attempting to add meaning to an element named for its function, being attached to the housing. Interpreting "attachment" to mean the attachment member is capable of having something attached to it opposite the housing would in fact render other parts of the patent meaningless, specifically claim 11 as described above. For these reasons, and the reasons stated above, Positec's arguments are unpersuasive.

Finally, there is disagreement as to whether the "attachment member" must allow air to enter and exit and also whether it must be a curved structure. Black & Decker concedes that the attachment member must allow air to enter and exit, otherwise the blower vacuum could not operate. This is confirmed in claim 11, among other places in the '954 patent, which describes different attachment members for when the blower vacuum in either "blower mode" or "vacuum mode." '954 patent, 6:43-46. The Court takes claim 11 as evidence that these attachment members must allow for the passage of air in order to accommodate the blower vacuum's blower and suction modes. It is also worth noting that Positec does not disagree with this characterization in its brief. Therefore, the Court finds fitting to include an air entry and exit description on the claim term "attachment member."

The more contentious issue, however, is whether the attachment member must be curved. Positec argues that according to the specification the attachment member must be an "involute" and therefore curved. While Positec is correct that an involute can be a curved structure (Ex. C, P. 1111), the Court will not import such a limitation from the specification unless a person of ordinary skill in the art would understand an attachment member to only be an involute "after reading the entire patent." *Phillips*, 415 F.3d at 1321. In this instance, we need not even look at

the specification for an answer because the claims themselves make clear that an attachment member can be more than an involute as Positec defines it. Claim 11, which depends from independent claim 1 of the '954 patent, recites that an "attachment member is a grill when the blower vacuum is in blower mode and a suction duct when the blower vacuum is in vacuum mode." '954 patent, 6:43-46. A grill is clearly not an involute and there is nothing to indicate in the claim that a suction duct has to be an involute either. Furthermore, claim 10, which separately depends from independent claim 1, specifically adds the requirement that the attachment member be an involute to claim 1. '954 patent, 6:38-42. If an "attachment member" were defined as a curved structure or an involute, dependent claim 10 would be rendered superfluous. *InterDigital Commun., LLC v. Intl. Trade Commn.*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) on reh'g, 707 F.3d 1295 (Fed. Cir. 2013) ("The doctrine of claim differentiation is at its strongest * * * where the limitation that is sought to be read into an independent claim already appears in a dependent claim." (internal quotations omitted)). For these reasons, the Court will not incorporate a curved limitation into the claim term "attachment member."

For the foregoing reasons, the Court construes the claim phrase "attachment member" of the '954 patent to mean a "structure that allows air to enter and exit."

### b.    "covers the fan"

Next, the parties disagree on the construction of "covers the fan." As the Court has discussed at length above in its discussion of the term "housing," the claim language does not indicate whether the fan is located partially within the housing or completely outside of it. The important thing to note is that in either case, the fan blades are exposed when the attachment member is not attached. Therefore, in order to attach to the housing, the attachment member must fit over and around the exposed portion of the fan. If the attachment member did not fit

around the fan, then the "safety interlock device" described in claim 1 would not be needed to prevent the fan from becoming exposed when the motor is running. '954 patent, 6:49-50, 7:3-4 ("a safety interlock located at the interface between the housing and the attachment member comprising * * * a locking means (54) for locking the attachment member to the housing when the motor is switched on."); *Lexion Med., LLC v. Northgate Technologies, Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("This court prefers a claim interpretation that harmonizes the various elements of the claim to define a workable invention."). Moreover, the specification teaches a "blowing involute 6 which is releasably attachable to the housing 4 fits over the fan 14." '954 patent, 2:61-62. Therefore, the Court finds that the disputed claim phrase "covers the fan" means "fits around the fan."

### c. **"releasably attached to the housing"**

Finally, the parties disagree on the third part of the claim term "releasably attached to the housing." Positec proposes construing "releasably attached to the housing" as "freely attached to, or detached from, the housing." Black & Decker argues that this construction is unsupported by the intrinsic record and that Positec's construction would only serve to confuse the jury. Black & Decker proposes construing the phrase as "attachable and detachable from the housing."

Looking first to the claim language itself, claim 1 of the '954 patent claims "at least one attachment member (6, 106) which covers the fan and which is releasably attachable to the housing, and a safety interlock located at the interface between the housing and the attachment member." '954 patent, 5:46-50. In addition, dependent claim 11 claims "[a] blower vacuum according to claim 1 characterized in that the attachment member is a grill when the blower vacuum is in blower mode and a suction duct when the blower vacuum is in vacuum mode." The claim language indicates that the attachment member must be capable of being removed

from the housing, but does not indicate how easily it can be removed. Positec correctly points the Court to the specification, which indicates that the attachment member can be attached and detached from the housing with a simple depression of a latch. See '954 patent, 4:56-5:3 ("[T]he involute 6, 106 is secured to the housing 4 by depressing the latch 42 against the action of the spring 43 * * * To release the involute 6, 106 from the housing 4, the latch 42 is depressed."). The specification shows that the attachment member is attached and detached from the housing with less difficulty than a semi-permanent attachment such as a screw or other fastener. Rather than rebut this argument, Black & Decker simply attacks Positec's construction of "freely" attached and detached as unsupported and confusing. The Court finds Black & Decker's arguments unpersuasive and agrees with Positec that "attachable and detachable from the housing" is an overly broad construction. Black & Decker's proposed construction would include semi-permanent attachment methods, such as screws or other fasteners, not claimed in the patent. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("claims may be no broader than the supporting disclosure."). For the forgoing reasons, the Court finds the phrase "releasably attached to the housing" to mean "non-permanently attachable to the housing."

### 3. **"actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing"**

The Court presumes that a claim element that uses the term "means" and recites a function indicates a means plus function limitation under § 112, ¶ 6. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008). The claim must provide sufficient structure to perform the claimed function to rebut this presumption. See *id.* Claim 1 requires "actuating means responsive to the attachment member for activating the switch only when the

attachment member is attached to the housing." '954 patent, 5:51-53. This clause does not include any specific structure to perform the means claimed. Therefore, § 112, ¶ 6 applies and the Court will construe this clause accordingly. See *Net MoneyIN*, 545 F.3d at 1366.

Having concluded that this clause is a means plus function limitation, the Court must now determine both what the claimed function is and what structures are disclosed to perform that function. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). The structures disclosed in the specification must be clearly linked with the claimed function in order to qualify as corresponding structures. *Id.* The parties dispute the claimed function of "actuating means." While both parties agree that the function must at least "activate the switch only when the attachment member is attached to the housing," Positec further contends that the "actuating means" is also "responsive to the attachment member."

A court errs when it construes a means-plus-function limitation by adopting a function different from that explicitly recited in the claim. *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005). This can occur during claim construction by defining a claimed function to require more than is actually claimed. *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1334 (Fed. Cir. 2006). Second, a court can also err by importing the functions of a working device into the claims, rather than reading the claims for their meaning independently. *JVW Enterprises*, 424 F.3d at 1331.

The Court finds that the phrase "responsive to the attachment member" does not add the separate function to the means plus function claim. The Court construes "responsive to the attachment member" to mean that the attachment member and the "actuating means" must interact with one another. In other words, the "actuating means" will not activate the switch unless the attachment member is attached to the housing, making it "responsive to the attachment

member." The function, therefore, becomes switch activation only when the attachment member is attached to the housing. This is not the same as the "actuating means" having to accept the attachment member as Positec contends. The attachment member need only be attached to the housing for the "actuating means" to activate the switch; how it is attached or detached is of no concern for this analysis. To incorporate into the function how the "attachment member" is attached would define a claim to require more than is actually claimed. See *JVW Enterprises*, 424 F.3d at 1331 (rejecting the district court's construction because there was no indication from the claim language that the structure must allow for the "unlocking" or "releasing" of the controller). Even if, as Positec argues, this does not claim more than is present, Poistec's argument requires the Court to import limitations from embodiments in the specification into the claimed function, which the Court will not do. See *id*. For these reasons, the function required for the "actuating means" clause in claim 1 is "activating the switch only when the attachment member is attached to the housing."

Now that the function has been determined, the Court next turns its attention to the structure of the means-plus function limitation. For a structure to qualify as an associated structure for a means-plus-function element, that structure must be clearly linked in the specification as performing that function. See *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424–25 (Fed. Cir. 1997) (holding that although a structure is disclosed in the specification, mere disclosure alone is not sufficient for a clear link); see also *Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.,* 248 F.3d 1303, 1313 (Fed. Cir. 2001) (even though structure is capable of performing function, if it is not clearly linked, it is not a corresponding structure). According to Positec, the structures disclosed in the specification to perform this function are "a pivot lever and spring" or "a pivot lever, slot, and biased switch." Black & Decker, however,

objects to the inclusion of "pivot" to describe the lever and any reference to a "spring," "slot," or "biased switch," suggesting instead "a lever and equivalent structures that perform the identified function."

The specification discusses three separate embodiments of the safety interlock device of which the "actuating means" is a part. The first embodiment describes:

> The pivot lever 53 is pivotably mounted within the housing 4 on a pin 51. A spring 55 biases the pivot lever 53 towards the front face of the housing 4, i.e., towards the left-hand side of the Figure, so that the pivot lever 53 will depress the switch 16 only when the catch 40, 140 urges pivot lever 53 against the action of the spring 55 into the vertical position as shown in FIGS. 1 and 2. Thus, only when the involute 6, 106 is attached to the housing 4 (i.e., only when the catch 40, 140 urges the pivot lever 53 as shown) can the switch 16 be depressed and the motor 10 be activated. When the involute 6, 106, is detached from the housing 4, i.e., when the fan 14 is exposed[,] moving the actuating member 50 forwards will not activate the motor 10 and so the blower vacuum cannot be operated when the impeller 14 is exposed. With the catch 40, 140 removed, the pivot lever 53 is urged by the spring 55 away from the switch 16 into the gap left by removal of the catch 40, 140.

> '954 patent, 3:51-67.

The second embodiment describes a similar structure:

> An upper pivot lever 62 is pivotably secured to a second pivot lever 66 by a second pin 64. The second pivot lever 66 is pivotably secured at its lower end to a plunger 17 of the switch 16. The lower pivot lever 66 is biased by a spring 55 towards the housing wall 68. The catch 40 has a recess 41 at its end which is engageable with the second pin 64 to urge the lower pivot lever 66 against the action of the spring 55.

> When the involute 6, 106 is attached to the housing 4 and the actuating member 50 is moved forward to its "on" position, the recess 58 in the actuating member 50 pushes to [sic] pin 60 forwards to move the upper pivot lever 62 into a more vertical position. The recess 41 in the catch 40, 140 bears against the second pin 64 and the second lever 66 is pushed downwards to depress the plunger 17 of the switch 16 and the motor is actuated.

> When the involute is removed from the housing, pushing the actuating member 50 into its forward position does not actuate the switch 16 because the second pin 64 is not supported by the catch 40, 140 and so the lever 66 is not urged downwards. Instead the spring 55 urges the bottom of the lever 62, the top of the lever 66 and the pin 64 into the gap left by the removal of the catch 40, 140. '954 patent, 4:19-

41.

Finally, the third embodiment describes yet another variation on the structure:

> The actuating member 50 comprises a recess 58 at its forward end which pivotally carries a first pin 84 which is attached to an L-shaped pivot lever 86. A second pin 88 is attached to the junction of the L-shaped pivot lever 86 and is pivotally and slidably mounted in a slot 90 in the housing 4.
>
> When the involute 6, 106 is attached to the housing 4, the projections 74 urge the second pin 88 along the slot 90 into the position shown in FIG. 4. When the second pin 88 is in this position, movement of the actuating member 50 to the forward position (as shown in FIG. 4) causes the recess 58 to move the pin 84 forward and pivot the L-shaped pivot lever 86 so that it depresses the switch 16 to activate the motor.
>
> When the involute is detached from the housing 4 (FIG. 5), the pin 88 is urged into the position shown in FIG. 5 by the switch 16 which is biased to its off position. Thus, movement of the actuating member 50 to the forward position cannot actuate the switch 16.
>
> '954 patent, 5:6-24.

Two necessary features are common among each embodiment in the specification: 1) a pivot lever and 2) a biasing device. Each embodiment in the specification specifically teaches that the pivot lever, when acted upon by the "attachment member," enables the pivot lever to activate the switch to turn on the motor. Therefore, a pivot lever is part of the necessary structure associated with the function of activating the switch only when the attachment member is attached to the housing. The biasing device, such as a spring, is also an integral part of the structure disclosed in the specification. In each of the three embodiments, the specification states that the biasing device moves the pivot lever to a forward position so the actuating member cannot activate the switch when the "attachment member" is not attached. Accordingly, the biasing device is necessary to ensure the safety interlock device only activates the switch when the "attachment member" is present.

Black & Decker argues that a biasing device is not part of the associated structure because it believes that a biasing device does not perform the identified function. While the biasing device alone does not perform the identified function, neither does the pivot lever. Both the pivot lever and the biasing device are necessary components to ensure that the switch is *only* engaged when the attachment member is secured to the housing. Black & Decker points the Court to *Asyst Technologies, Inc. v. Empak, Inc.* which holds that "[a] court may not import into the claim features that are unnecessary to perform the claimed function" because "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure." 268 F.3d 1364, 1370 (Fed. Cir. 2001). Black & Decker's reliance in *Asyst Technologies* is misguided. The Federal Circuit held that a line facilitating transmission of information between a process controller and a communication means was not a necessary structure because it was not clearly linked to the functions performed by the microcomputer means outlined in the specification. *Id.* at 1370-71. Here, the specification clearly requires a biasing means to perform the function outlined in the specification, which is to ensure that the switch is only activated when the attachment member is secured to the housing. See '954 patent, 4:35-41. In other words, the lever will only activate the switch when the attachment member is attached so long as the biasing device prevents it from doing so when the attachment member is missing. Furthermore, unlike the transmission line in *Asyst Technologies* that merely enabled the claimed device to work, the biasing means is a necessary component to perform the recited function in conjunction with the lever. Therefore, the biasing means is an integral part of the corresponding structure.

Black & Decker also argues that reading the structural limitation of a "pivot" lever into claim 1 is impermissible despite § 112, ¶ 6 because dependent claim 9 specifically requires it.

Citing the Federal Circuit opinion in *Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225, 1233-34 (Fed. Cir. 2001), Black & Decker explains that claim 1 cannot also require a pivot lever because to do so would undermine the doctrine of claim differentiation. The Court respectfully disagrees. The Federal Circuit in *Wegner* reaffirmed and clarified its prior holding in *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). In *Laitram*, the Federal Circuit explained that the interpretation of a means-plus-function claim limitation comes from the specification via § 112, ¶ 6 and not from any dependent claims. *Id*. Therefore, the prohibition against reading limitations from a dependent claim into the independent claim is not violated. *Id*. (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 404 (1967)) ("Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated."). In *Wenger*, the Federal Circuit reaffirmed that "the stringencies of a means-plus-function limitation are not to be avoided by the mere addition of a dependent claim that recites the corresponding structure disclosed in the specification." *Wenger Mfg., Inc.*, 239 F.3d at 1234. However, the *Wenger* court explained that *Laitram* does not stand for the broader proposition that a means-plus-function limitation must be interpreted without regard to other claims. *Id*.

This case differs from that before the *Wenger* court. In *Wegner*, the court emphasized that "other claims in a patent may provide guidance and context for interpreting a disputed means-plus-function limitation, especially if they recite additional functions." *Wenger Mfg., Inc.*, 239 F.3d at 1234. In this case, dependent claim 9 recites no new function from that in independent claim 1. Claim 9, in fact, recites the exact same function of claim 1, activating the switch only when the attachment member is attached to the housing.

In any event, claims 1 and 9 do not, as Black & Decker asserts, have exactly the same scope and, thus, claim differentiation is maintained. Claim 9 recites an additional limitation that an "extension of the attachment member" must engage the actuating means, which is not required in claim 1. '954 patent, 6:36-37. In addition, claim 1 remains broader than claim 9. Claim 1 covers the structure described in the specification and equivalents thereof. *Intell. Sci. and Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009). Dependent claim 9 does not literally cover equivalents of pivot levers and claim differentiation is preserved. For these reasons, the Court finds that the corresponding structure is "at least one pivot lever and a biasing device and equivalent structures that perform the identified function."

**4.    "locking means (54) for locking the attachment member to the housing when the motor is switched on"**

The parties both agree that the claim limitation is a means plus function limitation governed by § 112, ¶ 6. Because the limitation does not include any specific structure to perform the means claimed, the Court agrees that § 112, ¶ 6 applies and the Court will construe this clause accordingly.

Having concluded that this clause is a means plus function limitation, the Court must now determine both what the claimed function is and what structures are disclosed to perform that function. The parties also agree that the claimed function is "locking the attachment member to the housing when the motor is switched on" and propose the following construction: "that prevents the attachment member from being able to be detached from the housing when the motor is operating." The Court agrees with the parties' proposed construction, leaving the Court to determine what structures are disclosed to perform that function.

According to Black & Decker, the structure disclosed in the specification to perform this function is "a lock." Positech objects to this minimalistic characterization of the function and

instead proposes "an end of an actuating member, which engages a lip of a latch on the housing that is biased by a spring, and an involute with a catch that both engages the latch and the pivot lever."

The specification discusses the safety interlock device of which the "locking means" is a part as follows: "A lock 54 located at the end of the actuating member 50 is urged under a lip 56 of the latch 42 so that the latch cannot be depressed when the actuating member 50 is in its forward position in which the motor is actuated." '954 patent, 4:1-4. The latch is described as a component that "secure[s] the catch 40, 140 and thus the involute 6, 106 to the housing 4." '954 patent, 3:40-42. Additionally, the specification teaches that the "motor has to be deactivated by moving the actuating member to its rearward position as shown in FIGS. 1 and 2 before the latch 42 can be depressed to remove the volute." '954 patent, 4:4-7. In other words, the locking means prevents the attachment member from being removed by effectively deactivating the latch. Once the actuating member is moved to its rearward position the latch is re-enabled and the motor switch is deactivated, making it safe to remove the attachment member. Given this guidance from the specification, the Court finds that the necessary component to perform the claimed function is an end of the actuating member.

The specification teaches that when the actuating member is engaged into the latch it prevents the latch from being depressed and effectively locks the attachment member to the housing. The only component that performs the locking function is the end of the actuating member. See '954 patent, 4:1 ("A lock 54 located at the end of the actuating member 50"). While it is true, as Positec notes, that a lip of a latch, a biasing spring, and a catch on the attachment member keep the attachment member attached to the housing, these components do not actually perform the locking function as described in the specification. *Asyst Techs*, 268 F.3d

at 1369-70 (corresponding structure is limited to only those components necessary to perform the claimed function); *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) (structural features or components that are merely related to or enable the claimed function do not constitute corresponding structure). The parties agree that the locking means function is to "prevent the attachment member from being able to be detached from the housing when the motor is operating" and all that is needed to prevent detachment is to disable the latch from releasing the attachment member. The Court agrees with Black & Decker that these additional components, while important, merely enable the attachment member to perform the locking function.

To support its position, Black & Decker also points out that the doctrine of claim differentiation requires the Court to consider the impact that a claim construction has on claims that depend from it. The Court agrees with Black & Decker, but for a different reason than the one outlined in their briefs. As explained earlier, "other claims in a patent may provide guidance and context for interpreting a disputed means-plus-function limitation, especially if they recite additional functions." *Wenger Mfg., Inc.*, 239 F.3d at 1234. Dependent claim 2 specifically requires a catch means and a latch means to engage one another to releasably attach the attachment member. '954 patent, 6:5-9. Additionally, the function of claim 2 is to releasably attach the attachment member, which is different from Claim 1's locking function, and therefore further supports precluding a catch means and a latch means in Claim 1's locking means structure. For these reasons, and the reasons stated above, the Court finds that the corresponding structure is "an end of an actuating member and equivalent structures that perform the identified function."

**B.     The '975 Patent**

The parties dispute the construction of three terms in the '975 patent: "a lever connected to the edge guide"; "an aperture in the blade guard"; and "handle assembly."

**1.     "a lever connected to the edge guide"**

Black & Decker proposes construing "a lever connected to the edge guide" as "a rigid, elongated member connected to the edge guide to move the edge guide."  Positec agrees that the lever is a "rigid, elongated member connected to the edge guide," but argues that the lever must move the edge guide in a particular way, and so continues that lever is connected to the edge guide "at a first point to rotate the edge guide around a second distant point."

Black & Decker makes two persuasive points in support of its construction.  First, it is consistent with the language of the claim itself (independent claim 1), which states that the lever is "operable to **move** the edge guide between the curb-edging mode and the trench mode." '975 patent, 5:67-6:2.  Second, the '975 specification does not require that the lever must "rotate" the edge guide from curb to trench mode.  The specification states only that "the user can manipulate a lever to move, rotate or otherwise translate the edge guide."  '975 patent, 1:61-62.  Positec responds that this improperly broadens the patent by ignoring the meaning of "lever" — it is a lever *because* it is connected to the edge guide a location distant from the mounting location so that it exerts *leverage* on the edge guide to move it when the lever is manipulated by the user.  Further, in every embodiment the "rigid elongated member" is attached to the edge guide at a point apart from where the edge guide is mounted.

The Court agrees with Black & Decker that it would be improper to import a "distant point" limitation into the claim simply because a certain configuration appears in the embodiments. See *Thorner v Sony Computer Entertainment America, LLC*, 669 F.3d 1362, 1366 (Fed Cir. 2012). The language of claim one provides for "**moving** the edge guide," and does not suggest that the movement must be rotation. The specification confirms Black & Decker's position by stating that the lever may "move, rotate or **otherwise translate** the edge guide." '975 patent, 1:61-62 (emphasis added). Accordingly, the Court construes the claim "a lever connected to the edge guide" to mean: "a rigid, elongated member connected to the edge guide to move the edge guide."

2.    **"aperture in the blade guard"**

Black & Decker proposes construing "aperture in the blade guard" as "opening in the blade guard." Positec proposes construing the term as "a hole or gap surrounded on all sides by the blade guard." Black & Decker argues that nothing in the intrinsic history suggests that "aperture" should be construed in anything other than its plain and ordinary meaning. An aperture is just an opening, so the aperture in the blade guard is just an opening in the blade guard. Positec responds that the apertures in the blade guards in the embodiments are all openings that "are surrounded on all sides." Moreover, Positec argues, the walls of the aperture may play a part in the construction and operation of the invention. '975 patent, 4:14-17.

The Court construes "aperture in the blade guard" as "hole or gap in the blade guard." There is no intrinsic evidence that the aperture needs to be surrounded by the blade guard or, as Postec put it, "surrounded on all sides." Then again, to be an aperture *in* the blade guard, the blade guard must be around it. "Hole or gap" captures this sense that the aperture is in the blade

guard without improperly importing a limitation from the embodiments that the aperture must be completely surrounded.

### 3. "handle assembly"

Black & Decker argues that "handle assembly" ought to be construed as "one or more handles." Positec proposes "a device of at least two handles wherein one handle can be removed or attached." The description of the preferred embodiments states that "[t]he handle assembly includes an upper or auxiliary handle and a rear handle. The upper and rear handles * * * may have shapes significantly different from those shown, and the upper handle may be rotatable and is optional." '975 patent, 3:44-49. A different embodiment "shows the handle assembly without the upper handle." '975 patent, 4:22.

Positec argues that Black & Decker's proposed construction fails because it does not account for the term "assembly." If handle assembly simply meant "one or more handles," the inventors could have claimed "a handle," because "a handle" would cover one or more handles. See, *e.g.*, *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002) ("It is well settled that the term 'a' or 'an' ordinarily means 'one or more.'"). That the term "handle assembly" means more than one handle is reinforced by the description of the embodiments. Black & Decker notes that the description states that the second handle is optional, not removable, suggesting that it could have only one handle. But, in context, it is evident that the optional handle is one that the product user could use or not, and not that the invention could not have any (optional) upper handle at all. Accordingly, the Court construes "handle assembly" as "a device that includes at least two handles."

### C. The '376 Patent

The parties dispute the construction of four terms in the '376 patent: "the radius increasing smoothly from the leading end to the trailing end," "trailing portion," "labyrinth member," and "labyrinth seal."

### 1. "the radius increasing smoothly from the leading end to the trailing end"

Black & Decker's proposed construction of "the radius increasing smoothly from the leading end to the trailing end" is "the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." Positec proposes: "the radius increases in a continuous and consistent manner from the furthest forward point of the confronting portion at the bottom edge of the latch end of the housing to the furthest rearward point of the confronting portion."

The parties' first dispute concerns whether "increasing smoothly" requires construction. Positec argues that "increases in a continuous and consistent manner" better captures the claim. In support, Positec points to the specification:

> The radius is not constant, but rather increases in a smooth manner in the direction in which the blade 28 rotates between a leading end 70 and a trailing end 72. The increasing sweep of the radius 74 therefore provides an increasing amount of clearance between the tip 28a of the blade 28 and the inner surface 68a of the guard 52 * * * .

'376 patent, 3:7-14. Because the sweep is "is not constant, but rather increases," Positec argues that the radius must *continually* increase from the leading to the trail end. And because the radius must be "smooth," Positec asserts that the rate at which it increases must be *consistent*. The Court, however, does not see the basis or benefit of Postitec's proposal. "Smoothly" captures the continuing increase, and changing the term does not clarify the claim. And it is simply wrong to assert that a smooth increase must also be a consistent increase. The rate of increase could be uneven without discontinuities (or a decrease in radius) that may prevent it from being smooth. Thus, the Court agrees with Black & Decker that "increasing smoothly" does not require construction.

The Court also agrees with Black & Decker that there is no reason to replace the word "end" with "point." Positec explains that it is clear from the specification that the ends are points

where the confronting and trailing portions begin and terminate.  The ends, however, are also ends.  Calling them "points" only substitutes Positec's preferred term for the language of the claims and specification without clarifying the claim for the jury.

Thus, the Court construes "the radius increasing smoothly from the leading end to the trailing end" as "the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion."

### 2. "trailing portion"

The parties agree that "trailing portion" ought to be construed as "a portion extending from the trailing end to the bottom edge of the housing."  Positec argues that the trailing portion must be straight, and so proposes: "a straight portion extending from the trailing end to the bottom edge of the housing."

According to Positec, that the trailing portion must be straight because the claim states that the trialing portion extends away from the confronting portion and is "disposed generally tangent the radius at the trailing end." '376 patent, 7:3-6.  The suggestion is that the trailing portion could not extend away from the confronting portion and be "generally tangent" to it without being straight.  Moreover, it appears to be depicted as straight in Figure 3.  As Black & Decker rightly points out, however, just because it is "generally tangent" to the radius, it does not have to be straight.  A curve can also be tangent to another curve.  And a curve can also extend away from another component.  Accordingly, the Court construes "trailing portion" as "a portion extending from the trailing end to the bottom edge of the housing."

### 3. "labyrinth member"

As a construction of the term "labyrinth member" found in independent claims 9 and 18, Black & Decker proposes "projection or projections, that when engaged with another projection,

or projections, form a labyrinth seal." Positec's proposed construction is "an intricate projection, or projections, that when engaged with another intricate projection or projections, form a labyrinth seal." The disagreement is thus whether the projections must be "intricate." Positec argues that the projections must be intricate because one of the embodiments describes a labyrinth member containing "a pair of furcations," which could be described as intricate. '376 patent, 4:30-35. But the intricate furcations are not found in claims 9 or 18. The claims state only that the first and second labyrinth members engage one another to form a seal. Moreover, dependent claims 10 and 11 do claim labyrinth members that include pairs of furcations. The doctrine of claim differentiation suggests that the Court should not read a limitation found in a dependent claim into an independent claim. See *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) (quoting *Liebel–Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 910 (Fed. Cir. 2004) ("The doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.'"). The Court concludes that the limitation "intricate" should not be read into "labyrinth member" and so construes it as "projection or projections, that when engaged with another projection, or projections, form a labyrinth seal."

### 4. **"labyrinth seal" and "second labyrinth seal"**

Black & Decker argues that "labyrinth seal" found in independent claims 9 and 18 should be construed as "an engagement of the first and second labyrinth members that inhibits dust and debris from exiting the housing assembly." For "second labyrinth seal" found in dependent claim 14, Black & Decker proposes "an engagement of the guard lip and the guard that inhibits dust and debris from exiting the housing assembly or being transmitted to other portions of the housing assembly." Positec argues that "labyrinth seal" should be construed to mean "a tight

fitting, tortuous engagement that inhibits dust and debris from exiting the housing assembly." Positec maintains that "second labyrinth seal" does not require a separate construction.

Claims 9 and 18 explain that "the first and second labyrinth members engage on another when the door is placed in the closed position." '376 patent, 7:39-41 and 8:44-47 ("the door having a second labyrinth member that is configured to engage the first labyrinth member to form a labyrinth seal when the door is placed in the closed position"). The specification states that "the first and second labyrinth members 56 and 122 cooperate when the door 42 is in the closed position to form the labyrinth seal 200 that inhibits dust and debris from exiting the housing assembly." '376 patent, 6:6-10.

The specification goes on to describe a "secondary seal": "Further, the guard lip 120 and guard 52 cooperate to forma a secondary seal 202 that is located radially inwardly of the labyrinth seal." Black & Decker characterizes this as the "second labyrinth seal," but the Court agrees with Positec that Black & Decker's interpretation is incorrect. The "secondary seal" is distinguished from the "labyrinth seal." The Court therefore agrees with Positec that the "second labyrinth seal" does not require a separate construction.

As for "labyrinth seal," the Court concludes that it is properly construed as "a tortuous engagement that inhibits dust and debris from exiting the housing assembly." Positec's proposed "tight-fitting" limitation is not necessary to clarify the meaning of a seal that inhibits dust and debris from exiting the housing. By contrast, the limitation that the seal is "tortuous" clarifies that the patent claims a "labyrinth seal" as opposed to some other type of engagement of projections.

**D.     The '090 Patent**

The parties dispute the meaning of three terms in the '090 patent: "rotatable latch member," "a predetermined neutral position," and "latch receiving structure."

**1.          "rotatable latch member"**

Black & Decker proposes that "rotatable latch member" should be construed as "tab or projection that is capable of being turned on an axis."  Positec proposes "a tab or projection that is capable of being turned around on an axis like that of a skeleton key being turned in a lock."  The parties therefore dispute whether the projection is "turned *around* on an axis" or simply "turned on an axis" and whether the jury would benefit from Positec's proposed comparison to a skeleton key.

The Court believes that a comparison to a skeleton key would only confuse the jury, for the most salient feature of a skeleton key is that it can open many different locks, which is not part of the meaning of "rotatable latch member."  The only other question is whether the projection is capable of being "turned" or "turned around."  In support of "turned around," Positec notes that the dictionary defines rotate as "[t]o turn around on its axis or center."  Pl. Brief at Ex. E.  Helpful as dictionaries may be, the Court is not persuaded that the addition of "around" sharpens the meaning without adding an unnecessary risk of confusion.  When, for example, a person talks about the earth turning on its axis, there's no need to say that it turns *around* on its axis.  Adding the redundant "around" could mislead a juror to believe that something more than turning on an axis is required.  In other words, the addition of "around" is either redundant or confusing.  Accordingly, the Court construes "rotatable latch member" to mean a "tab or projection that is capable of being turned on an axis."

## 2. "a predetermined neutral position"

Black & Decker's proposed construction of "a predetermined neutral position" is "the position of the latch member when the door is in the open position." Positec argues that the claim is indefinite and so cannot be construed. As the Federal Circuit has explained, "claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet an exacting standard. Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite. A claim is not indefinite merely because parties disagree concerning its construction. An accused infringer must thus demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) (internal citations omitted).

Positec argues that the claim phrase is not amenable to construction because although the specification states that the latch member is biased in a "predetermined neutral position," the claims and remainder of the specification only teach that the latch member is movable between a "latched" and "unlatched" position. Therefore, Positec concludes, the reader of the specification is left guessing whether the neutral position is the latched or unlatched position or some other position. Def. Br. [47] at 34.

Black & Decker counters that, at most, this shows that the claim limitation "is not a model of clarity," but falls far short of showing by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim. The Court agrees. As Black & Decker explains, the knob 160 includes a latch member 170 that the "spring biases * * * in a predetermined rotational direction [for example, counterclockwise] * * * such that the

knob is positioned toward a predetermined neutral position * * * ."  '090 patent, 4:65-5:4; 5:35-40.  When the door is rotated to a closed position, "the side of the latch member 170 on the knob 160 is brought into contact with the ramp portion 80 * * * .  Further rotation of the door * * * toward the housing 40 causes the latch member 170 to both slide along the ramp portion 80 and rotate" in the opposite of the biasing direction.  '090 patent, 5:62-6:3.  Once the latch member is sufficiently aligned with the aperture of the latch receiving structure, the latch member shoots through the aperture.  The knob (and latch member) "no longer being constrained by the ramp portion 80, thereafter rotates in the predetermined biasing direction in response to the torsional biasing aspect of the spring * * * so that the latch member is no longer aligned to the slotted portion of the latch aperture."  '090 patent, 6:4-14.  In other words, when the latch member is no longer engaged with the latch receiving structure, the knob and latch member are biased toward the neutral position.  That neutral position, as Black & Decker explains, is "the position of the latch member when the door is in the open position."  This is also the position when the door is closed, but the position is first defined with reference to the door in the open position.  Thus, the Court agrees with Black & Decker's proposed construction — not challenged in its particulars by Positec — and so construes "a predetermined neutral position" to mean "the position of the latch member when the door is in the open position."

### 3.     "latch receiving structure"

A "latch receiving structure" is found in claim 14, which is dependent on claims 12 and 13.  Black & Decker argues that the term should be construed as "structure that receives a latch member."  Positec maintains that the term is governed by a means-plus-function analysis under 35 U.S.C. § 112 ¶ 6.  Positec suggests that the function is "for receiving a latch" and the corresponding structure is "a ramp that tapers downward to an aperture."

As explained above, "a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does *not* apply." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (internal citation omitted); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed. Cir. 2012). "[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Id.* "When the claim drafter has not signaled the intent to invoke § 112, ¶ 6 by using the term 'means,' [the Court will be] unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Flo Healthcare*, 697 F.3d at 1375. "In considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, [the Federal Circuit has] not required the claim term to denote a specific structure. Instead, * * * it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function. *Id.* at 1359-60. "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'" *Id.* at 1360.

Positec attempts to overcome the presumption that § 112 ¶ 6 does not apply by briefly arguing that (1) the term "structure" is generic, (2) its description is purely functional, (3) the claim in which the term is found does not recite sufficient structure, and Black & Decker can make a colorable argument that the claim recites a sufficiently definite structure only by looking to the specification and other claims.

Although the term "structure" may be generic, that does not mean that "latch receiving structure" requires a means-plus-function analysis. For example, in *Powell v. Home Depot USA,*

*Inc.*, 663 F.3d 1221, 1229-31 (Fed. Cir. 2011), the Court held that a claim of a "dust collection structure" is not a means-plus-function limitation because "in the context of the entire limitation" the claim recites "a sufficiently definite structure." *Home Depot* also undermines Positec's third point, that "the law requires the claim in which the term is found, not the specification or other claims" to recite sufficient structure to avoid a means-plus-function analysis. Def. Br. at 40. Positec is incorrect. As the Federal Circuit has repeatedly explained, "it is proper to consult the intrinsic record, including the written description, when determining if a challenger has rebutted the presumption that a claim lacking the term 'means' recites sufficiently definite structure." *Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011) (citing cases). As for sufficient structure, Black & Decker points out that in claim 15 the latch receiving structure claims a ramp portion and latch aperture that are used in connection with the rotatable latch member. '090 patent, 8:32-34. Moreover, one preferred embodiment discusses a latch receiving structure formed on the housing and made up of a ramp portion, a debris collar, and a latch aperture. '090 patent, 3:65-4:12.

The Court concludes that Positec has not overcome the presumption that "latch receiving structure" should not be governed by means-plus-function analysis. Although Positec understood that it was facing a strong presumption that § 112 ¶ 6 would not apply here, it declined to argue in the alternative how the term should be construed. Black & Decker argues briefly that the "latch receiving structure" should be construed as "structure that receives a latch member." The Court adopts Black & Decker's proposed construction.

**IV.    Conclusion**

For the reasons stated above, the Court adopts the following construction of the disputed terms:

**'954 Patent**

| housing | an enclosure containing the motor |
|---|---|
| attachment member which covers the fan and which is releasably attached to the housing | a structure that fits around the fan and allows air to enter and exit and that is non-permanently attachable to the housing |
| actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing | Function: activating the switch only when the attachment member is attached to the housing<br><br>Structure: at least one pivot lever and a biasing device and equivalent structures that perform the identified function |
| locking means (54) for locking the attachment member to the housing when the motor is switched | Function: preventing the attachment member from being able to be detached from the housing when the motor is operating<br><br>Structure: an end of an actuating member and equivalent structures that perform the identified function |

**'975 Patent**

| a lever connected to the edge guide | a rigid, elongated member connected to the edge guide to move the edge guide |
|---|---|
| aperture in the blade guard | hole or gap in the blade guard |
| handle assembly | a device that includes at least two handles |

**'376 Patent**

| the radius increasing smoothly from the leading end to the trailing end | the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion |
|---|---|
| trailing portion | a portion extending from the trailing end to the bottom edge of the housing |
| labyrinth member | projection or projections, that when engaged with another projection, or projections, form a labyrinth seal |
| labyrinth seal | a tortuous engagement that inhibits dust and debris from exiting the housing assembly |

|  |  |
|---|---|

**'090 Patent**

| | |
|---|---|
| rotatable latch member | tab or projection that is capable of being turned on an axis |
| a predetermined neutral position | the position of the latch member when the door is in the open position |
| latch receiving structure | structure that receives a latch member |

Dated:  September 10, 2013

_____

Robert M. Dow, Jr.
United States District Judge