IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., | ) ) ) | Case No. 1:11-cv-05426 |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | Magistrate – Judge Geraldine |
| | ) | Soat Brown |
| POSITEC USA INC. and RW DIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

ARGUMENT ....................................................................................................... 1

I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE ISSUE OF NON-INFRINGEMENT OF U.S. PATENT NOS. 5,604,954 AND 6,612,376, AS TO BOTH POSITEC'S ACCUSED BLOWER AND ACCUSED EDGER. ...........................1

   A.   The Accused Blower ................................................................................ 2

   B.   The Accused Edger ................................................................................. 4

   C.   Applicable Legal Standards .................................................................... 5

   D.   The Accused Blower Does Not Infringe the '954 Patent Because It Is Missing At Least One Claim Limitation From Each of the Asserted Claims. ............................6

      1.   The Accused Blower does not have the required "attachment member" element...7

         a.   The "attachment member" is literally missing from the Accused Blower...8

         b.   The Accused Blower is missing an equivalent of the "attachment member"………………………………………………………………..9

      2.   The Accused Blower does not have the required "actuating means" element…...10

         a.   The "actuating means" is literally missing from the Accused Blower…..11

         b.   The Accused Blower is missing an equivalent of the "actuating means"..13

   E.   The Accused Edger Does Not Infringe the '376 Patent Because It Is Missing At Least One Claim Limitation From The Independent Claims........................................16

      1.   The Accused Edger does not have the required "radius increasing smoothly" element………………………………………………………………..16

         a.   The "radius increasing smoothly" is literally missing from the Accused Edger………………………………………………………………..16

         b.   The Accused Edger is missing an equivalent of the "radius increasing smoothly"………………………………………………..…………………17

      2.   The Accused Edger does not have the required "labyrinth seal"………………..17

         a.   The "labyrinth seal" is literally missing from the Accused Edger……….18

         b.   The Accused Edger is missing an equivalent of the "labyrinth seal"……..18

II.  SUMMARY JUDGMENT SHOULD BE GRANTED ON THE ISSUE OF PATENT DAMAGES TO THE EXTENT OCCURRING PRIOR TO MAY 24, 2011.................................................................................................. 19

   A.   Background ........................................................................................... 19

   B.   Applicable Legal Standards .................................................................. 20

i

C.  No Damages Prior to May 24, 2011 (at the earliest) for Alleged Infringement of the '954 and '090 Patents................................................................................. 21

D.  No Damages Prior to May 24, 2011 (at the earlies) for Alleged Infringement of the '975 and '376 Patents................................................................................. 21

III.  SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR TRADE DRESS INFRINGEMENT, FOR LACK OF SECONDARY MEANING IN THE CLAIMED TRADE DRESS.............................................................................. 22

IV.  SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR TRADE DRESS INFRINGEMENT, BECAUSE (EVEN IF SECONDARY MEANING IS PROVED) POSITEC'S TRADE DRESS IS NOT LIKELY TO CAUSE CONFUSION................................................................................................. 28

A.  The Likelihood of Confusion Survey, Being Limited to Product Packaging for Positec's Miter Saw, Warrants Dismissal of B&D's Product Configuration Trade Dress Claims And Limits The Analysis To The Miter Saw Packaging. .......................29

B.  The Survey Does Not Support A Finding Of Likelihood of Confusion For The Miter Saw Packaging, Warranting Dismissal of B&D's Claim. ....................................30

C.  The Factored Analysis Shows No Likelihood of Confusion........................................... 33

    1.  The trade dress of the product packaging is not similar.............................33

    2.  The area and manner of concurrent use is a neutral factor..........................35

    3.  Consumers are likely to exhibit great care and are less likely to be confused.....36

    4.  B&D's claimed trade dress is weakened by virtue of the multitude of others using yellow and black color schemes.......................................................36

    5.  B&D has put forth no evidence of actual confusion.................................37

    6.  Positec has no intent to palm off its goods as those of B&D.......................38

    7.  No Likelihood of Confusion.........................................................38

V.  SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S DILUTION CLAIM BECAUSE THE CLAIMED TRADE DRESS IS NOT "FAMOUS" AND "DISTINCTIVE" UNDER THE LANHAM ACT.................................................39

A.  The Claimed Trade Dress Is Not "Famous" Under The TDRA..................................... 39

B.  The Claimed Trade Dress Is Not "Distinctive" Under The TDRA. .............................. 41

VI.  SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIM FOR ACTUAL DAMAGES BECAUSE THERE IS NO EVIDENCE OF ACTUAL CONFUSION.............................................................................................42

VII. SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR
ACTUAL DAMAGES AND POSITEC'S PROFITS UNDER THE LANHAM
ACT TO THE EXTENT ACCRUING PRIOR TO POSITEC'S RECEIPT OF
ACTUAL NOTICE OF THE CLAIMED TRADE DRESS RIGHTS. .............................42

CONCLUSION.......................................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009)......................................................6

*American Med. Sys., Inc. v. Med Eng'g Corp.*,
  6 F. 3d 1523 (Fed. Cir. 1993)...........................................................................20, 21, 22

*AutoZone, Inc. v. Strick*, 543 F.3d 923 (7th Cir. 2008)................................................................36

*Bai v. L & L Wings, Inc.*, 160 F.3d 1350 (Fed. Cir. 1998).............................................................6

*Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241 (Fed. Cir. 2000) ................................6

*Bd. of Regents Univ. of Tex. Sys. v. KST Elec., Ltd.*,
  550 F.Supp.2d 657 (W.D. Tex. 2008).......................................................................40

*Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*,
  616 F.3d 1249, 1254 (Fed. Cir. 2010).......................................................................13

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co KG.*,
  224 F.3d 1308 (Fed. Cir. 2000)..................................................................................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................1

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
  145 F.3d 1303 (Fed. Cir. 1998)...............................................................................15

*Coach Servs., Inc. v. Triumph Learning LLC*,
  668 F.3d 1356 (Fed. Cir. 2012)................................................................................40

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
  12 CIV. 4112 AJP, 2014 WL 814532 (S.D.N.Y. Mar. 3, 2014).................................24

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996)............................................34

*Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398 (Fed. Cir. 1996) .........................................13

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
  442 F.3d 1301 (Fed. Cir. 2006)..................................................................................5

*Gaus v. Conair Corp*, 363 F.3d 1284 (Fed. Cir. 2004)................................................................13

*Health o meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160 (N.D. Ill. 1995).......................23, 25

*Jackson v. Intel Corp.*, 2009 WL 2851742 (N.D. Ill. 2009) .......................................................19

*John H. Harland Co. v. Clarke Checks, Inc.*,
  711 F.2d 966 (11th Cir. 1983)..................................................................................23

*Johnston v. IVAC Corp.*, 885 F.2d 1574 (Fed. Cir. 1989) ............................................................5

*Laitram Corp. v. Rexnard, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991)................................................12

*Lans v Digital Equip. Corp.*, 252 F.3d 1320 (Fed. Cir. 2001).....................................................20

*Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*,
  841 F. Supp. 2d 753 (S.D.N.Y. 2012) ......................................................................40

*Minemyer v. B-Roc Representatives, Inc.*,
  678 F. Supp. 2d 691 (N.D. Ill. 2009).................................................................25, 35

*Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351 (Fed. Cir. 2012)...........................................17

*Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*,
  576 F. Supp. 2d 868 (N.D. Ill. 2008) .......................................................................36

*Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437 (Fed. Cir. 1998) ....................................20, 21

*Novartis Corp. V. Ben Venue Labs., Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001)..................................................................................5

*Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259 (Fed. Cir. 1999)...........................11, 14, 15

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
  803 F.2d 166 (5th Cir. 1986) ...................................................................................37

iv

*Paco Sport, Ltd. v. Paco Rabanne Parfums,*
86 F. Supp. 2d 305 (S.D.N.Y. 2000)................................................................ 24
*Pampered Chef, Ltd. v. Magic Kitchen, Inc.,*
12 F. Supp. 2d 785 (N.D. Ill. 1998) .................................................... 33, 37, 38
*PC Connector Solutions*, 406 F.3d 1359 (Fed. Cir. 2005)............................ 16
*Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,*
149 F.3d 722 (7th Cir. 1998) .......................................................................... 26
*Plumeus, Inc. v. Intersog LLC*, 13 C 2206,
2013 WL 5609331 (N.D. Ill. Oct. 11, 2013)................................................... 40
*Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808 (7th Cir. 2002) ...... 39
*Polo Fashions, Inc. v. J & W Enterprises*, 786 F.2d 1156............................. 44
*Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931 (7th Cir. 1989) .................. 37
*Rust Env't & Infrastructure, Inc. v. Teunissen,*
131 F.3d 1210 (7th Cir.1997) .......................................................................... 36
*Rutherford v. Trim-Tex, Inc.,* 803 F.Supp. 158 (N.D. Ill. 1992).................. 22
*Savin Corp. v. Savin Grp.,* 391 F.3d 439 (2d Cir. 2004) .............................. 24
*Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176 (7th Cir. 1989)................. 39
*Sentry Protection Prod., Inc. v. Eagle Mfg. Co.,*
400 F.3d 910 (Fed. Cir. 2005) ........................................................................ 21
*Southwall Techs., Inc. v. Cardinal IG Co.,*
54 F.3d 1570 (Fed. Cir. 1995).......................................................................... 6
*Syndicate Sales, Inc. v. Hampshire Paper Corp.,*
192 F.3d 633 (7th Cir. 1999) ........................................................................... 34
*TechSearch, LLC. v. Intel Corp.,* 286 F.3d 1360 (Fed. Cir. 2002) ..................... 8, 10, 15
*Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277 (7th Cir. 1998)........................ 33
*Top Tobacco, L.P. v. N. Atl. Operating Co., Inc.,*
509 F.3d 380 (7th Cir. 2007) ........................................................................... 40
*Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314 (N.D. Ill. 1991)....................... 22, 23
*U. S. Philips Corp. v. Iwasaki Elec. Co. Ltd.,*
505 F.3d 1371 (Fed. Cir. 2007)......................................................................... 5
*Venn v. Goedert*, 319 F.2d 812 (8th Cir. 1963) ........................................... 34
*Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.,*
50 F.3d 189 (3d Cir. 1995)............................................................................... 36
*Vivid Techs. v. Am. Sci. & Eng'g, Inc.,*
200 F.3d 795 (Fed. Cir. 1999).......................................................................... 5
*Wahpeton Canvas Co., Inc. v. Frontier, Inc.,*
870 F.2d 1546 (Fed. Cir. 1989)......................................................................... 7
*Web Printing Controls Co., Inc. v. Oxy-Dry Corp.,*
906 F.2d 1202 (7th Cir. 1990) ......................................................................... 42
*Weber-Stephen Products LLC v. Sears Holding Corp.,*
13-CV-01686, 2013 WL 5782433 (N.D. Ill. Oct. 25, 2013) ..................... 23, 24

## Statutes

15 U.S.C. §1125 ..................................................................... 39, 40, 42, 43
15 U.S.C. §1072 ........................................................................... 42, 43
15 U.S.C. §1111 ........................................................................... 42, 43

15 U.S.C. §1117 ................................................................................................................ 43

35 U.S.C. § 287 ..................................................................................................... 19, 20, 22

FED. R. CIV. P. 56(a) ........................................................................................................... 1

**Other Authorities**

4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104
   (4th ed. 2011) ........................................................................................................ 40, 44

H.R. Rep. No. 109-23 (2005) ........................................................................................... 39

## INTRODUCTION

A party is entitled to summary judgment "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Supreme Court has held that Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Defendants (collectively, "Positec") seek a grant of partial summary judgment as to various patent and trademark-related claims, each discussed below. In factual support of the motion, Positec refers to Defendants' Statement of Undisputed Material Facts ("SUMF") filed separately herewith.

## ARGUMENT

**I.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE ISSUE OF NON-INFRINGEMENT OF U.S. PATENT NOS. 5,604,954 AND 6,612,376, AS TO BOTH POSITEC'S ACCUSED BLOWER AND ACCUSED EDGER.**

Positec moves for summary judgment of non-infringement of the asserted claims[1] of U.S. Patent Nos. 5,604,954 and 6,612,376 ("the '954 Patent" and "the '376 Patent," respectively) because the undisputed facts establish that Positec's accused products, the "Accused Blower" and "Accused Edger,"[2] do not infringe any asserted claim of the '954 or '376 Patent,

---

[1] Plaintiffs (collectively, "B&D") assert claims 1-4, 6, 7 and 10 of the '954 Patent and claims 1, 4-10, 13, 14, and 16-18 of the '376 Patent. SUMF ¶9 and 61.

[2] B&D has accused Positec's blower-vacuums bearing model numbers WG500 of infringement of the '954 Patent. SUMF ¶9. However, through its expert report and other documents, it appears B&D is also contending, despite not amending its Final Infringement Contentions, that WG501, WG502, WG504/504.1, and WG508 also infringe the '954 Patent. Nonetheless, each of these models, except for the WG508, are identical to the WG500 in every material respect that is relevant to this motion. The WG508 is not relevant to this lawsuit in that is structurally and functionally very different than the other

respectively. The Accused Blower is structurally and functionally different from the '954 Patent and does not infringe for at least two independent reasons: the Accused Blower does not contain, either literally or by equivalents, the required "attachment member" or "actuating means." Likewise, the Accused Edger is structurally and functionally different from the '376 Patent and does not infringe because it does not contain, either literally or by equivalents, the required "radius increasing smoothly" or "labyrinth seal" elements.

### A. The Accused Blower

The Accused Blower is uniquely designed and is itself patented. SUMF at ¶39. Unlike other blower-vacuums, the Accused Blower allows the user to switch between blower and vacuum simply by turning a valve on the fan housing. *Id.* at ¶41. The user is not required to replace a vacuum attachment member with a blower attachment member, or vice versa, in order to change modes as is typically required by blower-vacuums as required by the '954 Patent. Instead, the Accused Blower has a <u>single</u> component, or duct, that has both a vacuum and blower tube. The following annotated photographs are illustrative of the Accused Blower:



SUMF ¶¶40-42.

---

models and B&D has no basis for asserting infringement of this device. Further, B&D has accused Positec's edger bearing model number WG895. SUMF ¶61.

When the valve on the housing is in the "blower" position, air is sucked in through the vacuum tube, into the inlet of the fan housing, out the outlet of the housing, and through the blower tube. When the valve is in the "vacuum" position, air is sucked in through the vacuum tube, into the inlet of the fan housing, and out through the outlet of the housing (and into a collection bag). Further, the duct is only removable in order to clear blockages that may occur due to leaves or debris. *Id.* at ¶45.

The Accused Blower does not have the "attachment member" or an equivalent structure required by the '954 Patent because the Accused Blower does not have "a structure that fits around the fan and allows air to enter and exit and that is non-permanently attachable to the housing." *Id.* at ¶¶ 43-48. The alleged "attachment member" of the Accused Blower does not "fit around the fan" because the fan is completely contained within the housing. *Id*. at ¶¶43-44. The only removable portion of the Accused Blower (i.e., the duct that is alleged to be the "attachment member") extends from the inlet of the unit and is completely forward, or in front, of the fan. *Id.*

Moreover, in the event the duct is removed, as shown below, the Accused Blower has a uniquely designed slide interlock that prevents the user-activated slide button from being pushed forward to turn on the unit.



3

The slide interlock blocks the ability to turn on the unit unless the duct is connected. SUMF ¶¶49-54.

The Accused Blower does not have the "actuating means" or any equivalent structure required by the '954 Patent because the Accused Blower does not have "at least one pivot lever and a biasing device" for "activating the switch only when the attachment member is attached to the housing." *Id.* at ¶¶49-60. Instead of a pivot lever, the Accused Blower utilizes the unique slide mechanism shown above to block the user-activated slide button from being able to be pushed forward to activate the switch when the duct is detached from the device. *Id.* at ¶¶49-51

**B.** **The Accused Edger**

The Accused Edger contains a blade guard assembly that has a construction and shape different from the '376 Patent. The alleged "confronting portion" of the assembly that "confronts" the blade is not defined by a constant radius or an increasing radius. Instead, as seen below, the alleged "confronting portion" has several discontinuities, including a section having a constant radius, a straight section (i.e., no radius), and a section where the radius <u>decreases</u>:



SUMF ¶¶74-79. Therefore, the Accused Edger does not have a "confronting portion" defined by a "radius increasing smoothly" from the forward end to the rearward end or any equivalent

structure required by the '376 Patent because there is no smooth increase and, in fact, the alleged confronting portion decreases for a distance. *Id*. at ¶¶74-79. Additionally, the door (when closed) is in an overlapping relationship with the housing. Such an arrangement does not form a "labyrinth seal" because there is no "tortuous engagement" and, in fact, does not even "seal" because even when closed there is a gap between the door and housing. *Id.* at ¶¶80-84

### C. Applicable Legal Standards

A patent case is as amenable to summary judgment and the standard is the same as in any other case. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989). "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U. S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1374–75 (Fed. Cir. 2007) (internal quotation marks omitted).

An accused infringer seeking summary judgment of non-infringement bears the initial burden of putting forth evidence sufficient to show there is no material issue of fact, and that it is entitled to judgment as a matter of law. *Vivid Techs. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999). This initial burden may be met "either by providing evidence that would preclude a finding of infringement or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. V. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). In other words, "nothing more is required than the filing of a summary judgment motion stating that the patentee ha[s] no evidence of infringement and pointing to the specific ways in which [the] accused system[] d[oes] not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006).

An infringement analysis involves two steps: (1) the scope of the claims must be construed and (2) the allegedly infringing device must be compared to the properly construed claims. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co KG.*, 224 F.3d 1308, 1316 (Fed. Cir. 2000). Infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

For there to be literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Moreover, "[i]nfringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent." *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (other citations omitted). An element of an accused product is only equivalent to a claim limitation if the differences between the two are insubstantial, a question that turns on whether the element of the accused product "performs substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1296-97 (Fed. Cir. 2009) (other citations omitted).

### D. The Accused Blower Does Not Infringe the '954 Patent Because It Is Missing At Least One Claim Limitation From Each of the Asserted Claims.

For purposes of this motion, the only pertinent claim limitations of the '954 Patent relate to the "attachment member" and "actuating means" found in claim 1. SUMF ¶¶ 11 and 12. Claims 2-4, 6, 7, and 10 of the '954 Patent depend either directly or indirectly from claim 1, and

therefore contain these same limitations.[3]  *Id.*  Thus, if just <u>one</u> limitation of claim 1 cannot be

found in the Accused Blower, either literally or by equivalents, there can be no infringement of

any of the asserted claims.  The following demonstrates that summary judgment of no

infringement of the '954 Patent is appropriate for at least two independent reasons.

   **1.**  ***The Accused Blower does not have the required "attachment member" element.***

 The claims require an "attachment member (6, 106) which covers the fan and which is

releasably attachable to the housing."  SUMF ¶12.  The Court defined this to mean "a structure

that fits around the fan and allows air to enter and exit and that is non-permanently attachable to

the housing."  *Id.* at ¶23.  In context with other claim limitations, the Court set forth that the

"attachment member may cover a fan that is either <u>partially outside</u> of the housing or <u>completely</u>

<u>outside</u> of it and still [be] releasably attachable to [the] housing."  *Id.* at ¶24 (emphasis supplied).

However, the Court ruled that "in order to attach to the housing, the attachment member must fit

over and around the exposed portion of the fan."  *Id.* at ¶25.  This is required because the

patented device has two separate attachment members that fit around the fan to cause the device

to be either a blower or a vacuum.  *Id.* at ¶¶14 and 15.  This is illustrated in the following

annotated patent figures:



'954 Patent Figures

---

[3] Because the Accused Blower does not infringe claim 1, it cannot, as a matter of law, infringe claims 2-4, 6, 7, or 10.  *Wahpeton Canvas Co., Inc. v. Frontier, Inc*., 870 F.2d 1546, 1552, fn. 9 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on . . . that claim.").

SUMF ¶¶18, 19, and 21. No such "attachment member" exists, either literally or by equivalents, in the Accused Blower.

<blockquote>
a.    **The "attachment member" is literally missing from the Accused Blower.**
</blockquote>

The Accused Blower does not have this claim limitation because it does not have a structure that "<u>fits around the fan</u> and allows air to enter and exit and that is non-permanently attachable to the housing." *Id.* at ¶¶41-48 (emphasis supplied). The fan of the Accused Blower is completely contained <u>within</u> the housing. *Id.* at ¶¶42-44. Thus, the only removable structure (the duct) of the Accused Blower attaches in front of the fan inlet and does not fit around the fan. *Id.* In other words, because the fan is completely contained within the housing, the duct does <u>not</u> "fit over and around" any "exposed portion of the fan." SUMF at ¶¶26 and 42-46. Unlike the patented device, no part of the fan is positioned within the duct of the Accused Blower and the portion that does fit around the fan is <u>not</u> removable. *Id.* at ¶¶43 and 46.

B&D contends that the duct identified above in the photograph is the "attachment member" and that it "fits around the fan." What is telling, however, is that B&D, through its expert's report, only makes this conclusory statement and has not asserted any factual explanation that could support the notion that the duct "fits around the fan." Such conclusory statements are not enough to create a genuine issue of material fact. *See TechSearch, LLC. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002). Moreover, B&D's expert admits that when the duct of the Accused Blower is attached to the housing, the duct is completely in front of the fan and that no portion of the fan is contained within the duct. SUMF ¶44. Therefore, this material fact (i.e., the location of the duct) is undisputed and, in light of the Court's claim construction, proves that the duct does not satisfy the "attachment member" claim element.

Consequently, summary judgment of no literal infringement by the Accused Blower is appropriate.

### b. The Accused Blower is missing an equivalent of the "attachment member."

Additionally, there is no infringement under the doctrine of equivalents. B&D has not provided, nor is there any, evidence of how the duct of the Accused Blower is an equivalent to the claimed "attachment member." In fact, B&D's expert failed to provide any "equivalent" analysis in his report. SUMF ¶48. This is for good reason. The structure and function of the duct of the Accused Blower and the claimed "attachment member" are significantly different. In other words, they perform substantially different functions to accomplish different results. SUMF ¶47. As previously discussed, the claimed "attachment member" of the '954 Patent fits around the fan in order to provide the necessary structure to allow the device to act as, and change between, a vacuum or a blower. *Id.* at ¶¶14 and 15. In other words, the changing of parts, or attachment members, converts the device from a vacuum to a blower, and vice versa. To the contrary, it is the permanently attached housing itself, and the valve located thereon, of the Accused Blower that allows it to act as, and change between, a blower and a vacuum. *Id.* at ¶¶41 and 47. The duct, or alleged "attachment member," of the Accused Blower is only removable to clear blockages. *Id.* at ¶45.

Finally, because of the design of the Accused Blower, its duct is fundamentally different than the required "attachment member," and achieves a substantially different result of requiring only a single component or duct in either blower or vacuum mode. SUMF ¶47. Therefore, because the duct of the Accused Blower does not have a structure equivalent to the claimed "attachment member," and the Plaintiff's expert report is devoid of facts to the contrary,

summary judgment of no infringement under the doctrine of equivalents is appropriate. *See, e.g., TechSearch*, 286 F.3d at 1372.

>    2.    **The Accused Blower does not have the required "actuating means" element.**

The second, independent reason the Accused Blower does not infringe is that it does not have the required "actuating means" element. The claims require an "actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing." SUMF ¶12. The Court construed this element as a means-plus-function limitation. The function was defined to be: "activating the switch only when the attachment member is attached to the housing." The structure was defined to be: "at least one pivot lever and a biasing device and equivalent structures that perform the identified function." SUMF ¶34.

Three embodiments of the safety interlock switch are shown in the '954 Patent, all of which utilize one or more pivot levers and a biasing device. The pivot levers in each embodiment pivot in order to be able to activate the motor switch. *Id.* at ¶¶26-30, 32, 37, and 38. Further, in each embodiment, the attachment member engages the pivot lever in order to pivot the lever, or put into a position such that it can pivot, to activate the motor switch only when the attachment member is attached. *Id.*

In the first embodiment, when attached to the housing, the attachment member contacts the pivot lever which causes the pivot lever to pivot into a position such that it can depress the motor switch. SUMF ¶26. In the second embodiment, there are two pivot levers pivotably secured to each other. When attached to the housing, the attachment member contacts one of the pivot levers which causes the pivot lever to pivot into a position such that it can activate the motor switch. *Id.* at ¶¶27 and 28. In the third embodiment, there is an "L-shaped" pivot lever.

When attached to the housing, the attachment member contacts the pivot lever and pushes it into a position such that when the pivot lever pivots, it activates the motor switch.  *Id.* at ¶¶29 and 30. Further, regardless of the position of the user-activated slide button, the pivot lever required by the '954 Patent is only in a position to be able to activate the motor switch when the attachment member is attached to the housing.  This is true for all embodiments, but is best illustrated by the third embodiment shown below:

| '954 Patent<br>Button Forward ("ON"); Motor Switch Activated by Pivot Lever Because in Position Due to Attachment Member | '954 Patent<br>Button Forward ("ON"); Motor Switch Not Activated by Pivot Lever Because Out of Position Due to Absence of Attachment Member |
| --- | --- |



SUMF ¶¶30-33.  No such "actuating means" element exists, either literally or by equivalents, in the Accused Blower.

> ### a. The "actuating means" is literally missing from the Accused Blower.

"Literal infringement of a [means-plus-function] limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999).  Further, the inquiry for equivalent structure examines whether "the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result. . . ."  *Odetics*, 185 F.3d at 1267 (a narrower test than under the doctrine of equivalents).  It is important to note that "a

11

means clause does not cover every means for performing the specified function." *Laitram Corp. v. Rexnard, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991).

The relevant structure in the Accused Blower, i.e., that structure which activates the motor switch, is neither a pivot lever nor an equivalent, and therefore does not literally infringe any of the claims for this additional reason. Instead, the Accused Blower utilizes three slide mechanisms for its safety interlock feature. SUMF at ¶¶49-54. In particular, the structure that activates the motor switch is a user-activated slide button that slides or moves laterally to activate or deactivate the motor switch. *Id.* at ¶¶49-51. This slide button does not pivot, nor is it a pivot lever. *Id.* at ¶¶51, 57, and 58.

In attempting to manufacture an argument that the Accused Blower contains a pivot lever, B&D, through its expert, has now asserted that the motor switch itself is a "pivot lever."[4] *Id.* at ¶¶55 and 56. Specifically, B&D's expert contends that the toggle or rocker arm portion of the motor switch—namely, that which allows the switch to be a switch (i.e., the toggle opens and closes the circuit)—is the required pivot lever. *Id.* at ¶56. Such a position is nonsensical for several reasons. First, the patent and the claims themselves require that the motor switch and pivot lever be separate structures. *Id.* at ¶35. Consequently, the motor switch cannot now also be the "pivot lever." This is logical because it is the pivot lever that acts <u>on</u> the switch; it is not part <u>of</u> the switch. SUMF ¶¶26-30 and 32. Second, the pivot lever and biasing device of the patent have been found by the Court to be the structure that performs the function of "activating the switch only when the attachment member is attached to the housing." *Id.* at ¶34. This is part of the "actuating means" limitation, and indeed only the pivot lever and biasing device of the

---

[4] B&D has taken this position for the first time through the expert report of Dr. Neuhalfen. This position was not articulated in the Plaintiffs' Final Infringement Contentions, nor did B&D seek leave of Court, as required by the Local Patent Rules, to amend its Final Infringement Contentions. Consequently, B&D should be precluded from taking this position now.

'954 Patent perform this function. The motor switch does not. In fact, the motor switch itself is a separate element in the claim of the patent and it is only because of the pivot lever and biasing device that the switch is prevented from activating when the attachment member is not attached. Third, if the toggle portion of the motor switch is the pivot lever and therefore the structure that performs the recited function, and the recited function is to activate the switch only when the attachment member is attached to the housing, this means that the switch activates itself. The switch cannot, and does not, activate itself.

Therefore, in light of the above, the toggle portion of the switch is not a pivot lever as now alleged by B&D. *See e.g., Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.") (citing *Gaus v. Conair Corp*, 363 F.3d 1284, 1288 (Fed. Cir. 2004); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404-05 (Fed. Cir. 1996).

Further, in a literal analysis, there is no equivalent structure of the required pivot lever in the Accused Blower, nor can B&D provide evidence to the contrary. SUMF ¶¶59 and 60. B&D's expert's report merely gives a conclusory opinion that the safety interlocks of the '954 Patent and the Accused Blower achieve the result of not allowing the motor to operate when the attachment member or the duct, as the case may be, is not connected to the housing. *Id.* at ¶60. There is <u>no</u> analysis as to the differences or similarities between the structures or, in other words, <u>no</u> explanation as to how the Accused Blower and the "actuating means" of the patent are able to provide this result in substantially the same way. *Id.* This lack of explanation is not surprising because the Accused Blower accomplishes the safety feature in a completely <u>different way</u> than the patented device. As seen above in the photograph of the Accused Blower in Section I.A., the

13

slide interlock is in an "up" position when the duct is not attached, which blocks the user-activated slide button from being slid forward. When the duct is attached, the slide interlock slides "down" to allow the user-activated slide button to be pushed forward. SUMF ¶¶49-54 and 59. On the other hand, the safety interlock of the '954 Patent does <u>not</u> function by blocking the user-activated slide button. In fact, the slide button can be pushed forward regardless of whether or not the attachment member is attached to the housing. This is because the "pivot lever" is what engages the motor switch to turn on, and the pivot lever is not in a position to do so unless the attachment member is attached to the housing.[5] SUMF ¶¶26-30 and 32.

The toggle portion of the switch of the Accused Blower also cannot satisfy the "actuating means" element literally because it does not perform the identical function recited in the claim of "activating the switch only when the attachment member is attached to the housing." *See Odetics*, 185 F.3d at 1267. As discussed, the motor switch is not a switch without the toggle portion to open and close the circuit, and the switch does not, and cannot, act to activate itself. Therefore, the toggle portion of the switch does not perform the function of "activating the switch only when the attachment member is attached to the housing."

Moreover, the Accused Blower does not satisfy the "responsive to the attachment member" limitation of the claims. As discussed above, the "pivot lever" of the '954 Patent is responsive to the attachment member in that it moves or changes orientation when the attachment member is attached to the housing in order for the pivot lever to be able to activate the motor switch. However, neither the user-activated slide button nor the toggle portion of the motor switch in the Accused Blower responds in any way to the duct being attached to the

---

[5] Moreover, the "result" is not the same because if the attachment member comes off of the patented device the motor switch will deactivate because the pivot lever will move out of position. In the Accused Device, this would not occur as the user-activated slide button would still need to be pulled back.

housing. The slide button is only responsive to the user sliding the button, and it is only the slide button that can activate the switch. SUMF ¶52. Consequently, for these additional reasons, summary judgment of no literal infringement by the Accused Blower is appropriate.

> **b.** **The Accused Blower is missing an equivalent of the "actuating means."[6]**

Although the slide mechanism of the Accused Blower acts as a safety interlock such that the motor switch cannot be activated when the duct is not attached to the housing, the differences between the mechanism of the Accused Blower, on one hand, and the pivot lever and biasing device of the '954 Patent, on the other, are <u>not</u> insubstantial. SUMF ¶59. As discussed above, the user-activated slide button on the Accused Blower, unlike that in the '954 Patent, cannot be pushed forward when the duct is not attached because another slide blocks the movement. *Id.* at ¶¶53, 54, 55, and 59. The user-activated slide button on the patented device <u>can</u> be moved forward or back by the user regardless of whether or not the attachment member is attached to the housing. *Id.* at ¶¶30-33 and 38. This difference results from the fact that when the attachment member is not attached to the housing, the pivot lever is biased out of position to activate the motor switch even when the slide button is pushed forward.

These substantial differences in the "way" the Accused Blower and the '954 Patent operate cannot be contradicted and, in light of these differences and the Plaintiff's expert report being devoid of any facts to the contrary, summary judgment of no infringement under the doctrine of equivalents is appropriate. *Id.* at ¶60; s*ee, e.g., TechSearch*, 286 F.3d at 1372

---

[6] Although an equivalence analysis under literal infringement is not coextensive with the doctrine of equivalents, they do apply a similar analysis and thus a finding of no literal infringement may preclude a finding of equivalence under the doctrine of equivalents. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310 (Fed. Cir. 1998). In both cases, you look to the differences in the "way" and "result" between the claimed element and the relevant structure in the accused device. *Odetics, Inc.*, 185 F.3d at 1267.

(general assertions or denials, or unsupported or conclusory averments, are insufficient to avoid summary judgment); *see also PC Connector Solutions*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) ("[C]onclusory statements regarding equivalence . . . do not raise any genuine issues of material fact.") (other citations omitted).

### E. The Accused Edger Does Not Infringe the '376 Patent Because It Is Missing At Least One Claim Limitation From The Independent Claims.

Claims 1, 9, and 18 are the independent claims. Thus, if just <u>one</u> limitation of claims 1, 9, and 18 cannot be found in the Accused Edger, either literally or by equivalents, there can be no infringement of the '376 Patent. SUMF ¶63. The following demonstrates that at least one required element of claims 1 and 9, and two required elements from claim 18, are missing from the Accused Edger and that no reasonable jury could find otherwise. Thus summary judgment of no infringement of the '376 Patent is appropriate.

#### 1. The Accused Edger does not have the required "radius increasing smoothly" element.

Claims 1 and 18 require that the confronting portion of the blade guard be "defined by a radius that increases in the rotational direction from a first radius at a leading end of the confronting portion to a second, larger radius at a trailing end of the confronting portion, the radius increasing smoothly from the leading end to the trailing end." SUMF ¶64. The Court defined this to mean "the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." *Id.* at ¶69.

##### a. The "radius increasing smoothly" is literally missing from the Accused Edger.

Unlike the '376 Patent, the Accused Edger has a confronting portion that actually <u>decreases</u> for a portion beginning at the leading end moving toward the trailing end. *Id.* at ¶¶74 and 75. In other words, the radius of the confronting portion in the Accused Edger decreases for

16

a distance in the rotational direction of the blade. This fact is uncontradicted: B&D's expert admits that the radius of the Accused Edger decreases for a distance. *Id.* at ¶77. Therefore, it is undisputed that the confronting portion of the Accused Edger does <u>not</u> increase smoothly from the leading end to the trailing end as required by the '376 Patent. Consequently, summary judgment of no literal infringement of claims 1 and 18 by the Accused Edger is appropriate.

      **b.**     **The Accused Edger is missing an equivalent of the "radius increasing smoothly."**

B&D has not provided, nor is there any, evidence of how the confronting portion of the Accused Edger is an equivalent to the claimed confronting portion having a "radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." In fact, B&D's expert fails to provide any "equivalent" analysis at all as to this claim element in his report. SUMF ¶78 and 79. This is not surprising in that it would be illogical to argue that a radius that decreases for a distance from the forward end is substantially equivalent to a radius that increases smoothly from the forward end to the rearward end. *Id.* Therefore, summary judgment of no infringement under the doctrine of equivalents of claims 1 and 18 is appropriate. *Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (no infringement because a finding of equivalents would have vitiated the claim language by allowing the opposite of what was required).

      *2.*     *The Accused Edger does not have the required "labyrinth seal."*

  Claims 9 and 18 require that the housing assembly have a "labyrinth seal" that forms between the door and housing when the door is closed. SUMF ¶¶64, 66, and 70. The '376 Patent describes the labyrinth seal as an engagement of a first labyrinth member and a second labyrinth member, with the first labyrinth member on the housing and the second labyrinth

member on the door. *Id.* at ¶¶71 and 72. The Court held that "labyrinth seal" means "a tortuous engagement that inhibits dust and debris from exiting the housing assembly." *Id.* at ¶73.

### a. The "labyrinth seal" is literally missing from the Accused Edger.

Unlike the '376 Patent, the Accused Edger does not have a seal between the door and housing, let alone a "labyrinth seal." In other words, there is no "tortuous" engagement between the door and housing of the Accused Edger. Instead, when the door of the Accused Edger is in the closed position, the housing merely overlaps the door. Moreover, even when closed, there is a gap between the door and housing. SUMF ¶¶80 and 81. Again, this fact is uncontradicted because B&D's expert admits that the door and housing of the Accused Edger have merely an overlapping relationship and that even when closed there is a gap between the door and housing. *Id.* at ¶82. Therefore, it is undisputed that the door of the Accused Edger does not form a tortuous engagement with the housing to form a seal to prohibit dust and debris from exiting. Consequently, summary judgment of no literal infringement of claims 9 and 18 (for this additional reason) by the Accused Edger is appropriate.

### b. The Accused Edger is missing an equivalent of the "labyrinth seal."

Additionally, there is no infringement under the doctrine of equivalents. SUMF ¶83. B&D has not provided, nor is there any, evidence of how the overlapping relationship between the door and housing of the Accused Edger is an equivalent to the required "tortuous engagement that inhibits dust and debris from exiting the housing assembly." In fact, B&D's expert fails to provide any "equivalent" analysis at all as to this claim element in his report. *Id.* at ¶84. Again, this is not surprising because one cannot legitimately argue that a mere overlapping relationship that has a gap between the door and housing is substantially equivalent to a tortuous engagement between a door and housing for preventing dust from exiting the housing assembly. *Id.* at ¶83.

18

Therefore, summary judgment of no infringement under the doctrine of equivalents of claims 9 and 18 (for this additional reason) is appropriate.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE ISSUE OF PATENT DAMAGES TO THE EXTENT OCCURRING PRIOR TO MAY 24, 2011.

In the event liability is proved on any one or all four of the patents at issue, B&D is not entitled to recover patent infringement damages prior to May 24, 2011, at the earliest, as a matter of law. *Jackson v. Intel Corp.,* 2009 WL 2851742, *2 (N.D. Ill. 2009) (granting summary judgment limiting damages for failure to give actual or constructive notice).  Thus, Positec's Motion for Partial Summary Judgment precluding any damages for patent infringement allegedly occurring before May 24, 2011 should be granted.

### A.   Background

B&D alleges that Positec has infringed three patents related to a lawn edger (the '975, '376, and '090 Patents) and one patent related to a blower-vacuum (the '954 Patent).  SUMF ¶8.  B&D also alleges it has "fully complied with the provisions of 35 U.S.C. § 287" (the "Statute").  *Id.* at ¶85.  However, the undisputed facts of record clearly indicate that B&D has <u>failed</u> to comply with the Statute.

Recovery of patent damages requires either actual or constructive notice under the Statute.  B&D has not alleged actual notice prior to May 24, 2011, when it sent a letter to Positec with alleged actual notice of the patent infringement allegations.  *Id.* at ¶87.  Thus, in order to recover patent infringement damages before this date, B&D must prove that it provided constructive notice by complying with the strictures of the Statute (i.e., marking the associated patented products with the relevant patent number).  However, the evidence does not support compliance by B&D, but instead shows non-compliance with the Statute.

B&D has admitted that the earliest date Positec could have had actual or constructive notice of two (the '954 and '090 Patents) of the four patents is May 24, 2011. SUMF ¶¶89 and 92. Further, B&D has not provided the required constructive notice of the remaining two patents because B&D has admitted that the patented products were not themselves marked, nor were they continually marked, with the corresponding patent numbers. *Id.* at ¶¶93 and 94. Thus, there is no genuine issue of material fact regarding whether B&D provided any notice prior to May 24, 2011 and, thus, patent infringement damages are not available for any of the patents prior to that date, at the earliest.

### B. Applicable Legal Standards

United States patent law requires notice as a prerequisite to recovery of patent damages, whether that notice is actual or constructive. 35 U.S.C. § 287(a). The Statute states in part:

> In the event of failure... to mark [properly], <u>no damages</u> shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

*Id.* (emphasis added). Thus, in order to recover pre-litigation damages where a patentee or its licensee sells articles embodying the patent(s)-in-suit, the patentee must either give actual notice of infringement, or the patented articles must be properly marked with the patent number pursuant to § 287(a). *American Med. Sys., Inc. v. Med Eng'g Corp.*, 6 F. 3d 1523, 1537 (Fed. Cir. 1993). Further, the patentee bears the burden of proving actual or constructive notice prior to filing an action, and failure to do so limits recoverable damages to the period after the suit was filed. *See, e.g., Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).

Actual notice requires an affirmative act by the patentee to put the defendant on notice of infringement. *Lans v Digital Equip. Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2001). "Constructive notice is provided when the patentee <u>consistently</u> marks <u>substantially all</u> of its

patented products [with the patent number]." *Sentry Protection Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005) (emphasis added; internal quotations and citations omitted). This marking <u>must</u> be "substantially consistent and continuous" to provide constructive notice. *See, e.g., Nike, Inc..*, 138 F.3d at 1446.

        **C.    No Damages Prior to May 24, 2011 (at the earliest) for Alleged Infringement of the '954 and '090 Patents.**

B&D <u>admits</u> that the earliest date Positec could have had either actual or constructive notice of the '954 and '090 Patents is May 24, 2011.[7] SUMF ¶¶89 and 92. Consequently, B&D is precluded from recovering any damages for the alleged infringement of the '954 or '090 Patents prior to the alleged actual notice date, May 24, 2011. *American Med. Sys., Inc.*, 6 F. 3d at 1537.

        **D.    No Damages Prior to May 24, 2011 (at the earliest) for Alleged Infringement of the '975 and '376 Patents.**

With respect to the '975 and '376 Patents, B&D has feigned constructive notice. However, B&D <u>admits</u> that it has not continually marked its edger model LE750 during the infringement period, or marked its Craftsman model edger at all, with the patent numbers despite both products admittedly being covered by the '975 and '376 Patents. SUMF ¶¶90, 91, and 93. Therefore, B&D has not complied with the constructive notice requirement of the Statute. *Nike, Inc.*, 138 F.3d at 1446.

B&D may argue that it provided constructive notice of the '975 and '376 Patents by placing the patent numbers on the <u>packaging</u> of the LE750. SUMF ¶¶91 and 94. However, this

---

[7] B&D alleges to have provided Positec with actual notice of alleged infringement via a letter sent to an officer of Positec. SUMF ¶87. Positec does not admit that the May 24, 2011 letter was sufficient to provide actual notice as required by Section 287(a) as B&D has the burden of proving it satisfies as actual notice. *See, e.g., Nike, Inc.* 138 F.3d at 1446. In any event, for purposes of this motion, this is the earliest date on which <u>any</u> allegation of actual notice is made and thus is the earliest date patent damages could start to accrue.

does not suffice. First, B&D admits that it has not continually marked the LE750 with the

patents. *Id.* at ¶93. Nonetheless, any patent markings that did exist on the packaging for the

LE750 do not comply with the Statute. The Statute states that patent markings must be on the

patented article itself and that marking the packaging of the article is only allowed when the

character of the article does not allow it to be so marked. 35 U.S.C. § 287(a). Further, this Court

has held that "[w]here [a] patented article has markings or printing on it, other than the

appropriate patent marking, then the alternate form of patent markings on the package is not

sufficient compliance with the statute." *Rutherford v. Trim-Tex, Inc.,* 803 F.Supp. 158, 163

(N.D. Ill. 1992). To this end, there is no evidence that the character of B&D's edgers were such

that they could not have been marked with the patent numbers, especially when B&D's edgers

contain other markings and printing. SUMF ¶97; *Rutherford*, 803 F. Supp. at 163.

Consequently, B&D is precluded from recovering any damages for the alleged

infringement of the '975 or '376 Patents, like with the '954 and '090 Patents, prior to the alleged

actual notice date, May 24, 2011, at the earliest. *American Med. Sys., Inc*., 6 F. 3d at 1537.

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR TRADE DRESS INFRINGEMENT, FOR LACK OF SECONDARY MEANING IN THE CLAIMED TRADE DRESS.

B&D has alleged infringement of its yellow and black trade dress specifically targeting

(1) the Rockwell brand miter saw, (2) the Rockwell JawHorse brand workstation, and (3) all of

Positec's products sold in packaging with the "sunburst" design. SUMF ¶99. Trade dress claims

are different from typical trademark claims as they refer to the "total image of a product,

including features such as 'size, shape, color or color combinations, texture, graphics, or even

particular sales techniques.'" *Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1316

(N.D. Ill. 1991) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th

Cir. 1983)). To establish trade dress infringement, a Plaintiff must prove that (1) its trade dress is nonfunctional and (2) that the trade dress has acquired secondary meaning. *Weber-Stephen Products LLC v. Sears Holding Corp.*, 13-CV-01686, 2013 WL 5782433 (N.D. Ill. Oct. 25, 2013). Only in the event these two criteria are fulfilled does the third, likelihood of confusion, come into play (discussed below in Section IV).

For purposes of this Motion, even if B&D can establish that the claimed yellow and black trade dress is nonfunctional, there is no evidence that the claimed trade dress has acquired secondary meaning. Of great significance, B&D has admitted that its trade dress claims are grounded in common law rights only and not in trademark registrations. SUMF ¶101. Accordingly, B&D must prove the claimed trade dress is inherently distinctive or has acquired secondary meaning. *See Health o meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160, 1168 (N.D. Ill. 1995). And because the claimed trade dress here consists solely of color, SUMF ¶100, the trade dress cannot be inherently distinctive; the only basis for protection is secondary meaning. *See, e.g. Turtle Wax, Inc.,* 781 F. Supp. at 1320-21 (N.D. Ill. 1991) (Finding trade dress not inherently distinctive when the most distinctive aspect of the trade dress was "color components—the black background, gold lettering, and red details, and particularly the way in which each is utilized on the package").

More to the point, it strains credulity, and basic principles of trademark law, for B&D to assert broad rights in the colors yellow and black, however and wherever they appear on any power tools or power tool packaging. Despite B&D's acknowledgement of a particular "DeWalt" shade of yellow B&D claims trade dress rights in all shades of yellow when combined with black, regardless whether other colors are present or predominate. SUMF ¶100. Such a claim lacks the specificity required to allow Positec (or any other company) to evaluate potential

infringement issues.  Indeed, a plaintiff must properly identify the "discrete elements which make up [the trade dress] ... separated out and identified in a list."  *Weber-Stephen*, 2013 WL 5782433 at *3.  B&D has done nothing of the sort here, instead relying on generalities asserted in its pleadings, in testimony by its own personnel, and in opinions by its survey expert. SUMF ¶100.  In short, there is no specifically defined "trade dress" for specifically defined goods (whether in the form of product packaging or product configuration) against which secondary meaning can be measured.

Absent trademark registrations duly establishing secondary meaning for those colors as and where they appear on particular goods (product configuration trade dress), or as and where such colors appear on particular packaging for such goods (product packaging trade dress), this Court cannot recognize B&D's claims of secondary meaning, and certainly not as to an entire category of goods (such as power tools).  "The presumption of distinctiveness extends only to the goods listed in the registration…[a] registration does not, in itself, give rise to a presumption that the mark is always distinctive for all uses."  *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 12 CIV. 4112 AJP, 2014 WL 814532 n.52 (S.D.N.Y. Mar. 3, 2014) (quoting *Savin Corp. v. Savin Grp.,* 391 F.3d 439, 457 (2d Cir. 2004) ("[A]n incontestable registered trademark enjoys a conclusive presumption of distinctiveness. Yet even if a mark is registered and, thus, afforded the utmost degree of protection, the presumption of an exclusive right to use the mark extends only so far as the goods or services noted in the registration certificate." (citations omitted)), *cert. denied,* 546 U.S. 822 (2005); *Paco Sport, Ltd. v. Paco Rabanne Parfums,* 86 F. Supp. 2d 305, 312 (S.D.N.Y. 2000) (Counterclaim-plaintiff's "only registration of the mark ... is for use on fragrances and various cosmetics products. This registration, therefore, cannot create the presumption that the trademark ... is distinctive when used on clothing." (record citation

24

omitted)), *aff'd*, No. 00–7344, 234 F.3d 1262 (table), 2000 WL 1721126 (2d Cir. Nov. 16, 2000)).

 Other factors considered in secondary meaning determinations include indirect and circumstantial evidence: (a) amount and manner of advertising; (b) volume of sales; (c) length and manner of use; and (d) proof of intentional copying. *Health o meter, Inc.*, 873 F. Supp. at 1172. Although B&D claims use of a yellow-and black color scheme since 1992, and claims to have "achieved sales of many billions of dollars of yellow and black tools throughout the United States," and spent "hundreds of millions in advertising and promotion," the courts consider this type of evidence merely circumstantial. *See Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704 (N.D. Ill. 2009); SUMF ¶100 & 117. B&D has not offered any evidence that the sales of these DeWalt tools actually resulted in consumer brand identification of DeWalt with any yellow and black trade dress. If such evidence exists, one would expect a resounding affirmation in B&D's expert's secondary meaning survey.

 Although B&D's claimed scope of trade dress is too broad to qualify for secondary meaning, the secondary meaning surveys by Mr. Berger, seeking to test the marketplace for "power tools," were constructed in a manner rendering them ineffective. One survey used a photo of a miter saw that had black and yellow, and the other verbally described a yellow and black tool in the marketplace. SUMF ¶125. The survey questions in the two surveys did not include either a description of or a photograph of packaging, and his expert report expressed no conclusions as to whether or not secondary meaning for packaging existed. *Id.* Moreover, Mr. Berger's secondary meaning survey "didn't show market conditions." *Id.* Even though Mr. Berger believed it important for survey respondents to see the colors and text being presented in

the secondary meaning survey for trade dress, he has never sought to determine whether any respondents are color-blind. SUMF ¶126.

Insofar as B&D asserts that its power tools are a high quality premium product aimed at professionals, SUMF ¶116, it is more likely that those consumers purchase the tools precisely because of the quality and reputation associated with the DeWalt name, and not because of any consumer recognition of yellow-and-black as source-identifiers for the DeWalt brand. Likewise, there is no evidence that the claimed millions of dollars of advertising created (much less sought to create) any source-identifying connection between DeWalt brand products and the claimed yellow-and-black trade dress. *Id.* at ¶117. Again, it is more likely that consumers would identify these power tools by their brand name, DeWalt, rather than any yellow-and-black color scheme.

Secondary meaning requires a showing of exclusivity. *See Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 728 (7th Cir. 1998). B&D is not the only company using yellow and black on tools and/or power tools. SUMF ¶102. When Positec was first notified of B&D's objections to their choice of color in tools, Positec responded with a list of 9 companies with registered trademarks claiming the colors yellow and black as part of the mark (3 specifically as power tools). *Id.* at ¶¶98 & 102. The most prominent example is Stanley – now a related entity of B&D (though not at the time B&D sent Positec its initial cease and desist letter). *Id.* at ¶103. Hence, consumers would not associate a yellow-and-black trade dress solely with the DeWalt brand if they were already conditioned to differentiate those colors on tools in the marketplace.

These circumstances weighing against a finding of secondary meaning makes the survey evidence adduced in this case all the more crucial to B&D's claims. In this regard, Mr. Berger's secondary meaning surveys focused solely on trade dress appearing directly on tools, and <u>not</u> the

products' packaging. SUMF ¶125. Mr. Berger testified that the surveys did not extend to packaging. *Id.* As a result, there is no evidence of record to support the conclusion that B&D's product packaging has acquired secondary meaning. Therefore, B&D's claims accusing Positec's packaging of trade dress infringement must be dismissed on summary judgment.

Likewise, Mr. Berger's secondary meaning surveys directed to B&D's product trade dress are insufficient to create a genuine issue of material fact as to whether Positec's JawHorse brand workstation is infringing. The surveys in this regard focused only on (1) a depiction of B&D's miter saw and (2) a general description of yellow-and-black in the context of power tools. *Id.* at ¶125. Although B&D claims that it sells miter saw stands that may serve a similar function as the JawHorse workstation, *id.* at ¶108, miter saw stands were not a subject of the survey. Positec's JawHorse brand workstation is not a power tool. *Id.* at ¶109. Mr. Berger's general survey inquiry about yellow-and-black was limited to a target consumer who sees power tools. *Id.* at ¶124. The survey therefore does not and cannot yield any relevant evidence regarding any protectable trade dress in a workstation. As a matter of law, then, B&D's trade dress claims fail as to the JawHorse brand workstation.

Insofar as Mr. Berger's secondary meaning survey could be relevant in assessing the product configuration trade dress of B&D's miter saw, as a prerequisite to determining whether Positec's miter saw infringes B&D's product trade dress, the latter inquiry is foreclosed by virtue of the fact – discussed below – that no evidence of likelihood of confusion regarding product configuration trade dress was adduced by Mr. Berger's surveys seeking to prove likelihood of confusion. SUMF ¶134. In any event (as discussed above), the secondary meaning survey is so flawed as to be unreliable to establish secondary meaning for the product trade dress for B&D's miter saw.

B&D claims "broad common law rights in the yellow and black color scheme for its DeWalt® packaging and products" by virtue of an opinion from the Eastern District of Virginia, *Black & Decker (U.S.) Inc. v. Pro-Tech Power, Inc.*, 26 F.Supp.2d 834, 850 (E.D. Va. 1998), wherein an expert report found "eighty-five percent of the professional power tool users … identified yellow and black with Black & Decker or DeWalt … a level of consumer recognition that parallels the extent to which the public associates golden arches with the McDonald's corporation." SUMF ¶122. B&D overstated the case by characterizing the survey result as a finding by the court. Moreover, the facts are distinguishable and do not extend to the case at hand: the defendant in *Pro-Tech* copied and implemented a "virtually identical" color scheme "in a way that belies the possibility of coincidence"; actual confusion was found; and the defendant's product suffered from "serious quality problems." *Id.* B&D is attempting to rely on this single, non-binding case to satisfy its burden to prove secondary meaning here over fifteen years later, rather than actually producing direct evidence of secondary meaning in the current marketplace. Indeed, the marketplace has changed dramatically since 1998, with several companies having adopted both yellow and black on tools (as Positec explained in detail in its response to B&D's C&D letter). SUMF ¶¶98 & 102-104.

## IV. SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR TRADE DRESS INFRINGEMENT, BECAUSE (EVEN IF SECONDARY MEANING IS PROVED) POSITEC'S TRADE DRESS IS NOT LIKELY TO CAUSE CONFUSION.

Regardless whether B&D's claims are stated as trademark infringement, unfair competition, or trade dress infringement, the likelihood of confusion standard applies to such claims. Accordingly, this motion addresses these claims together. One initial consideration is of great importance here, and greatly simplifies the Court's analysis. That consideration is the nature and scope of the likelihood of confusion survey conducted by B&D's expert, Mr. Berger.

28

A. **The Likelihood of Confusion Survey, Being Limited to Product Packaging for Positec's Miter Saw, Warrants Dismissal of B&D's Product Configuration Trade Dress Claims And Limits The Analysis To The Miter Saw Packaging.**

Mr. Berger conducted what he termed a likelihood of confusion survey, but that survey tested only product packaging for a packaged Rockwell miter saw appearing among various packaged DeWalt products depicted in a single photograph, and not product configuration trade dress. SUMF ¶134. Mr. Berger's likelihood of confusion survey only tested Positec's Rockwell brand miter saw as it appeared in its packaging. SUMF ¶127. His expert opinion did not extend to any Rockwell packaging other than that shown in the survey photograph, the only packaging he had seen. *Id.* at ¶135. B&D thus has adduced no direct evidence whatsoever on the issue of likelihood of confusion for product configuration trade dress with regard to the Positec products accused of trade dress infringement herein – the Rockwell brand miter saw and the JawHorse brand workstation. B&D's claims grounded in the product configuration trade dress of those products must be dismissed on summary judgment.[8]

Therefore, at best, B&D's likelihood of confusion claims extend only to Positec's packaged miter saw, and its claims regarding all other Rockwell packaging must likewise be dismissed on summary judgment. For this reason, the Court's analysis is greatly simplified. The Court need only assess whether a likelihood of confusion is presented by product packaging for Positec's Rockwell brand miter saw. That determination is likewise impacted by the likelihood of confusion survey, which has significant flaws.

---

[8] Even if the Court were to consider the issue of likelihood of confusion in the absence of an acceptable survey, substantial differences in the product configuration trade dress of the Rockwell brand miter saw and the JawHorse brand workstation would lead to summary judgment herein. As discussed below, the parties' respective Rockwell and DeWalt brand names appear both on the product packaging and directly on the products themselves, obviating any likelihood of confusion.

29

**B.**     **The Survey Does Not Support A Finding Of Likelihood of Confusion For The Miter Saw Packaging, Warranting Dismissal of B&D's Claim.**

The only evidence adduced by B&D that is probative on this issue is a likelihood of confusion survey by Mr. Berger depicting one packaged Rockwell brand miter saw product appearing among DeWalt packaged products. *Id.* at ¶127. This survey approach, and accompanying methodology, was flawed, and does not support a finding of likelihood of confusion. Mr. Berger did not use the "Eveready" methodology where a product is shown (sometimes with the wording of the brand removed) and the respondent is asked who put out the product. *Id.* at ¶129. Instead, below appears the photo used in his survey:



*Id.* at ¶127. Even though he did not know whether the products as shown in the photograph were staged that way for the photograph, Mr. Berger conducted some staging of his own. *Id.* The original photo provided to Mr. Berger, seen below, was cropped by Mr. Berger so that it would "focus on the two rows of …packaged products." *Id.*

30



Mr. Berger admitted that if survey participants in a likelihood of confusion survey do not see the actual colors of the products or packaging, it could skew the survey. *Id.* at ¶130. However, there is no way to know or see what the survey respondents actually looked at, because Mr. Berger did not possess the actual survey. *Id.* at ¶128. Mr. Berger has never conducted a survey where he sought to determine whether any respondents are color-blind. *Id.* at ¶126. Even so, the above photos clearly show DeWalt packaging having differing shades of yellow. Either the above photos fail to faithfully replicate the packaging colors, or the DeWalt packaging is revealed to lack consistency in color within its own lines of packaging, despite B&D's testimony that the DeWalt yellow is of one specific shade. *Id.* at ¶100. This may be because, as Mr. Berger testified, the lighting in the photograph might have been bad. *Id.* at ¶126.

These obvious visual inconsistencies make Mr. Berger's testimony all the more astounding and lacking in reliability. His opinion is based on the premise that the yellow and black colors on the above photograph, as depicted on the Rockwell brand packaging and DeWalt brand packaging, were "clearly identical." *Id.* at ¶128. Not only does the above photo belie this assumption, it was a questionable basis on which to base Mr. Berger's opinion, especially given

that has never actually seen the Rockwell brand packaging in person. *Id.* Nor did his survey test whether the images and text and other designs on the packaging had an effect on the survey. *Id.* at ¶133. Indeed, Berger's survey, by his own admission, was not trying to determine whether the trade dress caused confusion. *Id.* at ¶129. This is hardly surprising in light of his opinion that a control group was not necessary for his survey which he considered "observational research. … If it was causal, then you would use a control group." *Id.*

Apart from the flaws in the way the products were presented in the survey, the survey universe was not representative of the marketplace. The "relevant target market" for Mr. Berger's likelihood of confusion and secondary meaning surveys were "professional tradesmen and the serious do-it-yourselfer," the latter defined as a person owning $1,000 or more of tools. *Id.* at ¶124. Mr. Berger presumed that a serious do-it-yourselfer had purchased power tools and will probably purchase them again. *Id.* Yet, by contrast, the professional tradesmen included in the survey were "probably not" the ones likely to make a purchasing decision. *Id.* Indeed, even the trade channels were given short shrift. Berger testified that it does not matter whether the target population is going into a store or purchasing over the Internet: "All we're testing is a picture." *Id.* at ¶131.

Overall, Berger's likelihood of confusion survey utterly failed to represent the circumstances of a likely purchase of either the DeWalt or Rockwell brand products depicted in the photograph. Indeed, the survey did not replicate the expected practice under which purchasers would buy DeWalt products. For B&D, it is important for tools to be displayed outside their boxes so that purchasers can pick up and handle the tool prior to purchase, "the best way to convince a user that the purchase is the one they should make." *Id.* at ¶115. For the foregoing reasons, the likelihood of confusion survey cannot be deemed reliable evidence on the

issue of likelihood of confusion as to Positec's miter saw packaging.  Although these grounds should be sufficient to dismiss B&D's claim on summary judgment, a traditional likelihood of confusion assessment provides further support.

### C.     The Factored Analysis Shows No Likelihood of Confusion.

When determining whether a likelihood of confusion exists between the trade dress of two different products, the court should examine a number of different factors, including (1) the similarity of the trade dresses; (2) the area and manner of concurrent use; (3) the degree of care likely to be used by consumers; (4) the strength of the plaintiff's trade dress; (5) actual confusion; and (6) intent of the defendant to pass off its product as that of the plaintiff."  *Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 296 (7th Cir. 1998).  No one factor is dispositive, *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1184 (7th Cir. 1989), but "the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance," *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808 (7th Cir. 2002).  Although B&D does not have to prove all six factors to prevail on a trade dress infringement claim, "there must be more than a 'possibility' of public confusion in order for Plaintiffs to prevail.'" *Pampered Chef, Ltd. v. Magic Kitchen, Inc.,* 12 F. Supp. 2d 785, 795 (N.D. Ill. 1998).

### 1.     The Trade Dress of The Product Packaging Is Not Similar.

Despite B&D's claims, the overall appearance of the B&D trade dress and Positec's trade dress are not similar enough to cause confusion.[9]  Positec's packaging and tools do not display a

---

[9] As noted above, even if the Court were to consider the issue of likelihood of confusion in the absence of an acceptable survey, substantial differences in the product configuration trade dress of the Rockwell brand miter saw and the JawHorse brand workstation would lead to summary judgment herein.  As with the product packaging discussed herein, the presence of the parties' respective Rockwell and DeWalt brand names appear directly on the products themselves, obviating any likelihood of confusion.  More to the point, the product configuration trade dress is significantly different for Rockwell brand miter saw and the JawHorse brand workstation.  Neither Positec's miter saw nor its JawHorse brand workstation have

"yellow and black" color scheme, but instead employ a variety of colors, including yellow, gold, black, silver, and/or military green. SUMF ¶¶107, 109 & 111-113. Further, consumers will easily be able to distinguish between the packages and products because of the conspicuous placement of both products' well-known brand names, DeWalt and Rockwell. *Id.* at ¶¶105-113. The DeWalt trademark is always used in conjunction with the DeWalt trade dress, both on the tool and the packaging. *Id.* at ¶¶105, 106, & 110. Indeed, the DeWalt logo is "designed specifically as a logo, [a] unique graphic entity," and the same graphic entity is always used for the DeWalt name, with two bars each appearing above and below the name. *Id.* at ¶105. Although the packaging for the parties' respective miter saws displays different shades of yellow, each also prominently displays either the DeWalt® brand name or the Rockwell® brand name. *Id.* at ¶¶110-113.

Indeed, this Circuit has long held that prominent display of the manufacturer's name can obviate likelihood of confusion. *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc*., 94 F.3d 376, 383 (7th Cir. 1996) ("in the case of a high-priced, single-purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product"); *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 637 (7th Cir. 1999) (citing *Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir. 1963)) ("The most common and effective means of

---

ever employed a yellow and black color scheme as trade dress. SUMF ¶107 & 109. Though no longer on the market as of the date of filing of the Complaint, the primary color of Positec's miter saw was "military green," with black and yellow used merely as accent colors. *Id.* at ¶107. In particular, the color yellow was a "safety feature designed to alert the user to the location of certain moving mechanical parts of the device." *Id.* Likewise, the predominant color of Positec's JawHorse brand workstation is silver, with the use of yellow and black once again a functional characteristic; yellow is used as a safety feature, and black is used to "distinguish other functional moving parts of the device." *Id.* at ¶109. The color yellow is typically used as a functional color in power tools as a safety feature, and B&D admits that the color "black" is prevalent in other power tools. *Id.* at ¶103. Accordingly, B&D's trade dress claims – overly broad and unfocused as they are -- cannot be deemed to extend to any uses of the color "yellow" and/or "black" anywhere on all power tools, especially when such use is functional. Functional usage cannot operate as protectable trade dress, and so presents no issue of infringement.

apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name ... [and when] that is done, there is no basis for a charge of unfair competition").  Indeed, in a similar situation, this court has found no likelihood of confusion when two parties trade dress were similar, if not identical, except for "a significant exception" in which the parties' respective company names were embossed on their couplers:  "[t]his labeling provides a strong indication that there is no likelihood of confusion."  *Minemyer v. B-Roc Representatives, Inc.,* 678 F. Supp. 2d 691, 708 (N.D. Ill. 2009).  This was true even when the company names were not legible from a distance; because this is not how the products and trade dress were viewed in the marketplace, there was no confusion.  *Id.*  Likewise, here the parties' brand names are prominently and legibly displayed on both the tools and product packaging for their respective products. SUMF ¶¶105-113.

Positec's product packaging utilizing the "sunburst/distressed" design is also distinguishable from B&D's yellow and black color scheme on product packaging due to its display of a unique and distinctive "distressed look and feel" with an "eye-catching sunburst background."  *Id.* at 111.  Moreover, the packaging uses two different shades of gold, and grayish-green typeface, not black.  *Id.*  These differences, together with the prominent display of the Rockwell mark, enable consumers to distinguish between the Rockwell packaging and DeWalt packaging in the marketplace.

### 2. The Area And Manner Of Concurrent Use Is a Neutral Factor.

Both the DeWalt and Rockwell brand products are sold in major retail stores.  SUMF ¶114.  Nonetheless, this factor is outweighed by the remaining factors that make a likelihood of confusion remote.

35

### 3. Consumers Are Likely to Exhibit Great Care and Are Less Likely To Be Confused.

Another factor analyzed in trade dress infringement is the degree of care consumers exhibit when buying the products. Sophisticated customers, or those who carefully select a product after research, are less likely to be confused by a competitor's trade dress. *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 885 (N.D. Ill. 2008) (citing *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1217 (7th Cir.1997)).

B&D claims that its products at issue here are high-end, targeted primarily to professionals, and its survey is premised on sales to serious do-it-yourselfers as well. SUMF ¶¶116 & 124. A purchaser of B&D's products would be unlikely to buy on a whim. *Id.* at ¶116. It is more likely that the purchaser would research the product before buying, *id.*, or at least seek assistance at the place of purchase. It is unlikely, in this context, that a purchaser would be confused by the Rockwell brand miter saw packaging. Even assuming that a purchaser of one of either party's miter saw only exercised ordinary care, rather than the higher level of care expected when purchasing high-cost tools, it is likely that the consumer ultimately would rely on the name brands of the products. *See Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 204 (3d Cir. 1995). Again, if a product and/or product packaging is clearly labeled, a consumer exercising ordinary care should not be confused as to the sources of even similar products. *See id.* As established above, both parties' miter saw packaging is clearly labeled with their name brands, DeWalt and Rockwell.

### 4. B&D's Claimed Trade Dress Is Weakened By Virtue of the Multitude Of Others Using Yellow and Black Color Schemes.

Although normally the strength of the mark usually corresponds to its economic and marketing strength, *see AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008), "strength of

36

trade dress relates in part to its uniqueness." *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 937-38 (7th Cir. 1989). B&D apparently believes it has a monopoly for any tool using a yellow and black color scheme on the tool or related packaging. However, numerous other companies use these colors to identify their products and product packaging. At the time of the filing of the complaint, a total of nine companies owned existing federal trademark registrations for tools, or had an allowed application for tools, where the colors yellow and black were claimed as part of the marks. SUMF ¶102. Three other companies, including B&D's related entity Stanley, owned existing federal trademark registrations for power tools that claimed the colors yellow and black as part of their marks. SUMF ¶102. As such, B&D's claimed trade dress is hardly unique, rather, weak and insufficient to support a claim for trade dress infringement.

### 5. *B&D Has Put Forth No Evidence Of Actual Confusion.*

As discussed above, B&D's expert has produced a survey on likelihood of confusion that is highly flawed and should be disregarded. The best evidence of a likelihood of confusion is evidence of actual confusion. Though B&D declined to admit (in a Request for Admissions) that there are no instances of actual confusion, B&D has not proffered any evidence of actual confusion, and, indeed has admitted it is not aware of any such instances of actual confusion. *Id.* at ¶119. This absence of actual confusion is "conspicuous." *Pampered Chef, Ltd..,* 12 F. Supp. 2d at 795. The fact that B&D's miter saw packaging coexisted with Positec's miter saw packaging – without actual confusion -- until such time as Positec stopped selling the miter saw is "highly significant." *See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986). The lack of evidence of actual confusion here does not support, and indeed negates, a likelihood of confusion.

### 6. *Positec Has No Intent To Palm Off Its Goods As Those Of B&D.*

The final factor the Court must analyze when determining likelihood of confusion is whether the defendant had any intention to palm off its goods as those of B&D. This Court has held that "the relevant 'intent' is not whether defendant intended to use ideas from another's product for use in his own, but whether he intended to pass his product off as that of another in an effort to free-ride off the other's already developed good will, product recognition and customer loyalty." *Pampered Chef,* 12 F.Supp.2d at 795. When the trademark is "clearly and unequivocally" displayed on the trade dress, it raises serious doubts that the Defendant intends to palm-off its goods or confuse the public. *Id.*

Once again, B&D's claims of trade dress infringement are undermined by Positec's prominent display of the Rockwell brand both on the miter saw and its product packaging. SUMF ¶¶105-113. Not only does this practice differentiate Positec's product from B&D's even as to purchasers who (however unlikely) might exercise ordinary care in purchasing a miter saw, it indicates that Positec has no intent to confuse customers as to the source of its product. There is no evidence of any intention by Positec to palm off its goods or trade dress as those of B&D, and as such, this factor does not support a likelihood of confusion.[10] *Id.* at ¶120.

### 7. *No Likelihood of Confusion.*

Consideration of all of the factors demonstrates that Positec's packaging trade dress does not cause a likelihood of confusion with B&D's trade dress. On balance, the factors do not favor

---

[10] In fact, Positec has submitted evidence clearly showing it had no intention of copying DeWalt's yellow and black colors on power tools because Positec specifically began usage of the "sunburst/distressed" design for product packaging because Positec "wanted to make sure that [the packaging] didn't look like anybody else, that [Positec's] box had a unique look and feel that was different than anybody else in the power tool industry. SUMF ¶120. Other brands, including DeWalt's, were considered only to make sure Positec was "creating [its] own brand and [its] own look" and to ensure no one else could benefit from Positec's marketing efforts. *Id.*

B&D's claim. There is no evidence of actual confusion. B&D's claim should be dismissed on summary judgment.

**V.      SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S DILUTION CLAIM BECAUSE THE CLAIMED TRADE DRESS IS NOT "FAMOUS" AND "DISTINCTIVE" UNDER THE LANHAM ACT.**

Under the Trademark Dilution Revision Act (effective since 2006), an owner of a famous trademark is entitled to relief "against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). A prerequisite is that the allegedly famous mark must be "distinctive, whether inherently or through acquired distinctiveness," even to qualify for such protection. *Id.* Of great importance here, a mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added).

Hence, in a case like this where the alleged mark is trade dress, "famous" and "distinctive" are important gatekeepers in the dilution analysis. Here, both for the product configuration trade dress and the claimed product packaging trade dress, B&D has not established that such claimed trade dress is "famous," nor can it do so. Deposition testimony and expert testimony fail to support such a conclusion. The dilution claim therefore must be dismissed as to all claimed trade dress.

**A.      The Claimed Trade Dress Is Not "Famous" Under The TDRA.**

Notably, the TDRA eliminated protection under federal trademark dilution law for brands that are famous only in an industry-specific or product submarket (commonly referred to as

"niche fame"). *See* H.R. Rep. No. 109-23, at 8 (2005) ("In addition, the legislation expands the threshold of 'fame' and thereby denies protection for marks that are famous only in 'niche' markets"); *Top Tobacco, L.P. v. N. Atl. Operating Co., Inc.*, 509 F.3d 380, 384 (7th Cir. 2007) (statutory change "eliminated any possibility of 'niche fame,' which some courts had recognized before the amendment"); *Plumeus, Inc. v. Intersog LLC*, 13 C 2206, 2013 WL 5609331, *2 (N.D. Ill. Oct. 11, 2013) (Lanham Act's use of the " 'general consuming public' as a benchmark ... eliminated the possibility of 'niche fame' " as a basis for a dilution claim, which is available only for "a mark that has become a household name") (citing *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373-74 (Fed. Cir. 2012)).[11]

Dilution fame is difficult to prove and requires a "stringent showing." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104 at 24-290 (4th ed. 2011) ("The standard for the kind of 'fame' needed to trigger anti-dilution protection is more rigorous and demanding than the 'fame' which is sufficient for the classic likelihood of confusion test"); *see also* 4 MCCARTHY, § 24:104 at 24-286, 24-293 (noting that fame for dilution is "a difficult and demanding requirement" and that, although "all 'trademarks' are 'distinctive'—very few are 'famous' ").

Here, the "fame" that B&D asserts for the yellow and black trade dress is "niche" fame at best (based on brand recognition among power tool consumers), rather than the "household

---

[11] The *Plumeus* court also favorably cited *Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757-59 (S.D.N.Y. 2012) (dismissing trademark dilution claim because plaintiffs had "not alleged facts indicating that the cups', bottles', pacifiers', teething keys', and food containers' trademarks are recognized beyond a niche market, *i.e.,* the baby product market,"), and *Bd. of Regents Univ. of Tex. Sys. v. KST Elec., Ltd.,* 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008) (stating that dilution claims are restricted to "those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls and the like") (citations omitted).

name" degree of brand recognition necessary to find a mark "famous" under the TDRA.[12]  B&D

has alleged that "the DeWalt yellow-and-black color scheme is clearly famous to relevant

consumers <u>in the industry</u>."  SUMF ¶121.  Testimony by B&D personnel speaks of the colors

yellow and black only in the context of such a "niche" market.  *Id.*  Likewise, survey evidence

regarding the claimed yellow and black trade dress is not sufficiently broad to indicate brand

recognition among the general consuming public.  Mr. Berger's "secondary meaning" surveys

(which seek to measure brand recognition among a target group of consumers) did not utilize a

survey universe inclusive of the "general consuming public." *Id.* at ¶124.  Accordingly, the

results cannot suffice to show the claimed trade dress is "famous" for federal dilution purposes

(whether for the miter saw or for product packaging).  The dilution claim thus fails as a matter of

law, both as to B&D's product packaging and product configuration trade dress, because neither

can be characterized as "famous" under the statute.

### B.    The Claimed Trade Dress Is Not "Distinctive" Under The TDRA.

An additional ground for dismissal of the dilution claim is the lack of evidence of

distinctiveness.  Proof of distinctiveness is required not only to succeed on confusion-based

claims (as discussed above) but also to succeed on dilution claims under the TDRA.  The

dilution claim fails as to B&D's asserted trade dress because, as discussed above in the context of

the confusion-based claims, no credible evidence exists of secondary meaning.  In light of the

circumstance that B&D has admitted the trade dress not to be the subject of federal trademark

---

[12] Under the express provisions of the TDRA, B&D cannot impute any fame of the DeWalt brand to the
trade dress at issue here; for allegedly famous marks taking the form of <u>unregistered</u> trade dress, the
plaintiff bears the burden of proving that the trade dress, "taken as a whole" is famous.  15 U.S.C. §
1125(c)(4).  More to the point, to the extent that the DeWalt brand (as a registered mark) is subsumed
within the claimed trade dress (insofar as it appears on packaging), B&D must prove that "the
unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered
marks." *Id.*

registration, the only remaining avenue for proof of secondary meaning with respect to the

yellow-and-black packaging trade dress is trademark surveys. In this regard, Mr. Berger's

secondary meaning survey focused solely on trade dress appearing directly on the tools, and <u>not</u>

the products' packaging, and was otherwise so flawed as to establish secondary meaning for

product configuration trade dress. *Id.* at ¶125. As a result, there is no evidence of record to

support the conclusion that B&D's product packaging is "distinctive" under the TDRA. For this

reason, insofar as distinctiveness is concerned, the TDRA claim likewise fails as a matter of law.

## VI.   SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIM FOR ACTUAL DAMAGES BECAUSE THERE IS NO EVIDENCE OF ACTUAL CONFUSION.

The Seventh Circuit's seminal decision *Web Printing Controls Co., Inc. v. Oxy-Dry

Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990) holds that a plaintiff seeking damages must prove

that a violation of section 43(a) of the Lanham Act "caused actual confusion among consumers

of the plaintiff's product, and, as a result, that the plaintiff suffered actual injury." *Id.* B&D's

claim for damages under the Lanham Act fails as a matter of law because uncontroverted

testimony establishes that there is no evidence that any customers of B&D were actually

confused by Positec's product configuration trade dress or its packaging trade dress. SUMF

¶119.

## VII.  SUMMARY JUDGMENT SHOULD BE GRANTED ON B&D'S CLAIMS FOR ACTUAL DAMAGES AND POSITEC'S PROFITS UNDER THE LANHAM ACT TO THE EXTENT ACCRUING PRIOR TO POSITEC'S RECEIPT OF ACTUAL NOTICE OF THE CLAIMED TRADE DRESS RIGHTS.

To the best of Positec's knowledge, this issue is one of first impression within this

judicial Circuit. Lanham Act § 29 provides that no profits and no damages under the provisions

of the Act shall be recovered by the owner of a registered mark who fails to give statutory notice

of registration (such as the ® symbol) unless the defendant had "actual notice" of the

registration. The premise underlying this provision is that registration provides "constructive notice" of the registered mark in lieu of actual notice. *See* Lanham Act § 22. In such a situation, a potential defendant is in a position to conform its conduct in light of the registration's delineation of the mark and the scope of goods. Logically, then, as to a claim under § 43(a) for unregistered trade dress, the same limitation on remedies should apply, because no constructive notice is possible. That leaves "actual notice" as the only means by which a defendant could have the opportunity to avoid litigation and conform its conduct.

Indeed, B&D has stated that no trademark registrations are involved in this litigation and that their rights arise under common law only. SUMF ¶101. In the absence of registration, there is no presumption of validity and ownership of the asserted trade dress by B&D. It was therefore impossible for Positec to have been placed on constructive notice of such rights prior to receipt of actual notice of B&D's claims (whether by a sufficiently detailed cease and desist letter or the filing of the Complaint). Accordingly, the principle that no damages should be recoverable prior to Positec's receipt of actual notice equally applies. The damages available under Lanham Act § 35(a) for violations of § 43(a) (which specifically includes, as here, claims of "trade dress infringement … for trade dress not registered on the principal register) are "subject to the provisions" of § 29, as well as "the principles of equity." It stands to reason that if a claimed trade dress is unregistered, registration notice cannot be given, but "actual notice" of the claimed trade dress can still be given, and must be given prior to damages accruing. This reading not only makes common sense, but also harmonizes the provisions of Sections 35(a) and 22 and gives effect to the equitable limitations on damages under § 35(a).

Accordingly, B&D's claims for damages should be denied to the extent accruing prior to Positec's receipt of actual notice from B&D of their claimed unregistered trade dress. Especially

where (as here) the trade dress cannot be distinctive and enforceable absent acquired distinctiveness (secondary meaning), a requirement of providing actual notice of the claimed trade dress serves the policy underlying § 29. If B&D desired to establish validity and ownership of the claimed trade dress, it could have sought federal registration. A rule that simultaneously disallows recovery for a registered mark based on lack of notice, yet allows recovery for an unregistered mark despite the same lack of notice, would turn the policy evident in § 29 on its head.[13]

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Court enter Partial Summary Judgment in their favor, namely, that: (1) Positec's Accused Blower does not infringe the '954 Patent; (2) Positec's Accused Edger does not infringe the '376 Patent; (3) in the event liability for patent infringement is found, that the earliest date B&D is allowed to recover any damages for patent infringement is May 24, 2011; (4) B&D's claims for trade dress infringement are dismissed for lack of secondary meaning in the claimed trade dress;[14] (5) B&D's claims for

---

[13] Nonetheless, Prof. McCarthy's treatise concludes that "because the § 29 requirement of notice only applies to registered marks, it is, of course, not a limitation on recovery of damages under a § 43(a) count for infringement of an unregistered mark." 3 McCarthy on Trademarks and Unfair Competition § 19:144 (4th ed.). The only support offered for this contention is an unpublished decision from the Fourth Circuit, *Polo Fashions, Inc. v. J & W Enterprises*, 786 F.2d 1156 (table case), 229 U.S.P.Q. 69, 71 (4th Cir. 1986) (unpublished decision) (cited by Prof. McCarthy for proposition that failure to use the statutory notice has "no relevance whatsoever" to recovery of damages for violation of Lanham Act § 43(a)). More to the point, the Fourth Circuit provides by rule that an opinion will not be published unless it meets specific criteria, and further provides that citation of unpublished dispositions is "disfavored." Fourth Circuit Rules, I.O.P. 36.4, 36.6. The circumstance that the case may have been reported elsewhere does not make it any more reliable. In light of the utter absence of reliable authority, Prof. McCarthy's treatise, which fails to take account of all the relevant Lanham Act provisions, is entitled to no weight on this issue.

[14] Depending on the Court's findings on the issue of secondary meaning, the court can grant partial summary judgment (1) as to the JawHorse brand workstation (for lack of secondary meaning for B&D's claimed product configuration trade dress), and/or (2) as to the Rockwell brand miter saw (for lack of secondary meaning for B&D's claimed product configuration trade dress); or (3) as to Positec's products sold in the "sunburst/distressed" packaging (for lack of secondary meaning for B&D's claimed packaging

trade dress infringement are dismissed because (even if secondary meaning is proved) Positec's trade dress is not likely to cause confusion;[15] (6) B&D's dilution claim is dismissed because the claimed trade dress is not "famous" and "distinctive" under the Lanham Act; (7) B&D's claim for actual damages is dismissed because there is no evidence of actual confusion; and (8) B&D's claims for actual damages and Positec's profits under the Lanham Act are dismissed to the extent accruing prior to Positec's receipt of actual notice of the claimed trade dress rights.

Respectfully submitted,

/s/ Scot A. Duvall
Henry S. Alford
Scot A. Duvall
Robert J. Theuerkauf
MIDDLETON REUTLINGER
401 S. Fourth Street, Suite 2600
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (fax)
Counsel for Defendants

-and-

J. Aron Carnahan (IL. Bar 6242642)
HUSCH BLACKWELL LLP
120 South Riverside – 22d Floor
Chicago, Illinois 60606
Phone: (312) 665-1500
Facsimile: (312) 655-1501
Local Counsel for Defendants

---

trade dress) excluding the aforementioned workstation and miter saw products to the extent product configuration claims for those goods survive summary judgment.

[15] Depending on the Court's findings on the issue of likelihood of confusion, the Court can grant partial summary judgment (1) as to all of Positec's products sold in the "sunburst/distressed" packaging (given that packaging was not tested in Mr. Berger's likelihood of confusion survey); or (2) as to as to all of Positec's products sold in the "sunburst/distressed" packaging excluding only the Rockwell brand miter saw (the only specific product type included in Mr. Berger's likelihood of confusion survey); and/or (3) as to the JawHorse brand workstation (which is not a type of power tool, hence outside the scope of the likelihood of confusion survey).

<u>**CERTIFICATE OF SERVICE**</u>

  The undersigned certifies that on this 19th day of March, 2014, this Memorandum of Law was filed according to the rules of Electronic Court Filing (ECF) in effect for the Northern District of Illinois – Eastern Division, which ECF system will provide a copy of same to all persons registered to receive service in this case, including but not limited to Raymond P. Niro , Jr., Frederick C. Laney, Joseph A. Culig, and Oliver D. Yang of Niro, Haller & Niro, 181 West Madison Street, Suite 4600, Chicago, Illinois 60602.

        /s/ Scot A. Duvall     
        *Counsel for Defendants*