IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., <br><br> Plaintiffs, <br><br> v. <br><br> POSITEC USA INC. and RW DIRECT, INC. <br><br> Defendants. | Case No. 1:11-cv-05426 <br><br> Judge Robert M. Dow, Jr. <br> Magistrate-Judge Geraldine Soat Brown |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.    LEGAL STANDARD....................................................................................... 1

III.    DEFENDANTS' ACCUSED BLOWER INFRINGES THE '954 PATENT ..................... 2

    A.    A Reasonable Jury Could Find That The "Attachment Member" Claim Limitation Is Literally Present In The Accused Blower ............. 3

        1.    Summary Judgment Cannot Be Based Upon Defendants' Attempt To "Re-Interpret" The Court's Construction of The "Attachment Member" Claim Limitation ................. 3

        2.    The Accused Blower's Blower/Vacuum Tube Fits Around The Fan ........ 6

    B.    A Reasonable Jury Could Find That The "Actuating Means" Claim Limitation Is Present In The Accused Blower ...................................................... 9

        1.    Summary Judgment Cannot Be Based Upon Defendants' Attempt To "Re-Interpret" The Court's Construction Order...................... 9

        2.    The Accused Blower's Safety Interlock Literally Satisfies The Court's Identified Structure For The "Actuating Means" ..................................... 12

        3.    Alternatively, The Accused Blower Also Contains The Structural Equivalent Of The Court's Identified Structure For The "Actuating Means" .................................... 17

IV.    DEFENDANTS' ACCUSED EDGER INFRINGES THE '376 PATENT ...................... 19

    A.    A Reasonable Jury Could Find That The Accused Edger Satisfies The "Radius Increasing Smoothly" Element .............................. 20

    B.    The Accused Edger Literally Satisfies The "Labyrinth Seal" Claim Element ..... 22

V.    PLAINTIFFS ARE ENTITLED TO RECOVER PATENT DAMAGES PRIOR TO MAY 24, 2011 ...................................................... 23

VI.    A REASONABLE JURY COULD FIND THAT BLACK & DECKER'S TRADE DRESS HAS ACQUIRED SECONDARY MEANING.................................................. 25

    A.    Amount And Manner Of Advertising ................................................. 27

    B.    Volume Of Sales .............................................................................. 29

    C.    Length And Manner Of Use ............................................................. 30

    D.    Consumer Surveys .......................................................................... 31

E.     Intentional Copying ........................................................ 32

F.     Unsolicited Media Coverage............................................. 32

G.     The Yellow and Black DeWalt
       Trade Dress Has Obtained Secondary Meaning ..................... 32

VII.   THERE IS SIGNIFICANT EVIDENCE OF
       LIKELIHOOD OF CONFUSION WHICH COULD EASILY LEAD
       TO A REASONABLE JURY VERDICT IN BLACK & DECKER'S FAVOR ............. 33

A.     Survey Evidence Is Not Required To Prove Likelihood Of Confusion............... 33

B.     The Likelihood Of Confusion Factors Favor Black & Decker........................... 34

       1.     Positec's Trade Dress Is Very Similar To Black & Decker's ................... 34

       2.     Similarity Of The Products ........................................................ 38

       3.     The Area And Manner Of Concurrent Use
              Is The Same For Black & Decker And Positec...................................... 38

       4.     Degree Of Care Exercised By Consumers............................................. 38

       5.     The Yellow And Black DeWalt Trade Dress Is Extremely Strong ......... 38

       6.     Actual Confusion .................................................................... 40

       7.     Intent Of Positec .................................................................... 40

C.     If The Court Enters Summary Judgment,
       It Should Be Granted In Favor Of Black & Decker............................... 41

VIII.  DILUTION CLAIM................................................................... 41

IX.    BLACK & DECKER IS ENTITLED TO ACTUAL DAMAGES................................... 42

X.     POSITEC'S ATTEMPT TO LIMIT DAMAGES
       PRIOR TO ACTUAL NOTICE IS FRIVOLOUS
       AND ENTIRELY UNSUPPORTED IN THE LAW ....................................... 42

XI.    CONCLUSION........................................................................... 43

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abbott Labs. v. TorPharm, Inc.*,
    309 F. Supp. 2d 1043 (N.D. Ill. 2004) ...................................................................12

*Acosta v. Target Corp.*,
    281 F.R.D. 314 (N.D. Ill. 2012)...........................................................................25

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)..............................................................................4

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006).............................................................................19

*Artus Corp. v. Nordic Co.*,
    512 F. Supp. 1184 (W.D. Pa. 1981).......................................................................36

*Autozone, Inc. v. Strick*,
    543 F.3d 923 (7th Cir. 2008) ........................................................................ *passim*

*B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.*,
    375 Fed. Appx. 28 (Fed. Cir. 2010).........................................................................7

*Badger Meter, Inc. v. Grinnel Corp.*,
    13 F.3d 1145 (7th Cir. 1994) ...............................................................................33

*Bambu Sales, Inc. v. Sultana Crackers, Inc.*,
    683 F. Supp. 899 (E.D.N.Y. 1988) .......................................................................43

*Becton, Dickinson & Co. v. Tyco Healthcare Group*,
    616 F.3d 1249 (Fed. Cir. 2010).............................................................................16

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996)................................................................................2

*Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*,
    301 F. Supp. 2d 901 (W.D. Wis. 2003) .................................................................30

*Black & Decker Corp. v. Int'l Sales & Marketing*,
    1995 U.S. Dist. LEXIS 20120 (C.D. Cal. May 18, 1995) ................................28, 29

*Black & Decker v. ProTech*,
    26 F. Supp. 2d 834 (E.D. Va. 1998) ................................................................ *passim*

*Brilliant Instruments, Inc. v. GuideTech, LLC,*
    707 F.3d 1342 (Fed. Cir. 2013)................................................................19

*Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,*
    88 F. Supp. 2d 914 (C.D. Ill. 2000) ........................................................42

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
    295 F.3d 1277 (Fed. Cir. 2002)..........................................................4, 10

*Caterpillar Inc. v. Deere & Co.,*
    224 F.3d 1374 (Fed. Cir. 2000)................................................................18

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.,*
    723 F.3d 1376 (Fed. Cir. 2013)................................................................19

*Chattanooga Mfg., Inc. v. Nike, Inc.,*
    140 F. Supp. 2d 917 (N.D. Ill. 2001) ................................................29, 32

*Construction Tech., Inc. v. Cybermation, Inc.,*
    965 F. Supp. 416 (S.D.N.Y. 1997) ....................................................10, 11

*Cordis Corp. v. Boston Sci. Corp.,*
    561 F.3d 1319 (Fed. Cir. 2009)..................................................................6

*Crown Packaging Tech. Inc. v. Rexam Beverage Can Co.,*
    559 F.3d 1308 (Fed. Cir. 2009)................................................................24

*Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc.,*
    429 F.3d 1043 (Fed. Cir. 2005)..................................................................6

*Dorr-Oliver v. Fluid-Quip,*
    94 F.3d 376 (7th Cir. 1996) ..............................................................36, 37

*Dunkin' Donuts, Inc. v. Towns Family, Inc.,*
    1996 U.S. Dist. LEXIS 7982 (N.D. Ill. June 5, 1996) ............................42

*Eazypower Corp. v. ICC Innovative Concepts Corp.,*
    2002 U.S. Dist. LEXIS 20023 (N.D. Ill. Oct. 18, 2002).........28, 29, 33, 41

*Ethicon Endo-Surgery, Inc. v. Hologic, Inc.,*
    689 F. Supp. 2d 929 (S.D. Ohio 2010) ....................................................25

*Facebook, Inc. v. Teachbook.com LLC,*
    819 F. Supp. 2d 764 (N.D. Ill. 2011) ..............................................34, 35, 40, 41

*Fortinet, Inc. v. Palo Alto Networks, Inc.,*
    753 F. Supp. 2d 1024 (N.D. Cal. 2010) ..................................................16

*Games Workshop Ltd. v. Chapterhouse Studios LLC*,
2012 U.S. Dist. LEXIS 168360 (N.D. Ill. Nov. 27, 2012)....................................................41

*Global Traffic Techs., LLC v. Emtrac Sys., Inc.*,
946 F. Supp. 2d 884 (D. Minn. 2013).......................................................................25

*Greenwich Indus., L.P. v. Specialized Seating, Inc.*,
2003 U.S. Dist. LEXIS 5940 (N.D. Ill. Apr. 9, 2003) ......................................29, 32

*Health O Meter Inc. v. Terraillon Corp.*,
873 F. Supp. 1160 (N.D. Ill. 1995) ...........................................................................32

*Heraeus Electro-Nite Co. v. Midwest Instrument Co.*,
2007 U.S. Dist. LEXIS 84408 (E.D. Pa. Nov. 14, 2007).........................................25

*Hugunin v. Land O'Lakes, Inc.*,
2014 U.S. Dist. LEXIS 35788 (N.D. Ill. Mar. 19, 2014)..........................................42

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) .................................................................................35

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003)................................................................................16

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005).................................................................................15

*K-Tec, Inc. v. Vita-Mix Corp.*,
2010 U.S. Dist. LEXIS 33813 (D. Utah Apr. 6, 2010),
*aff'd*, 696 F.3d 1364 (Fed. Cir. 2012) ..................................................................7, 8

*K-Tec, Inc. v. Vita-Mix Corp.*,
729 F. Supp. 2d 1312 (D. Utah 2010)........................................................................8

*In re Katz Interactive Call Processing Patent Litig.*,
882 F. Supp. 2d 1123 (C.D. Cal. 2010) ....................................................................24

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010)..................................................................................6

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
285 F.3d 1353 (Fed. Cir. 2002)..................................................................................7

*Lexion Med., LLC v. Northgate Techs., Inc.*,
618 F. Supp. 2d 896 (N.D. Ill. 2009) .........................................................................2

*Lucent Techs., Inc. v. Microsoft Corp.*,
544 F. Supp. 2d 1080 (S.D. Cal. 2008)......................................................................19

*Malec v. Sanford*,
191 F.R.D. 581 (N.D. Ill. 2000)........................................................................1

*Martin v. Barber*,
755 F.2d 1564 (Fed. Cir. 1985)..........................................................4, 10, 11, 12

*MCA, Inc. v. Mid-Continent Adjustment Co.*,
1988 U.S. Dist. LEXIS 10502 (N.D. Ill. July 18, 1988).......................................39

*McDonald's Corp. v. McBagel's, Inc.*,
649 F. Supp. 1268 (S.D.N.Y. 1986)..................................................................39

*McGraw-Edison Co. v. Walt Disney Prods.*,
787 F.2d 1163 (7th Cir. 1986) .........................................................................39

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
2014 U.S. Dist. LEXIS 31461 (N.D. Cal. Mar. 5, 2014).........................................6

*Midlock v. Apple Vacations West, Inc.*,
406 F.3d 453 (7th Cir. 2005) ...........................................................................25

*Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*,
685 F.3d 1046 (Fed Cir. 2012)..........................................................................33

*Minemyer v. B-Roc Representatives, Inc.*,
678 F. Supp. 2d 691 (N.D. Ill. 2009) ................................................................29

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986)..........................................................................7

*Morgan Creek Prods., Inc. v. Capital Cities/ABC, Inc.*,
1991 U.S. Dist. LEXIS 20564 (C.D. Cal. Oct. 28, 1991).......................................33

*Nat'l Presto Indus., Inc. v. W. Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996)............................................................................3

*Nesscap Co., Ltd. v. Maxwell Techs., Inc.*,
2007 U.S. Dist. LEXIS 89450 (S.D. Cal. Dec. 5, 2007).........................................19

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999)....................................................................17, 18

*Olde Tyme Foods, Inc. v. Roundy's, Inc.*,
961 F.2d 200 (Fed. Cir. 1992)..........................................................................39

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...........................................................3

*Polo Fashions Inc. v. J&W Enters.*,
229 U.S.P.Q. 69, 786 F.2d 1156 (4th Cir. 1986) ...................................................42

*Powell v. Home Depot U.S.A., Inc.*,
663 F.3d 1221 (Fed. Cir. 2011)......................................................................16, 17

*Qualitex Co. v. Jacobson Prods Co.*,
514 U.S. 159 (1995).............................................................................................26

*Reed-Union Corp. v. Turtle Wax, Inc.*,
869 F. Supp. 1304 (N.D. Ill. 1994) ..........................................................28, 29, 30

*Rust Env't & Infrastructure Inc. v. Teunissen*,
131 F.3d 1210 (7th Cir. 1997) .............................................................................37

*Rutherford v. Trim-Tex, Inc.*,
803 F. Supp. 158 (N.D. Ill. 1992) ........................................................................25

*Samara Bros., Inc. v. Wal-Mart Stores, Inc.*,
165 F.3d 120 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000) ...........36

*Sands, Taylor & Wood Co. v. The Quaker Oats Co.*,
978 F.2d 947 (7th Cir. 1992) ...............................................................................40

*Source Search Techs. LLC v. LendingTree, LLC*,
588 F.3d 1063 (Fed. Cir. 2009).................................................................5, 11, 23

*Spurling v. C & M Fine Pack, Inc.*,
739 F.3d 1055 (7th Cir. 2014) ...............................................................................1

*Stryker Corp. v. Zimmer Inc.*,
2012 U.S. Dist. LEXIS 184380 (W.D. Mich. Nov. 29, 2012)................................25

*Stuart Hall Co., Inc. v. Ampad Corp.*,
51 F.3d 780 (8th Cir. 1995) .................................................................................30

*Thomas & Betts Corp. v. Panduit Corp.*,
138 F.3d 277 (7th Cir. 1998) ..................................................................... *passim*

*Timelines, Inc. v. Facebook, Inc.*,
938 F. Supp. 2d 781 (N.D. Ill. 2013) ...................................................1, 7, 25, 26

*Tulip Computers Int'l B.V. v. Dell Computer Corp.*,
2003 U.S. Dist. LEXIS 5409 (D. Del. Feb. 4, 2003) ............................................24

*Turtle Wax Inc. v. First Brands Corp.*,
781 F. Supp. 1314 (N.D. Ill. 1991) ......................................................................26

- vii -

*Two Pesos v. Taco Cabana,*
   505 U.S. 763 (1992) ...................................................................................26

*Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.,*
   514 F. Supp. 2d 351 (D. Conn. 2007) .....................................................19

*V&S Vin Spirit Aktiebolag v. Cracovia Brands, Inc.,*
   2004 U.S. Dist. LEXIS 17 (N.D. Ill. 2004) .......................................34, 40

*Vaughn Mfg. Co. v. Brinkam International Co.,*
   814 F.2d 346 (7th Cir. 1987) ...................................................................32

*Versata Software, Inc. v. SAP America, Inc.,*
   717 F.3d 1255 (Fed. Cir. 2013)..................................................................6

*VMG Enters. v. F. Quesada & Franco, Inc.,*
   788 F. Supp. 648 (D. P.R. 1992)..............................................................35

*WiAV Solutions LLC v. Motorola, Inc.,*
   732 F. Supp. 2d 634 (E.D. Va. 2010) .......................................................24

*WMH Tool Group, Inc. v. Woodstock Int'l, Inc.,*
   2009 U.S. Dist. LEXIS 125325 (N.D. Ill. Dec. 9, 2009) .......................25

*X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.,*
   155 F. Supp. 2d 577 (E.D. Va. 2001) .......................................................36

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,*
   19 F.3d 1418 (Fed. Cir. 1994)..................................................................12

## Statutes

35 U.S.C. § 287(a) ...........................................................................................24

## Other Authorities

Fed. R. Civ. P. 56(a) ..........................................................................................1

4 *Callmann on Unfair Competition, Trademarks and Monopolies* § 23:79 (4th ed.) ..................42

3 *McCarthy on Trademarks and Unfair Competition*, § 19:144 (4th ed.)....................................42

## I.      INTRODUCTION

Plaintiffs The Black & Decker Corporation, Black & Decker Inc. and Black & Decker (U.S.) Inc. (collectively "Black & Decker") hereby respond to the omnibus motion for summary judgment filed by Defendants Positec USA Inc. and RW Direct, Inc. (collectively "Positec").

Positec's motion as it relates to patent infringement simply re-argues its claim construction position (which this Court already rejected) and ignores the detailed and thorough factual evidence submitted by Black & Decker in this case.  Positec asks the Court to weigh the evidence and resolve genuine issues of material fact, which is clearly improper on summary judgment.

As for the trade dress claims, Positec moves for summary judgment on secondary meaning and likelihood of confusion – two of the most fact intensive issues in any area of the law.  *Autozone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (reversing grant of summary judgment; admonishing that courts must proceed "with great caution" before entering summary judgment in trade dress cases).  Here, where the factual questions of secondary meaning and likelihood of confusion are hotly disputed, summary judgment is improper.

## II.     LEGAL STANDARD

Summary judgment is not appropriate if there are genuine disputes of material fact.  Fed. R. Civ. P. 56(a).  A "material" fact is one that is "pertinent to the outcome of the issues identified in the summary judgment motion."  *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  "In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor."  *Timelines, Inc. v. Facebook, Inc.*, 938 F. Supp. 2d 781, 790 (N.D. Ill. 2013).  "The court does not make credibility determinations or weigh conflicting evidence."  *Id.*  Ultimately, summary judgment should be denied "if a material issue of fact exists that would allow a reasonable jury to find in favor of the non-moving party."  *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014).

### III.    DEFENDANTS' ACCUSED BLOWER INFRINGES THE '954 PATENT

Black & Decker asserts that Positec's Blower Model Nos. WG500, WG500.M3, WG500.M4, WG500.1, WG501, WG502, WG502.1 and WG504/504.1 infringe claims 1, 2, 3, 4, 6, 7, and 10 of the '954 patent.[1]    (Black & Decker's Response to Positec's Statement of Facts ("RSOF") at ¶ 9.)   On summary judgment, Positec only disputes the presence in the Accused Blower of two claim limitations found in claim 1 of the '954 patent –"attachment member" and "actuating means."    Because a reasonable jury could find that both of these claim limitations are present in the Accused Blower, summary judgment of non-infringement must be denied.

Two points need to be clarified at the outset.   ***First***, Positec's motion could be read as limiting the Accused Blower at issue in this case to one specific model number, the WG500.   To be clear, Black & Decker is accusing all of the "Accused Blowers" identified above, which Positec admits are identical to the WG500 for purposes of an infringement analysis. (Memorandum in Support of Positec's Motion Partial Summary Judgment, Dkt. No. 65-1 ("SJ Mem.") at p. 1 n.2; *see also* RSOF ¶ 9.)   Positec's technical expert, David Macarus, likewise identified these models as being essentially the same as the WG500 for purposes of his non-infringement analysis.   (RSOF ¶ 9.)   As such, the "Accused Blower" in this action is <u>not</u> limited to Model WG500 alone.

***Second***, Positec appears to support its non-infringement arguments, albeit subtly, based on the contention that the Accused Blower is "itself patented."   (SJ Mem. at pp. 2-4; RSOF ¶ 39.) However, whether components of the Accused Blower, or the Accused Blower as a whole, are "uniquely designed and…patented" does not absolve Positec of liability:   "[t]he existence of one's own patent does not constitute a defense to infringement of someone else's patent."  *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1559 (Fed. Cir. 1996); *accord Lexion Med., LLC v. Northgate Techs., Inc.*, 618 F. Supp. 2d 896, 901 (N.D. Ill. 2009).   This principle

---

[1] These models are hereafter collectively referred to as the "Accused Blower(s)."

- 2 -

stands regardless of whether the infringement alleged is literal or under the doctrine of equivalents. *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996).

**A.    A Reasonable Jury Could Find That The "Attachment Member" Claim Limitation Is Literally Present In The Accused Blower**

Claim 1 of the '954 patent requires an "attachment member (6, 106) which covers the fan and which is releasably attachable to the housing." (RSOF ¶ 12.) The Court has construed this limitation to mean "a structure that fits around the fan and allows air to enter and exit and that is non-permanently attachable to the housing." (RSOF ¶ 23.) Black & Decker submits that the blower/vacuum tube of the Accused Blower (which Positec refers to as a "duct") is a structure that (1) fits around a fan; (2) allows air to enter and exit; and (3) is non-permanently attachable to the housing of the Accused Blower, and, as such, literally constitutes an "attachment member." (Dkt. 68-12 and 68-13, Defs. Ex. G, Neuhalfen Rpt., ¶¶ 55-56, 59-61; Id., Exhibit E, Fig. 6; Pls. Ex. 1, Neuhalfen Dep. at 63:11-20, 68:24-69:1; Dkt. 68-1, Defs. Ex. A at pp. 6-10 of claim chart.)

**1.    Summary Judgment Cannot Be Based Upon Defendants' Attempt To "Re-Interpret" The Court's Construction of The "Attachment Member" Claim Limitation**

Positec's only noninfringement argument with respect to "attachment member" is that, because the fan of the Accused Blower is contained within its housing (or, in other words, is "unexposed"), the "attachment member" supposedly "cannot fit "around" the fan. (SJ Mem. at pp. 3, 7-8.) However, the Court's interpretation of "attachment member" has absolutely *no* requirement with respect to the exposure or non-exposure of the fan, or with respect to whether multiple attachment members must be used. (RSOF ¶ 23.) Moreover, the "patented device" at issue is defined by the ***claims*** of the '954 patent, as construed by the Court. It is ***not*** defined, as Positec contends, by examples of certain embodiments of the invention shown in the specification of the '954 patent, including embodiments that have two attachment members that fit "around" a fan. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).

- 3 -

Thus, Positec's perceived differences between the embodiments found in the '954 patent and the Accused Blower – for example, the '954 patent's disclosure of multiple attachment members, compared to the Accused Blower's single attachment member, and the '954 patent's disclosure of an "exposed" fan – are ***irrelevant*** to an infringement analysis: "[I]nfringement is to be determined by comparing the asserted claim to the accused device, not by comparing the accused device to the figures of the asserted patent." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002); *see also Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985) (infringement is not determined by comparing the accused device with a preferred embodiment of the patentee's claimed invention). Positec's request for the Court to determine infringement based upon embodiments disclosed in the '954 patent, instead of the actual claim limitations at issue, is an invitation for reversible legal error. *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003) (vacating summary judgment of non-infringement and remanding "so that the court may conduct a proper infringement inquiry in the first instance, comparing the accused device to the properly construed claims without limiting their scope to their examples in the specification or other limitations that are not properly a part of claims 4-9").

Indeed, Positec's own expert, Mr. Macarus, recognized that the "attachment member" claim limitation is not limited based upon the exposure of a fan or the number of attachment members. In opining that claim 1 of the '954 patent is invalid, Mr. Macarus identified three references – Comer, Miner, and Zahuranec – as disclosing the "attachment member" claim limitation. (Pls. Ex. 2, Macarus Invalidity Rpt. at p. 23; Id., Exhibit H at pp. 1-2.) As Mr. Macarus admitted during his deposition, the Comer reference discloses a device that would require multiple attachment members. (Pls. Ex. 3, Macarus Dep. at 221:19-23, 227:23-228:9.) Additionally, according to Positec, the Miner reference allegedly shows a fan that is "unexposed":



(Pls. Ex. 2, Macarus Invalidity Rpt., Exhibit D, Miner Reference, Figure 10 (annotations added), 6:30-64; Id., Exhibit H at pp. 1-2; Dkt. 68-4 to 68-9, Defs. Ex. D, Macarus Rebuttal Rpt., Exhibit D, Fig. D5.)  Mr. Macarus' reliance on these references confirms that satisfaction of "attachment member" does not turn on the exposure of a fan or the number of attachment components.[2]

Positec may argue that its expert's reliance on these references was merely an alternative theory based upon Black & Decker's reading of the Court's claim construction.  (*See, e.g.*, Pls. Ex. 2, Macarus Invalidity Rpt., Exhibit H at p. 2:  "Further, to the extent B&D contends that attaching a structure over an inlet or opening is the same as, or equivalent to, a structure that 'fits around the fan', then the above structure also 'fits around the fan.'").)  But the Federal Circuit has explicitly rejected such an approach.  Positec and its expert cannot accept Black & Decker's construction for invalidity purposes and then ignore this contention for infringement purposes.  *See Source Search Techs. LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) (explaining that "it is axiomatic that claims are construed the same way for both invalidity and

---

[2] In any event, whether the fan in the Accused Blower is exposed is a genuinely disputed issue of fact.  (Pls. Ex. 3, Macarus Dep. at 233:8-234:17 (testifying that even if blades are inside a housing, they are considered "exposed" to the outside); Defs. Ex. G, Neuhalfen Rpt. at ¶¶ 56, 62, 64.)

infringement").  It is an issue of fact (and will require a credibility determination) for the jury to decide which portion of Macarus' testimony to accept, if any, including his reference to "attachment members" having one component and an unexposed fan.

As Positec acknowledges, an infringement analysis involves (1) the legal issue of construing the scope of the claims and (2) the factual issue of comparing the accused device to the properly construed claims.  (SJ Mem. at p. 6.)  The Court has already performed the first step of this analysis.  (Dkt. No. 57, "CC opinion.")  Positec cannot now re-argue the first step of an infringement analysis under the guise of the second step.  *See Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (finding that the district court's preclusion of a party from arguing non-infringement based on the patent's prosecution history was proper); *see also MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 U.S. Dist. LEXIS 31461 at *18-24 (N.D. Cal. Mar. 5, 2014) (striking expert testimony that relied upon the prosecution history and specifications of patents to describe the "plain and ordinary meaning of the patent claim terms").  As such, it is now left to the ***trier of fact*** to determine whether the Court's construction of "attachment member" can be satisfied where the Accused Blower has only one attachment member and a fan that is allegedly unexposed.  *See Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013) (whether the phrase "computer instructions" could include source code was "a pure factual issue"); *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1375-76 (Fed. Cir. 2010) (the parties' dispute over what satisfied previously construed claim term concerned "factual questions relating to the test for infringement and not the legal inquiry of the appropriate scope" of the claim limitation); *Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc.*, 429 F.3d 1043, 1047 (Fed. Cir. 2005) (such factual disputes preclude summary judgment).

### 2.    The Accused Blower's Blower/Vacuum Tube Fits Around The Fan

Black & Decker's technical expert, Dr. Andrew Neuhalfen, has explained in great factual detail – in his expert report, in his deposition, and in claim charts – how the blower/vacuum tube of the Accused Blower fits around the Accused Blower's fan.  (Defs. Ex. G, Neuhalfen Rpt., ¶¶

55-56, 59-61; Id., Exhibit D at pp. 5-9; Pls. Ex. 1, Neuhalfen Dep. at 67:13-68:3, 69:2-70:11, 72:5-9.) This evidence must be accepted as true at this stage of the proceedings, with all inferences from such evidence drawn in favor of Black & Decker. *Timelines*, 938 F.Supp.2d at 790. The Accused Blower is a mechanical device and the asserted claim involves structural elements. As such, Dr. Neuhalfen's expert opinion alone – even if Positec and its expert disagree with it – precludes summary judgment. *See, e.g.*, *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361-62 (Fed. Cir. 2002) (reversing summary judgment where conflicting expert allegations left unresolved factual issues); *B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.*, 375 Fed. Appx. 28, 32 (Fed. Cir. 2010) (vacating summary judgment of invalidity in light of conflicting expert testimony regarding whether a claim element was disclosed by prior art).

Positec attempts to side-step this disputed factual evidence by saying that Dr. Neuhalfen's expert opinion is "conclusory." (SJ Mem. at p. 8.) But nothing could be farther from the truth. In coming to the conclusion that the "attachment member" limitation is satisfied by the blower/vacuum tube, Dr. Neuhalfen reviewed the Accused Blower's Operator Manual; examined and analyzed a physical sample of the Accused Blower; took several photographs documenting his examination and analysis of the Accused Blower; and more. (Defs. Ex. G, Neuhalfen Rpt., ¶¶ 53-56, 59-61; Id., Exhibit E, Figs. 1-18.)

Separately and independently, a reasonable jury could easily find that the Accused Blower satisfies the "attachment member" claim limitation irrespective of Dr. Neuhalfen's expert opinion. Expert testimony is not an absolute prerequisite to a finding of infringement. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986) ("We have never ***required*** a party to proffer expert testimony on claim interpretation or on application of claim language to accused devices." (emphasis in original)); *K-Tec, Inc. v. Vita-Mix Corp.*, 2010 U.S. Dist. LEXIS 33813 at *3-4 (D. Utah Apr. 6, 2010) ("The invention here is not complex. The court does not need expert testimony to assist it in comparing the claims of the K–TEC patents to

- 7 -

the XP Container."), *aff'd*, 696 F.3d 1364, 1374 (Fed. Cir. 2012).[3]   Here, whether a blower/vacuum fits "around" a fan is not an issue of such complexity that expert testimony is ***absolutely necessary*** to determine whether infringement is present.   Indeed, the below images, which show the interaction between the blower/vacuum tube of the Accused Blower and its housing, provide a factual basis upon which a reasonable jury could find that the blower/vacuum tube fits "around" the fan.



(Defs. Ex. D, Macarus Rebuttal Rpt., Exhibit D, Figs. D5, D7, D8; Defs. Ex. G, Neuhalfen Rpt., Exhibit E, Fig. 7.)   Summary judgment is precluded for this additional, independent reason.

---

[3] The *K-Tec* court found literal infringement as to four patent claims, but because the plaintiff elected not to pursue one of those claims at trial, the court later vacated as moot the portion of its infringement ruling with respect to that claim.   *K-Tec*, 2010 U.S. Dist. LEXIS 33813 at *3-4; *K-Tec, Inc. v. Vita-Mix Corp.*, 729 F. Supp. 2d 1312, 1315 (D. Utah 2010).

### B. A Reasonable Jury Could Find That The "Actuating Means" Claim Limitation Is Present In The Accused Blower

Claim 1 of the '954 patent also requires an "actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing." (RSOF ¶ 12.) The Court construed this limitation as a means-plus-function limitation with the following function and corresponding structure:

| Function: | activating the switch only when the attachment member is attached to the housing |
|---|---|
| Structure: | at least one pivot lever and a biasing device and equivalent structures that perform the identified function |

(RSOF ¶ 34.) There is no dispute that the function of the "actuating means" claim limitation is literally performed in the Accused Blower, i.e., the switch of the Accused Blower is activated *only* when the blower/vacuum tube (the attachment member) is attached to the housing. (Defs. Ex. G, Neuhalfen Rpt., ¶ 62; Defs. Ex. D, Macarus Rebuttal Rpt. ¶¶ 54-58; Id., Exhibit D, Figs. D14-17A.) Positec also does not dispute that the Accused Blower contains a biasing device that operates, in part, to perform the identified function, leaving Positec to focus instead solely on the presence of a "pivot lever." (*See, e.g.*, SJ Mem. at p. 12 ("The relevant structure in the Accused Blower, i.e., that structure which activates the motor switch, is neither a pivot lever nor an equivalent[.]").)

Thus, the sole question on summary judgment is whether a reasonable jury could find that the Accused Blower contains "at least one pivot lever and a biasing device" or "equivalent structures" that perform the identified function. Because the answer to that question is unequivocally "Yes," summary judgment of non-infringement must be denied.

### 1. Summary Judgment Cannot Be Based Upon Defendants' Attempt To "Re-Interpret" The Court's Construction Order

As with the "attachment member" claim limitation, Positec once again seeks to improperly narrow the scope of the Court's construction of "actuating means." And, once again, it's arguments fail as a matter of law.

*First*, although the Court already considered the specification in construing the "actuating means" claim limitation, Positec begins its discussion by referencing three embodiments of the safety interlock disclosed in the '954 patent specification. (SJ Mem. at p. 10.) Positec then contends that because the "safety interlock of the '954 Patent does <u>not</u> function by blocking the user-activated slide button," the Accused Blower – which does function by blocking the slide button – supposedly cannot have a structure equivalent to the "at least one pivot lever and a biasing device" set forth in the Court's construction. (Id. at pp. 13-14 (emphasis in original).)

Positec's twisted non-infringement argument improperly relies upon specific preferred embodiments disclosed in the '954 patent, which cannot be used to show (as a matter of law) the alleged absence of a structural equivalent. *See Martin*, 755 F.2d at 1567 ("Infringement, either literal or by equivalence, is determined by comparing the accused device with the claims in suit, not with a preferred or commercial embodiment of the patentee's claimed invention."); *Construction Tech., Inc. v. Cybermation, Inc.*, 965 F. Supp. 416, 431, 434-35 (S.D.N.Y. 1997) (applying the principle of *Martin* to means-plus-function claims); *see also Catalina Lighting*, 295 F.3d at 1286. In other words, the '954 patent's disclosure of mechanisms that may not block a user-activated slide button does not foreclose such mechanisms from being considered to satisfy – either literally or through equivalence – the corresponding structure for the construed "actuating means."

Positec's own expert confirmed that Positec's interpretation of "actuating means" is unduly narrow. Specifically, Mr. Macarus opined that the Zahuranec reference discloses the claimed "actuating means." (Pls. Ex. 2, Macarus Invalidity Rpt., Exhibit H at pp. 3-4.) As Mr. Macarus admitted during his deposition, the Zahuranec reference discloses a device that Positec now says would ***not*** contain the "actuating means" structure: a device with a rocker arm that has a mechanism to block the sliding of a component to activate the switch. (Pls. Ex. 3, Macarus Dep. at 241:15-17, 244:21-245:4, 247:10-15, 249:7-10, 250:9-251:6.) Positec may again argue that this analysis was solely for invalidity purposes, but as already discussed, such an approach violates the long-standing principle that claims are construed the same way for both invalidity

and infringement.  *See Source Search Techs.*, 588 F.3d at 1075.  A reasonable jury could credit the above portion of Mr. Macarus' testimony, and therefore, Positec's motion must be denied based on the admissions of its own expert.

*Third*, Positec appears to contend that the "responsiveness" of the claimed "pivot lever" must be a movement or change in orientation when the attachment member is attached, because such responsiveness allegedly appears somewhere in the specification of the '954 patent.  This contention again attempts to improperly resolve infringement based upon specific embodiments in the '954 patent.  *See Martin*, 755 F.2d at 1567; *Construction Tech.*, 965 F. Supp. at 431, 434-35.  But, more significantly, there is *no* "responsive to the attachment member" requirement that must be satisfied.  In fact, in construing the "actuating means" claim limitation, the Court specifically *rejected* the contention Positec sets forth here:

> [T]he phrase "responsive to the attachment member" does not add the separate function to the means plus function claim.  The Court construes "responsive to the attachment member" to mean that the attachment member and the "actuating means" must interact with one another.  In other words, the "actuating means" will not activate the switch unless the attachment member is attached to the housing, making it "responsive to the attachment member."  The function, therefore, becomes switch activation only when the attachment member is attached to the housing.  This is not the same as the "actuating means" having to accept the attachment member as Positec contends.  The attachment member need only be attached to the housing for the "actuating means" to activate the switch; how it is attached or detached is of no concern for this analysis.  To incorporate into the function how the "attachment member" is attached would define a claim to require more than is actually claimed.  Even if, as Positec argues, this does not claim more than is present, Poistec's [sic] argument requires the Court to import limitations from embodiments in the specification into the claimed function, which the Court will not do.  For these reasons, the function required for the "actuating means" clause in claim 1 is "activating the switch only when the attachment member is attached to the housing."

(CC opinion at pp. 18-19 (internal citations omitted).)  Positec's attempt to import limitations into the "actuating means" claim limitation despite the Court's claim construction to the contrary should be rejected.

*Lastly*, Positec improperly relies upon the structure of *Black & Decker's* own products to support its non-infringement argument.  Positec includes, as statements of undisputed *material*

- 11 -

facts, photographs that purportedly show the "pivot lever mechanism" of Black & Decker's BV2500 when the attachment member is attached or detached, and when the user-activated button is pushed forward. (RSOF ¶¶ 31, 33; *see also* SJ Mem. at p. 11) (see also SJ Mem. at 14 ("[t]he safety interlock of the '954 Patent does <u>not</u> function by blocking the user-activated slide button.") (emphasis in original).)

Once again, Positec's non-infringement analysis invites legal error. The design and operation of products sold by Black & Decker is irrelevant to the Court's infringement analysis: "it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent." *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994); *accord Abbott Labs. v. TorPharm, Inc.*, 309 F. Supp. 2d 1043, 1053 (N.D. Ill. 2004) ("You infringe a claim, not a product[.]"). This principle holds true whether infringement is literal or by equivalence. *Martin*, 755 F.2d at 1567 ("Infringement, either literal or by equivalence, is determined by comparing the accused device with the claims in suit, not with a preferred or commercial embodiment of the patentee's claimed invention.").

Positec's legally erroneous attempt to re-do the first step of the infringement analysis should be rejected, again. As with the "attachment member" claim limitation, it is now for the factfinder to determine whether the Court's construction of the "actuating means" claim limitation is satisfied by the Accused Blower.

### 2. The Accused Blower's Safety Interlock Literally Satisfies The Court's Identified Structure For The "Actuating Means"

The Accused Blower has a safety interlock at the interface where the blower/vacuum tube (i.e., the attachment member) attaches to the housing. (Defs. Ex. G, Neuhalfen Rpt., ¶ 62; Id., Exhibit E, Fig. 9.) When the blower/vacuum tube is detached from the housing, the safety interlock prevents the internal switch of the Accused Blower from being activated to power the motor for the fan. (Defs. Ex. G, Neuhalfen Rpt., ¶ 62.) Conversely, the safety interlock provides that the internal switch of the Accused Blower can *only* be activated when the attachment

- 12 -

member is attached to the housing. (Defs. Ex. G, Neuhalfen Rpt., ¶¶ 57, 63; Pls. Ex. 1, Neuhalfen Dep. at 91:18-24, 102:3-10.)

Specifically, this safety interlock incorporates a pivot lever, a biasing device, and a sliding actuating member. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Id., Exhibit E, Fig. 13.) The pivot lever, which is a mechanism that incorporates a movable bar and an axis, is positioned and oriented on the top portion of the internal switch for the fan motor.[4] (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Id., Exhibit E, Figs. 9, 10; Pls. Ex. 1, Neuhalfen Dep. at 83:15-84:1, 88:15-89:11, 87:3-14, 102:11-14.) The biasing device is positioned and oriented at the base of the latch. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Id., Exhibit E, Fig. 11.) The sliding actuating member has an end that extends downward and is capable of depressing the pivot lever (and thereby activating the internal switch) when the biasing device is in a certain position. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Pls. Ex. 1, Neuhalfen Dep. at 88:24-89:3, 102:3-10.) The pivot lever and biasing device are necessary to properly operate the safety interlock of the Accused Blower. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63.)

When the attachment member, i.e., the blower/vacuum tube of the Accused Blower is detached from the housing, the biasing device is in an "up" position, "blocking" the transverse movement of the sliding actuating member. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Pls. Ex. 1, Neuhalfen Dep. at 99:11-100:1.) As such, the actuating member cannot depress the pivot lever, thereby preventing the pivot lever from activating the internal switch:

---

[4] Positec half-heartedly contends, in a footnote, that Black & Decker should be precluded from making this argument as untimely. (SJ Mem. at p. 12 n.4; RSOF ¶¶ 55-56.) However, Positec's expert fully responded to this exact assertion in his rebuttal report (Defs. Ex. D, Macarus Rebuttal Rpt. at ¶¶ 47-62) and Positec deposed Dr. Neuhalfen at length regarding the alleged "pivot lever." Black & Decker's infringement theory has been thoroughly addressed by both parties in discovery and there is no basis for the draconian exclusion request.



(Defs. Ex. G, Neuhalfen Rpt., Exhibit E, Fig. 11 (annotations added); Pls. Ex. 1, Neuhalfen Dep. at 98:19-99:3.)

However, when the attachment member is <u>attached</u> to the housing of the Accused Blower, a projection on the end of the attachment member interacts with the safety interlock, causing the biasing device to be pushed downward. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63.) The transverse movement of the sliding actuating member is no longer "blocked," and it can be moved such that the contact end of the actuating member depresses the pivot lever to activate the internal switch. (Defs. Ex. G, Neuhalfen Rpt., ¶ 63; Pls. Ex. 1, Neuhalfen Dep. at 102:3-103:6.)



(Defs. Ex. G, Neuhalfen Rpt., Exhibit E, Figs. 13, 14 (annotations added).)  As a result, the pivot lever and the biasing device (along with the sliding actuating member) work together to activate the internal switch in only one instance – when the attachment member is attached to the housing – and thus constitute the structure of the "actuating means" as construed by the Court.[5]  (Defs. Ex. G, Neuhalfen Rpt., ¶¶ 57, 63; Pls. Ex. 1, Neuhalfen Dep. at 91:18-24, 102:3-10.)

In contrast, Positec argues that "the structure that activates the motor switch is a user-activated slide button that slides or moves laterally to activate or deactivate the motor switch" and that this structure does not constitute a pivot lever.  (SJ Mem. at p. 12.)  As Dr. Neuhalfen confirmed, while this "slide button" – which he refers to as a sliding actuating member – aids in performing the identified function, it does not do so alone.  (Defs. Ex. G, Neuhalfen Rpt., ¶¶ 57, 63; Pls. Ex. 1, Neuhalfen Dep. at 91:18-24, 102:3-10.)  This structure operates in conjunction with the "pivot lever and biasing device" that Dr. Neuhalfen has identified in the Accused Blower (Id.), fully supporting a finding of infringement in this case.  *JVW Enters.,* 424 F.3d at 1333-1334.

Positec further contends that Black & Decker's identified "pivot lever" – the toggle or rocker arm found on top of the internal switch – cannot constitute part of the "actuating means." (SJ Mem. at p. 13: "[T]he toggle portion of the switch is not a pivot lever as now alleged by B&D.")  Apparently, Positec contends that because the identified "pivot lever" is allegedly part of the Accused Blower's switch, it cannot "act" on itself to perform part of the identified function, the activation of the switch.  (Id. at pp. 12-13.)  In essence, Positec argues that the

---

[5] The presence of an extra component in the Accused Blower – the sliding actuating member – that aids in performing the identified function does not preclude a finding that the Accused Blower literally contains the corresponding means-plus-function structure.  *See JVW Enters., Inc. v. Interact Accessories, Inc.,* 424 F.3d 1324, 1333-34 (Fed. Cir. 2005) ("[T]he means-plus-function limitation need only read on part of the [accused product] for the [accused product] to infringe[.]"; rejecting argument that accused corresponding structure could not infringe because it could not perform the identified function without additional structure).

"pivot lever" must be a structure entirely separate and apart from the activated "switch."  (Id.)
Such is not the case.

The rocker arm identified by Dr. Neuhalfen as the "pivot lever" is on top of, and separate
from, the ***internal*** switch that actually activates the motor.  (Defs. Ex. G, Neuhalfen Rpt., ¶¶ 62,
63; Pls. Ex. 1, Neuhalfen Dep. at 83:15-23.)  While Positec is free to argue to the jury that the
toggle or rocker arm is integrated into the internal switch and thus infringement is precluded,
such a factual determination is not appropriate on summary judgment, because even if the rocker
arm and the internal switch are considered to be one integrated component, the Federal Circuit
has stated that there is "no reason why, as a matter of law, one claim limitation may not be
responsive to another merely because they are located in the same physical structure."
*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308,
1320 n.9 (Fed. Cir. 2003); *see also Fortinet, Inc. v. Palo Alto Networks, Inc.*, 753 F. Supp. 2d
1024, 1030-31 (N.D. Cal. 2010) (finding that claim language reciting the forwarding of a packet
to a processor did not require the packet to be forwarded from a separate processor).  In other
words, even if the rocker arm and internal switch are considered to be one, integrated physical
structure, the switch limitation of claim 1 is not precluded from being responsive to (or activated
by) something contained in the same physical structure (the "pivot lever").

The Federal Circuit's decision in *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed.
Cir. 2011) is instructive.  In *Powell*, the jury found that the accused saw guard literally infringed
claims that required a "***cutting box*** interior in fluid communication with ***dust collection structure***
for collecting sawdust."  *Powell*, 663 F.3d at 1231 (emphases added).  The plaintiff's
infringement theory for this requirement was that the front half of the accused device's cutting
box met the "cutting box" limitation, and that the rear half of the cutting box met the "dust
collection structure" limitation.  *Id.*  On appeal, the defendant argued that there could be no
infringement because "the terms 'cutting box' and 'dust collection structure' are distinct terms and
can only be infringed by a device that has separate structures corresponding to the distinct claim
elements."  *Id.*  The defendant in *Powell* relied upon *Becton, Dickinson & Co. v. Tyco*

- 16 -

*Healthcare Group*, 616 F.3d 1249 (Fed. Cir. 2010) for this argument, the same precedent Positec relies upon. (SJ Mem. at p. 13.) The Federal Circuit rejected this argument and found that nothing precluded the "cutting box" and the "dust collection structure" from being contained in the same structure. *Id.* at 1231-32.

In other words, the cutting box in *Powell* could be in fluid communication ***with itself***, because one half of the cutting box satisfied the "cutting box" requirement and the other half of the cutting box satisfied the "dust collection structure" requirement. Similarly, Black & Decker's theory of infringement – where the rocker arm on top of the switch is the "pivot lever" that activates the internal switch – is entirely proper and is not precluded as a matter of law. While Positec and its expert unsurprisingly disagree with this theory, this merely creates a hotly contested issue of fact for the jury to decide.

### 3. Alternatively, The Accused Blower Also Contains The Structural Equivalent Of The Court's Identified Structure For The "Actuating Means"

An equivalent structure is one that "performs the claimed function in substantially the same way to achieve substantially the same result" as the Court's identified means-plus-function structure. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Even if the Accused Blower is somehow found <u>not</u> to contain a pivot lever and a biasing device (which it does), the Accused Blower still contains structures that activate the switch only when the attachment member is attached to the housing and that are equivalent to, and insubstantially different from, the construed "at least one pivot lever and a biasing device":

> The components of the safety interlock for the Accused Blower Products also perform the same function, in the same way, to achieve the same result as the claimed "Actuating means", as construed by the Court. The examination of the Accused Blower Product demonstrates that the blower-vacuum device only operates when the attachment member is attached to the housing for the product. The attachment member interacts with the safety interlock when attached to the housing to allow for the motor for the fan to operate. When the attachment member is detached from the housing, the interaction between the attachment member and the safety interlock prevents the exposed fan from operating even when the user may attempt to move the switch to the ON position. The verification of this operation and non-operation of the motor for the fan with respect to the position of the attachment member to the housing of the Accused

- 17 -

> Blower Product was demonstrated during the examination and operation of the Accused Blower Product. The Operators' Manual describes the technique for "STARTING/STOPPING (Fig. D)" the Accused Blower Product. The Operators' Manual states "IMPORTANT: The unit will not run unless the Blower/Vacuum Tube is assembled to the motor housing."

(Defs. Ex. G, Neuhalfen Rpt., ¶ 64.)  These structures include the biasing device, the pivot lever, the switch and the actuating member, which accomplish the very purpose of the '954 patented invention to insure that the motor will not run unless the tube is assembled to the motor housing. (Pls. Ex. 1, Neuhalfen Dep. at 105:4-17.)

To the extent Positec contends that Black & Decker must show an equivalent structure to the "pivot lever" itself (see, e.g., SJ Mem. at p. 13), Positec's argument fails as a matter of law. Where the Court has construed a means-plus-function structure as containing multiple components – as is the case here – it is improper to parse out the components of the construed structure and demand corresponding equivalent structures for each separate component. *Odetics*, 185 F.3d at 1267-68; *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1379-80 (Fed. Cir. 2000) ("[T]he district court conducted an impermissible component-by-component analysis to determine that no reasonable jury could find structural equivalence.").  Thus, in contending that Black & Decker must show a structure equivalent to the pivot lever alone, as opposed to one that is equivalent to the combination of "at least one pivot lever and a biasing device," Positec again attempts to lead this Court directly into reversible error.  *See Odetics*, 185 F.3d at 1263; *Caterpillar*, 224 F.3d at 1380.

Positec also contends "the differences between the mechanism of the Accused Blower, on one hand, and the pivot lever and biasing device of the '954 Patent, on the other are not insubstantial" because "the user-activated slide button on the Accused Blower, unlike that in the '954 Patent, cannot be pushed forward when the duct is not attached because another slide blocks the movement."  (SJ Mem. at p. 15 (emphasis in original); *see also* Id. at pp. 13-14.)  As already discussed, this argument is grounded in an improper attempt to limit the "actuating means" to the preferred embodiments in the '954 patent.  Nonetheless, in light of Dr. Neuhalfen's detailed and

well supported refutation of this factual contention, this issue is genuinely disputed and cannot be resolved on summary judgment.

Recognizing this clearly disputed issue of fact, Positec attempts to attack credibility and weigh evidence by once again proclaiming that Dr. Neuhalfen's expert opinion is "conclusory." (SJ Mem. at pp. 13, 15-16.)  As shown above, it is not, and similar attempts to discount or ignore expert testimony with respect to equivalence have been soundly rejected.  *See, e.g.*, *Lucent Techs., Inc. v. Microsoft Corp.*, 544 F. Supp. 2d 1080, 1090-91 (S.D. Cal. 2008) (rejecting challenge to the sufficiency of expert testimony regarding equivalence and denying motion for summary judgment that structures were not structurally equivalent); *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 514 F. Supp. 2d 351, 371-72 (D. Conn. 2007) (rejecting the "defendant's protestations that the doctrine of equivalents analysis … is conclusory and lacks particularity"); *Nesscap Co., Ltd. v. Maxwell Techs., Inc.*, 2007 U.S. Dist. LEXIS 89450 at *9-15 (S.D. Cal. Dec. 5, 2007) (rejecting defendant's contention that an expert's declaration was conclusory; finding summary judgment on the issue of equivalence inappropriate "[b]ased on [the] competing expert opinions").

Indeed, the Federal Circuit has repeatedly reversed or vacated summary judgment findings of non-infringement where a party has submitted expert testimony, such as Dr. Neuhalfen's, that provides evidence of equivalence.  *See, e.g.*, *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1379-80 (Fed. Cir. 2013); *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347-48 (Fed. Cir. 2013); *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1335-37 (Fed. Cir. 2006).  As such, Positec's arguments regarding the nature of Dr. Neuhalfen's expert opinion should be disregarded at this stage of the proceedings, requiring denial of its summary judgment motion.

## IV.    DEFENDANTS' ACCUSED EDGER INFRINGES THE '376 PATENT

Only one of the three patents asserted against Positec's Accused Edger, the '376 Patent, is the subject of Positec's motion for summary judgment. In particular, Positec argues that the Accused Edger does not infringe independent claims 1 and 18 because it allegedly lacks the

required " radius increasing smoothly," and that the Accused Edger does not infringe independent claims 9 and 18 because it allegedly lacks the claimed "labyrinth seal." But, in making these arguments, Positec relies on claim construction arguments that have already been rejected by this Court, and ignores key facts.

### A. A Reasonable Jury Could Find That The Accused Edger Satisfies The "Radius Increasing Smoothly" Element

Independent claim 1 requires a power edger housing assembly having a "confronting portion being defined by a radius …[,] the radius increasing smoothly from the leading end to the trailing end." Similarly, claim 18 requires a power edger housing assembly having a "confronting portion being defined by a radius that increases smoothly in the rotational direction." This limitation has been construed by the Court as follows: "the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." (CC opinion, p. 31).

Applying the Court's construction, Black & Decker's expert, Dr. Neuhalfen, determined that the Accused Edger's confronting portion clearly satisfies the smooth increase requirement of claims 1 and 18. (Defs. Ex. G, Neuhalfen Report, ¶85 and ¶114). Dr. Neuhalfen's factual conclusion is based in part on measurements of the radius at the leading and trailing ends of the confronting portion, which show that "[t]he radius at the leading end of the confronting portion is less than the radius of the trailing end of the confronting portion." (Id. at ¶86). Furthermore, Dr. Neuhalfen confirmed that the increase in the Accused Edger's confronting portion is "smooth" because "[t]here [are] no discontinuities nor inflections in the radius of the confronting portion from the leading end of the confronting portion to the trailing end of the confronting portion." (Id.). And, "[a]lthough[] the shape of the confronting portion comprise[s] varying curved sections and straight sections, the radius of the confronting portion increase[s] smoothly from the leading end to the trailing end of the confronting portion. The radius of the confronting portion [does] not exhibit abrupt changes." (Id.).

The following image shows the confronting portion of the Accused Edger, which a reasonable jury could find to increase smoothly:



(Defs. Ex. G, Neuhalfen Report, Figure 36.)   Thus, a reasonable jury could rely on Dr. Neuhalfen's application of the plain and ordinary meaning of "increasing smoothly" to find that the Accused Edger infringes claims 1 and 18.  Positec's motion for summary judgment must accordingly be denied.

Positec also erroneously points to a small decreasing portion at the very front of the radius as allegedly removing the Accused Edger from the scope of claims 1 and 18. However, Positec's argument is based on an interpretation of the claim language which has been specifically rejected by this Court. In particular, Positec's proposed construction for the "increasing smoothly" limitation was a radius which "increases in a continuous and consistent manner." The Court declined to adopt Positec's "consistent" increase, finding that "it is simply wrong to assert that a smooth increase must also be a consistent increase." (CC opinion, p. 30). Instead, the Court "agree[d] with Black & Decker that 'increasing smoothly' does not require construction." (CC opinion, p. 30). Furthermore, the Court addressed Positec's argument, finding that a discontinuity or decrease "**may** prevent it from being smooth," (Id.) (emphasis added). Notably, the Court did not find that any discontinuity or decrease necessarily precludes the

radius from increasing smoothly as a matter of law; thus, the application of the plain and ordinary meaning is a classic question of fact for the jury.

### B. The Accused Edger Literally Satisfies The "Labyrinth Seal" Claim Element

Claims 9 and 18 are directed to an edger having a "labyrinth seal." The Court construed the term to mean "a tortuous engagement that inhibits dust and debris from exiting the housing assembly." (CC Opinion at 33). The Court clarified that the term "tortuous" signifies that the seal is "a 'labyrinth seal' as opposed to some other type of engagement of projections." (CC Opinion at 33). Importantly, though, the Court rejected Positec's proposed inclusion of a "tight-fitting" limitation. (CC Opinion at 33).

Despite the Court's rejection of a "tight-fitting" limitation, Positec continues to argue exactly that; namely, that any small gap between the door and the housing is a basis for a finding of non-infringement. In order to literally infringe the "labyrinth seal" limitation, however, the seal of the Accused Edger must merely be "tortuous;" there is no prohibition against a small gap. And the evidence shows that the seal between the door and the housing of the Accused Edger does indeed satisfy the Court's "tortuous" limitation.

For example, Dr. Neuhalfen opined that "[t]he configuration of the engagement of the first and second labyrinth members forms a tortuous engagement that inhibits dust and debris from exiting the housing assembly. The overlapping configuration of the labyrinth members inhibits the flow of dust and debris from [exiting] the housing assembly …" (Defs. Ex. G, Neuhalfen Report at ¶100). During his deposition, Dr. Neuhalfen further explained the factual determination that "[what's] [t]ortuous about it is there is only one particular line of sight that can get through it, but for debris hitting the portion of the confronting portion away from that gap, you still have to get around and travel around the surface and through that opening." (Pls. Ex. 1, Neuhalfen Dep., 154:16-21).

In fact, even Positec's expert Dr. Macarus, acknowledges that a labyrinth seal could have different forms. For example, during his deposition, Dr. Macarus circled the following seals as allegedly disclosing the claimed labyrinth seal limitation:



(Pls. Ex. 4, Macarus Dep. Ex. 2 at p. 130) (handwritten annotations in original; colored annotation added.)

Positec may argue that Dr. Macarus' identification of labyrinth seals was only done in the alternative, even eliciting a statement from Dr. Macarus, at the end of his deposition, that "if they're going to construe [the labyrinth seal] that way, I guess we need to too." (Pls. Ex. 3, Macarus Dep. 263:22 –264:7). But, as explained above, the Federal Circuit has rejected this approach *Source Search Techs.*, 588 F.3d at 1075 ("it is axiomatic that claims are construed the same way for both invalidity and infringement"). In other words, Defendants cannot escape, for infringement purposes, Dr. Macarus' factual identification of the "labyrinth seal" in the prior art.

Thus, based on the opinions and testimony offered by both parties' expert witnesses, there is a sufficient basis on which a reasonable jury could find that the Accused Edger's seal is a "labyrinth seal," as required by claims 9 and 18.

## V. PLAINTIFFS ARE ENTITLED TO RECOVER PATENT DAMAGES PRIOR TO MAY 24, 2011

Where a patentee produces a patented product, notice of patent infringement can be provided by "marking" the product with the patent number or providing actual notice to the

infringer. 35 U.S.C. § 287(a); *Crown Packaging Tech. Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316-17 (Fed. Cir. 2009). Positec concedes that disputed issues of fact exist as to whether Black & Decker gave actual notice to Positec of infringement of the patents-in-suit by May 24, 2011. (SJ Mem. at p. 21 n.7; RSOF ¶¶ 87, 89, 92.) Thus, the "marking" inquiry turns to whether Black & Decker was required to "constructively" give Positec notice of its alleged infringement of the '975 and '376 patents prior to May 24, 2011. Positec's motion fails for two independent reasons.

First, a patentee is only subject to section 287(a)'s marking requirement if its products have been shown by the accused infringer to actually embody inventions of the patents at issue. *See In re Katz Interactive Call Processing Patent Litig.*, 882 F. Supp. 2d 1123, 1142-43 (C.D. Cal. 2010). Black & Decker does not dispute that from 2001-2008, the LE750 and Craftsman edger model 79654 embodied inventions claimed in the '975 and '376 patents. (RSOF ¶ 90.) However, Positec does not provide any evidence that either of these products continued to embody inventions claimed in the '975 and '376 patents from 2008 to 2011, so Black & Decker was <u>not</u> subject to a marking requirement for the '975 and '376 patents during that time period. Black & Decker is accordingly entitled to damages from 2008 through the present, notwithstanding any alleged non-compliance with the marking requirement during other time periods. *See*; *WiAV Solutions LLC v. Motorola, Inc.*, 732 F. Supp. 2d 634, 638-40 (E.D. Va. 2010); *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 2003 U.S. Dist. LEXIS 5409 at *45-63 (D. Del. Feb. 4, 2003).

Second, disputed issues of fact exist because Black & Decker has marked the packaging of the LE750 with respect to the '376 and '975 patents since 2001 through 2012. (RSOF ¶¶ 91, 93, 94.) And, contrary to Positec's contention, Black & Decker did not admit that it failed to continually mark the LE750 for ***all time***. (*See* SJ Mem. at p. 22.) Black & Decker admitted that it did not continually mark the LE750 from 2006 to ***October 2013***. (RSOF ¶ 93.) Because Black & Decker ceased marking the LE750 in 2012 (after Positec already received actual notice), its admission was proper. (Id.) While Positec mistakenly read the admission as indicating non-

- 24 -

continual marking prior to 2008, such a reading *on summary judgment* is improper. *See Timelines*, 938 F. Supp. 2d at 790 (evidence viewed "in a light most favorable to the nonmoving party" and "all reasonable inferences [are drawn] in the nonmoving party's favor").

Positec's argument that marking the LE750 packaging is allegedly insufficient is based upon *Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158 (N.D. Ill. 1992), which interpreted the marking statute over twenty years ago. Numerous subsequent district court opinions have foregone *Rutherford*'s outdate, bright-line rule and have instead found that whether marking on the packaging of a product complied with the marking statute was a factual issue for trial that precluded summary judgment. *See, e.g.*, *Global Traffic Techs., LLC v. Emtrac Sys., Inc.*, 946 F. Supp. 2d 884, 906-07 (D. Minn. 2013); *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 945-46 (S.D. Ohio 2010); *Stryker Corp. v. Zimmer Inc.*, 2012 U.S. Dist. LEXIS 184380 at *7-11 (W.D. Mich. Nov. 29, 2012); *Heraeus Electro-Nite Co. v. Midwest Instrument Co.*, 2007 U.S. Dist. LEXIS 84408 at *8-15 (E.D. Pa. Nov. 14, 2007). And, while *Rutherford* is an opinion from this District, it has no more precedential force than opinions from other district courts. *See Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005) ("But as we have noted repeatedly, a district court decision does not have stare decisis effect; it is not a precedent."); *Acosta v. Target Corp.*, 281 F.R.D. 314, 319 (N.D. Ill. 2012).

For the separate and independent reasons set forth above, Plaintiffs should not be precluded, as a matter of law, from seeking damages at trial for infringement of the '376 and '975 patents prior to actual notice on May 24, 2011.

## VI. A REASONABLE JURY COULD FIND THAT BLACK & DECKER'S TRADE DRESS HAS ACQUIRED SECONDARY MEANING

The determination of secondary meaning is an ultimate question of fact, based upon a number of factual underpinnings, including: (a) amount and manner of advertising; (b) volume of sales; (c) length and manner of use; (d) consumer surveys; (e) intentional copying; and (f) unsolicited media coverage. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 293 (7th Cir. 1998) (reversing summary judgment of no secondary meaning); *WMH Tool Group, Inc. v.*

*Woodstock Int'l, Inc.*, 2009 U.S. Dist. LEXIS 125325, at *20 (N.D. Ill. Dec. 9, 2009) (denying summary judgment on issue of secondary meaning, which is "highly fact intensive, requiring consideration of multiple factors"); *Black & Decker v. ProTech*, 26 F. Supp. 2d 834, 850-851 (E.D. Va. 1998) (applying secondary meaning factors and finding that "the yellow and black color scheme on the DeWalt line achieved secondary meaning in the minds of professional power tool users by May 1992"). On summary judgment, Positec cannot simply argue that Black & Decker has not shown secondary meaning; it must "demonstrate that no genuine issue of material fact exists" as to secondary meaning. *Timelines*, 938 F. Supp. 2d at 793.

Positec begins with the remarkable statement that "it strains credulity, and basic principles of trademark law, for Black & Decker to assert broad rights in the colors yellow and black" for power tools and power tool packaging (SJ Mem. at 23)[6]. Positec cites *Turtle Wax Inc. v. First Brands Corp.*, 781 F. Supp. 1314 (N.D. Ill. 1991) for the now ***overruled*** proposition that "color alone cannot provide the basis for trade dress protection." *Id.* at 1321. The Supreme Court has unequivocally established that color alone can, in fact, provide the basis for trade dress protection: "We cannot find in the basic objectives of trademark law any obvious theoretical objection to the use of color alone as a trademark, where that color has attained "secondary meaning" and therefore identifies and distinguishes a particular brand (and thus indicates its "source")." *Qualitex Co. v. Jacobson Prods Co.,* 514 U.S. 159, 162-66 (1995); *Two Pesos v. Taco Cabana,* 505 U.S. 763, 764, n. 1 (1992); see also *Black & Decker*, 26 F. Supp. 2d at 850. That Positec was forced to rely on propositions of law which have been overruled by the Supreme Court demonstrates, as much as anything that can be said in response, the weakness of its substantive position.

---

[6]     What strains credulity is Positec's suggestion that a competitor could slavishly copy DeWalt's famous yellow and black color scheme so long as they change the "shade" or "placement" of yellow on the tool. Positec's hypothetical arguments about hypothetical designs are irrelevant – the only issue in this case is whether ***Positec's*** accused products and packaging infringe DeWalt's protectable trade dress rights.

Accordingly, the traditional secondary meaning factors must be analyzed for the factual determination of whether the color combination of yellow and black is associated with the DeWalt line of power tools and associated packaging. As previously held, the fact that the DeWalt yellow and black colors enjoy secondary meaning is truly "beyond debate." *Black & Decker*, 26 F. Supp. 2d at 851. At a minimum, genuine issues of material fact preclude entry of summary judgment in favor of Positec.

### A. Amount And Manner Of Advertising

Since the formal launch of the yellow and black DeWalt line in 1992, Black & Decker's advertising has been sweeping, continuous and massive in scope, with over $150 million spent in the U.S. alone (Pls. Ex. 12, Declaration of Helen Fischer at ¶7-8; Pls. Ex. 13, Declaration of Rory Leyden). In addition to the more conventional nationwide advertising and promotion efforts (color print ads and billboards, attendance at trade shows) the yellow and black family of products has also been promoted in a number of unique ways, including:

- Sponsorship of the "DeWalt" racing team, which competes in NASCAR events nationwide, racing a car painted in the DeWalt yellow and black colors;

- Sponsorship of "DeWalt Challenge" competitions nationwide in which professionals compete in tests of skill and accuracy using DeWalt tools;

- Training seminars to employees of retailers, such as Lowe's and Home Depot, to help them inform their retail customers about DeWalt products;

- Sent groups of sales representatives in DeWalt color jackets (driving vans with the DeWalt colors) to perform sales demonstrations on job sites, in stores and at sporting events where DeWalt teams were in competition;

- Conducted nationwide merchandising of jackets and the like, all utilizing the DeWalt colors;

- Provided DeWalt sales support for stores, such as banners and other in-store promotional items;

- Used a semi-trailer traveling demo unit to help promote sales of the DeWalt product line.

(Pls. Ex. 12, Fischer Decl. at ¶8; Pls. Ex. 13, Leyden Decl. at ¶ 10, 19-20). The $150 million spent by Black& Decker to advertise and promote the yellow and black DeWalt trade dress

dwarfs the amounts found sufficient in other cases.  See e.g. *Eazypower Corp. v. ICC Innovative Concepts Corp.*, 2002 U.S. Dist. LEXIS 20023 at *19-22 (N.D. Ill. Oct. 18, 2002) (denying summary judgment where $1 million spent on advertising with $3.9 million in sales, even though plaintiff presented no "consumer testimony or consumer surveys").

Importantly, the Seventh Circuit has established that advertising should be considered as evidence of secondary meaning, regardless of whether the asserted trade dress is "specifically pointed out in the advertising." *Thomas & Betts,* 138 F.3d at 292 (although plaintiff's ads did not say "look for the [asserted trade dress]" they still could function to create association of the trade dress with Plaintiff, holding that such an issue "is a question of fact which cannot be resolved on summary judgment").  Here, however, it is not only the staggering ***amount*** of advertising of DeWalt's yellow and black products, but also the ***type*** of advertising that supports a finding of secondary meaning.  For example, Black & Decker ran a national series of advertisements for a "DeWalt ***yellow and black*** payback" promotion (Pls. Ex. 14).  For every dollar spent on DeWalt "yellow and black" tools or accessories, consumers would earn points which could be exchanged for rewards in the "yellow and black payback" program.  These ads prominently display the yellow and black DeWalt power tools, ***as well as the yellow and black boxes and packaging for the tools*** (Id.).  Still further the print ads for DeWalt consistently and repeatedly state that the colors yellow and black are a trademark of Black & Decker (Pls. Ex. 15: "the following are examples of trademarks for one or more DEWALT power tools and accessories: the yellow and black color scheme …"; Pls. Ex. 12, Fischer Decl. at ¶9).

The amount and manner of advertising strongly favors a finding of secondary meaning in this case.  *See, e.g.*, *Reed-Union Corp. v. Turtle Wax, Inc.*, 869 F. Supp. 1304, 1309 (N.D. Ill. 1994) (finding that advertisements "on television for fifteen years with expenditures of over one million dollars each of those years" contributed to finding of secondary meaning); *Black & Decker Corp. v. Int'l Sales & Marketing*, 1995 U.S. Dist. LEXIS 20120 at *7 (C.D. Cal. May 18, 1995) ("*Int'l Sales*") ("Finally, the Court finds that the enormous volume of sales of Black & Decker's product, as well as the substantial investment in advertising and marketing by Black &

- 28 -

Decker, further supports a finding of secondary meaning."); see also *Greenwich Indus., L.P. v. Specialized Seating, Inc.*, 2003 U.S. Dist. LEXIS 5940 at *10-12 (N.D. Ill. Apr. 9, 2003) (in determining secondary meaning, "the issue of whether [the plaintiff's] advertising convinced consumers is a question of fact that cannot be resolved on summary judgment").

Faced with the overwhelming evidence against it on this factor, Positec is relegated to stating that "courts consider this type of evidence merely circumstantial." (SJ Mem. at p. 25, citing *Minemyer v. B-Roc Representatives, Inc.,* 678 F. Supp. 2d 691 (N.D. Ill. 2009)). Tellingly, Positec added the word "merely" before "circumstantial," and also omitted the very next sentence in the *Minemyer* decision:

> There is nothing wrong with circumstantial evidence, *see Sylvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 903 (7th Cir. 2006), which can even be more certain, satisfying and persuasive than direct evidence.

*Minemyer*, 678 F.Supp.2d at 704. *Black & Decker*, 26 F. Supp. 2d at 851 ("Even circumstantial evidence is admissible to establish secondary meaning."). The "circumstantial" evidence here is indeed "more certain, satisfying and persuasive than direct evidence." *Minemyer*, 678 F.Supp.2d at 704.

### B. Volume Of Sales

Black & Decker has sold over $20 billion dollars in yellow and black power tools (in yellow and black packaging) since introduction in 1992. (Pls. Ex. 12, Fischer Decl. at ¶11.) Positec again says this evidence is "merely circumstantial," ignoring the fact that far less volumes of sales have been found sufficient to create issues of fact on secondary meaning. *Eazypower*, 2002 U.S. Dist. LEXIS 20023 at *20-22 ($3.9 million in sales). And, even "mere" circumstantial evidence of secondary meaning, such as volume of sales, precludes summary judgment in Positec's favor. *See, e.g.*, *Chattanooga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 924 (N.D. Ill. 2001) (question of fact as to whether secondary meaning was attained where plaintiff achieved $16 million in net sales); *Reed-Union Corp*, 869 F. Supp. at 1309 (finding that "remarkable growth" in sales after product's introduction contributed to finding of secondary meaning); *Int'l Sales*, 1995 U.S. Dist. LEXIS 20120 at *7.

- 29 -

### C.    Length And Manner Of Use

In this case, secondary meaning was established soon after the initial launch of DeWalt's yellow and black products in 1992. *Black & Decker*, 26 F. Supp. 2d at 850-851. Positec turns the law on its head by disparagingly stating that the *Pro-Tech* decision was issued "over fifteen years ago" (SJ Mem. at 28), as if that were a bad thing for Black & Decker. To the contrary, the additional fifteen years of usage further *supports* – not negates – a finding of secondary meaning. *Thomas & Betts*, 138 F.3d at 295-96 ("An additional factor that is important in determining secondary meaning, which the district court did not examine, is the time, if any, that T & B continuously and exclusively produced the ovalheaded cable ties. . . . Under the Lanham Act, five years' use weighs strongly in favor of secondary meaning. This evidence has some bearing on the issue of secondary meaning, and it should have been considered by the district court."); *Reed-Union Corp.*, 869 F. Supp. at 1309 (finding that marketing of product over eighteen years contributed to finding of secondary meaning); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, 910 (W.D. Wis. 2003) ("[Plaintiff's] nine-year use is important. Proof of continuous and exclusive use of a mark for five or more years establishes prima facie evidence of secondary meaning"); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789-90 (8th Cir. 1995) ("Although no absolute time span can be posited as a yardstick in cases involving secondary meaning, length and exclusivity of continuous use is a factor bearing on secondary meaning. Stuart Hall's exclusive and continuous use of its trade dress for the period of time that creates a statutory presumption of secondary meaning for trademark registration weighs in favor of a finding of secondary meaning"). It is only common sense that the longer a certain trade dress has been used, the *more* likely it is that consumers associate the trade dress with plaintiff.

Black & Decker's twenty-plus years of continuous, nationwide use of yellow and black on its power tools, power tool accessories, and all related boxes and packaging, with several billions of dollars in sales, clearly favors a finding of secondary meaning. Importantly, the use has also been exclusive, as Black & Decker has successfully enforced its rights for the past two

decades against any third party that used yellow and black on power tools or power tool packaging (see e.g. Pls. Ex. 16-19). At a minimum, genuine issues of fact abound.

### D. Consumer Surveys

Unlike Positec, which conducted no surveys of its own, Black & Decker commissioned a highly regarded market research and survey expert, Mr. James T. Berger, to conduct scientific research studies on both secondary meaning and likelihood of confusion. Mr. Berger used well established survey protocols and determined that there are extremely high levels of consumer recognition of the colors yellow and black with DeWalt, as well as high levels of likelihood of confusion (Defs. Ex. AA). Despite Positec's attacks, at this stage of the proceedings, the Berger surveys must be construed in Black & Decker's favor, raising genuine issues of fact that cannot be resolved on summary judgment:

> While the fact that no ultimate consumers were surveyed may be relevant to determining the weight the survey should be given by the finder of fact, it does not render the 1996 survey meaningless for determining if secondary meaning exists. … The district court's determination that part I of the 1996 survey did not establish secondary meaning or raise any issues of fact because ultimate consumers were not interviewed is therefore incorrect.
>
> * * *
>
> Taking the evidence contained in the 1996 survey in a light most favorable to T & B, questions of fact are raised on the issue of secondary meaning.

*Thomas & Betts*, 138 F.3d at 295. Indeed, all of Positec's quibbling over the Berger surveys go to weight, not admissibility, such as the argument that the respondents were not screened for "color-blind[ness]" (SJ Mem. at 31).[7]

The bottom line is that the levels of recognition demonstrated in the Berger survey (as well as the prior Johnson survey, see Pls. Ex. 20), far surpass the minimum legal threshold for secondary meaning. *Thomas & Betts*, 138 F.3d at 295-6.

---

[7]    Aside from the illogic that a color blind person would secretly complete and submit a survey of this type, the survey still supports a finding of secondary meaning (and likelihood of confusion) even if reduced by the relatively minor percentage of the U.S. population that is actually color blind.

Nonetheless, as set forth in Positec's own case law: "The Seventh Circuit has long held, however, that survey evidence is not required to prove secondary meaning." *Health O Meter Inc. v. Terraillon Corp.*, 873 F. Supp. 1160, 1173 (N.D. Ill. 1995), citing *Vaughn Mfg. Co. v. Brinkam International Co.*, 814 F.2d 346, 349 (7th Cir. 1987). Therefore, irrespective of Black & Decker's survey, there are material questions of fact making summary judgment improper. *Id.*; *cf. Chattanooga*, 140 F. Supp. 2d at 928-30 (despite considering defendant's survey more reliable than plaintiff's survey, questions of fact precluded summary judgment).

### E.     Intentional Copying

With the myriad of potential colors and color combinations to choose from, Positec decided on yellow and black, and presented its products in such a way as to clearly attempt to trade off of Black & Decker's goodwill (Pls. Ex. 21; Pls. Ex. 12, Fischer Decl. at ¶3-6). This heavily supports a finding of secondary meaning in this case.

### F.     Unsolicited Media Coverage

As held in *Pro-Tech*, based upon the same evidence being presented herein:

> As a result of these marketing efforts, the "DeWalt look" quickly took hold in the spring of 1992. Customers remarked that they "loved the yellow tools" and even identified the products as "DeWalt yellow." Newspaper and magazine articles celebrated Black & Decker's success in promoting the DeWalt image, and over twenty marketing awards honored the level of popular recognition that the tools had acquired. The Harvard Business School created a case study on the DeWalt line, and described the new color scheme as a major factor in its success.

*Black & Decker*, 26 F. Supp. 2d at 845 (citations omitted). This factor again supports Black & Decker.

### G.     The Yellow and Black DeWalt
### Trade Dress Has Obtained Secondary Meaning

The aforementioned evidence (billions in sales, $150 million in advertising, over twenty years of exclusive use, survey evidence, intentional copying and unsolicited media coverage) conclusively shows that secondary meaning has been established or, at a minimum, that genuine issues of fact preclude summary judgment on this issue. *See, e.g.*, *Greenwich Indus.*, 2003 U.S. Dist. LEXIS 5940 at *10-14 (finding genuine issues of fact as to secondary meaning where

- 32 -

evidence included over $1 million in advertising and marketing expenses; survey and affidavit evidence showing that consumers associated the product with the plaintiff; and evidence that the product was manufactured for more than 10 years without competition); *Eazypower*, 2002 U.S. Dist. LEXIS 20023 at *19-22 (finding genuine issues of fact as to secondary meaning where the plaintiff claimed that it had used the trade dress at issue for fourteen years; spent $1 million on advertising and promotion; received unsolicited coverage from a third-party periodical; and sales of products totaled at least $3.9 million); *Morgan Creek Prods., Inc. v. Capital Cities/ABC, Inc.*, 1991 U.S. Dist. LEXIS 20564 at *22 (C.D. Cal. Oct. 28, 1991) (finding secondary meaning had been established as a matter of law) ("Plaintiff expended huge amounts of money advertising YOUNG GUNS in a nationwide campaign. The film enjoyed tremendous commercial success both in the theaters and in video sales. The exposure was huge, and the success such that a sequel with the same title was made. The sequel was also commercially successful. There can be no question but that many, many people saw YOUNG GUNS.").  Positec's request for summary judgment must be denied.

## VII.  THERE IS SIGNIFICANT EVIDENCE OF LIKELIHOOD OF CONFUSION WHICH COULD EASILY LEAD TO A REASONABLE JURY VERDICT IN BLACK & DECKER'S FAVOR

### A.  Survey Evidence Is Not Required To Prove Likelihood Of Confusion

In a stunning misapplication of the law, Positec again incorrectly argues that the Court "must dismiss" all of Black & Decker's trade dress claims that are not supported by a likelihood of confusion survey.  (SJ Mem. at 28-33).  Positec makes this assertion, incredibly, without citing a single case in five pages of argument and without informing the Court that its assertion is directly contrary to the controlling legal authorities on this issue.  *See Badger Meter, Inc. v. Grinnel Corp.*, 13 F.3d 1145, 1153 (7th Cir. 1994) (failure to introduce any market survey evidence of likely consumer confusion goes to the weight, and not the sufficiency, of likelihood of confusion evidence); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed Cir. 2012) (citing several Courts of Appeal holdings that supported its conclusion that survey evidence is not required to show likelihood of confusion).

- 33 -

Nonetheless, at this stage of the proceedings, the Court should accept ***Black & Decker's*** interpretation of the survey results, not Positec's:

> Because this case comes before us on [plaintiff's] motion for summary judgment, the Court accepts for present purposes [defendant's] interpretation of the survey results…. At the least, a genuine issue of fact exists as to how the survey results should be interpreted.

*V&S Vin Spirit Aktiebolag v. Cracovia Brands, Inc.*, 2004 U.S. Dist. LEXIS 17 at *12 (N.D. Ill. 2004). The Berger survey was properly conducted and should be considered as persuasive evidence of both secondary meaning and likelihood of confusion.

Even if the Court disregards Black & Decker's survey in its entirety, which would be inappropriate at this stage of the proceedings, there are still numerous genuine issues of fact on the likelihood of confusion factors, making summary judgment inappropriate.

## B. The Likelihood Of Confusion Factors Favor Black & Decker

In determining whether likelihood of confusion exists, the Court should consider several highly fact intensive issues, including: (1) similarity of the trade dress; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care exercised by consumers; (5) strength of plaintiff's trade dress; (6) any actual confusion; and (7) intent of defendant to palm off its product as plaintiff's. *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 779 (N.D. Ill. 2011); *Thomas & Betts,* 138 F.3d at 296 (reversing district court grant of summary judgment of no likelihood of confusion); *Autozone*, 543 F.3d at 929 (reversing district court grant of no likelihood of confusion.

Positec concedes, as it must, that "Black & Decker does not have to prove all six [sic] factors to prevail on a trade dress infringement claim" (SJ Mem. at 33). See also *Facebook*, 819 F. Supp. 2d at 784 ("the seven-factor test requires equitable balancing and not all of the factors need to be present" to prove likelihood of confusion).

## 1. Positec's Trade Dress Is Very Similar To Black & Decker's

The similarity of Positec's trade dress is clearly evident from the photographs themselves demonstrating how the products and packaging appear in the actual marketplace (Pls. Ex. 21;

Pls. Ex. 12, Fischer Decl. at ¶3-6). These photographs accurately show the accused products and were not manipulated in any way (Id.). Positec did not present any photographic or other evidence showing a different layout at retail stores – and even if it did, such evidence would merely raise an issue of fact that cannot be resolved on summary judgment. Positec quibbles over the "shade of yellow" and the supposed use of "military green," which does not change the fact that Positec's yellow and black accused products and packaging are strikingly similar to the yellow and black DeWalt line of products and packaging. (Id.).

Positec next argues (incorrectly) that the use of its Rockwell brand name automatically "obviates likelihood of confusion" in this case (SJ Mem. at 29 n. 8, 33 n. 9 and 34) – an argument squarely rejected by the controlling legal authorities. In *Thomas & Betts*, for example, the Seventh Circuit reversed summary judgment of no likelihood of confusion where the district court focused on the fact that plaintiff's and defendant's products both had "the company's respective name stamped on it." *Thomas & Betts,* 138 F.3d at 296. The Seventh Circuit held:

> This cursory discussion does not remotely fulfill the court's duty to conduct an examination in light of what occurs in the marketplace, and its finding is improper.

*Id.*

Put simply, the inclusion of a brand name or label in connection with an allegedly infringing trademark or trade dress does not preclude a finding of infringement. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988) (use of a house mark in conjunction with an allegedly infringing mark is "a smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's name" because consumers "would necessarily believe that the [plaintiff] had licensed, approved or otherwise authorized the defendants' use of the [plaintiff's] name."); *VMG Enters. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 660 (D. P.R. 1992) ("The fact that the company name is in the package does not generally excuse infringement and might even increase confusion by linking a different house mark to plaintiff's good will, since consumers might think there is a relationship between the parties…. [T]he use of the [defendant's] name in the package may actually *add* to the

confusion." (emphasis in original)); *X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 624 (E.D. Va. 2001) ("[i]f having a company name on the package were dispositive, there could be no packaging trade dress claims"); *Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 128 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000) ("Wal-Mart does argue that its use of its own labels in the garments alerts customers that the garments are not Samara brand. This Court has held that labels alone cannot insulate an infringer."); *Artus Corp. v. Nordic Co.*, 512 F. Supp. 1184, 1190-91 (W.D. Pa. 1981) ("[T]here is no evidence to indicate that the mere presence of the word 'Nordic' on the package avoids the likelihood of confusion. A display of a manufacturer's name is not always dispositive of the issue. A dissimilarity in names will often prove ineffective in preventing confusion caused by the general similarity in appearance of the product.").

The authority cited by Positec regarding "prominent display of the manufacturer's name" is easily distinguishable (SJ Mem. at 34-35). For example, in *Dorr-Oliver*, the clamshell products at issue cost $40,000 each, with a typical customer buying "several clamshells at once, spending hundreds of thousands of dollars" on a single purchase. *Dorr-Oliver v. Fluid-Quip*, 94 F.3d 376, 378 (7th Cir. 1996). These massive transactions were made after "extensive discussions and negotiations" which lasted for "months or even years." *Id.* at 379. The market for the specialty products in *Dorr-Oliver* was limited to only **twelve purchasers** worldwide. *Id.* at 378. The twelve customers were obviously well versed in the differences between the plaintiff's company and defendant. *Id.* at 378-79.

In addition to those unique circumstances (twelve customers buying $40,000 products), the *Dorr-Oliver* decision was also based on the "delicate interplay of the patent and trademark laws in the context of product configurations," because the plaintiff in that case had already "reaped the rewards of its patent on the clamshell for seventeen years, after which time the product passed into the public domain." *Id.* at 383-84. Incredibly, Positec's chopped quotation from *Dorr-Oliver* omitted the critical portion shown in bold italics below:

> ***One way in which courts have avoided the potential conflict between trademark*** ***and patent laws as applied to product configurations is by finding that,*** in the case of a high-priced, single-purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product.

*Id.* at 383 (compare to Positec's SJ Mem. at 34).

The *Dorr-Oliver* decision could hardly be more different than the case before this Court. Here, there are millions of potential customers (not twelve), the products retail for hundreds of dollars (not hundreds of thousands) and the DeWalt yellow and black trade dress is not a product configuration and is not covered by any patent, let alone an expired patent, so there is no "delicate interplay of the patent and trademark laws in the context of product configurations." *Id.* at 384.

Still further, Positec's "brand name" argument fails to address the well established doctrine that "initial interest confusion is also forbidden by the Lanham Act." *Rust Env't & Infrastructure Inc. v. Teunissen, ,* 131 F.3d 1210, 1217 (7th Cir. 1997); *Dorr-Oliver,* 94 F.3d at 382 ("The Lanham Act forbids a competitor from luring potential customers away from a product by initially passing offer its goods as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated."). This type of "initial interest" confusion addresses the unfair situation where a competitor is allowed to "get its foot in the door by confusing customers." *Rust Env't*, 131 F.3d at 1217 (quotations and citation omitted). The manner in which Positec's yellow and black packaging is displayed at retail (at a minimum) leads directly into "initial interest" confusion, given the likelihood that confused customers will at least be "lured" to the accused products from their initial glance at the retail shelves (Pls. Ex. 20, Ohm Decl.; Pls. Ex. 21, Fischer Decl.). The doctrine of initial interest confusion provides a separate, independent basis to deny Positec's motion.

The bottom line is that the accused trade dress is strikingly similar in appearance to the DeWalt trade dress, heavily favoring a finding of likelihood of confusion.

### 2.    Similarity Of The Products

The products at issue here are not only similar, they are identical. Positec uses its accused yellow and black packaging for miter saws and drills, exactly the same products covered by DeWalt's trade dress rights. So, too, for the accused Jaw Horse and miter saw products. This factor significantly favors Black & Decker.

### 3.    The Area And Manner Of Concurrent Use Is The Same For Black & Decker And Positec

Positec admits that "the DeWalt and Rockwell brand products are sold in major retail stores" (SJ Mem. at 35). In fact, they are sold in the same geographic location, in the exact same major retail stores – *even on the same shelves* – to the same customers throughout the United States (Pls. Ex. 21; Pls. Ex. 12, Fischer Decl. at ¶3-6). Without explanation, Positec deems this as a "neutral factor" (SJ Mem. at 35, heading 2). It is not neutral. The factor strongly favors Black & Decker and a finding of likelihood of confusion.

### 4.    Degree Of Care Exercised By Consumers

As indicated above, the products at issue don't sell for $40,000 and are not purchased after years of discussions and negotiations. On the other hand, they are not $2 candy bars in a grocery store checkout display. This factor probably is "neutral," unlike Factor 3, above.

### 5.    The Yellow And Black DeWalt Trade Dress Is Extremely Strong

As previously set forth in detail, the yellow and black colors are associated with DeWalt to the same extent the golden arches are associated with McDonald's. *Black & Decker,* 26 F. Supp. 2d at 851. The asserted trade dress is not only strong, it is famous.

Black & Decker has exclusively used the yellow and black color scheme for its DeWalt products for over twenty years, achieving over $20 billion dollars in sales, $150 million in advertising and promotion, and levels of recognition that have become the subject of case studies (Pls. Ex. 12, Fischer Decl. at ¶7, 11; Pls. Ex. 13, Leyden Decl.; Pls. Ex. 22). Importantly, Black & Decker has been extremely diligent in policing the industry to prevent third parties from entering the power tool industry with yellow and black colors, including attending trade shows

and providing notice to competitors displaying yellow and black power tools, monitoring the online marketplace and successfully filing lawsuits where necessary (see e.g., Pls. Ex. 16-19).

In response to this mountain of evidence, Positec makes a meager showing of a handful of trademark registrations to third parties (SJ Mem. at 37). This "evidence" is legally insignificant in a trade dress infringement analysis because trademark *registrations* do not demonstrate the nature and extent of *actual use* in the marketplace by third parties. *Autozone*, 543 F.3d at 933 (defendant must show the extent to which third party registered marks have been "promoted or become recognized by consumers in the marketplace"); *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986) (finding no evidence that the third-party trademark registrations "are actually used by third parties or that they have been promoted and are recognized by consumers"); *Olde Tyme Foods, Inc. v. Roundy's, Inc.*, 961 F.2d 200, 203-04 (Fed. Cir. 1992) (third-party registrations are given little weight in evaluating likelihood of confusion); *MCA, Inc. v. Mid-Continent Adjustment Co.*, 1988 U.S. Dist. LEXIS 10502 at *20 (N.D. Ill. July 18, 1988) ("Third-party registrations are material in determining the strength of a trademark only to the extent that the similar marks are promoted by their owners or recognized by the consuming public. Neither party has presented any evidence of whether or not these third-party owners promote their use of the marks. A disputed question of fact exists, therefore, as to whether these registrations weaken plaintiff's mark.") (internal citation omitted); *McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1274 (S.D.N.Y. 1986) ("Mere registrations, by themselves, prove neither actual use of any of the marks registered by competitors, nor the degree of competitors' promotion of their marks through advertising."). Moreover, none of Positec's cited registrations are in the area of power tools or packaging for power tools, but rather they relate to hand tools, accessories or pneumatic tools.[8] (Dkt. 66, SUMF ¶ 102).

---

[8]    Obviously, Positec's reference to Stanley as a third party is legally incorrect and irrelevant, because Stanley merged with Black & Decker several years ago to form Stanley Black & Decker; not to mention that Stanley previously offered hand tools and pneumatic tools, not power tools.

The strength of Black & Decker's yellow and black trade dress is beyond serious debate. It overwhelmingly supports a finding of likelihood of confusion or, at a minimum, raises issues of fact that require denial of Positec's summary judgment motion.

### 6.    Actual Confusion

A plaintiff "need not show actual confusion in order to establish *likelihood* of confusion." *Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992) (emphasis in original); *Facebook*, 819 F. Supp. 2d at 781 ("the absence of actual confusion is not fatal to an infringement claim").  However, such evidence of confusion can be presented by "either direct evidence or by survey evidence." *V&S Vin*, 2004 U.S. Dist. LEXIS 17 at *7-8.

Here, Black & Decker's survey evidence demonstrates confusion levels of 47% (Defs. Ex. AA), far above the 8-15% typically found persuasive in a likelihood of confusion analysis. *Id.* at *10-11 (collecting cases).

### 7.    Intent Of Positec

The issue of intent is a classic factual issue not well-suited for resolution on summary judgment.  *See Thomas & Betts*, 138 F.3d at 297 (district court's summary judgment finding on intent was "inappropriate and suggests that the court engaged in weighing of the evidence, which is improper on a motion for summary judgment….   The decision of how much weight such evidence should be given is the province of the fact finder, not the court on a motion for summary judgment.  Similarly, whether [defendant] did all that it can to prevent confusion is an issue that is not properly decided at present [stage of summary judgment."); *Autozone*, 543 F.3d at 934 (intent is issue for trier of fact; reversing district court's summary judgment grant of no likelihood of confusion).

One look at the manner in which Positec's yellow and black products are displayed at retail (Pls. Ex. 21; Pls. Ex. 12, Fischer Decl. at ¶3-6) leaves no question about Positec's intent to cause confusion and benefit from the good will developed by Black & Decker in its DeWalt product line.  Positec had a myriad of other colors and color schemes to choose from.  Its

selection of yellow and black to confuse customers strongly favors a finding of likelihood of confusion. *Id.*

### C. If The Court Enters Summary Judgment, It Should Be Granted In Favor Of Black & Decker

Positec says that "on balance" after "consideration of all of the factors," its motion should be granted. Yet, on summary judgment, it is not this Court's place to weigh the evidence and resolve fact issues and balance the evidence – that is the role of the jury. *Thomas & Betts*, 138 F.3d at 297; *Games Workshop Ltd. v. Chapterhouse Studios LLC*, 2012 U.S. Dist. LEXIS 168360, at *49 (N.D. Ill. Nov. 27, 2012) (denying summary judgment in trademark case despite cross motions by parties "because the factors point in opposite directions, questions of fact, drawing of inference and, and weighing of evidence abound. Summary judgment for either party on the question of likelihood of confusion is therefore inappropriate."). In light of the unanimous sweep of the likelihood of confusion factors in favor of Black & Decker, if summary judgment is entered by the Court, it should be granted in favor of Black & Decker.[9]

## VIII.  DILUTION CLAIM

In order to prove trademark dilution under 15 U.S.C. § 1125(c), Black & Decker must establish that: (1) its mark is famous; (2) Positec's use began after the mark became famous; (3) Positec's use causes dilution of the mark; and (4) Positec's use is commercial and in commerce. *Facebook*, 819 F. Supp. 2d at 785. Positec only challenges the first element, which involves the same type of analysis set forth above in the context of secondary meaning. For the same reasons there are genuine issues of fact on secondary meaning, Positec's request for summary judgment

---

[9]  In a passing footnote, Positec claims that the color yellow is used as a "safety" feature and that "[f]unctional usage cannot operate as protectable trade dress, and so presents no issue of infringement" (SJ Mem. at 33-34 n.9). Positec does not develop this functionality argument, cites no case law and does not request a finding of functionality in its motion (Dkt. 65). See *Eazypower*, 2002 U.S. Dist. LEXIS 20023 at *23 (declining to consider undeveloped functionality claim: "Perfunctory arguments that are unsupported by pertinent authority are waived"). In any event, Positec's functionality argument is frivolous, as shown by the plethora of other power tools in the marketplace that do <u>not</u> use yellow and the number of "safety" colors seen on construction job sites including red, orange, blue, white and green (Pls. Ex. 23).

on dilution must also fail, as the yellow and black mark is clearly famous to the general population:

> This is a "fact-intensive inquiry," *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014), which means that summary judgment will be inappropriate unless "the evidence is so one-sided that there can be no doubt about how the question should be answered." *World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831, 846 (N.D. Ill. 2002).

*Hugunin v. Land O'Lakes, Inc.*, 2014 U.S. Dist. LEXIS 35788 *14-15 (N.D. Ill. Mar. 19, 2014).

## IX. BLACK & DECKER IS ENTITLED TO ACTUAL DAMAGES

As indicated above, Black & Decker's survey evidence is sufficient to demonstrate actual confusion, at least at this stage of the proceedings. Accordingly, Positec's request to limit damages (based on the alleged lack of actual confusion) must fail. Positec also ignores its own willful infringement, which impacts the damage award as well. *Dunkin' Donuts, Inc. v. Towns Family, Inc.*, 1996 U.S. Dist. LEXIS 7982 at *24 (N.D. Ill. June 5, 1996); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 927 (C.D. Ill. 2000).

## X. POSITEC'S ATTEMPT TO LIMIT DAMAGES PRIOR TO ACTUAL NOTICE IS FRIVOLOUS AND ENTIRELY UNSUPPORTED IN THE LAW

Without citing a single case, scholarly article or ***anything*** else, Positec asks this Court to re-write § 29 of the Lanham Act, which specifically sets forth the notice requirements for ***registered*** trademarks only (SJ Mem. at 42-44). Positec tells this Court to add the words "and unregistered marks" to the statute, an argument squarely rejected in the leading treatises on trademark law, as well as the only cases that address this issue: "Because the § 29 requirement of notice only applies to registered marks, it is, of course, not a limitation on recovery of damages under a § 43(a) count for infringement of an unregistered mark." 3 *McCarthy on Trademarks and Unfair Competition*, § 19:144 (4th ed.); *see also* 4 *Callmann on Unfair Competition, Trademarks and Monopolies* § 23:79 (4th ed.) ("statutory notice is irrelevant to claims for infringement of an unregistered mark under § 43(a) of the Lanham Act"); *Polo Fashions Inc. v. J&W Enters.*, 229 U.S.P.Q. 69, 71, 786 F.2d 1156 (4th Cir. 1986) (table) (upholding summary judgment for monetary relief under § 43(a) despite absence of notice under

§ 29); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 912 (E.D.N.Y. 1988) (because "registration is not a prerequisite to" a cause of action under § 43(a), "liability may be found and damages are recoverable regardless of whether the legends provided in § 29 are affixed to the goods.").  If Section 29 is somehow construed to apply to unregistered marks, which is clearly improper under the law, then Black & Decker complied with the "constructive notice" provision by notifying the public in all of its advertising and promotion that the "yellow and black color scheme" is a "trademark of Black & Decker" (see Pls. Ex. 15).  Likewise, the section of the trademark statute addressing incontestability, 15 U.S.C. § 1065, should also apply to Black & Decker's unregistered mark, under Positec's theory.  Positec should not be permitted to pick-and-choose which sections to gratuitously add unregistered marks in with registered marks.

Positec's wholly unsupported attempt to limit damages under § 29 of the Lanham Act should be rejected by this Court.

## XI.    CONCLUSION

Positec's motion should be denied in its entirety.  The motion relies upon incorrect legal arguments and a misapplication of the relevant facts.  Black & Decker requests that this case now be set for trial at the earliest date available on the Court's calendar.

Respectfully submitted,

_____/s/ Raymond P. Niro, Jr._____
Raymond P. Niro, Jr.
Frederick C. Laney
Joseph A. Culig
Oliver D. Yang
NIRO, HALLER & NIRO
181 W. Madison, Suite 4600
Chicago, IL 60602
(312) 236-0733
Fax: (312) 236-3137
RNiroJr@nshn.com; Laney@nshn.com;
JCulig@nshn.com; OYang@nshn.com

Attorneys for Plaintiffs

- 43 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 25, 2014 the foregoing

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

J. Aron Carnahan
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, 22nd Fl.
Chicago, IL 60606
aron.carnahan@huschblackwell.com

Henry S. Alford
Scot A. Duvall
Robert J. Theuerkauf
MIDDLETON REUTLINGER
401 S. Fourth Street
2500 Brown & Williamson Tower
Louisville, KY 40202
HAlford@MiddletonLaw.com
SDuvall@MiddletonLaw.com
RJT@MiddletonLaw.com

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

_____/s/ Raymond P. Niro, Jr._____
Attorneys for Plaintiffs
NIRO, HALLER & NIRO