# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THE BLACK & DECKER
CORPORATION,
BLACK & DECKER INC. and BLACK
& DECKER (U.S.) INC.,

        Plaintiffs,

        v.

POSITEC USA INC. and
RW DIRECT INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 11-cv-5426

Judge Robert M. Dow, Jr.

## MEMORANDUM OPINION AND ORDER

Plaintiffs The Black & Decker Corporation, Black & Decker Inc., and Black & Decker (U.S.) Inc. ("B&D") have sued Defendants Positec USA Inc. ("Positec") and RW Direct Inc. ("RW") for infringement of United States Patent Nos. 5,604,954 ("the '954 patent"), 6,263,975 ("the '975 patent"), 6,612,376 ("the '376 patent"), and 6,926,090 ("the '090 patent"); for trademark infringement under 15 U.S.C. § 1051 *et seq.*; for unfair competition, false designation of origin and trade dress infringement in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a); for dilution of Plaintiffs' trademarks under 15 U.S.C. § 1125(c); and for common law trademark infringement and state law unfair competition.

Before the Court is Defendants' motion for partial summary judgment ("MSJ") [65], which is granted in part and denied in part.[1] More specifically, the Court grants Defendants' motion for partial summary judgment of non-infringement of claims 1, 2-7, and 10 of the '954

---

[1] Plaintiffs' motion for leave to file supplemental declaration [79] is granted in that the Court has reviewed and considered both the declaration and the response thereto [86].

patent and claims 1, 4-8, and 18 of the '376 patent. It denies Defendants' motion for partial summary judgment of non-infringement of claims 9, 10, 13, 14, 16, and 17 of the '376 patent. The Court grants Defendants' motion for partial summary judgment with respect to infringement damages, holding that Plaintiffs may not recover damages arising from the alleged infringement of the '090, '376, and '975 patents prior to May 24, 2011. Lastly, the Court grants Defendants' motion with respect to the trade dilution claim and denies it with respect to the trade dress claims and trade dress damages.

## I.    Background

The Court takes the relevant facts primarily from the parties' respective Local Rule ("L.R.") 56.1 statements.[2] Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The Court carefully reviews statements of material facts and eliminates from consideration any assertions unsupported by the documented evidence or arguments. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004). Where a party has offered a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. It is well-established that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd.*

---

[2] See Defendants' Statement of Undisputed Material Facts ("Defs.' SOF") [66]; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("Pls.' RSOF") [74]; Plaintiffs' Statement of Additional Facts ("Pls.' SOF") [74]; Defendants' Response to Plaintiffs' Statement of Additional Facts ("Defs.' RSOF") [77].

*of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

### A.     Patent Claims

Plaintiffs and Defendants are competing power tool manufacturers.  Plaintiffs allege that Defendants have infringed four of Plaintiffs' patents: the '954, '376, '975, and '090 patents. Defendants move for summary judgment of non-infringement of the '954 and '376 patents. Defendants also move for summary judgment on Plaintiffs' request for infringement damages arising before May 24, 2011.

### 1.     The '954 Patent

The '954 patent, entitled "Blower Vacuum Device," relates to a lawn device that "may be used either in a vacuum mode to suck debris into the device or in a blowing mode to discharge a stream of air so that debris can be blown into piles, ready for collection."  [68-2], '954 patent at 1:2-6.  According to the specification, the aim of the invention is to "provide an improved safety interlock * * * [which] does not allow the fan to be exposed while the motor is running.  The motor has first to be switched off before the attachment member can be unlocked and removed from the housing."  *Id.* at 1:39-40; 1:57-60.

In their Final Infringement Contentions, Plaintiffs contend that Defendants' blower-vacuum model WG500 infringes various claims in the '954 patent.  According to Plaintiffs' subsequent expert reports, Defendants produce other blower-vacuums that also infringe these claims.  See [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶¶ 2, 51; [75-7], Pls. Ex. 5, Gemini Rpt., at ¶ 15; [74], Pls.' RSOF at ¶ 9.  The parties agree that all of these blowers ("Accused Blowers")

are identical for the purposes of the '954 infringement analysis. [65-1], Defs.' MSJ at 1, n. 2; [73], Pls.' Resp. to MSJ at 2.

Plaintiffs allege that the Accused Blowers infringe claims 1, 2-7, and 10 of the '954 patent. Claims 2-7 and 10 depend from and include each of the limitations of claim 1. Defendants move for partial summary judgment of non-infringement of the '954 patent, arguing that no reasonable tier of fact could find that the Accused Blowers embody all elements of claim 1 and therefore the remaining '954 claims at issue. Claim 1 of the '954 patent is an independent claim that reads as follows:

> A blower vacuum comprising:
> a motor (10) operated by a switch (16) and located in a housing (4),
> a fan (14) drivable by a motor,
> at least one attachment member (6,106) which covers the fan and which is releasably attachable to the housing, and
> a safety interlock located at the interface between the housing and the attachment member comprising;
> actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing,
> characterized in that the safety interlock additionally comprises;
> a locking means (54) for locking the attachment member to the housing when the motor is switched on.

'954 patent, 5:41-6:4. Defendants argue that the Accused Blower lacks two elements: first, the "attachment member which covers the fan and which is releasably attachable to the housing" ("attachment member") and, second, the "actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing" ("actuating means").

### a.    Attachment Member

During claim construction, the Court interpreted "attachment member which covers the fan and which is releasably attached to the housing" to mean "a structure that fits around the fan

and allows air to enter and exit and that is non-permanently attachable to the housing." [57], Claim Constr. at 11. The Accused Blowers include an attachable duct ("Accused Duct") that non-permanently connects to the fan housing. Defendants offer the following photographs of the product.



[66], Defs.' SOF at ¶ 42; [68-5], Defs.' Ex. D, Macarus Rpt., 3.



[66], Defs.' SOF at ¶ 43; [68-5], Defs.' Ex. D, Macarus Rpt.,7.



[68-5], Defs.' Ex. D, Macarus Rpt., 4. Defendants offer the photographs to show that when attached to the housing, the Accused Duct falls completely in front of the fan rather than around the fan and that no part of the fan is contained within it. [66], Defs.' SOF at ¶¶ 43-44. They also contend that the photographs show that the fan is unexposed when the Accused Duct is detached. *Id.* at ¶ 42.

In response, Plaintiffs offer an expert report by Andrew Neuhalfen, concluding that when the Accused Duct is detached, the fan is exposed, and when the Accused Duct is attached, it does fit over the fan. [74], Pls.' RSOF at ¶¶ 42, 43 (citing [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶¶ 56, 59, 60, 61). In support of this conclusion, Neuhalfen offers the following photographs:



[68-12], Neuhalfen Rpt., Defs.' Ex. G. at 189, Fig. 3.



[68-12], Neuhalfen Rpt., Defs.' Ex. G. at 189, Fig. 4.



[68-13], Neuhalfen Rpt., Defs.' Ex. G. at 1, Fig. 5.



[68-13], Neuhalfen Rpt., Defs.' Ex. G. at 1, Fig. 6. Neuhalfen additionally provided the following deposition testimony explaining these photographs:

Q: How does the item in figure 6 fit around the fan in the accused device?

A: That circular opening * * * fits around the fan when it's attached to the housing.

Q:  So is it your opinion that the fan goes into the circular opening of that item in figure 6?

A:  It doesn't go into it.  But when you place it, it fits around the fan.

Q:  You would agree, right, that when you attach the item in figure 6 to the housing in figure 3, that all of the item in figure 6 is to the left of the fan? * * *

A:  In that perspective. But when you take a look down the unit, the attachment member is around the fan * * * * the attachment member or the opening would be around the fan." * * *

Q:  * * * When the item in figure 6 is attached to the housing, no portion of the fan is within the item in figure 6, is that accurate?

A:  Yes.

[79-2], Pls.' Ex. 1, Neuhalfen's Dep., at 69:13 – 73:21.

### b.  Actuating Means

The '954 patent includes a "safety interlock located at the interface between the housing and the attachment member."  [68-2], '954 patent at 1:49-59.  The safety interlock comprises, in part, an "actuating means responsive to the attachment member for activating the switch only when the attachment member is attached to the housing."  *Id.* at 1:51-53.  The specification explains the role of the "actuating means" within the larger invention:

> The locking means and the actuating means are preferably responsive to an actuating member on the housing which is operable by a user of the blower vacuum so that movement of the actuating member to a first position causes the actuating means to activate the motor switch and to lock the latch means and movement of the actuating member to a second position causes the actuating means to deactivate the motor switch and to unlock the latch means.

*Id.* at 1:66-67-2:1-6.  In other words, the user cannot activate the motor, and therefore the fan, unless the attachment member is connected to the housing; when the attachment member is disconnected and no longer covers the fan, the safety interlock prevents the fan from spinning, avoiding a hazard to the user.

The Court construed the "actuating means" limitation as a means-plus-function limitation with a function of "activating the switch only when the attachment member is attached to the housing." [57], Claim Constr. at 19. The Court interpreted the corresponding structure to be "at least one pivot lever and a biasing device and equivalent structures that perform the identified function." *Id.* at 24.

The specification of the '954 patent discloses three embodiments of the safety interlock, including the "actuating means." The specification, referring to figures 1 and 2 below, describes the first embodiment as follows:

> The involutes 6, 106 have a lower rim 30, 130 which locates within a longitudinal slot 38 in the housing 4. The involutes 6, 106 also have a catch 40, 140 which locates within a latch 42. The latch 42 is biased by a spring 43 into the position shown in FIGS. 1 and 2, in which the latch is urged upwards to secure the catch 40, 140 and thus the involute 6, 106 to the housing 4 * * * *
>
> In order to activate the motor 10 the switch 16 must be depressed. The switch 16 is depressed by moving the actuating member 50 forward. The actuating member 50 when in its forward position (not shown) depresses a pivot lever 53 which bears against the end of the catch 40, 140 and depresses the switch 16. The actuating member 50 is slidably mounted on the rearward handle 18 in a position where it can be moved forwards and backwards by an operator of the blower vacuum. The pivot lever 53 is pivotably mounted within the housing 4 on a pin 51. A spring 55 biases the pivot lever 53 towards the front face of the housing 4, i.e., towards the left-hand side of the Figure, so that the pivot lever 53 will depress the switch 16 only when the catch 40, 140 urges pivot lever 53 against the action of the spring 55 into the vertical position as shown in FIGS. 1 and 2. Thus, only when the involute 6, 106 is attached to the housing 4 (i.e., only when the catch 40, 140 urges the pivot lever 53 as shown) can the switch 16 be depressed and the motor 10 be activated. When the involute 6, 106, is detached from the housing 4, i.e., when the fan 14 is exposed[,] moving the actuating member 50 forwards will not activate the motor 10 and so the blower vacuum cannot be operated when the impeller 14 is exposed. With the catch 40, 140 removed, the pivot lever 53 is urged by the spring 55 away from the switch 16 into the gap left by removal of the catch 40, 140.
>
> A lock 54 located at the end of the actuating member 50 is urged under a lip 56 of the latch 42 so that the latch cannot be depressed when the actuating member 50 is in its forward position in which the motor is actuated. The motor has to be

deactivated by moving the actuating member 50 to its rearward position as shown in FIGS. 1 and 2 before the latch 42 can be depressed to remove the volute.

[68-2], '954 patent, 3:27-4:7.



*Id.*, Fig. 1.



*Id.*, Fig. 2.

The specification describes the second embodiment as follows, additionally referring to figure 3 below:

> The safety interlock comprises the actuating member 50 which is slidably located in the rearward handle 18 of the blower vacuum. The member 50 can be moved between a forward "on" position and a rearward "off" position. The actuating member 50 has a recess 58 within which is secured a first pin 60.
>
> An upper pivot lever 62 is pivotably secured to a second pivot lever 66 by a second pin 64. The second pivot lever 66 is pivotably secured at its lower end to a plunger 17 of the switch 16. The lower pivot lever 66 is biased by a spring 55 towards the housing wall 68. The catch 40 has a recess 41 at its end which is engageable with the second pin 64 to urge the lower pivot lever 66 against the action of the spring 55.
>
> When the involute 6, 106 is attached to the housing 4 and the actuating member 50 is moved forward to its "on" position, the recess 58 in the actuating member 50 pushes to (*sic*) pin 60 forwards to move the upper pivot lever 62 into a more vertical position. The recess 41 in the catch 40, 140 bears against the second pin 64 and the second lever 66 is pushed downwards to depress the plunger 17 of the switch 16 and the motor is actuated.
>
> When the involute is removed from the housing, pushing the actuating member 50 into its forward position does not actuate the switch 16 because the second pin 64 is not supported by the catch 40, 140 and so the lever 66 is not urged downwards. Instead the spring 55 urges the bottom of the lever 62, the top of the lever 66 and the pin 64 into the gap left by the removal of the catch 40, 140.
>
> Similarly to the devices described in relation to FIGS. 1 and 2, the involute 6, 106 cannot be removed from the housing 4 when the motor is actuated because the lock 54 is held underneath the lip 56 of the latch 42. Thus, the latch 42 cannot be depressed to remove the involute 6, 106.

*Id.*, 4:14-46.



*Id.*, Fig. 3.

The specification describes the third embodiment as follows, referring to figures 4 and 5 below:

The actuating member 50 comprises a recess 58 at its forward end which pivotally carries a first pin 84 which is attached to an L-shaped pivot lever 86. A second pin 88 is attached to the junction of the L-shaped pivot lever 86 and is pivotally and slidably mounted in a slot 90 in the housing 4.

When the involute 6, 106 is attached to the housing 4, the projections 74 urge the second pin 88 along the slot 90 into the position shown in FIG. 4. When the second pin 88 is in this position, movement of the actuating member 50 to the forward position (as shown in FIG. 4) causes the recess 58 to move the pin 84 forward and pivot the L-shaped pivot lever 86 so that it depresses the switch 16 to activate the motor.

When the involute is detached from the housing 4 (FIG. 5), the pin 88 is urged into the position shown in FIG. 5 by the switch 16 which is biased to its off position. Thus, movement of the actuating member 50 to the forward position cannot actuate the switch 16.

Also, when the actuating member 50 is in its forward 25 position as shown in FIGS. 4 and 5, the catch 42 cannot be depressed and so the involute cannot be removed when the motor is running.

A further advantage is that if the hook 70 breaks, the involute 6, 106 will fall away from the housing 4 and with 30 it the projections 74. Thus, the motor will be deactivated should the attachment between the involute 6, 106 and the housing 4 break at its weakest point. This provides a further safety advantage. If the

13

actuating means, i.e. the pivot lever 58 is responsive to an extension 74 of the involute 6, 106 35 which does not bear the main weight or stresses of the releasable attachment between the attachment member and the housing then should the attachment fail in its weakest place, the motor will be deactivated.

*Id.*, 5:6-39.



*Id.*, Fig. 4.



*Id.*, Fig. 5.

At issue at summary judgment is whether the Accused Blowers include a structure ("Accused Structure") that is identical or equivalent to the corresponding structure of the "actuating means" in the specification—that is, "at least one pivot lever and a biasing device and equivalent structures that perform the identified function." [65-1], MSJ at ¶¶ 11-16. In arguing that "actuating means" is literally missing from the Accused Blower, Defendants argue that the Accused Structure lacks the required "pivot lever." Defense expert David Macarus states that it instead "has three slide mechanisms, none of which pivot." [68-4], Defs.' Ex. D, Macarus Rpt., at ¶ 53. Referring to the photograph D14 and D15 below, Macarus describes the Accused Blower's interlock mechanism as follows:

> A first slide is the push button that activates and deactivates, against the bias force of its own spring * * * the catch mechanism for non-permanently attaching the duct to the housing. A second slide is a slide interlock that translates, against the bias of its own spring (see Figures D14-D15) into and out of a blocking relationship with a portion of a third slide, which is a slide button that moves, under operation of a user, from a rearward ("off") position to a forward ("on") position.

*Id.* The following photograph shows the Accused Duct attached and the slide button in the rearward position so that the motor switch is off.



[66], Defs.' SOF at ¶ 49. In the following photograph, the Accused Duct is attached, and the slide button is in the forward position so that the motor switch is on:



*Id.* at ¶ 50. Defendants also offer the following photograph of the Accused Blower with the Accused Duct detached. According to Defendants, this image shows "how contact with the slide interlock prevents the slide button from moving forward" to activate the motor switch.



*Id.* at ¶ 53.[3]

According to Plaintiffs, the toggle portion of the motor switch in the Accused Structure is the "pivot lever." [74], Pls.' RSOF at ¶ 51. Neuhalfen's report states,

> As a person of ordinary skill in the art, I understand that a pivot lever is a mechanism which incorporates a movable bar and an axis. The safety interlock of the Accused Blower Products incorporates at least one pivot lever. The pivot lever in the safety interlock is positioned and oriented on the top portion of the internal switch for the motor for the fan.

[68-12], Defs.' Ex. G, Neuhalfen Rpt. at ¶ 63. Neuhalfen further explains his theory of literal infringement:

> The pivot lever in the safety interlock is positioned and oriented on the top portion of the internal switch for the motor for the fan. The internal switch is connected to the energized conductor of the power cord and to the conductor for the motor. * * * * The pivot lever can only be actuated when the attachment member is attached to the housing. When the attachment member is attached to the housing, a slidable actuating member for the switch is allowed to traverse the pivot lever, and actuate the switch. The safety interlock includes an actuating means that is responsive to the attachment member for activating the switch only when the attachment member is attached to the housing. The sliding contact can only activate the switch when the blower/vacuum tube is attached to the housing.

[68-12], Defs.' Ex. G at ¶ 63.

At issue in the literal infringement analysis is whether the "actuating means" limitation requires a pivot lever that is separate from the switch and whether the toggle is part of or separate from the switch. In addressing the latter point, Neuhalfen described the toggle in the Accused Structure as "the top portion of the switch," answering "yes" when asked if it was "part of the motor switch." [75-1], Pls.' Ex. 1, Neuhalfen Dep. 84:1; see also *id.* at 89:9-11 ("Q: What you've outlined is part of the motor switch, correct? A: It's one component of it, yes."). He also stated that the circuit could not open and close without the toggle. *Id.* at 89: 18-20.

---

[3] Plaintiffs objected to the characterization of the language used in the annotations but do not otherwise dispute the accuracy of these photographs. [74], Pls.' RSOF at ¶¶ 49-50, 53.

In its equivalents analysis, the Neuhalfen report additionally states that the "components of the safety interlock for the Accused Blower Products also perform the same function, in the same way, to achieve the same result as the claimed 'Actuating means', as construed by the Court." [74], Pls.' RSOF at ¶ 59 (citing [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 64). The entirety of the report's equivalents analysis is as follows:

> The examination of the Accused Blower Product demonstrates that the blower-vacuum device only operates when the attachment member is attached to the housing for the product. The attachment member interacts with the safety interlock when attached to the housing to allow for the motor for the fan to operate. When the attachment member is detached from the housing, the interaction between the attachment member and the safety interlock prevents the exposed fan from operating even when the user may attempt to move the switch to the ON position. The verification of this operation and non-operation of the motor for the fan with respect to the position of the attachment member to the housing of the Accused Blower Product was demonstrated during the examination and operation of the Accused Blower Product. The Operators' Manual describes the technique for "STARTING/STOPPING (Fig. D)" the Accused Blower Product. The Operators' Manual states "IMPORTANT: The unit will not run unless the Blower/Vacuum Tube is assembled to the motor housing."

[68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 64.

## 2. The '376 Patent

The '376 patent, entitled "Hinged Edger Housing Improved Internal Debris Guard and Labyrinth Perimeter Seal," relates to the housing assembly for a lawn power edger. The specification describes the invention as:

> A housing assembly for a power edger that includes a housing and a door that is coupled to the housing and movable between an open position and a closed position. When positioned in the closed position, labyrinth seal members that are formed onto the housing and the door engage one another to form a labyrinth seal that inhibits dirt and debris from being expelled from the housing assembly. The housing assembly also includes a guard for shrouding a rotating blade. The guard includes a confronting portion having a leading end and a trailing end. The confronting portion is defined by an increasing radius relative to the rotary axis of the blade.

[68-14], '376 patent, Abstract.

Plaintiffs allege that Defendants' 2-in-1 Lawn Edger Model No. WG895 ("Accused Edger") infringes claims 1, 4-10, 13, 14, and 16-18 of the '376 patent. Of these claims, only claims 1, 9, and 18 are independent. Claims 4 through 8 depend from and include each of the limitations of claim 1. Claims 10, 13, 14, and 17 depend from and include each of the limitations of claim 9. And claim 16 depends from and includes each of the limitations of claim 14. Claim 1 reads as follows:

> A power edger comprising:
> > a power source for providing a rotational output;
> > a blade device coupled to the power source and rotating about a rotary axis in a rotational direction in response to the rotational output of the power source;
> > a housing assembly defining a blade cavity in which the blade device is rotatably mounted, the housing assembly including a guard that is configured to shroud the blade device, the guard having a confronting portion that at least partially surrounds the blade device as it rotates in the blade cavity, the confronting portion being defined by a radius that increases in the rotational direction from a first radius at a leading end of the confronting portion to a second, larger radius at a trailing end of the confronting portion, the radius increasing smoothly from the leading end to the trailing end.

*Id.*, 6:44-60. Claim 9 reads as follows:

> A power edger comprising:
> > a power source for providing a rotational output;
> > a blade device coupled to the power source and rotating in response to the rotational output;
> > a housing assembly configured to shroud the blade device, the housing assembly including a housing and a door, the housing being coupled to the power source, the housing having a wall member and a first labyrinth member, the wall member defining a blade cavity in which the blade device is rotatably mounted, the first labyrinth member being coupled to the wall member and extending around at least a portion of the blade cavity, the door having a wall member and a second labyrinth member, the door being mounted to the housing and movable between an open position, which substantially clears the blade cavity, and a closed position, which closes a portion of the blade cavity;

wherein the first and second labyrinth members engage one another to form a labyrinth seal when the door is placed in the closed position.

*Id.*, 7: 21-40. Claim 18 reads as follows:

A power edger comprising a power source for providing a rotational output, a blade device coupled to the power source and rotating about a rotary axis in a rotational direction in response to the rotational output of the power source, and a housing assembly configured to shroud the blade device, the housing assembly including a housing and a door, the housing being coupled to the power source and having a wall member, a first labyrinth member, and a guard, the wall member defining a blade cavity in which the blade device is rotatably mounted, the guard being coupled to the wall member and having a confronting portion that at least partially surrounds the blade device as it rotates in the blade cavity, the confronting portion being defined by a radius that increases smoothly in the rotational direction from a first radius at a leading end of the confronting portion to a second, larger radius at a trailing end of the confronting portion, the first labyrinth member being coupled to the wall member and being disposed radially outwardly from the guard such that it extends around at least a portion of the blade cavity, the door being mounted to the housing and movable between an open position, which substantially clears the blade cavity, and a closed position, which closes a portion of the blade cavity, the door having a second labyrinth member that is configured to engage the first labyrinth member to form a labyrinth seal when the door is placed in the closed position.

*Id.*, 8:22-47.

Defendants move for partial summary judgment of non-infringement of the '376 patent on two grounds. First, they argue that the confronting portion of the Accused Edger ("Accused Confronting Portion") lacks a "radius that increases in the rotational direction from a first radius at a leading end of the confronting portion to a second, larger radius at a trailing end of the confronting portion, the radius increasing smoothly from the leading end to the trailing end," as required by claims 1 and 4-8. Further to that point, they argue that the Accused Confronting Portion lacks a "radius that increases smoothly in the rotational direction from a first radius at a leading end of the confronting portion to a second, larger radius at a trailing end of the confronting portion," as required by claim 18. Second, Defendants argue that the Accused Edger lacks the "labyrinth seal" limitation of claims 9, 10, 13, 14, 16, 17, and 18.

### a. Radius Increasing Smoothly

In its Claim Construction Order, the Court interpreted "the radius increasing smoothly from the leading end to the trailing end" as "the radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." [57], Claim Constr. Op. at 31. The Court declined to construe "increasing smoothly," rejecting Defendants' proposed construction of "increases in a continuous and consistent manner" for the following reasons:

> Because the sweep is "is not constant, but rather increases," Positec argues that the radius must *continually* increase from the leading to the trail end. And because the radius must be "smooth," Positec asserts that the rate at which it increases must be *consistent*. The Court, however, does not see the basis or benefit of Postitec's proposal. "Smoothly" captures the continuing increase, and changing the term does not clarify the claim. And it is simply wrong to assert that a smooth increase must also be a consistent increase. The rate of increase could be uneven without discontinuities (or a decrease in radius) that may prevent it from being smooth.

*Id.* at 30.

The Accused Confronting Portion includes a section with a decreasing radius[4] and a section that is straight,[5] therefore lacking a radius. [66], Defs.' SOF at ¶ 75; [68-3], Defs.' Ex. C, Neuhalfen Dep., at 133-134; [66], Defs.' SOF at ¶ 76; [68-12], Defs.' Ex. G, Neuhalfen Rpt. at ¶ 86. According to Plaintiffs' expert, the radius at the leading end of the Accused Confronting Portion is less than the radius at its trailing end. [74], Pls.' RSOF at ¶ 76; see [68-12], Defs.' Ex.

---

[4] Macarus measured this decrease to be 0.1 inch long. [68-4], Defs.' Ex. D at ¶ 98. Plaintiffs' expert acknowledged this same decrease in his deposition. [68-3], Defs.' Ex. C at 133-134 ("Q: But you agree that there is a portion in the accused device where the radius actually decreases when you're going from the furthest forward end to the furthest rearward end? A: A very slight small area, yes").

[5] See [66], Defs.' SOF and [74] Pls.' RSOF at ¶ 76; [68-4], Defs.' Ex. D, Macarus Rpt., at ¶ 99 (stating that the Accused Confronting Portion is "actually a straight, that is uncurved, section. This straight section does not really have a radius. From an engineering perspective, a 'radius increasing smoothly' does not allow for such discontinuities"); [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 86 (acknowledging that the Accused Confronting Portion included "varying curved sections and straight sections").

G, Neuhalfen Rpt., at ¶ 86 (stating that the radius of the Accused Confronting Portion is 105 mm at the leading end and 127 mm at the trailing end). Plaintiffs' expert additionally states that "[t]here [are] no discontinuities nor inflections in the radius of the confronting portion from the leading end of the confronting portion to the trailing end of the confronting portion," and the "radius of the confronting portion [does] not exhibit abrupt changes." [74], Pls.' RSOF at ¶ 76 (citing [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 86).

### b. Labyrinth Seal

The Court construed "labyrinth seal" to mean "a tortuous engagement that inhibits dust and debris from exiting the housing assembly." *Id.* at 33. Plaintiffs allege that the engagement between the door and the housing of the Accused Edger ("Accused Engagement") satisfies the "labyrinth seal" limitation under a literal theory of infringement. They do not allege infringement under the doctrine of equivalents.

When the Accused Edger's door is closed, the door and the housing are not in direct contact; rather, they have an overlapping relationship. [66] Defs.' SOF and [74] Pls.' RSOF at ¶ 82. Moreover, when the door is in the closed position, a gap exists between the door and the housing. [66], Defs.' SOF at ¶ 81; Defs.' Ex. D, Macarus Rpt., at ¶ 107 (finding a gap measuring up to 1/16 inch); [79-2], Pls.' Ex. 1, Neuhalfen Dep., at 154:2-10 ("If the door is just closed and latched and you look into it, you can see that there is a section that there was a gap").

Neuhalfen states that the housing of the Accused Edger has a first labyrinth member and that the door has a second labyrinth member. [68-12], Defs.' Ex. G at ¶¶ 95, 98. He explains:

> The examination of the interaction between the door of the housing assembly and the housing of the housing assembly for the Accused Edger Product demonstrated that a labyrinth seal is formed when the door is in the closed position. The first labyrinth member engages with the second labyrinth member by overlapping the two components of the housing assembly when the door is placed in the closed position. The engagement between the first labyrinth member for the housing with

the second labyrinth member for the door of the housing assembly forms a labyrinth seal. The configuration of the engagement of the first and second labyrinth members forms a tortuous engagement that inhibits dust and debris from exiting the housing assembly. The overlapping configuration of the labyrinth members inhibits the flow of dust and debris from the housing assembly for the lawn edger device. The Accused Edger Products incorporate first and second labyrinth members that engage one another to form a labyrinth seal when the door is placed in the closed position.

[68-12], Defs.' Ex. G, Neuhalfen Rpt. at ¶ 100. Neuhalfen further explained in a deposition that what makes the Accused Engagement tortuous is that "there is only one particular line of sight that can get through it, but for debris hitting the portion of the confronting portion away from that gap, you still have to get around and travel around the surface and through that opening." [79-2], Pls.' Ex. 1, Neuhalfen Dep. at 154:17-21.

### 3. Patent Damages

Defendants also move for partial summary judgment on Plaintiffs' request for infringement damages arising before May 24, 2011. On May 24, 2011, Senior Group Patent Counsel for B&D wrote a letter to the President of Positec USA Inc., alleging infringement of each of the four patents in suit, marking the earliest point at which Defendants could have known about the '954 and '090 patents. [66], Defs. SOF and [74], Pls.' Resp. SOF at ¶¶ 87, 89, 92. Prior to May 24, 2011, Plaintiffs sold two products that may have embodied the remaining '975 and '376 patents: the Craftsman edger model 79654 and the edger LE 750. Plaintiffs sold the Craftsman edger model 79654, which did, in fact, embody the '975 and '376 patents, without marking either the product or its packaging with the patent numbers. *Id.* at ¶ 90, 96. Plaintiffs sold edger model LE750 from 2001 to 2013. [74], Pls.' Resp. SOF at ¶¶ 90, 93. The parties agree that this model embodied the '975 and '376 patents from 2003 to 2008 but dispute whether it embodied those same patents beginning in 2008. *Id.* at ¶ 90. Plaintiffs continually marked the packaging but not the actual product with the '975 and '376 patents from 2001 to 2013. *Id.* at ¶¶

91, 93, 94.  Plaintiffs marked the product itself with several non-patent markings.  [66], Defs.' SOF at ¶ 97.

### B.  Trade Dress and Trade Dilution Claims

Plaintiffs introduced the DeWalt line of power tools in 1992.  They allege trade dress rights in a yellow and black color combination appearing on DeWalt's power tools, power tool accessories, and packaging.  Plaintiffs allege that Defendants committed trade dress infringement, trademark infringement, unfair competition, and trade dilution by using yellow and black color schemes on their products, including (1) the Rockwell brand RK7137 miter saw, (2) the Rockwell JawHorse brand workstation, and (3) all of Positec's products sold in packaging with the sunburst design.

#### 1.  Fischer Declaration

In response to Defendants' motion for summary judgment, Plaintiffs submitted a declaration by Helen Fischer, director of brand marketing for the DeWalt brand, detailing Plaintiffs' marketing efforts and sales relating to their trade dress.  The Fischer Declaration states that Plaintiffs have spent more than $150 million in advertising and promoting the yellow and black DeWalt power tools, accessories and packaging.  Examples include (i) sponsorship of the DeWalt racing team, which drives a yellow and black DeWalt car in NASCAR events nationwide; (ii) sponsorship of the nationwide DeWalt Challenge competitions, which test professionals' skill and accuracy using DeWalt tools; (iii) training seminars for employees of retailers, like Lowe's and Home Depot, on how to inform customers about DeWalt products; (iv) sales demonstrations by representatives in DeWalt colored jackets driving DeWalt colored vans at job sites, stores, and sporting events where DeWalt teams competed; (v) nationwide

merchandising of yellow and black DeWalt apparel; (vi) sales support for stores, including banners and other promotional items; (vii) promotions by a semi-trailer traveling demo unit.

According to Fischer's Declaration, the DeWalt products and Defendants' accused products are sold in the same major retail stores to the same customers throughout the United States. As an example, Fischer took the following photograph, showing DeWalt and the accused products at Costco.



[75-14], Pls.' Ex. 12 at 4. Fischer further states that, since 1992, Plaintiffs have achieved sales of over $20 billion of yellow and black DeWalt power tools and power tool accessories in the United States.

In response to Plaintiffs' statement of additional facts, Defendants move to exclude the Fischer declaration under Federal Rule of Civil Procedure 37(c)(1), arguing that Plaintiffs "never disclosed the factual statements in the Fischer Declaration as a basis for its claims in the present case." [77] at ¶ 38; see also *id.* at ¶¶ 37-50, 53-55. In subsequent briefing regarding the admissibility of the Fischer declaration, Defendants explain further:

> The Fischer Declaration * * * was not made available during discovery, having been crafted by B&D after the close of discovery in an apparent effort to establish certain facts (which B&D had failed to establish during discovery) perceived

necessary to preclude summary judgment. If all of the facts contained in the Fischer Declaration were indeed disclosed or supplemented during discovery, B&D would not have needed for Ms. Fischer to sign the newly-minted declaration; B&D could have merely cited, as the Local Rules required, to the actual evidence of record such as deposition testimony or, at least, interrogatory responses.

[86] at 7.

Rule 37(c)(1) provides, in part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Under Rule 26(a), a party generally must disclose (i) "the name and, if known, the address and telephone number of each individual likely to have discoverable information" and (ii) "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A). Under Rule 26(e)

A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

Fed. R. Civ. P. 26(e)(1). The "obligation to supplement responses to formal discovery requests applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to deposition testimony." Fed. R. Civ. P. 26 Advisory Committee Note.

Because Plaintiffs did not violate Rule 26(a) or (e), Defendants' request for exclusion under Rule 37(c)(1) is denied. Plaintiffs Rule 26(a) disclosure stated that Fischer "may have

discoverable information relating to the design, development, promotion, sales and marketing of the yellow and black DeWalt® power tools and power tool accessories," providing her name and contact information. [86], Ex. 1 at 3-4. Plaintiffs also satisfied Rule 26(a) by identifying the category of documents relating to the information she later included in her declaration. More specifically, the disclosure listed the "efforts, costs and expenses in developing and promoting the yellow and black color scheme for power tools and power tool accessories"; the "promotional activity of power tools and power tool accessories having the yellow and black color scheme"; and "[s]ales, marketing and financial information regarding Black & Decker's DeWalt family of power tools and power tool accessories." *Id.* at 7. Because these disclosures provided (i) the declarant's name and contact information and (ii) the category of information relating to the substance of her declaration, they satisfied Rule 26(a).

Plaintiffs did not violate Rule 26(e) either. To the extent that Defendants argue that Rule 26(e) required Plaintiffs to submit the Fischer Declaration itself during discovery, no such obligation exists under Rule 26(e). To the extent that they argue that Plaintiffs were required to disclose the facts underlying Fischer's declaration during discovery, Plaintiffs generally did. In his deposition, Robert Welsh, Plaintiffs' Vice President of Industrial Design provided numerous examples of marketing, including NASCAR sponsorship, print ads, digital ads, banner ads, in-store point of purchase materials, catalogs, brochures, and flyers. [79], Ex. 5, Welsh Dep., at 42-43. In her own deposition, Fischer also described examples of marketing, including NASCAR sponsorship; channels, programs, flyers, and circulars with retail partners; as well as Swarm teams that traveled to retail locations on trucks, providing demonstrations. [79], Ex. 6, Fischer Dep. at 78-80. Defendants' Interrogatory No. 9 asked Plaintiffs to "Identify all media in which Black & Decker, or Black & Decker's licensee, has advertised products in connection with each

of the DeWalt Trademarks at any time from January 1992 to the present." [79], Ex. 4 at 109. Plaintiffs responded, "Black & Decker has directly and indirectly advertised its products using the DeWalt trademarks through, for example, television, Internet, magazines, newspapers, brochures, sales literature, NASCAR, billboards, vans, hats t-shirts, banners, in-store displays, etc." *Id.* This information closely parallels the information in the Fischer Declaration.

To the extent that the Fischer Declaration may add new information, it does not create grounds for exclusion for three reasons. First, Plaintiffs were not required to supplement the Welsh or Fischer depositions. See Fed. R. Civ. P. 26 Advisory Committee Note. Second, Plaintiffs were not required to supplement their response to Interrogatory No. 9 because it remained an accurate and comprehensive answer to the question asked; it did not become "incomplete or incorrect," nor did the Court order further information. Fed. R. Civ. P. 26(e). Third, Defendants were free to cross-examine Welsh and Fischer or submit further written requests for information.

Plaintiffs also argue that the Welsh Deposition, the Fischer Deposition, and the response to Interrogatory No. 9 did not expressly link the specified marketing channels to the colors yellow and black, specifically. This argument, too, fails to persuade given that (1) the trademark claims entirely revolve around DeWalt's yellow and black color combination, (2) Plaintiffs allege that all of their DeWalt products exhibited this yellow and black color combination, and (3) all of this discovery addressed the DeWalt products.

Defendants also move to strike Plaintiffs' facts supported by the Fischer Declaration, arguing that it parrots another declaration that Plaintiffs submitted in previous trade dress litigation (the "Leydon declaration") and that the two declarations differ only in one material respect: the Fischer declaration describes a yellow and black trade dress, but the Leydon

declaration describes a yellow, black and silver trade dress. See [77], ¶¶ 37-50, 53-55. This difference does not create valid grounds to strike under L.R. 56.1, the Federal Rules of Civil Procedure, or the Federal Rules of Evidence, nor do Defendants cite any such rule in making their argument. To the extent that Defendants dispute the credibility of the Fischer declaration by arguing that it contradicts the Leydon declaration, they create triable issues of fact requiring credibility determinations, which the Court may not make on summary judgment. Defendants are free to highlight these discrepancies at trial, but, in the meantime, the Court finds no reason to strike the facts supported by the Fischer declaration based on how it compares or contrasts with a declaration submitted almost seventeen years ago.

Finally, Defendants argue that the Fischer declaration fails to discuss when these marketing efforts took place. On the contrary, the declaration does discuss the relevant timeframe. See [75-14], Ex. 12 at ¶¶ 7-8 (stating that Plaintiff has advertised and promoted the yellow and black DeWalt power tools since 1992, then providing the examples at issue). More importantly, a failure to pinpoint the timeframe would not create valid grounds to strike the facts under L.R. 56.1, the Federal Rules of Civil Procedure, or the Federal Rules of Evidence.

Finding no other valid reason to strike Plaintiffs' facts rooted in the Fischer Declaration, the Court admits her statements as undisputed facts.[6]

### 2. Berger Surveys

Plaintiffs' response includes two expert reports by James Berger, one testing secondary meaning and the other the likelihood of confusion.

---

[6] Plaintiffs use the Leydon Declaration to support many of these same facts. Defendants argue that the Leydon Declaration is inadmissible. Because these facts are sufficiently supported by the Fischer Declaration, the Court need not address the admissibility of the Leydon Declaration.

### a.    Secondary Meaning

Berger's secondary meaning report includes two double-blind surveys administered over the internet.  The sample of respondents were randomly selected using e-Rewards, Inc., an internet research organization.  To qualify, a prospective respondent had to be at least eighteen years old and be a professional tradesman or serious Do-It-Yourselfer, defined as owning at least $1,000 worth of power tools.  A prospective respondent could not have anyone in their household who worked for an advertising agency, market research firm, or any business involved in the sale of power tools.  Respondents needing eyeglasses were required to view the computer screen using their glasses.  There were no gender or geographic restrictions.  Each survey was given to 200 individuals.

### i.    Survey A

Survey A included the following photograph of a DeWalt miter saw.



[68-33] at 80.  Respondents were asked the following questions:

- Have you ever seen this product before?
- If yes, where have you seen it?
- Who do you believe puts out this product?
- Here are some power tool manufacturers.  Which if any, do you believe puts out this product?  (The list included DeWalt, Bosch, Milwaukee, Rockwell, Craftsman, Ryobi, Makit, and Don't know.  The order of products was varied as the names were rotated throughout the survey.)

- Why?

*Id.* at 56-57.  One hundred eighty out of 203 respondents stated that they had seen the product before.  When asked who they believe puts out this product, their responses were:

- DeWalt: 40%
- Ryobi: 4%
- Many manufacturers: 3%
- Black & Decker: 3%

*Id.* at 127.  Of the 81 respondents who said they believed the pictured product was put out by DeWalt, 40% said it was because of the color, and 32% indicated the color yellow.  *Id.* at 58.

### ii.     Survey B

Survey B asked respondents, in part, "If you were shopping at a Home Depot, Lowes or some other retailer that sells power tools and you saw a power tool that was yellow and black, would you have a belief as to who or what company makes or manufacturer [*sic*] it?"  Eighty three per cent answered yes.  [68-33] at 58, 107.  Of those, 55% answered DeWalt and 15% answered Black & Decker.  *Id.*

### b.     Likelihood of Confusion

In the likelihood of confusion survey, respondents were shown the following photograph, which was taken in an actual retail store:



[68-33] at 30. All products in the photo were DeWalt products, except one, which was a Rockwell product. Respondents were asked if they believed the products were put out by the same company, and, if so, why? Forty-seven percent of respondents said they believed that all the products pictured were put out by the same company. *Id.* at 9, 43. Defendants offered no survey going either to secondary meaning or likelihood of confusion.

## II.     Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party

seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Lastly, "because the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of non-infringement may meet its initial burden either by providing evidence that would preclude a finding of infringement, or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case." *Cannon Rubber Ltd. v. First Years Inc.*, 2004 WL 2533720, at *2 (N.D. Ill. Sep. 28, 2004) (citing *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)).

## III.    Analysis

Defendants move for partial summary judgment on multiple grounds. With respect to the patent claims, Defendants argue that they did not infringe Plaintiffs' '954 or '376 patents and that, even if they did, Plaintiffs should be barred from recovering infringement damages allegedly incurred before May 24, 2011. With respect to the trade dress claims, Defendants argue that Plaintiffs' trade dress is not protectable and is unlikely to cause confusion. In regard to the trade dilution claim, Defendants argue that Plaintiffs' trade dress is neither "distinctive" nor "famous," as required by the Federal Trademark Dilution Act. Lastly, Defendants argue that

Plaintiffs may not receive actual damages for the trade dress claims, or, alternatively, that actual damages may not accrue prior to Defendants' receipt of actual notice of Plaintiffs' trade dress. The Court considers each argument in turn.

### A.     Non-infringement of the '954 and '376 Patents

Determining patent infringement generally requires two steps.  *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1361 (Fed. Cir. 2007).  First, the asserted claims must be properly construed to determine their scope and meaning.  *Id.*  Second, the properly construed claims must be compared to the accused product to determine whether the accused products infringe the asserted claims.  *Id.*  This comparison involves questions of fact.  The question on summary judgment is whether there is a genuine dispute of material fact regarding infringement.  See *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  Conclusory statements about infringement without evidentiary backing are insufficient to create a genuine dispute of material fact.  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) ("the party opposing the motion for summary judgment of non-infringement must point to an evidentiary conflict created on the record, at least by a counter-statement of a fact set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient").

An accused product may infringe a patent claim either literally or under the doctrine of equivalents.  Literal infringement requires that "every element of the invention as claimed is present in the accused device."  *ACCO Brands, Inc. v. Micro Sec Devices, Inc.*, 346 F.3d 1075, 1080 (Fed. Cir. 2003).  Under the doctrine of equivalents, a product may be "found to infringe if there is 'equivalence' between the elements of the accused product * * * and the claimed elements of the patented invention."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997).  "The doctrine of equivalents allows the patentee to claim those insubstantial

alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002). The doctrine of equivalents is designed to prevent "the unscrupulous copyist [from] mak[ing] unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co*., 339 U.S. 605, 607 (1950).

A finding of infringement under the doctrine of equivalents requires a showing that the accused product contains each limitation of the claim or its equivalent. See *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). "An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial." *Id.* One way of demonstrating that a difference is insubstantial is "by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Stumbo*, 508 F.3d at 1364; see also *Graver Tank*, 339 U.S. at 608.

The doctrine of equivalents is applied to the claimed limitations of an invention, not the invention as a whole. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997). An accused device must be more than equivalent overall to the claimed invention, and instead the doctrine is to be applied to each individual limitation to see whether it is literally infringed or replaced by an equivalent in the allegedly infringing invention. *Id.* Otherwise, courts would be allowed to expand the scope of the claims. *Id.*

The issue of equivalence is a question of fact. *Graver Tank*, 339 U.S. at 607. However, "where the evidence is such that no reasonable jury could determine two elements to be

equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner-Jenkinson*, 520 U.S. at 39 n.8. To avoid a grant of summary judgment of non-infringement by equivalents, the patentee must present "particularized evidence and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device, or with respect to the 'function, way, result' test." *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1382 (Fed. Cir. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)).

### 1.    The '954 Patent

To show non-infringement of the '954 patent, Defendants need only demonstrate that the Accused Blowers lack a single limitation in claim 1. Defendants argue that the Accused Blowers lack two limitations: the "attachment member" and the "actuating means." The Court finds that a reasonable trier of fact could find that Accused Duct satisfies the "attachment member" element but not the "actuating means" element. Accordingly, the Court grants Defendants' motion for partial summary judgment of non-infringement of the '954 patent.

### a.    Attachment Member

Plaintiffs allege that the Accused Duct satisfies the "attachment member" limitation only under a theory of literal infringement, not the doctrine of equivalents. For the Accused Product to literally satisfy the "attachment member" limitation, it must include "a structure that fits around the fan and allows air to enter and exit and that is non-permanently attachable to the housing." [57], Claim Constr. Op. at 11. Moreover, the fan must be "located partially within the housing or completely outside of it," and "in either case, the fan blades [must be] exposed when the attachment member is not attached." *Id.* at 15.

Defendants are not entitled to summary judgment of non-infringement of the '954 patent based on the Accused Product's lack of an "attachment member" because there is a genuine dispute as to whether the Accused Duct fits around the fan when attached to the housing. Defendants' photographs D5, D6 and D9 appear to show that the housing, not the Accused Duct itself, fits around the fan. According to Neuhalfen's report and deposition testimony, however, the top circular opening of the Accused Duct fits around the fan when the Accused Duct is attached. Based on the evidence submitted at summary judgment, whether the Accused Duct fits around the fan appears to be a matter of visual perspective; if a person looked down the Accused Duct while attached, it would be around the fan. A reasonable trier of fact looking at Neuhalfen's photographs could accept his conclusions. Accordingly, the Court denies Defendants' motion of non-infringement on the theory that the Accused Blowers lack the "attachment member" element of the '954 patent.

### b. Actuating Means

The Court next considers non-infringement of the '954 patent on the theory that the Accused Blowers lack an "actuating means" limitation. The "actuating means" limitation is a means-plus-function limitation. Literal infringement of a means-plus-function claim limitation requires that "the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification" under § 112, ¶ 6. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) (citing *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003)). "Structural equivalence under § 112, ¶ 6 is, as noted by the Supreme Court, 'an application of the doctrine of equivalents * * * in a restrictive role.'" *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (quoting *Warner-Jenkinson Co.*, 520 U.S. at

28). "Once the relevant structure in the accused device has been identified, a party may prove it is equivalent to the disclosed structure [under § 112, ¶ 6] by showing that the two perform the identical function in substantially the same way, with substantially the same result." *Applied Med. Res. Corp.*, 448 F.3d at 1333 (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000)). In other words, unlike the doctrine of equivalents test, which requires a substantially similar function-way-result, "functional identity" is required under § 112, ¶ 6. *Odetics, Inc.*, 185 F.3d at 1267. "The content of the test for insubstantial differences under § 112, ¶ 6 thus reduces to 'way' and 'result.'" *Id.*

The Court construed the "actuating means" limitation as a means-plus-function limitation with a function of "activating the switch only when the attachment member is attached to the housing." [57], Claim Constr. at 19. The Court interpreted the corresponding structure to be "at least one pivot lever and a biasing device and equivalent structures that perform the identified function." *Id.* at 24.

Plaintiffs contend that the Accused Blowers satisfy the "actuating means" limitation both under a theory of literal infringement and under the doctrine of equivalents. To win partial summary judgment of non-infringement of the '954 patent based on a lack of the "actuating means" element, Defendants must demonstrate that no reasonable trier of fact could find that the Accused Blowers satisfy the "actuating means" limitation under a literal theory of infringement—in which there are identical or statutorily equivalent structures—or under the doctrine of equivalents.

Beginning with literal non-infringement, Defendants argue that (1) the corresponding structure requires a pivot lever that is entirely separate from the switch; (2) the Accused

Structure's toggle is a part of the switch rather than entirely separate from it; and (3) the Accused Structure therefore literally lacks the "actuating means."

The Court begins by addressing Defendants' first contention, which is a matter of claim construction and a question of law. To determine whether the corresponding structure requires the pivot lever to be separate from the switch, the Court looks to the three embodiments disclosed in the specification. See *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) ("The construction of a means-plus-function limitation includes two steps. First, we determine the claimed function. Second, we identify the corresponding structure in the written description that performs that function.") (internal citation omitted); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("Once the functions performed by the claimed means are identified, we must then ascertain the corresponding structures in the written description that perform those functions."); *Micro Chem, Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1999) ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments").

Because all three of the disclosed structures include pivot levers that are separate from the switches, the Court concludes that the structure of the "actuating member" requires a pivot lever to be separate from the switch. In the first embodiment, the pivot lever 53 sits on top of and acts upon the switch 16, the two components being entirely separate. See '954 patent, fig. 1, fig. 2; see also *id.* at 3:45-48 ("The actuating member 50 when in its forward position (not shown) depresses a pivot lever 53 which bears against the end of the catch 40, 140 and depresses the switch 16."); *id.* at 3:52-57 ("A spring 55 biases the pivot lever 53 towards the front face of the housing 4, i.e., towards the left-hand side of the Figure, so that the pivot lever 53 will depress

the switch 16 only when the catch 40, 140 urges pivot lever 53 against the action of the spring 55 into the vertical position as shown in FIGS. 1 and 2.").  In the second embodiment, the pivot levers are also separate from the switch.  See *id.*, fig. 3.  As the specification explains, there are two pivot levers, the lower one of which is "pivotably secured at its lower end to a plunger 17 of the switch 16."  *Id.* 4:21-22.  By describing the lower pivot lever as a component secured to the plunger of the switch, the specification indicates that the lower pivot lever is separate from the switch.  *Id.* at 4:19-20.  The remainder of the written description affirms this conclusion:

> When the involute 6, 106 is attached to the housing 4 and the actuating member 50 is moved forward to its "on" position, the recess 58 in the actuating member 50 pushes to (*sic*) pin 60 forwards to move the upper pivot lever 62 into a more vertical position. The recess 41 in the catch 40, 140 bears against the second pin 64 and the second lever 66 is pushed downwards to depress the plunger 17 of the switch 16 and the motor is actuated.

> When the involute is removed from the housing, pushing the actuating member 50 into its forward position does not actuate the switch 16 because the second pin 64 is not supported by the catch 40, 140 and so the lever 66 is not urged downwards. Instead the spring 55 urges the bottom of the lever 62, the top of the lever 66 and the pin 64 into the gap left by the removal of the catch 40, 140.

*Id.* at 4:27-41.  In the third embodiment, the pivot lever is again separate from the switch.  See *id.*, fig. 4; see also *id.* at 5:14-19 ("When the second pin 88 is in this position, movement of the actuating member 50 to the forward position (as shown in FIG. 4) causes the recess 58 to move the pin 84 forward and pivot the L-shaped pivot lever 86 so that it depresses the switch 16 to activate the motor.").  Although the Court's claim construction did not specifically address whether the pivot lever must be separate from the switch, it is not inconsistent with the Court's present conclusion that the two must be separate.

Finding that the pivot lever must be separate from the switch, the Court next considers whether there is a genuine dispute of fact as to whether the Accused Blowers include an identical structure.  Defendants contend that the Accused Blowers' toggle, which Plaintiffs identify as the

required pivot lever, is part of the switch rather than separate from the switch, precluding an identical structure. In response, Plaintiffs argue that the toggle is on top of and separate from the switch.[7] This argument is not persuasive. Plaintiffs' own expert unequivocally stated in his deposition testimony that the toggle was "part of the motor switch." See [75-1], Pls.' Ex. 1, Neuhalfen Dep. 84:1; see also *id.* at 89:9-11 ("Q: What you've outlined is part of the motor switch, correct? A: It's one component of it, yes."). His testimony therefore concedes Defendants' point that the Accused Blowers lack an identical structure.

Having found no identical structure, the Court now examines whether there is a genuine fact issue as to whether the Accused Blowers include an equivalent structure—either under a theory of literal infringement or under the doctrine of equivalents. At issue here is whether the structures perform in a substantially similar way. Defendants offer Macarus's explanation of the three-part slide mechanism to show that the structures perform in substantially different ways. Specifically, an important feature of the Accused Structure is a blocking relationship absent in the disclosed structures; when the Accused Duct is detached, the slide interlock moves up,

---

[7] Defendants argue in two footnotes that this argument should be procedurally barred because it did not first appear in Plaintiffs' Final Infringement Contentions. In particular, Defendants submit that Plaintiffs should have amended their Final Infringement Contentions rather than introduce the argument for the first time in their expert reports. The Court is not persuaded. Not only do Defendants fail to cite a local rule or case law, but their argument ignores the goals of the local patent rules. The local patent rules were enacted to "prevent a shifting sands approach to claim construction by forcing the parties to crystallize their theories of the case early in litigation'" and to "provide notice of the plaintiff's theories of infringement early in the case because, in practice, it is difficult to obtain such information through traditional discovery means, such as interrogatories." *Fujitsu Ltd. v. Tellabs Operations, Inc.*, 08 C 3379, 2012 WL 5444979, at *4 (N.D. Ill. Mar. 21, 2012); *Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 622951, at *2 (N.D. Ill. Feb. 20, 2013). Plaintiffs' Final Infringement Contentions included a detailed description of the Accused Structure and a photograph with red marks drawing attention to the toggle, making clear that the toggle played an important role in the infringement claim. The arguments in Plaintiffs' subsequent expert reports and motions are consistent with this suggestion. The Final Infringement Contentions therefore gave Defendants fair notice of Plaintiffs' theory of infringement, satisfying the purpose of the local patent rules. The absence of the particular words "pivot lever" in the Contentions is to be expected; the Court did not use those words in its claim construction opinion until over one year later. Requiring an amendment in these circumstances would only prolong the litigation, increasing the costs to both parties and needlessly wasting judicial resources. Accordingly, the Court finds that Plaintiffs' argument is not procedurally barred.

preventing the user from moving the slide button forward and activating the motor. As Defendants argue, the safety function of the '954 patent involves no blocking relationship. Rather, the slide button "can be pushed forward regardless of whether or not the attachment member is attached to the housing. This is because the 'pivot lever' is what engages the motor switch to turn on, and the pivot lever is not in a position to do so unless the attachment member is attached to the housing." [65], MSJ at 14.

In response, Plaintiffs point to the Neuhalfen report. That report asserts that the "components of the safety interlock for the Accused Blower Products also perform the same function, in the same way, to achieve the same result as the claimed 'Actuating means', as construed by the Court," [74], Pls.' RSOF at ¶ 59 (citing [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 64). See [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 64. While Neuhalfen's subsequent analysis addresses function and result, it is silent on way:

> The examination of the Accused Blower Product demonstrates that the blower-vacuum device only operates when the attachment member is attached to the housing for the product. The attachment member interacts with the safety interlock when attached to the housing to allow for the motor for the fan to operate. When the attachment member is detached from the housing, the interaction between the attachment member and the safety interlock prevents the exposed fan from operating even when the user may attempt to move the switch to the ON position.

[68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 64. No reasonable trier of fact could find that this analysis explains how the Accused Structure performs in substantially the same way. It also fails to respond to Defendants' evidence that the Accused Structure performs in a different way (1) by using a three-part slide mechanism, which (2) creates a blocking relationship preventing the user-activated slide button from moving forward when the duct is attached. Simply put, Defendants offer evidence that this blocking relationship is absent in the disclosed structures, and Plaintiffs produce nothing in response. To raise an issue of fact for trial under either theory of

equivalence, Plaintiffs must offer evidence showing, in part, that the Accused Structure performs (1) in a substantially similar way, (2) producing a substantially similar result. See *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Plaintiffs fall short on the first prong of this analysis; at most, Neuhalfen presents somewhat conclusory evidence that the Accused Structure performs the claimed function and produces a substantially similar result, but not in a substantially similar way. Accordingly, the Court finds that there is no genuine dispute as to whether the Accused Structure is an equivalent structure—either under § 112 or the doctrine of equivalents.

Plaintiffs argue that Defendants improperly ask the Court to weigh Neuhalfen's expert opinion, citing various cases rejecting attempts to discount expert testimony with respect to equivalence. See [73] at 19 (citing *Lucent Technologies, Inc. v. Microsoft Corp.*, 544 F. Supp. 2d 1080, 1090 (S.D. Cal. 2008); *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 514 F. Supp. 2d 351, 371-72 (D. Conn. 2007); *NessCap Co. v. Maxwell Techs., Inc.*, 2007 U.S. Dist. LEXIS 89450, at *9-15 (S.D. Cal. Dec. 5, 2007)). Those cases are distinguishable in that they involved expert testimony with analysis, not conclusory opinions. As the Federal Circuit has explained,

> Pursuant to our precedent, *a patentee must ... provide particularized testimony and linking argument* as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. * * * Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice. The same rule applies in the summary judgment context.

*AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

In sum, the Court finds no genuine dispute as to whether the "actuating means" literally or equivalently reads onto the Accused Structure. Accordingly, it grants Defendants' motion for partial summary judgment of non-infringement of the '954 patent.

### 2. The '376 Patent

To win partial summary judgment of non-infringement of the '376 patent, Defendants must show both that the Accused Edger lacks the "radius increasing smoothly" element and the "labyrinth seal" as a matter of law. The Court addresses each element in turn.

### a. Radius Increasing Smoothly

Claims 1, 4-8 and 18 require a confronting portion with a "radius increasing smoothly from the furthest forward end of the confronting portion to the furthest rearward end of the confronting portion." [57], Claim Constr. Op. at 31. The Accused Confronting Portion, however, includes a section with a decreasing radius and a section that lacks a radius at all because it is straight. No reasonable trier of fact could find that a radius that decreases and, at a certain point, ceases to exist, could be a radius that increases smoothly.

Plaintiffs' arguments to the contrary are unpersuasive. First, Plaintiffs offer evidence showing that the radius at the leading end of the Accused Confronting Portion is smaller than the radius at its trailing end. They argue that a reasonable trier of fact could rely on this overall increase to find that the Accused Confronting Portion satisfies the "radius increasing smoothly" limitation. This argument does not address the claim's requirement that the radius increase smoothly. It isolates the endpoints of the Accused Confronting Portion and states that the radius is larger at one point than at the other without describing what happens to the radius between those two points.

Second, Plaintiffs contend that the overall increase in the confronting portion is "smooth" because, according to Neuhalfen, "[t]here [are] no discontinuities nor inflections in the radius of the confronting portion from the leading end of the confronting portion to the trailing end of the confronting portion," and the "radius of the confronting portion [does] not exhibit abrupt changes." [74], Pls.' RSOF at ¶ 76 (citing [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶ 86). Not only is the Neuhalfen report conclusory, but it also contradicts itself insofar as it acknowledges that the Accused Confronting Portion includes a straight section, which, by definition, lacks a radius. *Id.* A radius that ceases to exist in a given section, by definition, discontinues in that section. Accordingly, Neuhalfen's statement about the absence of discontinuities does not create a genuine dispute of fact nor is it sufficient grounds for a trier of fact to find infringement.

Third, Plaintiffs argue that the Accused Confronting Portion can have a decreasing section and still satisfy the "radius increasing smoothly" limitation because the Court rejected Defendants' proposed claim construction of "the radius increases in a continuous and consistent manner" and held that "it is simply wrong to assert that a smooth increase must also be a consistent increase." [73], Pls.' Resp. to MSJ at 21 (citing [57], Claim Constr. Op. at 30). This argument isolates and misconstrues language from the claim construction opinion. The Court also noted that it declined to adopt Defendants' proposed construction of "increases smoothly" as "increases in a continuous and consistent manner" because "'smoothly' [already] captures the *continuing* increase." Again, a radius that ceases to exist at certain points cannot experience a *continuing* or smooth increase, at least under a literal theory of infringement.

Fourth, Plaintiffs argue that the Court's construction only provided that a discontinuity or decrease "*may* prevent it from being smooth." [73], Pls.' Resp. to MSJ at 21 (citing [57], Claim Constr. Op. at 30) (emphasis added). This argument takes the quoted language out of context.

The entire point of the paragraph from which the quoted language is taken was to underscore that a *continuing* increase need not increase in a *consistent* manner. But it nevertheless must continue to increase to satisfy the requirement that the radius be "smooth," and a radius that decreases at any point plainly ceases to increase.[8] For these reasons, no reasonable trier of fact could find that the Accused Confronting Portion literally satisfies the "radius increasing smoothly" limitation.[9]

Accordingly, the Court grants Defendants' motion for partial summary judgment of non-infringement of claims 1, 4-8 and 18 of the '376 patent.

### b. Labyrinth Seal

To win partial summary judgment of non-infringement of the '376 patent based on the absence of the "labyrinth seal" limitation, Defendants need only show that the Accused Edger literally lacks this limitation; Plaintiffs do not allege that the Accused Engagement satisfies this limitation under the doctrine of equivalents. Defendants argue that, because the Accused Engagement is characterized by a "mere overlap" with the gap, the Accused Edger lacks "a seal between the door and housing, let alone a 'labyrinth seal.'" [65], Defs.' MSJ at 18. They additionally argue that, because there is no seal, let alone a labyrinth seal, the Accused Edger lacks a "tortuous engagement." *Id.* at 18. This argument fails because nothing in the Court's

---

[8] Perhaps in hindsight the Court should have substituted the word "would" for "may" in the sentence that Plaintiffs have highlighted because the logic of the paragraph as a whole appears to dictate that description. It is important to keep in mind, however, that the purpose of the sentence was not to elaborate on the Court's actual claim construction but rather to explain why the Court did not find the need to engage in further construction.

[9] Although Plaintiffs declined to specify in their motion whether they were arguing under a literal theory of infringement or under the doctrine of equivalents or both, their citations come exclusively from their expert's literal infringement analysis, and Neuhalfen's report lacks any analysis of this element under the doctrine of equivalents. [66], Defs.' SOF at ¶ 79 (citing [68-3], Defs.' Ex. C, Neuhalfen Dep., at 137 and [68-12], Defs.' Ex. G, Neuhalfen Rpt., at ¶¶ 86, 114); see [74], Pls.' RSOF at ¶ 79. Accordingly, the Court agrees with Defendants that Plaintiffs have conceded the absence of infringement under the doctrine of equivalents as to the "radius increasing smoothly" element and thus will not address it further.

claim construction prohibits a gap. As Plaintiffs note, the Court expressly rejected the Defendants' proposed "tight-fitting" limitation as "not necessary to clarify the meaning of a seal that inhibits dust and debris from exiting the housing" because "the limitation that the seal is 'tortuous' [already] clarifies that the patent claims a 'labyrinth seal' as opposed to some other type of engagement of projections." [57], Claim Constr. Op. at 33. Defendants' also argue that the Accused Edger literally lacks the "labyrinth seal" because it lacks a "tortuous engagement." This argument also fails; aside from citing Macarus's conclusory statement that the Accused Engagement is not tortuous, Defendants offer no explanation or evidence showing a lack of a "tortuous engagement." Because these arguments fail and because Plaintiffs' expert report offers evidence that a labyrinth seal is formed when the door is in the closed position, Defendants are not entitled to judgment as a matter of law. Accordingly, the Court denies Defendants' motion for partial summary judgment of non-infringement of claims 9, 10, 13, 14, 16, 17, and 18 based on the absence of the "labyrinth seal" limitation.

In sum, based on the Court's analysis of both the "radius increasing smoothly" and "labyrinth seal" limitations, the Court grants Defendants' motion for partial summary judgment of non-infringement of claims 1, 4, 5-8, and 18 and denies their motion with respect to claims 9, 10, 13, 14, 16, and 17.

## B.     Patent Infringement Damages Allegedly Incurred Before May 24, 2011

The patent marking statute, 35 U.S.C. § 287(a), provides:

Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of

the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

In other words, a patentee may not recover damages incurred prior to "marking or actual notice." *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993). Once marking begins, "it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *Id.* Compliance with § 287 is a question of fact, and the "patentee bears the burden of proving compliance by a preponderance of evidence." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998); see *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996). "The purpose of the constructive notice provision is to give patentees the proper incentive to mark their products and thus place the world on notice of the existence of the patent." *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d at 1538 (citation omitted).

The parties agree that Defendants received actual notice on alleged infringement of all four patents on May 24, 2011. The parties dispute whether Defendants had constructive notice before that date.

### 1. The '954 and '090 Patents

Defendants argue that they lacked constructive notice of the '954 and '090 patents prior to May 24, 2011 based on Plaintiffs' own admissions during discovery.[10] The Court need not consider their arguments with respect to the '954 patent, as the Court has found non-

---

[10] During discovery, Defendants made two requests that Plaintiffs admit that "the earliest date that Defendant could have had either actual or constructive notice [of the '954 and '090 patents] is May 24, 2011." Defs.' Ex. K, Nos. 23 and 24 at p. 11. Plaintiffs admitted both requests subject to two form objections. *Id.*

infringement of the '954 patent. With respect to the '090 patent, Plaintiffs fail to respond with any evidence or arguments. Given Plaintiffs' admissions and the silence in their response brief, the Court grants Defendants partial summary judgment, finding that Plaintiffs may not recover damages for the alleged infringement of the '090 patent prior to May 24, 2011.

### 2. The '975 and '376 Patents

Plaintiffs sold two products that may have embodied either one or both of the '975 and '376 patents: the Craftsman edger model 79654 and the edger LE750. Plaintiffs admit that when they sold the Craftsman edger model 79654, which embodied the '975 and '376 patents, they never marked it with the patent numbers. Because these articles lacked any patent markings, Plaintiffs may not recover infringement damages allegedly incurred before May 24, 2011 on the theory that Defendants had constructive notice of the '975 or '376 patents due to Plaintiffs' sale of the Craftsman edger model 79654.

The question remains whether Plaintiffs' sale of the LE750 from 2001 through the date of actual notice created constructive notice, permitting recovery of infringement damages allegedly incurred before May 24, 2011. When Plaintiffs sold the LE750, they placed '376 and '975 patent markings on the packaging but not the product itself. Defendants move for partial summary judgment, arguing that the patent markings on the packaging failed to comply with § 287. In Defendants' view, Plaintiffs could have marked the LE750 with their patent, given the non-patent markings on the product, but they marked the packaging instead. Defendants interpret § 287 to permit markings on packages only when "the character of the article does not allow it to be so marked." [65], MSJ at 22. Accordingly, they argue that Plaintiffs may not recover damages arising from the alleged infringement of those patents prior to May 24, 2011.

In support of their argument, Defendants cite *Rutherford v. Trim–Tex, Inc.*, 803 F. Supp. 158 (N.D. Ill. 1992). In *Rutherford*, the patentee sold patented products that were completely unmarked, unlike the LE750, which included non-patent markings. Like the LE750, the embodiment of the patent in *Rutherford* was sold in packaging with patent markings. The court held that the patent markings on the package complied with § 287 because it would have been burdensome for the patentee to undergo additional manufacturing steps to put a patent marking on the product. *Id.* In arriving at this conclusion, the court emphasized that the "primary purpose of § 287 is to provide information to the public concerning 'the status of the intellectual property embodied in an article of manufacture or design.'" *Id.* at 161 (citations omitted). The court in *Rutherford* also quoted *Bonito Boats, Inc. v. ThunderCraft Boats, Inc.*, 489 U.S. 141, 162 (1989), for the proposition that the Supreme Court has had a "long-standing focus on the notice effected * * * rather than on the precise mechanistic compliance with the statute," noting that the Seventh Circuit has had a similarly "relaxed attitude toward compliance." *Id.* (citing *Sessions v. Romadka*, 145 U.S. 29 (1892); *Smith v. Dental Products Co., Inc.*, 140 F.2d 140, 152 (7th Cir. 1944); *Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 675 (7th Cir. 1960)). After adopting this "practical common sense approach" toward compliance, however, the court noted one caveat in dicta:

> Where the patented article has markings or printing on it, other than the appropriate patent marking, then the alternate form of patent markings on the package is not sufficient compliance with the statute * * * The rationale behind stricter conformity to the marking provisions of § 287 when the article contains other markings is bound-up with the purpose of the statute to give notice to the public. Where the public finds markings or writings upon the article itself, the public should be able to rely upon the fact that a patent, if it exists, should also be noted with that writing.

*Id.* Defendants argue that because Plaintiffs' products bore markings other than patent markings, their marking of the packaging is insufficient under *Rutherford*.

Other courts examining the sufficiency of patent marking on packages have rejected *Rutherford*'s bright-line exception and denied summary judgment, holding that the sufficiency of patent markings is a fact issue for trial to be determined in light of the public notice function of the statute. See *e.g.*, *Global Traffic Technologies, LLC v. Emtrac Sys., Inc.*, 946 F. Supp. 2d 884, 906 (D. Minn. 2013) (finding that "[w]hether marking on the packaging" satisfied § 287 because it "served as the most effective notice to the public of this product, given its multiple and hidden components, is a fact issue for trial); *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 946 (S.D. Ohio 2010) (holding that the presence of other markings on a patented article was insufficient to demonstrate non-compliance with § 287 because "in certain situations, like the present case, marking the device with information other than the relevant patent information may be more practical and more informative to the public"); *Stryker Corp. v. Zimmer Inc.*, 1:10-CV-1223, 2012 WL 6821683 (W.D. Mich. Nov. 29, 2012) (emphasizing "the marking statute's notice-serving purpose over the precise mechanics of compliance" and considering the sufficiency of package marking under the following factors: (1) size of the product, (2) the cost of marking the product itself rather than the packaging, (3) industry norms for marking similar products, and (4) whether an alternative form of marking would provide users with adequate notice of the patent).

Defendants are entitled to judgment as a matter of law under either line of cases cited above. Under *Rutherford*, the undisputed presence of non-patent markings on the LE750 renders the patent-marking on the packaging insufficient under § 287 as a matter of law. Under the more recent precedents from other districts, the question before the Court is whether Plaintiffs have produced sufficient evidence from which a reasonable trier of fact could find that the patent markings on the packaging satisfied § 287's public notice requirement. Unlike the patentees in

the cases cited above, Plaintiffs offer no evidence that their alternative package markings were justified by specific circumstances, such as the size of the product, the cost of marking the product as opposed to the packaging, industry norms, or adequate notice.  The Federal Rules of Civil Procedure provide that in order to survive summary judgment, "an opposing [party's] * * * response must * * * set out specific *facts* showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2) (emphasis added).  As the Seventh Circuit often reminds litigants and district judges, "summary judgment is the 'put up or shut up' moment in the life of a case."  *AA Sales & Assocs., Inc. v. Coni–Seal, Inc.*, 550 F.3d 605, 612–13 (7th Cir. 2008).  The Court therefore grants Defendants partial summary judgment, holding that Plaintiffs may not recover damages arising from the alleged infringement of the '376 and '975 patents prior to May 24, 2011.

Lastly, the Court rejects Plaintiffs' argument that "a patentee is only subject to § 287(a)'s marking requirement if its products have been shown by the accused infringer to actually embody inventions of the patents at issue."  [73], Resp. at 24.  In the case cited by Plaintiffs, *In re Katz Interactive Call Processing Patent Litig.*, 882 F. Supp. 2d 1123, 1142-43 (C.D. Cal. 2010), the plaintiff sued for infringement of patented interactive telephone call processing systems.  As a threshold matter, the plaintiff argued that it need not satisfy § 287's notice requirement because the patented invention it sold consisted of multiple products and services from different sources; in other words, it did not sell an "article" within the meaning of the statute.  Because the defendant failed to produce any evidence that the patentee did, in fact, sell a patented article, the court held that § 287 was inapplicable.

Plaintiffs concede that they sold an article—the LE750—embodying the '975 and '376 patents from 2001 to 2008. Plaintiffs neither concede nor deny that this article embodied these same patents from 2008 to 2011. They argue that, under *Katz*, Defendants must first show that the LE750 was patented before § 287 applies to the years 2008 to 2011, and that Defendants have failed to carry this burden. The Court is unpersuaded for two reasons. First, *Katz* is inapposite because the parties agree that Plaintiff sold an article, the LE750, as opposed to a patented combination of products and services, from 2001 through the moment of actual notice. Second, even if *Katz* did apply, Plaintiffs effectively concede that the LE750 embodied the relevant patents from 2008 to 2011 by stating that they themselves patent-marked the LE750 packaging from 2001 through the time of actual notice. [73], Resp. at 24. Accordingly, summary judgment as to damages arising before May 24, 2011 is proper.

## C.     Trade Dress and Trade Dilution Claims

Defendants move for summary judgment on Plaintiffs' trade dress claims, arguing that Plaintiffs insufficiently articulate the elements of their trade dress; that their trade dress lacks secondary meaning; that Defendants' trade dress is unlikely to cause confusion; and that Plaintiffs' trade dress is not protectable because it is functional. Defendants also move for summary judgment on the trade dilution claim, arguing that Plaintiffs' trade dress is neither "famous" nor "distinctive," the Federal Trademark Dilution Act. With respect to remedies, Defendants argue that Plaintiffs may not receive actual damages because there is no evidence of actual confusion, or alternatively, that actual damages may only begin to accrue after Defendants received actual notice of Plaintiffs' alleged rights in its trade dress. For the reasons explained below, the Court denies Defendants' motion with respect to the trade dress claim and damages and grants Defendants' motion with respect to the trade dilution claim.

1. **Trade Dress Infringement**

"Trade dress" refers to the "total image of a product, including size, shape, color combinations, graphics, packaging and label." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994). To obtain relief for trade dress infringement under 15 U.S.C. § 1125(a), a plaintiff must show that 1) its trade dress is protectable, and 2) its trade dress was infringed. *Id.* A plaintiff satisfies the first prong when it shows that its trade dress is inherently distinctive or has acquired secondary meaning. *Id.* It satisfies the second prong "if it can show that the similarity of the defendant's trade dress to that of the plaintiff is such as to create a likelihood of confusion on the part of consumers as to the source of the goods." *Id.* If a plaintiff satisfies both elements, the defendant can prevail if it demonstrates that the plaintiff's trade dress is functional. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998).

These requirements advance the economic policies of trademark law, one of which is to reduce consumers' search costs by "quickly and easily assur[ing] a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995). At the same time, trademark law encourages investing in brand development by discouraging free-riding; it "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* In doing so, trademark law "'encourage[s] the production of quality products,' and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." *Id.* at 164 (quoting 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 2.01[2], p. 2–3 (3d ed. 1994)).

### a. Articulated Elements of Plaintiffs' Trade Dress

Defendants suggest that as a threshold matter, a plaintiff must first articulate the discrete elements of its trade dress. They argue that Plaintiffs' failure to do so entitles Defendants to summary judgment. In the absence of Seventh Circuit precedent governing whether an articulation requirement exists, the Court looks to other courts for guidance. The Second Circuit has held that "a plaintiff asserting that a trade dress protects an entire line of different products must articulate the specific common elements sought to be protected." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001) (finding that a trade articulated as "the artistic combination of cable jewelry with other elements" was "too broad to be a protectable, source-identifying expression" because "artistic" and "other elements" lacked specificity). The Second Circuit has given four reasons for imposing an articulation requirement, all of which this Court finds persuasive.

> First, without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings.

> Second, no juror can evaluate secondary meaning, overbreadth, or nonfunctionality without knowing precisely what the plaintiff is trying to protect: "[w]ithout such a precise expression of the character and scope of the claimed trade dress, ... courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market."

> Third, "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, *i.e.,* the claimant seeks protection for an unprotectible style, theme or idea." * * *

> Fourth, "[c]ourts will ... be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." * * * [I]f a court is unable to identify what types of designs will infringe a trade dress, how is a competitor * * * to know what *new* designs would be subject to challenge by Yurman?

*Yurman Design, Inc.*, 262 F.3d at 117 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)).  It also has explained that the need for the articulation requirement is heightened in the context of a trade dress covering an entire product line. *Landscape Forms, Inc.*, 113 F.3d at 380 ("[A] claim of trade dress covering an array of items is likely to be broader than one for an individual product's design."); see also *Yurman Design, Inc.*, 262 F.3d at 116.  *Id.* at 117-18.  Other courts have similarly required plaintiffs to articulate the discrete elements of their trade dresses.  See *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir. 2006); *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014); *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2014 WL 7366578, at *32 (S.D. Ind. Dec. 24, 2014); *Weber-Stephen Products LLC v. Sears Holding Corp.*, 2013 WL 5782433, at *3 (N.D. Ill. Oct. 25, 2013).

Meanwhile, the Supreme Court has held that protectable trademarks may consist of a color that has acquired secondary meaning.  *Qualitex Co.*, 514 U.S. at 163 (finding that trademark law protected Qualitex's use of a green-gold color).  Viewing the articulation requirement alongside *Qualitex Co.*, the Court concludes that a party may satisfy the articulation requirement, to the extent it exists in the Seventh Circuit, by articulating a trade dress consisting of a color combination.  Plaintiffs here do so by consistently describing their alleged trade dress as a yellow and black color combination appearing on power tools, power tool accessories, and their packaging.  Although it may be simple, this color combination is far more specific than the elements of the trade dress in *Yurman*.  Accordingly, the Court denies Defendants' motion for summary judgment based on insufficient articulation of the elements of Plaintiffs' trade dress.

### b.  Secondary Meaning

A color combination is not inherently distinctive but may have secondary meaning. *Qualitex Co.*, 514 U.S. at 163.  Secondary meaning exists when "in the minds of the public, the primary significance of a product feature * * * is to identify the source of the product rather than the product itself." *Thomas & Betts Corp.*, 138 F.3d at 291 (citations and quotation marks omitted).  Secondary meaning can be established through "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id.* (citations and quotation mark omitted). Consumer testimony and consumer surveys are direct evidence; the remaining types of evidence are circumstantial. *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).

Defendants move for summary judgment, arguing that the Berger report is too defective to create a genuine issue of fact; that the remaining evidence is merely circumstantial; and that Plaintiffs, accordingly, fail to make a showing sufficient to establish secondary meaning—an essential element of trade dress infringement.  To the extent that Defendants attack the Berger report, they only create triable issues of fact, precluding summary judgment; none of the defects they highlight is so fatal as to render Berger's results meaningless.  For example, Defendants argue that the Berger report is flawed because the surveys only asked respondents about yellow and black tools, not yellow and black packaging.  They argue that this flaw is fatal because Plaintiffs allege that their trade dress appears on both products and packaging.  The Berger report may well have been stronger if the surveys had tested the secondary meaning of Plaintiffs' trade dress as it appeared on both products and packaging.  But it is not the job of the Court to weigh evidence on motion for summary judgment, nor is this claimed defect so egregious as to be fatal.

A reasonable trier of fact could infer that if respondents associate Plaintiffs with yellow and black products—a conclusion supported by the Berger report—consumers also associate Plaintiffs with tools and accessories in yellow and black packaging. Defendants also argue that the surveys failed to ask whether respondents were color-blind. Given the low prevalence of color-blindness, a reasonable trier of fact still could find the survey results meaningful. Defendants further argue that the report does not create a genuine issue of fact as to whether Defendants' JawHorse brand workstation, in particular, infringes Plaintiffs' trade dress; the surveys only included a photograph of Plaintiffs' miter saw and a general description of yellow and black power tools, not a yellow and black workstation. Again, the Berger report may have been more persuasive had it tested secondary meaning in the context of both the saw and the workstation. But this defect is not fatal. A reasonable trier of fact viewing the Berger report could conclude that consumers associate yellow and black power tool and accessories at large with Plaintiffs, even though Berger did not test secondary meaning with respect to each and every relevant product.

The conclusion set out in the preceding paragraph about the Berger report is buttressed by the Fischer Declaration. The Fischer Declaration addresses the "length and manner of use," explaining that Plaintiffs have used their yellow and black trade dress since 1992. See *Thomas & Betts Corp.*, 138 F.3d at 291. It addresses the "amount and manner of advertising," stating that Plaintiffs have spent over $150 million on at least seven kinds of advertising, described above. See *id.* And it addresses the "volume of sales," asserting that sales have exceeded $20 billion since 1992. See *id.* Defendants dismiss this evidence as "merely" circumstantial. Calling circumstantial evidence "merely" circumstantial does not entitle Defendants to summary judgment. At times, circumstantial evidence may be "more certain, satisfying and persuasive

than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S. Ct. 6, 11, 5 L. Ed. 2d 20 (1960). See also *Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704-05 (N.D. Ill. 2009); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); Federal Civil Jury Instructions of the Seventh Circuit 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence."). Here, the combination of the Berger report, which is direct evidence of secondary meaning, and the Fischer Declaration, which is circumstantial evidence of secondary meaning, provide sufficient evidence for a trier of fact to find secondary meaning.

Defendants also argue that consumers may purchase DeWalt tools because of DeWalt's reputation, not because they attribute yellow and black to Plaintiffs. This argument misses the mark; the question in a trade dress infringement claim is not why consumers buy a product but whether they identify the source of a product by its trade dress. Defendants further argue that the presumption of distinctiveness extends only to goods listed in a registration, citing a series of cases outside this circuit. This argument also fails. Plaintiffs do not allege a registered trade dress. Rather, they allege trade dress infringement under 15 U.S.C. § 1125(a).

Lastly, Defendants argue that secondary meaning requires a showing of exclusivity, citing *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722 (7th Cir. 1998) for the rule that a "mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the word, term, name, symbol, or device has come to mean that those products or services are the company's trademark." *Id.* at 728 (internal quotation marks and citation omitted). In their statement of facts, Defendants assert that nine other companies have registered tool-related trademarks claiming yellow and black and that these trademarks preclude the exclusive use of a

trade dress necessary to establish secondary meaning. But Defendants offer no evidence about how extensively these registrants have used these marks and how their use, if any, affected the source-identifying capacity of Plaintiffs' trade dress. *Platinum Home Mortgage Corp.* itself explained that the core inquiry is whether a trade dress has been "*used* so long and so exclusively by one company" that it has developed secondary meaning. *Platinum Home Mortgage Corp.*, 149 F.3d at 728. As the Seventh Circuit has made clear in the likelihood of confusion prong, third party registrations of similar trademarks affect the distinctiveness of a mark "only to the extent that the similar marks are promoted by their owners or recognized by the consuming public." *McGraw-Edison Co.*, 787 F.2d at 1171 (7th Cir. 1986).

> A trademark which is found only in the records of the Patent and Trademark Office does not materially affect the distinctiveness of another's mark which is actively used in trade * * * * the existence of these registrations is not evidence of what happens in the marketplace or that customers are familiar with their use.

*Id.* (citation and internal quotation marks omitted). See also *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001); *AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008). The same is true here. A third party with a registered mark might, for example, abandon it, use it in a different market, or insufficiently promote it to affect the secondary meaning of Plaintiffs' trade dress. Thus, third-party registration of similar trademarks does not, without more, preclude the secondary meaning of plaintiffs' trade dress. Accordingly, the Court denies Defendants' motion for summary judgment on this ground.[11]

### c.     Likelihood of Confusion

Defendants also argue that their trade dress is unlikely to cause confusion as a matter of law. Courts in the Seventh Circuit analyze the likelihood of confusion under a seven-factor test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products;

---

[11] In any event, even if Defendants had shown use, a reasonable trier of fact still could find that Plaintiffs' trade dress has acquired secondary meaning based on the Berger study and the Fischer Declaration.

(3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another." *Packman*, 267 F.3d at 643. "No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented, although, in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *Id.* The likelihood of confusion is a question of fact that may be resolved on summary judgment only if "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (citations and internal quotation marks omitted). "Accordingly, a motion for summary judgment in trademark infringement cases must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993).

The likelihood of confusion analysis reflects one purpose of trademark law, which is to reduce the cost of information to consumers. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380-81 (7th Cir. 1996). The likelihood of confusion analysis reduces the costs of information by "permit[ting] a producer to choose an identifier for his product and correspondingly forbid[ding] other producers from using confusingly similar identifiers on their products." *Id.* at 380. "Because a trademark is an identifier rather than a property 'right,' the use of a competitor's mark that does not cause confusion as to source is permissible. Consistent with this economic focus of trademark law, the likelihood of confusion must be determined with reference to the realities of consumer behavior in the relevant market." *Id.* at 380-81.

The evidence here is not so one-sided as to make summary judgment appropriate. First, a reasonable trier of fact could find a likelihood of confusion based on Berger's report; viewing a photograph of Plaintiffs' and Defendants' packaging alongside each other, 47% of respondents

said they believed all of the products pictured were put out by the same company. Defendants attack the Berger survey on the same or similar grounds as those explained above, but those attacks go to weight—and thus highlight disputes of fact—rather than to admissibility or sufficiency. In addition to the arguments addressed above, they argue, for example, that Berger failed to use the Eveready methodology, but they fail to explain why his methodology consequently is defective as a matter of law or cite supporting case law to that end.[12] Plaintiffs also argue that Berger's photograph may have been staged or cropped, that the lighting in the photograph may have been poor, and that Plaintiffs' and Defendants' products are presented differently in actual retail stores. At most, these arguments reveal triable issues concerning the credibility and the weight that should be given to Berger's report. Defendants also point to Berger's own testimony that the professional tradesmen included in the survey probably are not the actual purchasers in many cases. But a reasonable trier of fact could infer that the actual purchasers' views parallel or at least correlate in some meaningful way to their professional

---

[12] In an Eveready survey, which takes its name from *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), "respondents are generally shown only the [allegedly infringing] product (or brand name) and asked questions such as: (1) Who do you think puts out this product? (2) What makes you think so? and (3) Name any other products put out by the same concern which puts out this product." *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 289 (S.D.N.Y. 1997). Although the Eveready methodology is a "widely accepted format to prove the likelihood or non-likelihood of confusion," 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:174 (4th ed.), it is not the exclusive means of proving the likelihood of confusion. The case law shows that surveys using other methodologies can be sufficient to raise a genuine dispute of fact. See *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1037–1038, (9th Cir. 2010) (finding that the results of a survey—which was similar to the Berger survey in that it showed respondents pictures of the plaintiff's and defendant's branded products and asked questions about whether they thought that the branded products came from the same company, related companies or did not know—created a genuine issue of fact). Moreover, the cases recognize that Eveready surveys may not be appropriate in all circumstances because they are "less likely to reveal confusion if respondents think that the [allegedly infringing] mark is the [plaintiff's] mark ... and do not know the name (or products) of the company that puts out the [plaintiff's] mark." *Simon & Schuster, Inc.*, 970 F. Supp. at 289 (citation and quotation marks omitted) (finding that an Eveready survey may not have been appropriate given the type of product at issue); see also J.B. Swann, "Likelihood of Confusion Studies and the Straightened Scope of Squirt," 98 Trademark Rptr. 739, 755–756 (2008) ("The *Squirt* format is the alternative for testing the likelihood of confusion between marks that are weak, but are simultaneously or sequentially accessible in the marketplace for comparison").

employees' views and preferences. At the very least, a trier of fact might not dismiss the entire survey as meaningless based on this potential discrepancy between the professionals and the actual purchasers. Finally, Defendants also argue that Berger's survey failed to test the causal relationships between (i) the different images, text, or other designs on the packaging and (ii) confusion. But, unlike the articulation requirement, which requires Plaintiffs to identify the discrete elements of their trade dress, the likelihood of confusion analysis focuses on the total image of a product; the key question is whether consumers might be confused when they see Defendants' trade dress as a whole, not how much relative confusion the various parts of Defendants' trade dress cause.

Analysis of the individual factors under the Seventh Circuit test also indicates that summary judgment in favor of Defendants is not warranted on this issue.

### i. Similarity of Trade Dress

To determine whether two trade dresses are similar, the Court views the trade dresses as a whole. *AutoZone, Inc.*, 543 F.3d at 929. It does not "focus on minor stylistic differences to determine if confusion is likely." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). The Court makes a comparison "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *AutoZone, Inc.*, 543 F.3d at 930 (citations and internal quotation marks omitted). And it considers "whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Id.*

A reasonable trier of fact could find that the trade dresses are confusingly similar on the basis of the photographs in the Fischer Declaration and the Berger surveys; the photographs show that both trade dresses use yellow and black color combinations in relation to power tools,

power tool accessories, and packaging. Defendants argue that their power tools sometimes exhibit additional colors, like silver or green, but, at most, this creates a genuine dispute of fact regarding the extent of the similarity of the trade dresses.

Defendants also argue that the trade dresses are dissimilar because each party labels its products and packaging with "DeWalt" or "Rockwell." Although labeling may provide strong evidence against the likelihood of confusion, it is not necessarily dispositive. For example, labeling may not prevent confusion "when little care should be expected by the relevant purchaser, or when the differences in labeling and packaging are not great." *Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 637 (7th Cir. 1999). See also *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed. Cir. 1984) (finding that the legal effect of labeling may depend on the prominence of the label as well as how expensive and routinely purchased the product is); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1047 (2d Cir. 1992) ("the trade name may be a less dominant feature of the entire trade dress and thus have less force in countering other similarities between two trade dresses"); *Artus Corp. v. Nordic Co.*, 512 F. Supp. 1184, 1190-91 (W.D. Pa. 1981) ("A dissimilarity in names will often prove ineffective in preventing confusion caused by the general similarity in appearance of the product"). In fact, labeling may increase confusion where trade dresses are otherwise similar because consumers might infer a relationship between the parties; for example, they might infer that a plaintiff has purchased a defendant or that a plaintiff has licensed, approved or otherwise authorized the defendant's use of its trade dress. See *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 660 (D.P.R. 1992).

Here, a reasonable trier of fact viewing the photographs in the Fischer Declaration and Berger report—and especially the photograph in the likelihood of confusion survey—could find

that the yellow and black color combination in both parties' trade dresses predominates over the differences in the labels.  It also could conclude that purchasers who notice the different labels would infer a relationship between the two parties.  Plaintiffs could make this association particularly because, as Defendants acknowledge, Plaintiff Black & Decker previously purchased another tool manufacturer with yellow and black trade dress: Stanley, now known as Stanley Black & Decker.  A trier of fact might find the labels insufficient to dispel confusion particularly because Berger's results indicate that 47% of survey respondents were confused.

Defendants cite *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 383 (7th Cir. 1996), for the proposition that "in the case of a high-priced, single-purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product."  But that case is distinguishable in at least two ways.  First, the cited passage from *Dorr-Oliver, Inc.* addressed "[o]ne way in which courts have avoided the potential conflict between trademark and patent laws as applied to product configurations"—a question not at issue here.  *Id.*  Second, even if a trier of fact did find that purchasers are careful when purchasing tools that cost hundreds of dollars, it still could find that purchasers noticing the labels would incorrectly infer a relationship between the two companies because their similarities are more prominent than their differences.  Accordingly, there are genuine disputes of fact with respect to this factor.

## ii.        Similarity of the Products

The Court's "inquiry in comparing the two products is not whether they are interchangeable, but whether the parties' products are the kind the public might very well attribute to a single source (the plaintiff)." *AutoZone, Inc.*, 543 F.3d at 931 (citations and internal quotation marks omitted).  Here, both parties sell power tools and accessories—most

relevant here, miter saws and workstations. Defendants do not address this factor, offering no reason for the Court to find for them on it.

### iii.    Area and Manner of Concurrent Use

In addressing the area and manner of concurrent use, the Court assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *AutoZone, Inc.*, 543 F.3d at 932 (citation and internal quotation marks omitted). Defendants admit that both parties' products are sold in major retail stores. A trier of fact could conclude from the Fischer Declaration and Berger photographs that the two products are even sold on the same shelves. Common sense also suggests that stores would display similar products in the same general area, regardless of their brand name, as a convenience to their customers. When similar products with similar trade dresses are sold in the same retail stores, let alone on the same shelves, a trier of fact could find a likelihood of confusion. Defendants offer no reason why this factor should weigh in their favor.

### iv.    Degree of Care Likely To Be Exercised By Consumers

The Court evaluates this factor by considering how sophisticated and deliberative buyers are as well as how expensive and accessible the products are. See *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) ("where consumers are sophisticated, deliberative buyers, confusion is less likely"); *CAE, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001) ("The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases."). The relevant consumers here are serious DIYs and professionals. The products are frequently hundreds of dollars, and they are widely accessible. Defendants argue that these facts weigh against a likelihood of confusion, and a trier of fact might agree. Yet even accepting that this

factor weighs in favor of Defendants, the trier of fact still could find in favor of Plaintiffs based on an assessment of the remaining factors.

**v.       Strength of Plaintiffs' Trade dress**

The strength of a trade dress refers to its "distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE, Inc.*, 267 F.3d at 684.   Trademarks generally are classified into five categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary and fanciful. *CAE, Inc.* 267 F.3d 660, 684 (7th Cir. 2001).  A generic mark is "one that is commonly used and does not identify any particular source" and, therefore, is not distinctive. *Platinum Home Mortgage Corp.*, 149 F.3d at 727.  A descriptive mark "describes the ingredients, qualities, or characteristics of an article of trade or a service." *Id.* (citation and internal quotation marks omitted).  Although a descriptive mark is not inherently distinctive, it may become distinctive by acquiring secondary meaning. *Id.*    Lastly, suggestive, arbitrary and fanciful marks are inherently distinctive.   Color combinations are not suggestive, arbitrary or fanciful and, therefore, are not inherently distinctive. *Qualitex Co.*, 514 U.S. at 162.   If they acquire secondary meaning, however, they may come to identify a product "much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car–Freshner" on deodorizer) can come to indicate a product's origin." *Id.* at 163.  In addition to considering the category of distinctiveness, the strength of a trade dress corresponds to economic and marketing strength, *AutoZone, Inc.*, 543 F.3d at 933, which can include the length of use, the volume of sales, the volume of marketing expenses, see *CAE, Inc.*, 267 F.3d at 685.  The Court uses all of these factors to assess the strength of a trade dress because the stronger it is, "the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc.*, 543 F.3d at 933.

Viewing Plaintiffs' trade dress under this standard, a reasonable trier of fact could find that Plaintiffs have a strong trade dress. As explained above, a trier of fact could find that the yellow and black color combination has acquired secondary meaning, identifying Plaintiffs' product much as a descriptive word would. A trier of fact might also find that Plaintiffs' trade dress is strong because Plaintiffs have spent $150 million on promoting it since 1992 through NASCAR events, competitions, training seminars, sales demonstrations, apparel, and sales support and because Plaintiffs have achieved approximately $20 billion in sales.

Defendants again argue that Plaintiffs' trade dress is weakened by third party registrations of yellow and black trademarks connected to tools. However, as explained above, the effect of third-party registrations of similar trademarks "depends wholly upon their usage"; the fact of registration itself says little about actual use in commerce. *McGraw-Edison Co.*, 787 F.2d at 1171; *CAE, Inc.*, 267 F.3d at 685; *AutoZone, Inc.*, 543 F.3d at 933. Because Defendants offer no evidence as to how extensively these trademarks have been used, they do not persuasively show that these trademarks undermine the strength of Plaintiffs' trade dress.

Accordingly, a reasonable trier of fact could find that this factor weighs in Plaintiffs' favor.

### vi.     Actual Confusion

Actual confusion is one of the most significant factors for determining the likelihood of confusion, and "understandably so: what better evidence that confusion is likely than proof that it actually has occurred?" *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 883 (N.D. Ill. 1999). It is well-established that a "plaintiff need not show actual confusion in order to establish *likelihood* of confusion." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992). See also *Int'l Kennel Club of Chicago, Inc. v.*

*Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988); *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir. 1977). However, evidence of actual confusion is entitled to "substantial weight." *McGraw-Edison Co.*, 787 F.2d at 1172 (citations and internal quotation marks omitted); *Helene Curtis Indus., Inc.*, 560 F.2d at 1330. "Actual confusion can be shown by either direct evidence or by survey evidence." *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997).

Here, Defendants have moved for summary judgment without offering any survey evidence showing that confusion is unlikely. Plaintiffs, in contrast, have offered the Berger study, which shows a 47% rate of confusion. As discussed, Defendants' various challenges to the study go to its weight, not its admissibility or sufficiency. Accordingly, Defendants fail to establish the absence of factual disputes regarding actual confusion. See *McGraw-Edison Co.*, 787 F.2d at 1173.

### vii. Defendants' Intent to Palm Off Their Products as Plaintiffs'

Finally, the Court considers whether Defendants intended to palm off their products as those of Plaintiffs. The relevant question is not whether a defendant borrowed ideas from another's product—a practice which may promote competition. See *Pampered Chef, Ltd. v. Magic Kitchen, Inc.*, 12 F. Supp. 2d 785, 795 (N.D. Ill. 1998). Instead, it is "whether he intended to pass his product off as that of another in an effort to free-ride off the other's already developed good will, product recognition and customer loyalty" in a way that makes confusion more likely. *Id.* "In some circumstances, an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety." *AutoZone, Inc.*, 543 F.3d at 934. But where a party labels its trade dress with its name, a finding of intent may be doubtful. See *Pampered Chef, Ltd. v. Magic Kitchen, Inc.*, 12 F. Supp. 2d 785, 795 (N.D. Ill. 1998).

Defendants argue that its prominent display of the Rockwell brand on its trade dress indicates no intent to palm off. A trier of fact might disagree based on the prominence of the labeling relative to the prominence of the yellow and black coloring as well as the likelihood that consumers might assume that the two parties were affiliated even if they did notice the different labels. Plaintiffs, meanwhile, argue that Defendants' intent can be inferred in light of the strength of Plaintiffs' mark, which it has promoted since 1992. These arguments indicate a genuine dispute of material fact with respect to this factor.

### viii.    Balancing the Factors

The likelihood of confusion is a question of fact that may be resolved on summary judgment only if "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone, Inc.*, 543 F.3d at 929 (citations and internal quotation marks omitted). Here, as shown above, the evidence is not so one-sided in favor of Defendants. Accordingly, the Court declines to find no likelihood of confusion as a matter of law.

### d.    Functionality

Defendants argue in a footnote that Plaintiffs' trade dress is functional, entitling them to judgment as a matter of law. Even where a plaintiff satisfies the two prongs of trademark infringement, the defendant may prevail if it demonstrates that the Plaintiffs' trade dress is functional. *Thomas & Betts Corp.*, 138 F.3d at 291. Functionality is a "fact-specific conclusion about whether aspects of a design are essential to the use or purpose of the article or if it affects the cost or quality of the article"; functionality is not a question of law. *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 726 (7th Cir. 2010) (citations and internal quotation marks omitted). The purpose of the functionality affirmative defense is to promote competition:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate

competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation.

*Qualitex Co.*, 514 U.S. at 164 (internal citation omitted).

Defendants argue that the colors in Plaintiffs' trade dress are functional because they operate as a safety feature. More specifically, they argue that the color yellow alerts the user to moving mechanical parts of the device, and the color black distinguishes other functional moving parts of the device. Defendants' argument is unpersuasive for three reasons. First, Defendants offer insufficient support for their statements of fact; they point to their answers to Plaintiffs' interrogatories, which only restate the argument in a conclusory fashion. Second, Plaintiffs dispute that yellow is commonly understood as a safety color, pointing to leading power tool manufacturers that produce tools without yellow colors, instead using red, teal or green. Plaintiffs also offer evidence that manufacturers produce construction helmets not only in yellow, but also in orange, blue, red and black, thereby undermining Defendants' claim that certain colors signify safety in the construction or tool industry. Accordingly, Plaintiffs raise a genuine dispute of fact precluding summary judgment on this ground.

### 2. Trade Dilution Claim

Defendants move for summary judgment on Plaintiffs' trade dilution claim, arguing that Plaintiffs make an insufficient showing that their trade dress is "distinctive" and "famous." The Federal Trademark Dilution Act ("FTDA") provides that:

[s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). A mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In 2006, Congress amended the statute, making "the general consuming public" the benchmark. "This change eliminated any possibility of 'niche fame,' which some courts had recognized before the amendment." *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 384 (7th Cir. 2007). In determining whether a mark is famous, the court may consider all relevant factors, including the following: (i) the duration, extent, and geographic reach of advertising and publicity of the mark; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; (iv) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A).

Courts generally agree that the standard of dilution fame is "difficult to prove." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) ("It is well-established that dilution fame is difficult to prove."); *Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard."); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) ("Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value."); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("the mark must be a household name"); *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 2007 WL 118527, at *8 (N.D. Ill. Jan. 4, 2007) ("Courts routinely hold that a mark must be truly prominent and renowned before it is entitled to protection under the dilution statute.").

Defendants first argue that Plaintiffs' trade dress is not distinctive as a matter of law. As the Court explained above, there are genuine disputes of fact going to the secondary meaning of

Plaintiffs' trade dress.  Accordingly, the Court declines to grant Defendants' motion on this basis.

Second, Defendants argue that Plaintiffs offer insufficient evidence that their trade dress is "famous" within the meaning of the FTDA.  More specifically, they argue that Plaintiffs evidence only addresses fame among DIYs and professional tradesman—a niche market that is narrower than "the general consuming public."  15 U.S.C. § 1125(c)(2)(A).  Analyzing the evidence under the four statutory factors of analysis and relevant case law, the Court agrees that Plaintiffs fail to offer sufficient evidence of fame.

With respect to the first factor—the duration, extent, and geographic reach of advertising and publicity of the mark—Plaintiffs do show that they have spent over $150 million extensively promoting their trade dress nationwide since 1992.  And with respect to the second factor—the amount, volume, and geographic extent of sales of goods or services offered under the mark— Plaintiffs offer evidence that they have earned over $20 billion in sales nationwide.  However, with respect to the third factor—the extent of actual recognition of the mark—Plaintiffs make an insufficient showing as to how recognized their trade dress is among "the general consuming public."  15 U.S.C. § 1125(c)(2)(A).  The Berger study only addresses the population of DIYs and professional tradesmen.  At various points in their brief, Plaintiffs cite *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 851 (E.D. Va. 1998), in which a court found that "eighty-five percent of the professional power tool users that [Plaintiffs' expert] polled identified yellow and black with Black & Decker or DeWalt—a level of consumer recognition that parallels the extent to which the public associates golden arches with the McDonald's Corporation."  *Black & Decker (U.S.) Inc.*, 26 F. Supp. 2d at 851.  To the extent that Plaintiffs suggest that this is sufficient evidence of fame, the Court disagrees.  As an initial

matter, the Court hesitates to give too much weight to factual findings made in a case that was litigated almost two decades ago.  More importantly, however, even if the Court were to  assume that those findings are still true today, they only address the extent of recognition in the market of professional power tool users—again, a niche market.  Finally, with respect to the fourth factor, Plaintiffs do not allege their trade dress was registered.

Viewing these factors as a whole, the Court concludes that Plaintiffs have offered insufficient evidence indicating that their trade dress has achieved fame among the general consuming public, as opposed to the niche market of DIYs and professional tradesmen.  This lack of evidence is particularly problematic in light of the heightened showing that may be required to show fame within the meaning of the FTDA.

In response to Defendants' argument, Plaintiffs respond only with the following: "[f]or the same reasons there are genuine issues of fact on secondary meaning, Positec's request for summary judgment on dilution must also fail, as the yellow and black mark is clearly famous to the general population."  [73], Pls.' Resp. MSJ at 42.  This argument is unpersuasive.  First, Plaintiffs only cite authority addressing the likelihood of confusion analysis in a trademark claim, not trade dilution law.  Second, evidence of secondary meaning, which goes to distinctiveness, is not tantamount to evidence of fame under the FTDA.  Accordingly, the Court grants Defendants' motion with respect to Plaintiffs' trademark dilution claim.  See *Thane Int'l, Inc.*, 305 F.3d at 911.

### 3.    Actual Damages

Defendants move for summary judgment on Plaintiffs' claim for actual damages, arguing that actual damages are prohibited where there is no evidence of actual confusion.  "A plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's

Lanham Act violation, that the violation caused actual confusion among consumers of the plaintiff's product, and, as a result, that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)." *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204-05 (7th Cir. 1990). See also *CFM Majestic, Inc. v. NHC, Inc.*, 93 F. Supp. 2d 942, 960 (N.D. Ind. 2000). For the reasons explained above, the Berger survey raises genuine disputes of fact going to actual confusion. Accordingly, the Court denies Defendants' motion for summary judgment on this ground.

### 4.     Damages Prior to Actual Notice

Defendants also move for summary judgment on Plaintiffs' claim for damages, asking the Court to find that Plaintiffs may not collect damages accruing before Defendants had actual notice of Plaintiffs' claimed trade dress rights. The Lanham Act provides that

> [n]otwithstanding the provisions of section 22 hereof, a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed in a circle, thus ®; and in any suit for infringement under this Act by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this Act unless the defendant had actual notice of the registration.

15 U.S.C. § 1111. Defendants argue that registration gives potential defendants constructive notice of plaintiffs' protectable marks, making it easier to avoid infringement. They argue that with unregistered marks, constructive notice via registration is impossible, making actual notice the only means by which a defendant may avoid infringement. They further ask the Court to extend § 1111 to unregistered marks on policy grounds, arguing that a rule that disallows recovery for a registered mark based on lack of notice yet allows recovery for an unregistered mark despite the same lack of notice creates inconsistency. Accordingly, they ask the Court to

apply § 1111 to unregistered marks and find that Plaintiffs may not collect damages accruing before they gave Defendant actual notice of their trade dress.

Defendants' argument is unpersuasive for several reasons. First, the plain language of § 1111 makes clear that it only applies to registered trademarks. If Congress wanted the provision to apply to unregistered marks, it could have said so. Second, Defendants cite no authority in support of their argument, and, as Defendants acknowledge, there is a good deal of authority to the contrary. *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 912 (E.D.N.Y. 1988) (finding that "the absence of statutory notice has no relevance whatsoever" in cases brought under § 43(a) of the Lanham Act); 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:144 (4th ed.) ("But because the § 29 requirement of notice only applies to registered marks, it is, of course, not a limitation on recovery of damages under a § 43(a) count for infringement of an unregistered mark."); 4 CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 23:79 (4th ed.) ("Statutory notice is irrelevant to claims for infringement of an unregistered mark under § 43(a) of the Lanham Act or under state law").

Defendants also unpersuasively argue that, in the case of an unregistered mark, the available forms of notice are statutory notice and actual notice. Inquiry notice, if not constructive notice, may well have preceded Plaintiffs' demand letter given that Plaintiffs have spent $150 million promoting their trade dress since 1992 through NASCAR events, competitions, training seminars, sales demonstrations, apparel, and sales support, given that they have achieved $20 billion in sales, and given that they sell their products in the same retail stores as Defendants nationwide. Lastly, Defendants' policy argument ignores a policy that likely guides § 1111 and applies only to registered marks: to incent registrants to give notice of

registration earlier rather than later. Accordingly, the Court denies Defendants' motion to limit Plaintiffs' damages on these grounds.

## III.    Conclusion

For the reasons stated above, the Court grants Plaintiffs' motion for leave to file a supplemental declaration [79] and grants Defendants' motion for partial summary judgment [65] in part and denies it in part. More specifically, the Court grants Defendants' motion for partial summary judgment of non-infringement of claims 1, 2-7, and 10 of the '954 patent and claims 1, 4-8, and 18 of the '376 patent. It denies Defendants' motion for partial summary judgment of non-infringement of claims 9, 10, 13, 14, 16, and 17 of the '376 patent. The Court grants Defendants' motion for partial summary judgment with respect to infringement damages, holding that Plaintiffs may not recover damages arising from the alleged infringement of the '090, '376, and '975 patents prior to May 24, 2011. Lastly, the Court grants Defendants' motion with respect to the trade dilution claim and denies it with respect to the trade dress claims and trade dress damages.

Dated: March 31, 2015

Robert M. Dow, Jr.
United States District Judge