IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., <br><br> Plaintiffs, <br><br> v. <br><br> POSITEC USA INC. and RW DIRECT, INC. <br><br> Defendants. | Case No. 1:11-cv-05426 <br><br> Judge Robert M. Dow, Jr. <br> Magistrate-Judge Geraldine Soat Brown |

**BLACK & DECKER'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JAMES T. BERGER ON THE ISSUE OF SECONDARY MEANING**

**I.     INTRODUCTION**

Defendants seek to exclude the report and testimony of Plaintiffs' expert, James T. Berger ("Mr. Berger"), as to the issue of secondary meaning.  Given Mr. Berger's extensive educational background and his decades of professional experience in designing trademark and trade dress surveys (Ex. 1, Berger Sec. Mean. Rep. at pp. 2-6 and Assoc. Ex. A), Defendants do not (and could not) challenge Mr. Berger's qualifications to testify in this matter.  *U. of Kansas v. Sinks*, 06-2341-JAR, 2008 WL 755065, at *5 (D. Kan. Mar. 19, 2008) (finding that, "based on its review of Berger's credentials," Mr. Berger was "certainly qualified as an expert in this case to design a [trademark] survey to test the hypotheses posed in his report.").  Defendants also do not (and could not) argue that Mr. Berger's secondary meaning report is irrelevant or lacking in probative value, as this Court previously held that Mr. Berger's report "is direct evidence of secondary meaning" and provides "sufficient evidence for a trier of fact to find secondary meaning." (Dkt. 93, Court's 3/31/15 Opinion and Order at p. 59).

Thus, the sole issue here is whether the alleged methodological flaws in Mr. Berger's surveys are so egregious to render his report and opinions meaningless and unreliable.[1] Yet, Defendants' primary criticisms of Mr. Berger's secondary meaning surveys have already been thoroughly addressed by the parties and considered by this Court on summary judgment: "To the extent that Defendants attack the Berger [secondary meaning] report, they only create triable issues of fact, precluding summary judgment; ***none of the defects they highlight is so fatal as to render Berger's results meaningless***." (Dkt. 93, Court's 3/31/15 Opinion and Order at p. 57) (emphasis added). Likewise, in denying Defendants' motion for reconsideration, the Court again confirmed "its conclusion that the Berger secondary meaning survey was sufficient to enable a jury to find secondary meaning in B&D's asserted trade dress." (*See* Dkt. 97, Defts' Mot. for Reconsideration at p. 9, n.3; Dkt. 121, Court's 7/10/15 Opinion and Order).

As this Court has repeatedly recognized, and as the controlling decisions from the Seventh Circuit clearly state, Defendants' attacks on Mr. Berger's secondary meaning report and testimony go to <u>weight</u>, not <u>admissibility</u>. Defendants' motion should be denied out of hand.

## II. MR. BERGER'S TESTIMONY AND SECONDARY MEANING REPORT ARE ADMISSIBLE UNDER RULE 702

"[S]urvey evidence need not be perfect to be admissible." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 07 C 4718, 2010 WL 1687883, at *5 (N.D. Ill. Apr. 26, 2010) (Dow, J.). It is

---

[1] Mr. Berger's secondary meaning surveys in this case were properly conducted using double-blind research methodology. (Ex. 1, Berger Sec. Mean. Rep. at p. 6); (Ex. 2, Berger Dep. at pp. 110-111, 131-132 ("Neither the organization administering the survey[s] or the people who are taking the survey[s] had any idea who was putting out the survey[s].")). *Georgia-P. Consumer Products LP v. Kimberly-Clark Corp.*, 09 C 2263, 2010 WL 1334714, at *5 (N.D. Ill. Mar. 31, 2010) ("In order to ensure their objectivity, reliable surveys are conducted using double-blind research methodology whenever possible."). In *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1009 (N.D. Ill. 2010), a case Defendants rely on, the survey respondents "potentially knew the purpose of the survey before taking it," unlike the properly conducted double-blind methodology used by Mr. Berger here.

clear in the Seventh Circuit that only in "rare" situations will a "proffered survey" be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("We believe that any shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact."); *see also Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, 92 C 5170, 1994 WL 529331, at *8 (N.D. Ill. Sept. 27, 1994) (denying motion to bar survey, holding that "the research is not so fundamentally flawed to justify its exclusion on a motion *in limine*. Rather, these are precisely the types of issues which can be explored (often to great effect) during cross-examination.").

At trial, Defendants will be afforded the opportunity to cross-examine Mr. Berger, wherein the ***jury*** can properly determine the credibility of Mr. Berger and weigh the evidence based on a fully developed record, which is always the favored approach over exclusion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of" weighing the evidence presented).

> As explained in detail by Professor McCarthy:
>
> [T]here is no such thing as a "perfect" survey…Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some potential flaws somewhere. The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.

6 McCarthy on Trademarks and Unfair Competition § 32:178 (4th ed.); *id.* at § 32:170 ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence…Ordinarily, evidence from a professionally

conducted survey should be found sufficiently reliable and admissible under the gatekeeping test of the Supreme Court's Daubert precedent.").

Furthermore, at trial, Defendants' rebuttal expert, Dr. Jeffrey Stec ("Dr. Stec"), will have every opportunity to elaborate on any alleged deficiencies in Mr. Berger's surveys. *See Bobak Sausage*, 2010 WL 1687883 at *8 ("The admissibility of survey evidence often is resolved in the context of a ***battle of the experts***, where both sides have developed and placed before the Court competing views" on the disputed issues) (emphasis added).

Tellingly, Defendants had an equal opportunity to conduct their own survey eliminating all of Mr. Berger's alleged methodological flaws, but chose not to. Instead, Defendants solely rely on the criticisms of their high-priced expert, Dr. Stec, who supposedly "could have conducted a more accurate survey but did not do so." *See Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, 1:03 CV 414, 2006 WL 62846, at *5 (W.D. Mich. Jan. 10, 2006) (denying plaintiffs' motion to exclude expert's trademark survey and testimony; plaintiffs' expert "did not conduct any survey demonstrating that her suggested modifications to [defendant's expert's] survey would produce different or more accurate results."). The same rationale applies here.

### A. The Secondary Meaning Surveys Defined The Relevant Participant Universe

Defendants assert (incorrectly) that Mr. Berger's secondary meaning surveys were conducted through a faulty universe of respondents. (Dkt. 101-1, Defts' Memo. at pp. 6-9). At summary judgment, however, this Court correctly held that the "relevant consumers here are serious [do-it-yourselfers] and professionals" (Dkt. 93, Court's 3/31/15 Opinion and Order at p. 66), which Defendants recognize is the "relevant target market" for Mr. Berger's surveys. (Dkt. 101-1, Defts' Memo. at p. 6). Incredibly, Defendants rely on a snippet from Helen Fischer's ("Ms. Fischer") deposition testimony to support their contention that "serious do-it-yourselfers" ("DIYers") are not within the target universe because DeWalt products are targeted to professional

- 4 -

users. (*Id*. at p. 7). However, even on the deposition pages cited by Defendants, Ms. Fischer <u>clearly stated</u> that the target consumers of the DeWalt tools include "whoever would like to purchase these tools…," such as "professionals" and "aspirational DIYers [that] are more than welcome to purchase the tools based on [Plaintiffs'] advertising and marketing." (Ex. 3, Fischer Dep. at pp. 59-60; *see also id*. at pp. 75 ("[W]e absolutely sell to DIYers."), 76, 85-88, 90-91, 109).

Likewise, Mr. Berger testified that "serious do-it-yourselfers" are potential purchasers of both Plaintiffs' and Defendants' yellow and black power tool products.[2] (*See* Ex. 2, Berger Dep. at pp. 65-66 ("The serious do-it-yourselfer uses the power tools and is ***likely to purchase*** more power tools.") (emphasis added), 68-69, 70 ("[T]he serious do-it-yourselfer might very well purchase over the Internet."), 74 (stating that it is "very possible" that professional workmen or serious do-it-yourselfers "either work with DeWalt products or buy DeWalt products or own DeWalt products."), 75, 79 ("I observed the results, and in my expert opinion I surmised that the results from the survey were the opinions or the observations of what one would generally find in a target market.")). Dr. Stec even conceded that at least some DIYers "certainly can be" potential purchasers. (Ex. 4, Stec Dep. at p. 153).

Additionally, Defendants' concern as to whether a "professional tradesman" is part of the target universe was ***specifically addressed*** by this Court on summary judgment:

> Defendants also point to Berger's own testimony that the professional tradesmen included in the survey probably are not the actual purchasers in many cases. But ***a reasonable trier of fact could infer that the actual purchasers' views parallel or at least correlate in some meaningful way to their professional employees' views***

---

[2] Defendants' expert, Dr. Stec, stated that "presumably potential purchasers of the plaintiff's products, if the plaintiff and defendant compete in the same marketplace, are potential purchasers of the defendant's products, so those people would be potentially at least one in the same." (Ex. 4, Stec Dep. at p. 94). Plaintiffs and Defendants are "competing power tool sellers." (Dkt. 147, Court's 8/05/15 Opinion and Order at p. 1; *see also id*. at p. 15 ("Plaintiffs' evidence suggests that…the parties are ***direct competitors***…") (emphasis added); (Dkt. 93, Court's 3/31/15 Opinion and Order at p. 3); (Dkt. 121, Court's 7/10/15 Opinion and Order at p. 1)).

> *and preferences*. At the very least, a trier of fact might not dismiss the entire survey as meaningless based on this potential discrepancy between the professionals and the actual purchasers.

(Dkt. 93, Court's 3/31/15 Opinion and Order at pp. 62-63) (emphasis added); (*see also* Ex. 4, Stec Dep. at pp. 94-96 (testifying that "users" of products – "people who use the products…as part of their job, but…don't go out and purchase the products because their employer provides them" – may be considered in developing the relevant target population), 138 (admitting that a professional tradesman could at some point purchase tools); Ex. 2, Berger Dep. at pp. 65-66, 67 (stating that professional tradesmen are representative of the target universe because "they use the tools and they are able to recognize the maker of the tools."), 69, 70 (recognizing that professional workmen "might end up at a Home Depot or a Lowe's to purchase" a DeWalt tool), 74-75, 79).[3]

Contrary to Mr. Berger, the expert witness in *Competitive Edge* "did not define a universe when developing the survey." 763 F. Supp. 2d at 1008. Similarly, the survey at issue in *Spraying Sys. Co. v. Delavan, Inc*., failed to target "actual purchasers." 975 F.2d 387, 394 n.5 (7th Cir. 1992). Thus, Defendants' reliance on these cases is entirely misplaced.

In any event, all of Defendants' arguments about the target universe go to the weight and not the admissibility of Mr. Berger's surveys. *See, e.g.*, *Piper Aircraft Corp. v. Wag-Aero, Inc*.,

---

[3] Mr. Berger used the same format and protocol for his secondary meaning surveys as expert Philip Johnson used in the survey accepted with approval by the Court in *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc*., 26 F. Supp. 2d 834, 851 (E.D. Va. 1998) ("That the DeWalt colors currently enjoy secondary meaning is also beyond debate. Philip Johnson, Black & Decker's survey expert, found that eighty-five percent of the ***professional power tool users*** that he polled identified yellow and black with Black & Decker or DeWalt…." (emphasis added). (*See also* Ex. 2, Berger Dep. at pp. 27-28).

741 F.2d 925, 930-31 (7th Cir. 1984); *Georgia-Pacific*, 2010 WL 1334714 at *3; *Sinks*, 2008 WL 755065 at *3-5[4]; *Whirlpool Properties*, 2006 WL 62846 at *4-5.

Furthermore, Defendants criticize Mr. Berger's use of a non-probability survey instead of a probability survey, and the sample selected by the internet research organization, e-Rewards. (Dkt. 101-1, Defts' Memo. at pp. 8, 13). However, as stated by Professor McCarthy,

> nonprobability surveys are of a type often relied upon by marketing experts and social scientists in forming opinions on customer attitudes and perceptions. Thus, ***expert opinions based on such surveys are admissible in evidence***.

6 McCarthy on Trademarks and Unfair Competition § 32:165 (4th ed.) (emphasis added).[5] *See also id*. at § 32:164 (discussing drawbacks of probability surveys); (Ex. 2, Berger Dep. at p. 77 (stating that in "most cases that survey experts participate in, the standard practice is to use the non-probability sample."), 118-119). Mr. Berger also testified that there have been "***a lot*** of peer review articles about non-probability samples and how effective they are in this kind of research," *id*. at p. 78 (emphasis added), which directly contradicts Dr. Stec's opinions. (*See* Dkt. 101-1, Defts' Memo. at p. 13). These are all issues for the jury to consider in determining the appropriate amount of weight to give to Mr. Berger's surveys (i.e., this is a question of weight, not admissibility).

Similarly, online surveys using an e-Rewards panel are admissible in evidence. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgt., Inc*., 618 F.3d 1025, 1036-38 (9th Cir. 2010).

---

[4] In *Sinks*, where a survey conducted by Mr. Berger was also at issue, the Court found that Defendants' argument about whether survey respondents would purchase the disputed products again went to weight, not admissibility. *Id*. at *3, 5.

[5] *See* Reference Manual on Scientific Evidence, 382 (Federal Judicial Center 3rd ed. 2011) ("A majority of the consumer surveys conducted for Lanham Act litigation present results from non-probability convenience samples. They are admitted into evidence based on the argument that non-probability sampling is used widely in marketing research and that 'results of these studies are used by major American companies in making decisions of considerable consequence.'").

In fact, in *Fortune Dynamic*, the "e-Rewards panel consist[ed] of **211,000 members**," *id*. at 1036 (emphasis added), whereas here, e-Rewards was allegedly "limited to **6.5 million total**, worldwide members" according to Defendants' expert, Dr. Stec. (Dkt. 101-1, Defts' Memo. at p. 8) (emphasis added). Thus, the use of the e-Rewards panel here was sufficiently reliable under Rule 702 – Mr. Berger testified that e-Rewards ensures that "people who take these surveys indeed are qualified to take these surveys." (Ex. 2, Berger Dep. at p. 51; *see also* Ex. 1, Berger Sec. Mean. Rep. at p. 10 and Assoc. Ex. D). Nevertheless, Defendants' criticisms do not render Mr. Berger's surveys inadmissible. *See Georgia-Pacific*, 2010 WL 1334714 at *4-6 (survey admissible despite questioning "the reliability of the sample population to whom the survey was administered, even if the [target] universe…were deemed the correct one….").

Defendants rely on two cases where surveys prepared by Mr. Berger were allegedly excluded on "similar grounds" to this case.[6] (Dkt. 101-1, Defts' Memo. at p. 8). In *Powerhouse Marks LLC v. Chi Hsin Impex, Inc*., the survey at issue was conducted in close physical proximity to plaintiff's fitness centers. 04-73923, 2006 WL 897254, at *3 (E.D. Mich. Apr. 5, 2006). Thus, the survey respondents, which consisted of individuals who had worked out at a fitness center within the last five years, were "more likely to associate [defendant's] products with [plaintiff] than the larger universe of potential buyers of [defendant's] products." *Id*. Here, however, Mr. Berger's target universe was widespread, comprising qualified internet users, and consequently did not inherently attract a respondent pool that was more familiar with Plaintiffs' tools than

---

[6] Several of Mr. Berger's surveys have been found admissible. *See, e.g.*, *Morningware, Inc. v. Hearthware Home Products, Inc*., 09 C 4348, 2012 WL 3721350, at *12-15 (N.D. Ill. Aug. 27, 2012); *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 3:09-CV-10-TLS, 2012 WL 12281609, at *1-6 (N.D. Ind. Feb. 21, 2012); *Sinks*, 2008 WL 755065 at *3-8; *Seed Lighting Design Co., Ltd. v. Home Depot*, C 04-2291 SBA, 2005 WL 1868152, at *5-6 (N.D. Cal. Aug. 3, 2005); *S & M Nutec, L.L.C. v. T.F.H. Publications, Inc.*, 03-1033-CV-W-NKL, 2005 WL 1224607, at *7 (W.D. Mo. May 23, 2005).

Defendants' tools. Likewise, in *Vista Food Exch., Inc. v. Vistar Corp.*, "[n]o effort was made to include individuals who fall within Defendant's target market," and the parties served "different tiers" of customers. 03-CV-5203DRHWDW, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005). Further, the *Vista* Court found that a sample size of **75 respondents** was "too small a sample to be representative of the universe of potential consumers of Defendant's products," *id*. at *7 (emphasis added), whereas here, the sample size of Mr. Berger's secondary meaning surveys consisted of **200 participants**. (Ex. 1, Berger Sec. Mean. Rep. at p. 6). Defendants' case law does not support their position here.

### B. The Secondary Meaning Surveys Did Not Ask Leading Questions

As in *Dwyer*, the close-ended question employed by Mr. Berger in his first secondary meaning survey, which uses "the phrase 'Which, *if any*,' in conjunction with the option to answer 'don't know'" (Ex. 1, Berger Sec. Mean. Rep. at pp. 7-8) (emphasis added), is not "patently biased and leading." 2012 WL 12281609 at *5 (holding that the wording of Mr. Berger's survey did not contravene "the principles of professional survey research.").[7]

Similarly, this Court has previously rejected Defendants' assertion regarding whether surveys are inadmissible if they ask close-ended questions. *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 955 (N.D. Ill. 2009) (denying motion to exclude expert's testimony; "the mere existence of the [consumer survey's] closed-ended question does not render the survey inadmissible"):

---

[7] Defendants improperly rely on *Mennen Co. v. Gillette Co*., 565 F. Supp. 648, 652-53 (S.D.N.Y. 1983), *I.P. Lund Trading ApS v. Kohler Co*., 118 F. Supp. 2d 92, 107 n.24 (D. Mass. 2000), and *Straumann Co. v. Lifecore Biomedical Inc*., 278 F. Supp. 2d 130, 138 (D. Mass. 2003). (Dkt. 101-1, Defts' Memo. at pp. 9-10, 12). In those cases, the disputed survey questions did not use the phrase "Which, *if any*" in combination with the option to answer "don't know," and thus, "suggested to the respondents that the products *did* come from a single manufacturer." *Straumann*, 278 F. Supp. 2d at 138. (emphasis in original). Again, Defendants' case law is clearly inapplicable.

> [A] non-leading closed-ended question is not improper merely because it explicitly provides respondents with a set of responses from which to choose—particularly where as here, the question allows respondents the option of choosing ***"don't know/not sure,"*** in case they do not agree with any of the provided choices.

*Id*. (emphasis added). (Ex. 2, Berger Dep. at pp. 116 (stating that he did not ask any leading questions in his secondary meaning surveys), 120-121 (testifying that a question prompting a respondent to either agree or disagree with the question is not necessarily leading)).

As in *LG Electronics*, Mr. Berger's first secondary meaning survey gave respondents the option of choosing "don't know" when provided a list of power tool manufacturers from which to choose. (Ex. 1, Berger Sec. Mean. Rep. at p. 8 and Assoc. Ex. B, Tradesmen Sec. Mean. 1).[8] Likewise, the second survey allowed respondents to choose "don't know" when asked whether they had a belief as to what company manufactures the product identified in the question. (Ex. 1, Berger Sec. Mean. Rep. at p. 8 and Assoc. Ex. B, Tradesmen Sec. Mean. 2). Accordingly, the use of "don't know" in the close-ended questions of Mr. Berger's secondary meaning surveys "sufficiently mitigates" Defendants' concerns over the risk of guessing "to permit admission of the survey[s]." *LG Electronics*, 661 F. Supp. 2d at 955; *Dwyer*, 2012 WL 12281609 at *5 ("Some respondents to a survey will not have an opinion on a question asked, which can result in a respondent guessing as to the 'right' answer. Reliable surveys address this issue through the use of filter questions and 'don't know' or 'no opinion' answer alternatives.").

In any event, whether the surveys consist of leading questions (which they clearly do not) goes to weight, not admissibility. *See, e.g.*, *LG Electronics*, 661 F. Supp. 2d at 956; *Morningware*,

---

[8] Defendants contend that the question about whether respondents have ever seen the product depicted in the survey implies "that there is a single company that puts out the product." (Dkt. 101-1, Defts' Memo. at p. 10). This argument has no logical force, as there clearly are no such implications.

2012 WL 3721350 at *12; *Sinks*, 2008 WL 755065 at *5; *Whirlpool Properties*, 2006 WL 62846 at *5-7.

Furthermore, without citing any authority other than their expert's opinions, Defendants erroneously argue that Mr. Berger did not consider respondents' answers to the surveys' open-ended questions (e.g., "why", "what makes you say that", "is there anything else that makes you say that") and made his conclusions "with ignorance as to why respondents answered the questions the way they did." (Dkt. 101-1, Defts' Memo. at p. 12).[9] In his secondary meaning report, Mr. Berger ***explicitly identified the percentages of several verbatim answers*** for respondents identifying DeWalt as the manufacturer. (Ex. 1, Berger Sec. Mean. Rep. at pp. 9-10).[10] Moreover, Defendants' assertion that Mr. Berger "***didn't care*** why respondents answered the way they did" (Dkt. 101-1, Defts' Memo. at p. 12, n.6) (emphasis added), completely misstates Mr. Berger's testimony. Mr. Berger merely said that while he was "mainly interested" in the close-ended questions in formulating his opinions, the "verbatim answers shed a little bit more light on the feelings or the opinions of the people" and "provide the client with a little bit more marketing

---

[9] Defendants' reliance on *Competitive Edge* and *Sears, Roebuck and Co. v. Menard, Inc*., 01 C 9843, 2003 WL 168642 (N.D. Ill. Jan. 24, 2003) is misplaced. (Dkt. 101-1, Defts' Memo. at pp. 9, 14). In *Competitive Edge*, the survey questions "allowed for ***only*** 'yes' or 'no' responses" and failed "to use open-ended questions or to allow for 'don't know' responses." 763 F. Supp. 2d at 1009 (emphasis added). Likewise, in *Sears*, the survey at issue failed to even ask respondents "why" they believed that the parties were "affiliated." 2003 WL 168642 at *3.

[10] For example, 40% of respondents believed the yellow and black product depicted in the first secondary meaning survey was put out by DeWalt "because of the color." (*Id*. at p. 9). Similarly, 33% of respondents answered DeWalt in the second survey because they "have some DeWalt tools already – own some – known them"; 20% responded "[t]hat's DeWalt's colors/colors of DeWalt tools"; 14% stated "DeWalt has yellow and black tools"; and 6% answered "[c]olors." (*Id*. at pp. 9-10). Clearly, Defendants' claim that not "a single respondent surveyed indicated that the color combination of yellow and black was the reason why they associated the product pictured (or described) as being a DeWalt product" is completely false. (*See* Dkt. 101-1, Defts' Memo. at p. 13). These responses are undoubtedly relevant to whether the asserted yellow and black trade dress has attained secondary meaning.

information." (Ex. 2, Berger Dep. at pp. 121, 124; *see also id*. at p. 122 (testifying that for the most part, respondents' verbatim answers were due to the "appearance of the product" – specifically, "the yellow and black colors.")). Regardless, these criticisms address the weight of the secondary meaning surveys, rather than their admissibility, and thus should be explored on cross-examination. *LG Electronics*, 661 F. Supp. 2d at 956. Like Defendants here, defendant in *LG Electronics* contended that open-ended questions are the most probative evidence, and thus plaintiff's expert "erred in failing to base his opinion on responses" to those questions. *Id*. at 954. This Court rejected defendant's argument, and recognized that "the closed-ended question may provide relevant information beyond what first pops into the minds of respondents. ***The jury thus will be free to weigh the utility, if any, of the closed-ended question along with the open-ended question and the survey as a whole***." *Id*. at 955 (emphasis added).

### C. A Control Was Unnecessary For The Secondary Meaning Surveys

Mr. Berger testified that in his expert opinion, it was "totally unnecessary" to run a control in this case. (Ex. 2, Berger Dep. at p. 103; *see also id*. at pp. 24 (recognizing that in some cases it is "impractical" to use a control), 102 ("In this case it was just not necessary to run a control group.")). Moreover, the fact that Mr. Berger employed several screening questions[11] that "assessed the familiarity of the [potential respondents] with the [targeted] products" further supports Mr. Berger's opinion that a control group was not required in this case. *Kinetic Concepts, Inc. v. Bluesky Med. Corp*., SA-03-CA-0832, 2006 WL 6505346, at *4-6 (W.D. Tex. Aug. 11,

---

[11] To qualify, a prospective respondent had to fulfill the following qualifications: (1) Had to be age 18 or over; (2) had to be either a professional tradesman who uses power tools or a serious do-it-yourselfer, defined as owning more than $1,000 worth of power tools; (3) could not have anyone in their household who works for an advertising agency, market research firm or any business involved in the sale of power tools; and (4) was wearing eyeglasses, if needed, to view the computer screen. (Ex. 1, Berger Sec. Mean. Rep. at p. 7 and Assoc. Ex. B, Tradesmen Sec. Mean. 1-2 (s1, s4-s7)).

2006) (denying motion to exclude expert's survey and dismissing defendant's assertion that the survey failed to use a control group; "Defendant has not persuaded this Court that its arguments defeat admissibility but, rather, are more appropriately made before the jury, eminently capable of assessing the survey's weight."). Further, Defendants' contentions that respondents' answers to the survey questions were due to factors other than the alleged trade dress or as a result of guesswork are unfounded, *supra* Section II(B).

Nevertheless, whether the secondary meaning surveys improperly lacked a control group bears on the weight and not the admissibility of the surveys. *See, e.g.*, *Ironclad, L.P. v. Poly-Am., Inc.*, CIV. A. 3:98-CV-2600, 2000 WL 1400762, at *8 (N.D. Tex. July 28, 2000) (although plaintiff's expert "admitted the survey lacked a control question or control product,…the Court need not exclude the survey due to the lack of control…."); *Nightlight Sys., Inc. v. Nitelites Fran. Sys., Inc.*, 1:04-CV-2112-CAP, 2007 WL 4563873, at *8 (N.D. Ga. July 17, 2007); *N.W. Airlines, Inc. v. NWA Fed. Credit Union*, CIV. 03-3625DWFSRN, 2004 WL 1968662, at *2-3 (D. Minn. Sept. 2, 2004); *Playtex Products, Inc. v. Procter & Gamble Co.*, 02 CIV. 8046 (WHP), 2003 WL 21242769, at *1-2 (S.D.N.Y. May 28, 2003). Accordingly, Mr. Berger and Dr. Stec should <u>both</u> be afforded the opportunity to present their opinions as to the necessity of a control in the context of trial. *See Bobak Sausage*, 2010 WL 1687883 at *8.

### III. MR. BERGER'S REPORT IS ADMISSIBLE TO SHOW THAT THE DISPUTED PRODUCTS AND PACKAGING HAVE ACHIEVED SECONDARY MEANING

Without citing <u>any</u> authority, Defendants argue that Mr. Berger's secondary meaning surveys are inadmissible to show that Plaintiffs' yellow and black power tool "packaging" has acquired secondary meaning. (Dkt. 101-1, Defts' Memo. at pp. 14-15). Yet again, Defendants' criticisms were raised by the parties and thoroughly considered by the Court on summary judgment:

> Defendants argue that the Berger report is flawed because the surveys only asked respondents about yellow and black tools, not yellow and black packaging. They argue that this flaw is fatal because Plaintiffs allege that their trade dress appears on both products and packaging. The Berger report may well have been stronger if the surveys had tested the secondary meaning of Plaintiffs' trade dress as it appeared on both products and packaging. But *it is not the job of the Court to weigh evidence on motion for summary judgment, nor is this claimed defect so egregious as to be fatal. A reasonable trier of fact could infer that if respondents associate Plaintiffs with yellow and black products—a conclusion supported by the Berger report—consumers also associate Plaintiffs with tools and accessories in yellow and black packaging*.

(Dkt. 93, Court's 3/31/15 Opinion and Order at pp. 57-58) (emphasis added). Likewise, the Court rejected Defendants' request to reconsider "its conclusion that the Berger survey results as to secondary meaning in product design may be transferable to product packaging." (*See* Dkt. 97, Defts' Mot. for Reconsideration at p. 9, n.3; Dkt. 121, Court's 7/10/15 Opinion and Order (denying Defendants' motion for reconsideration)). There is no basis for the Court to consider yet again the same argument already submitted twice by Defendants and rejected twice by the Court.

Additionally, Mr. Berger testified as follows regarding the survey respondents: "[I]f you were at a Home Depot and you saw [a yellow and black power tool] you might very well have seen the packaging that was yellow and black if you're at the store. So you could have seen the tool or you could have seen the packaging." (Ex. 2, Berger Dep. at p. 114). In Mr. Berger's opinion, his survey results apply equally to the product packaging as they do to the tools themselves. (*Id*.). Once again, Defendants' arguments go to weight, not admissibility.

### IV. MR. BERGER'S SECONDARY MEANING REPORT SHOULD NOT BE EXCLUDED UNDER RULE 403

Only in "rare" situations will a proffered survey be deemed "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary*, 1 F.3d at 618. Defendants failed to demonstrate how the probative value of Mr. Berger's secondary meaning surveys is "substantially outweighed" by unfair prejudice or misleading the jury, Fed. R. Evid.

403; thus, the surveys and corresponding report pass muster under Rule 403 and "should be evaluated by the trier of fact." *See AHP Subsidiary*, 1 F.3d at 618; *see also Classic Foods Intern. Corp. v. Kettle Foods, Inc*., SACV04-725CJC(EX), 2006 WL 5187497, at *7 (C.D. Cal. Mar. 2, 2006) (denying motion to exclude expert's survey; "Rule 403 only permits a court to exclude relevant evidence when its probative value is *substantially* outweighed by possible prejudice, and where that prejudice would be *undue*.") (emphasis in original); *Friesland Brands, B.V. v. Vietnam Natl. Milk Co*., 221 F. Supp. 2d 457, 460-61 (S.D.N.Y. 2002) (survey admissible despite "an 'overbroad' universe…."); *Playtex*, 2003 WL 21242769 at *1-2; *Nightlight*, 2007 WL 4563873 at *10.

Accordingly, any shortcomings in Mr. Berger's surveys should be challenged on cross-examination or through the presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

## V.  CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude the opinions and report of Mr. Berger on the issue of secondary meaning.

    Respectfully submitted,

    */s/ Raymond P. Niro, Jr.*
    Raymond P. Niro, Jr.
    Kyle D. Wallenberg
    NIRO McANDREWS, LLC
    200 W. Madison St., Suite 2040
    Chicago, IL 60606
    (312) 755-8575
    Fax: (312) 674-7481
    rnirojr@niro-mcandrews.com
    kwallenberg@niro-mcandrews.com

    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 24, 2015 the foregoing

**BLACK & DECKER'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JAMES T. BERGER ON THE ISSUE OF SECONDARY MEANING**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

| | |
|---|---|
| J. Aron Carnahan<br>HUSCH BLACKWELL LLP<br>120 S. Riverside Plaza, 22nd Fl.<br>Chicago, IL 60606<br>aron.carnahan@huschblackwell.com | Henry S. Alford<br>Scot A. Duvall<br>Brian P. McGraw<br>Dennis D. Murrell<br>Robert J. Theuerkauf<br>MIDDLETON REUTLINGER<br>401 S. Fourth Street<br>2500 Brown & Williamson Tower<br>Louisville, KY  40202<br>HAlford@MiddletonLaw.com<br>SDuvall@MiddletonLaw.com<br>BMcGraw@MiddletonLaw.com<br>DMurrell@MiddletonLaw.com<br>RJT@MiddletonLaw.com |

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

> */s/ Raymond P. Niro, Jr.*
> Attorney for Plaintiffs
> NIRO McANDREWS, LLC