IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 11-cv-5426 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| POSITEC USA INC. and RW DIRECT INC., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Black & Decker Corporation, Black & Decker Inc., and Black & Decker (U.S.) Inc. (collectively, "Plaintiffs") bring trademark infringement and related claims against Defendants Positec USA Inc. and RW Direct Inc. (collectively, "Defendants"). Before this Court are eleven motions *in limine* ([126] through [135] and [140]) and three *Daubert* motions ([101], [103] and [136]). Defendants withdrew motion *in limine* [135] at the September 14, 2015 final pre-trial conference. As to the remaining motions, the Court provisionally grants motion *in limine* [134]; grants in part and denies in part motions *in limine* [127] and [128]; denies motions *in limine* [126], [129], [130], [131], [133] and [140]; and denies the three *Daubert* motions, [101], [103] and [136]. The Court reserves ruling on Defendants' motion *in limine* [132] and will discuss the motion and the pertinent authorities with counsel at the September 23 final pre-trial conference.

## I.       Background

The background of this trademark case, knowledge of which is assumed, is set forth in the Court's Memorandum Opinion and Order [93] granting in part and denying in part Defendants' motion for summary judgment. In that order, the Court granted summary judgment in favor of Defendants on parts of Plaintiffs' claim for patent infringement under 35 U.S.C. §§ 284 and 285 (Count I) and on Plaintiffs' claim for trademark dilution under 15 U.S.C. § 1125(c) (Count V). The parties have subsequently agreed to resolve the remaining patent infringement issues and to dismiss the patent infringement claim and have advised the Court that a stipulation of dismissal will be filed in short order. Therefore, the following claims remain for trial: trademark infringement under 15 U.S.C. § 1114 (Count II); Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a) (Count III); Federal Trade Dress Infringement under 15 U.S.C. § 1125(a) (Count IV); and state common law trademark infringement and unfair competition (Count VI). See [50].

## II.     Motions *In Limine*

### A.     Legal Standard

A motion *in limine* is a motion "at the outset" or one made "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997) (observing that, when used properly, the motions may sharpen the issues for trial). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009).

Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989); see also *Luce*, 469 U.S. at 41-42 ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). In addition, if an evidentiary issue raised in a motion *in limine* "cannot be evaluated accurately or sufficiently" prior to trial, it is appropriate to defer ruling until trial. *Jonasson*, 115 F.3d at 440 (delaying until trial may afford the judge a better opportunity to estimate the evidence's impact on the jury).

### B.     Testimony Concerning Defendants' Products Being Made In China or Defendants Being Owned by a Chinese Company [126]

Defendants move to bar Plaintiffs from introducing as evidence or making any reference at trial to the fact that Defendants are owned by a Chinese entity or that Defendants' allegedly infringing products were made in China. According to Defendants, such evidence is not relevant and is intended to improperly inflame potential bias against foreign corporations. The Court denies Defendants' motion because the evidence Defendants seek to bar is relevant to explaining the relationship between the parties in this case and there is no indication that this relevance is outweighed by concerns of unfair prejudice.[1] The origin of the Defendants' products and the common ownership of Defendants by a Chinese company are relevant "to explain [Defendants] corporate structure and the interplay between" the Defendants, their parent, and the sister companies from which they purchased the allegedly infringing products. *Apple, Inc. v. Samsung Electronics Co.*, 2014 WL 549324, at *14 (N.D. Cal. Feb. 7, 2014) (finding that Apple did not evoke racial or national origin prejudice "by using the phrase 'Samsung Korea' and asking questions regarding whether certain actions were undertaken by Samsung's Korean executives," where such evidence was relevant to explain Samsung's corporate structure and the interaction

---

[1] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

between various executives). It would likely be difficult, and confusing to the jury, to scrub the record of any references to China. For instance, both parties have marked the Defendants' products—which are marked "made in China"—as trial exhibits. And Defendants' damages expert states in his report that the Defendants tools "are manufactured, assembled and packaged at Positec Machinery Co., Ltd. in China." [159] at 2.

Apart from repeating the language of Rule 403, Defendants have not explained how they would suffer any unfair prejudice if Plaintiffs are allowed to refer to the nationality of their parent company or the origin of their products. See Fed. R. Evid. 403. The Court therefore denies Defendants' motion [126]. The Court cautions however, that Plaintiffs should present this evidence in a business-like, non-inflammatory manner (as they have committed to do) and limit its use to that which is clearly relevant. As the Court will instruct the jury, it "cannot consider a defendant's race, ethnicity, or national origin in reaching a verdict." *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1046 (7th Cir. 2013). Therefore Plaintiffs should carefully avoid any argument "suggest[ing] an us-versus-them, American-versus-non-American theme to the jury," which "could * * * evoke[] national origin prejudice." *Apple*, 2014 WL 549324, at *13.

## C.    Evidence and Arguments as to Claims That Have Been Dismissed [127]

Defendants move to bar Plaintiffs from introducing as evidence or making arguments at trial as to the patent infringement claims that have been dismissed from this lawsuit, because this evidence is not relevant to the active claims in the case and would have a prejudicial effect on the jury. Defendants identify PX-11, PX-12, PX-13, PX-14, PX-54, PX-55 and PX-90 as exhibits that Plaintiffs intend to introduce "which relate solely to those products that were accused of patent infringement (and not trade dress infringement)." [127] at 2. Plaintiffs assert that these exhibits should be admitted to the extent that they relate to the trademark and trade dress issues.

The Court grants this motion in part and denies it in part. As an initial matter, on the basis of the parties' representations in the final pre-trial order, the Court assumes that the remaining patent infringement claims will be dismissed prior to trial. Based on that assumption, the Court grants Defendants' request to preclude arguments at trial concerning Plaintiffs' claims for patent infringement, patent damages, and trademark dilution, except to the extent that (1) Defendants argue that Plaintiffs delayed in filing suit; and (2) Plaintiffs' testimony concerning patent infringement, patent damages, and trademark dilution is relevant to Defendants' particular argument concerning delay. Plaintiffs represent that they "have no intention of eliciting testimony, making argument or dwelling on the dismissed patent infringement claims at trial, so long as Defendants abide by the same principles." [163] at 1. Plaintiffs assert, however, that if Defendants argue at trial that Plaintiffs delayed in filing suit, "then Plaintiffs must present the full scope of the initial complaint and pre-filing investigation, which included an in-depth analysis of the patent-related issues, to provide context and explain the time from the last correspondence and the filing of this suit." *Id.* It is unclear from the parties' briefs precisely how Plaintiffs' investigation of the patent claims would be relevant to any alleged delay by Plaintiffs in bringing the trademark infringement and trade dress infringement claims. Nonetheless, the Court will allow Plaintiffs an opportunity to demonstrate relevance should the issue arise during the course of trial.

The Court also grants Defendants' motion as to the exhibits that have been marked by Plaintiffs as PX-11, PX-12, PX-13 and PX-14. These documents all consist of interrogatories concerning Plaintiffs' patent infringement claims and have no apparent relation to any other claims that remain in the case.

The Court denies Defendants' motion as to PX-54, PX-55 and PX-90, because these exhibits all contain information that may be relevant to Plaintiffs' remaining trademark and trade dress infringement claims. Specifically, PX-54 consists of Defendants' Answers to Plaintiffs' Amended First, Second and Third Sets of Interrogatories. The answers to Interrogatories 1, 4, 5, 6, 7, 10, 13, 14 and 15 concern, at least in part, Defendants' alleged trademark infringement. PX-55 is the Court's order granting in part and denying in part Defendants' motion for summary judgment. Although it is unclear how Plaintiffs conceive of possibly introducing the order at trial, it does contain an extensive discussion of Plaintiffs' trade dress claims, which remain in the case. See [93] at 53-71. PX-90 consists of Plaintiffs' seven sets of document requests (five to Positec USA Inc. and 2 to RW Direct, Inc.). Many of these requests specifically concern Plaintiffs' trademark and trade dress infringement claims, and defendants have made no attempt to separate out the allegedly relevant and irrelevant portions of these exhibits.

In sum, Defendants are precluded from making arguments at trial concerning Plaintiffs' claims for patent infringement, patent damages, and trademark dilution, except to the extent that Defendants argue that Plaintiffs delayed in filing suit and Plaintiffs contend that the delay was due to Plaintiffs' investigation of the patent infringement claims. Defendants are also precluded from introducing PX-11, PX-12, PX-13 and PX-14, but may introduce PX-54, PX-55 and PX-90 to the extent that they can identify a permissible use for the documents at trial.

D.      **Evidence as to Actual Damages, Treble Damages, and/or Statutory Damages Under the Lanham Act, 15 U.S.C. § 1117 [128]**

Defendants move to bar Plaintiffs from introducing evidence or making arguments that they are entitled to recover at trial any actual, treble, or statutory damages under the Lanham Act, 15 U.S.C. § 1117.

The Court denies Defendants' motion as to actual damages. The Court already held, in denying Defendants' motion for summary judgment on the issue of actual damages for trademark infringement, that "profits may function as a 'proxy for damages.'" [147] at 6 (quoting *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994)). The Court explained that "[a]ctual confusion * * * may support a plaintiff's theory of actual loss," and "actual loss supports a theory of profits as a proxy for damages." [147] at 15 (citing *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204-05 (7th Cir. 1990)). The Court also previously held, in denying Defendants' motion to strike Plaintiffs' jury demand, that "Plaintiffs have a viable theory that profits serve as a proxy for damages." [147] at 15. Defendants acknowledge that Plaintiffs have "provided computations and/or support for their claim to Positec's profits" in compliance with the Federal Rules. See [128] at 3 (citing Fed. R. Civ. P. 26(a)(1)(A)(iii); Fed. R. Civ. P. 26(e)). Therefore, there is no basis to bar Plaintiffs from introducing evidence or making arguments that they are entitled to recover actual damages at trial, including profits as a proxy for damages.

The Court also denies Defendants' motion as to treble damages. According to Defendants, the Lanham Act does not provide for the trebling of an award of defendants' profits and, therefore, evidence as to treble damages should be excluded from trial. [128] at 4. Plaintiffs respond that "[t]he issue of treble damages (or increased damages) is for the Court to decide post-trial based upon the findings of willful infringement by the jury." [157] at 3. The Court agrees that the issues of treble and increased damages should be decided by the Court following trial.

The Court writes further, however, to provide guidance to the parties concerning the Court's discretion to modify awards of damages and profits prior to entering judgment. Section 1117(a) of the Lanham Act provides that:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. *In assessing **damages** the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on **profits** is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.* Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (emphasis added).

The plain language of subsection (a) delineates between "damages," which a court may treble "according to the circumstances of the case," and "profits," which a court may adjust upwards or downwards only when, in the Court's view, the amount of recovery based on profits is inadequate or excessive. In contrast to subsection (a), subsection (b) – which applies only in cases involving the use of a counterfeit mark—expressly provides for the "[entry of a] judgment for three times such *profits or damages*, whichever is greater" if certain criteria are met. 15 U.S.C. § 1117(b). If Congress had intended for subsection (a)'s provision allowing the trebling of damages also to apply to profits, then presumably Congress would have said so, as it did in subsection (b). See, *e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000) ("Different words in a statute * * * should be given different meanings unless the context indicates otherwise."); *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005) ("Normally, when Congress uses different terms in * * *

the same statute, Congress's choice to employ different terms (at least in the absence of contrary evidence) means that the two terms have different meanings.").

Under § 1117(a), profits may not be trebled and instead may be increased only where the Court finds that the amount of recovery would otherwise be inadequate. See, *e.g.*, *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994) ("Because it is often difficult to demonstrate a causal connection between the defendant's infringement and the defendant's profits, and because plaintiffs' lost profits are notoriously difficult to prove, section 1117(a) provides two methods which the district court can utilize separately or in combination to approximate a fair recovery for the plaintiff. The first discretionary method is to award up to three times the damages plaintiff can actually prove. This of course requires that the plaintiff be able to prove some damages. The second discretionary method allows the court to award the plaintiff 'such sum as the court shall find to be just, according to the circumstances of the case,' and is premised on the finding that 'recovery based on [defendant's] profits is either inadequate or excessive.'"); *Georgia-Pac. Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 718 (4th Cir. 2015), *as amended* (Apr. 15, 2015) ("Under [§ 1117(a)], when a plaintiff seeks recovery based on a defendant's profits, the court may adjust the jury's verdict up or down, but only if it finds the amount of recovery to be either 'inadequate or excessive,' and then only insofar as the adjustment is determined to be just and compensatory, not punitive."); *Thompson v. Haynes*, 305 F.3d 1369, 1380 (Fed. Cir. 2002) ("By the terms of [section 1117(a)], 'damages' are to be treated separately from 'profits.' As for damages, the court may award up to three times actual damages, depending on the circumstances of the case. As for profits, however, the court is not authorized to award up to three times the amount proved. For profits, the court is constrained to award the amount proved, subject only to an adjustment, up or down, where the recovery would be otherwise unjust."); *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 460 (S.D.N.Y. 2012) ("Though the plain language of the Lanham Act permits trebling of only plaintiff's damages, the Court may enhance an award of profits without identified limit to 'such sum as the court shall find to be just' if 'the amount of the recovery based on profits is *** inadequate.'" (quoting 15 U.S.C. § 1117(a))), *aff'd*, 760 F.3d 247 (2d Cir. 2014); *Quidgeon v. Olsen*, 2011 WL 98938, at *5-6 (C.D. Ill. Jan. 11, 2011) (finding that the phrase "the Court may enter judgment for a sum higher than the amount of actual damages, not to exceed three times the amount, depending on the circumstances of the case," as used in section 1117(a), "only authorizes the trebling of damages, not of profits" (citing *Thompson*, 305 F.3d at 1380)).

In this case, if Plaintiffs prove that they have suffered actual damages *other than* "profits as a proxy for damages," then the Court will have discretion to award damages "for any sum above" this amount, "not exceeding three times such amount." 15 U.S.C. § 1117(a). If the only damages that Plaintiffs establish are based on the Defendants' profits, then the Court will have discretion to adjust the profits award upward if it determines prior to entry of judgment that "the recovery based on profits is * * * inadequate." *Id.* The Court could also adjust the profits award downward if it believes the profits award is excessive. *Id.* The amount the Court ultimately awards as profits must "constitute compensation and not a penalty." *Id.*

Finally, the Court grants Defendants' motion *in limine* as to statutory damages under section 1117(c) of the Lanham Act. This provision authorizes statutory damages only in cases involving the "use of counterfeit marks." 15 U.S.C. § 1117(c). Plaintiffs have no claims against

Defendants that involve counterfeit marks and have agreed to withdraw their claim for statutory damages.

In sum, the Court denies Defendants' motion [128] as to actual damages and treble damages and grants Defendants' motion as to statutory damages.

**E.     Evidence of Plaintiffs' Alleged Claim Under the Lanham Act, 15 U.S.C. § 1114, and References to Certain Registrations With the U.S. Patent & Trademark Office [129]; and Conclusory Statements or Questioning as to Trademark or Trade Dress Ownership [133]**

Defendants have filed two related motions *in limine* challenging the admissibility of evidence of trademark and trade dress ownership.  In the first motion [129], Defendants move to bar Plaintiffs from introducing evidence at trial supporting, or making references at trial to, their claim for violation of Section 32 of the Lanham Act, which is codified at 15 U.S.C. § 1114.  In connection with this motion, Defendants also seek to bar Plaintiffs from introducing their registrations with the U.S. Patent and Trademark Office, which are marked PX-1.  Defendants assert that this evidence is irrelevant and would confuse the jury because "Plaintiffs have disclaimed the presence of any claim for registered trademark infringement" in the parties' joint Final Pretrial Order and at various other points during the litigation.  [129] at 1.  Plaintiffs vigorously deny Defendants' claim of waiver.  They explain that, although they are "not asserting a *specific* registration against a *corresponding specific* product of Positec," they are alleging that Defendants have infringed "the *family* of yellow and black color trademarks associated with DeWalt products," including fifty-one specific U.S. Trademark Registration Numbers.  [156] at 1, 2.

The Court denies this motion [129] because Plaintiffs have not waived their claim for trademark infringement under 15 U.S.C. § 1114.  This provision states that "[a]ny person who shall, without the consent of the registrant[,] use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive * * * shall be liable in a civil action by the registrant for the remedies hereinafter provided[.]"  15 U.S.C. § 1114.  The Seventh Circuit has recognized that a claim for trademark infringement may be premised on a "family of marks."   "A "family of marks" is "a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner."  *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (quoting *McDonald's Corp. v. Druck & Gerner, DDS., P.C.,* 814 F. Supp. 1127, 1131 (N.D.N.Y. 1993)).  "A family of marks exists only if and when 'the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods.'"  *Id.* (quoting *Han Beauty, Inc. v. Alberto-Culver Co.,* 236 F.3d 1333, 1336 (Fed. Cir. 2001)).  Thus, "[t]o prevail at trial on [a] trademark infringement claim" based on a family of trademarks, the plaintiff is required "to prove that its family of marks is distinctive" and that the defendant's allegedly infringing product "is likely to cause consumers to believe mistakenly that [its product] is manufactured, sponsored, or endorsed by, or affiliated or connected with, the" plaintiff's brand.  *Id.* at 805.  "Whether a

family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in [the] party's other marks." *Id.* at 815 (citing *McDonald's Corp. v. McBagel's, Inc.,* 649 F. Supp. 1268, 1271 (S.D.N.Y. 1986)).

Colors and color combinations may be subject to trademark. As the Supreme Court has explained, "[i]t is the source-distinguishing ability of a mark—not its ontological status as color, shape, fragrance, word, or sign—that permits it to serve the[] basic purposes" of trademark law. *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995). These purposes are to "quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past" and to simultaneously "encourage[] the production of quality products" and "discourage[] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." *Id.*

In this case, Plaintiffs' governing complaint alleges a claim for trademark infringement based on the DeWalt yellow and black "family of marks." Specifically, in Count II of their amended complaint, Plaintiffs allege that the Black & Decker Corporation "owns and has standing to sue for infringement of the *family* of yellow and black color trademarks associated with the DeWalt products, including common law trademarks and" certain "U.S. Trademark Registration Nos." which Plaintiffs list by number. [50] at 8, ¶ 35 (emphasis added). Plaintiffs allege that Defendants have made "unauthorized use of its yellow and black products and packaging which duplicate or otherwise imitate the DeWalt Trademarks" and that this use "is likely to cause confusion and mistake in the minds of purchasers, and create[] the false impression that [Defendants'] Infringing Goods are authorized, sponsored, or approved by Plaintiffs." [50] at 10-11, ¶ 45. According to Plaintiffs, these acts "constitute trademark infringement in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114." [50] at 13, ¶¶ 63, 64.

Plaintiffs have continued to pursue, and have not abandoned, their claim for trademark infringement. The claim is included in Plaintiffs' proposed verdict form, proposed jury form, and statement of the case in the final pre-trial order. Therefore, evidence supporting Plaintiffs' claim under 15 U.S.C. § 1114, including Plaintiffs' registrations with the U.S. Patent and Trademark Office, is relevant to Plaintiffs' case and admissible at trial.

In their second motion concerning trademark and trade dress ownership [133], Defendants seek to preclude Plaintiffs from offering "conclusory statements or questions as to the issue of trademark or trade dress ownership." [133] at 1. Defendants assert that this evidence is not relevant, because Plaintiffs "are not asserting any claim for infringement of their registered trademarks and are instead relying on their claims for trade dress infringement under either the common law or under § 1125(a) of the Lanham Act." [133] at 2. However, as just explained, Plaintiffs are asserting a claim for trademark infringement in violation of section 1114(a), and therefore evidence concerning Plaintiffs' registered trademarks obviously will be relevant at trial.

Defendants also argue that fact witnesses should be precluded from offering legal conclusions as to trademark ownership because "this is an ultimate issue for the trier of fact."

[133] at 4. It is well established, though, that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "[L]ay witnesses are entitled to offer their opinion on the ultimate issue of fact so long as they have a rational basis for their belief." *Ty Inc. v. Softbelly's Inc.*, 2006 WL 5111124, at *18 (N.D. Ill. Apr. 7, 2006). In *Softbelly*'s, for example, the court denied the defendants' motion *in limine* to bar the plaintiff's witnesses from testifying that Ty owned the "Beanies" mark. *Id.* The court found that "Ty's lay witnesses may testify as to whether they *believe* Ty had a trademark in the word Beanie(s) provided that Ty can lay a proper foundation for the testimony and demonstrate the relevance of the witness' belief to an issue at trial." *Id.* Likewise, in this case, lay witnesses may testify as to whether they believe (or believed) Plaintiffs have (or had) valid trademarks, so long as an appropriate foundation is laid and the testimony is not objectionable on some other ground.

Defendants provide one specific example of what they believe to be inappropriate questioning, which came up in the deposition of Positec's president, Tom Duncan. Plaintiffs' counsel asked Duncan if he was "aware that Black & Decker trademarked the colors black and yellow prior to March 1, 2010," and Duncan responded "yes." [133] at 4. Defendants assert that the same line of questioning should not be allowed at trial, because it "necessarily elicits a legal conclusion as to whether Plaintiffs own *valid* trademark rights to the trade dress rights at issue." [133] at 3-4 (emphasis added). The Court disagrees. Duncan's statement that he knew that Black and Decker "trademarked the colors black and yellow" prior to 2010 does not "necessarily elicit[]" a legal conclusion that any such trademarks are *valid* and legally enforceable against Defendants. Moreover, Duncan is allowed to testify as to the ultimate issue of whether Black and Decker's trademarks are valid, so long as the testimony is based on a proper foundation.[2]

For these reasons, the Court denies both of Defendants' motions *in limine* ([129] and [133]) concerning trademark and trade dress ownership.

### F.   References to Other Cases, In Which Plaintiffs Were Not Parties, Involving Plaintiff's Alleged "Yellow and Black" Trade Dress [130]

Defendants move to bar Plaintiffs from introducing as evidence or making arguments at trial as to decisions and evidence arising in other cases involving Plaintiffs' alleged "yellow and black" trade dress. Specifically, defendants seek to exclude three consent judgments from other cases (PX-23, PX-24 and PX-25), cease and desist letters (PX-26), and two declarations from other cases (PX-16 and PX-27). Defendants assert that, because they were not parties to those cases and could not be bound by their decisions under principles of claim preclusion, decisions and evidence from those cases have no relevance to the present litigation. Defendants also assert that admitting such decisions and evidence would be unduly prejudicial, as the jury may substitute the judgments in other cases rather than arriving at an independent verdict based on the evidence presented.

---

[2] To be sure, lay witnesses must frame any such testimony in terms of their belief or understanding, as it is the Court's exclusive province to instruct the jury on what the law actually is. See, *e.g.*, *Christiansen v. Nat'l Savings & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("Lay legal conclusions are inadmissible as evidence").

The Court denies this motion. Plaintiffs are not arguing that Defendants are bound by the judgments of other courts in other cases concerning its alleged yellow and black trade dress. Instead, Plaintiffs seek to introduce the exhibits and related testimony as evidence on several material issues in this litigation. First, the evidence may be relevant to the strength of Plaintiffs' marks, which is one of the seven factors that bears on whether Defendants' use of an allegedly infringing mark has resulted in likelihood of confusion. See *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). The strength of the mark may be evidenced by, among other things, "the owner's actions to protect its marks through the successful use of cease and desist letters and litigation." *Bd. of Trustees of Univ. of Arkansas v. Prof'l Therapy Servs., Inc.*, 873 F. Supp. 1280, 1285 (W.D. Ark. 1995). See *also Softbelly's*, 2006 WL 5111124 at *7 ("Ty correctly points out that the cease and desist letters sent by Ty are admissible as evidence of Ty's policing efforts, *i.e.,* to show that Ty sent letters to individuals who were purportedly selling infringing products.").

Second, evidence of prior litigation involving Plaintiffs' yellow and black trade dress may be relevant to whether that trade dress has acquired a secondary meaning. *See Badger Meter*, 13 F.3d at 1151. One factor in this inquiry is the exclusivity of Plaintiffs' use of its trade dress. See *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295-96 (7th Cir. 1998). Exclusivity of use might be shown by the mark holder's efforts to police the market and take action against alleged infringers. Cf. *Sara Lee Corp. v. Am. Leather Products, Inc.*, 1998 WL 433764, at *5 (N.D. Ill. July 29, 1998) (granting preliminary injunction to the plaintiff on trademark and trade dress infringement claims and finding that the plaintiff protected its trade dress by "issu[ing] cease and desist letters to counterfeiters and manufacturers, initiat[ing] suits against landlords of counterfeiters, fil[ing] complaints and motions for injunctions, obtain[ing] seizure orders, and enter[ing] agreements in which retailers * * * protect its trade dress").

Third, evidence of prior consent judgments involving Defendants' yellow and black trade dress may be relevant to whether Defendants willfully infringed Plaintiffs' trademarks. The willfulness of Defendants' trademark infringement must be considered when assessing damages under 15 U.S.C. § 1117(a). See, *e.g.*, *Abbott Labs. v. TorPharm, Inc.*, 2003 WL 22462614, at *24 (N.D. Ill. Oct. 29, 2003) (denying motion to exclude from patent infringement case evidence relating to a prior lawsuit in which the same patents were found to be valid, because "[t]he existence of the [earlier] decision may have a tendency to make it more probable that [the defendant] had no reasonable basis for believing that the patents were invalid or that its proposed product did not infringe the patents when it filed its [patent application] in 1997 and continued to prosecute its [application]").

Finally, Defendants argue, without elaboration, that the two declarations are inadmissible hearsay and should be excluded because Defendants have not disclosed either declarant as a trial witness. [130] at 6-7. However, Defendants do not develop this argument and have only provided copies of one of the declarations (PX-27). Given the lack of briefing on the issue, the Court will not exclude these exhibits but will allow Defendants to raise hearsay objections as necessary prior to or during trial.

For these reasons, the Court denies Defendants' motion *in limine* to exclude references to other cases involving Plaintiffs' alleged yellow and black trade dress. [130]

### G. Certain Evidence Concerning Secondary Meaning [131]

Defendants move to bar Plaintiffs from introducing evidence of Plaintiffs' advertising, promotion and sale of yellow and black DeWalt products after 2009, when Defendants entered the market. Specifically, Defendants seek to exclude on relevance grounds: (1) surveys that Plaintiffs' proposed expert James Berger conducted in 2011 concerning secondary meaning; and (2) records concerning Defendants' advertising and promotion costs and sales figures for 2011-2013 (PX-92 through PX-99). For the reasons explained below, the Court denies Defendants' motion [131] as to both categories of evidence.

#### 1. Elements of Trade Dress Infringement

This motion [131] involves Plaintiffs' claim for trade dress infringement. "To obtain relief for trade dress infringement under 15 U.S.C. § 1125(a), a party must show that (1) its trade dress is protectable, and (2) the trade dress of the accused product is confusingly similar." *RNA Corp. v. Procter & Gamble Co.*, 747 F. Supp. 2d 1008, 1016 (N.D. Ill. 2010) (citing *Badger Meter,* 13 F.3d at 1151. A plaintiff will satisfy the first element, protectable trade dress, by establishing "either that its trade dress is inherently distinctive or that it has acquired a secondary meaning." *Badger Meter*, 13 F.3d at 1151. A "secondary meaning" is "a mental association in buyers' minds between the alleged mark and a single source of the product." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992) (internal quotation marks and citation omitted). A party may establish secondary meaning through "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id.* In evaluating the second element of trade dress infringement, that the trade dress of the accused product is confusingly similar, factors that must be considered include: "1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir. 1998).

#### 2. Plaintiffs' Consumer Surveys

According to Defendants, "[i]t is well settled that the appropriate date for assessing secondary meaning is when the defendant has commenced use of the allegedly infringing trade dress." [131] at 4. Defendants entered the market and began using the allegedly infringing trade dress in 2009. Plaintiffs' expert Berger conducted two consumer surveys in November 2012 to test secondary meaning.[3] Defendants assert that these surveys are irrelevant and inadmissible because they were conducted several years after Defendants entered the market. Plaintiffs agree that secondary meaning is assessed as of the date the defendant commenced using the allegedly

---

[3] The contents of these surveys are discussed in detail in the Court's order granting in part and denying in part Defendants' motion for summary judgment. See [93] at 29-32.

infringing trade dress, but submit that Defendants' argument goes only to the weight, rather than the admissibility, of the Berger surveys.[4]

The Court concludes that the Berger surveys are relevant as to secondary meaning, even though they were not conducted prior to the time Defendants began using the allegedly infringing trade dress. The same issue was before the court in *Softbelly's*. The plaintiff sought to introduce customer surveys, which were conducted eight months after the defendants' allegedly infringing product entered the marketplace, as proof of secondary meaning. 2006 WL 5111124 at *13. The defendants moved *in limine* to exclude the surveys, arguing that "secondary meaning surveys conducted after an allegedly infringing product enters the marketplace are *per se* irrelevant." *Id.* Judge Lefkow denied the defendants' motion. She found that "secondary meaning surveys conducted after the allegedly infringing product entered the marketplace" are admissible "where the time difference was insubstantial or the marketplace was unchanged." *Id.* (citing *STX, Inc. v. Trik Stik, Inc.,* 708 F. Supp. 1551, 1559 (N.D. Cal.1988) (admitting secondary meaning survey conducted eight months after defendant entered market); *Tone Brothers, Inc. v. Sysco Corp.,* 28 F.3d 1192, 1201-03 (Fed. Cir. 1994) (considering secondary meaning survey conducted in 1990 even though allegedly infringing product entered the market in 1998)).

Here, approximately three years passed between the time that Defendants' allegedly infringing products entered the market (2009) and the time that Berger conducted his surveys (2012). This delay is longer than the eight-month delay in *Softbelly's*, but shorter than the delay in other cases in which customer surveys have been admitted as evidence of secondary meaning. In *Black & Decker, Inc. v. Pro-Tech Power Inc.*, the district court for the Eastern District of Virginia, conducting a bench trial, admitted consumer surveys conducted in 1998 as evidence that the black and yellow DeWalt line had established a secondary meaning by the time the defendant's allegedly infringing products entered the market at the end of 1992. 26 F. Supp. 2d 834, 848-49 (E.D. Va. 1998). While recognizing that the surveys "could not measure consumer perceptions any earlier than 1998," the court explained that "brand identity takes time to develop and cannot arise instantaneously" and that the surveys were "at least implicitly supported" by testimony that "consumers began to associate yellow and black with the DeWalt line almost immediately after its introduction in late January, 1992." *Id.* at 849.

The only in-circuit decision on which Defendants rely in their motion, *Ty Inc. v. Perryman,* 2001 WL 826893 (N.D. Ill. July 17, 2001), arose in the context of the court's consideration of cross-motions for summary judgment and was vacated by Seventh Circuit in 2002. See *Ty Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002). The two out-of-circuit cases cited by Defendants do not support the blanket proposition that a jury should never be allowed to consider customer surveys that were conducted after the allegedly infringing product entered the

---

[4] Plaintiffs also assert that Defendants' "criticisms of the Berger survey have already been thoroughly addressed by the parties and considered by the Court" in its order granting in part and denying in part Defendants' motion for summary judgment. [154] at 3. Although Plaintiffs did challenge Berger's survey methodology in their motion for summary judgment, they did not raise the specific issue that they raise here—whether the Berger survey was conducted too late to be admissible as evidence of secondary meaning.

market. *See Calvin Klein Co. v. Farah Mfg. Co.*, 1985 U.S. Dist. LEXIS 13475, *24 (S.D.N.Y. Nov. 26, 1985) (denying plaintiff's request for a preliminary injunction; finding that a consumer survey conducted in 1985 did not support finding that secondary meaning for Calvin Klein jeans was established in 1978, where the survey did not "purport to reproduce the market conditions years before when [the defendant] entered the market," and there was not "any evidence" to support the surveyor's "brief statement that the secondary meaning he believed to exist in 1985 was also developed in 1978"); *Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024-25 (D. Minn. 2005) (granting summary judgment to Kraft in case involving Schwan's trademark "Brick Oven"; finding that Schwan's June 2004 customer survey "fail[ed] to demonstrate the requisite secondary meaning" of its trademark where the survey "was conducted months after Kraft's Brick Oven Style product had already entered the market" and where Schwan's circumstantial evidence concerning its "extensive advertising and promotional efforts" did not "identify the source of the product" as Schwan's). Again, as Judge Lefkow observed, the critical considerations in this context are the time difference and the extent to which the marketplace changed or remained the same. *Softbelly's*, 2006 WL 5111124, at *13.

Applying those criteria, the Court concludes that the jury should be allowed to evaluate the customer surveys in conjunction with the other evidence offered by the parties concerning secondary meaning. The jury will be free to discount or disregard the surveys altogether if it feels the surveys are too recent to be probative of consumer understanding as of 2009. It can also evaluate the extent to which the marketplace has changed between 2009 and 2012 and decide whether any such changes render inaccurate the results of the 2012 surveys. Defendants have not articulated why consideration of the surveys in this manner would create a risk of prejudice that substantially outweighs their probative value. For all of these reasons, the Court denies Defendants' motion *in limine* [131] seeking exclusion of the Berger surveys.

### 3. Evidence of advertising and sales numbers

Defendants also seek to exclude Plaintiffs' evidence of their advertising and sales figures for 2011-2013. Defendants assert that "[a]ll such evidence put forth for establishing secondary meaning after 2009 carries no weight and must be excluded as unduly prejudicial." [131] at 5. Plaintiffs respond that this argument is a straw man, because their post-2009 evidence of advertising, promotion and sales of black and yellow DeWalt products "must be admitted to show 'strength of the mark,' one of the likelihood of confusion factors which 'should be determined *at the time of litigation* and *not* at the time of the alleged infringer entered the market.'" [154] at 1 (quoting *Softbelly's*, 2006 WL 5111124 at *16) (emphasis by Plaintiffs).

Defendants, as the parties seeking to exclude Plaintiffs' proffered exhibits, have the burden of demonstrating that they are "not admissible for *any* purpose." *Mason*, 631 F. Supp. 2d at 1056 (emphasis added). The court agrees with Plaintiffs that, regardless of whether the post-2009 advertising and sales figures are relevant to first element of trade dress infringement (that the plaintiff has protectable trade dress), they are relevant to the second element: that the Defendants' trade dress is "confusingly similar" to the Plaintiffs'. The "marketplace strength of the mark *at the time of litigation*" is one of the factors that may be considered in the "confusingly similar" analysis. *Chicago Tribune Co. v. Fox News Network, LLC*, 520 F. Supp. 2d 930, 938 (N.D. Ill. 2007) (quoting 2 McCarthy on Trademarks and Unfair Competition § 11:83 (4th ed.))

(emphasis added). The post-2009 advertising and sales figures are relevant to this analysis, and Defendants have not articulated why this relevance would be outweighed by the risk of undue prejudice. Therefore, Defendants' motion *in limine* [131] to exclude Plaintiffs' post-2009 advertising and sales figures is denied.

### H.     BD011552, PX 29 and PX 10 [132]

Defendants move to bar Plaintiffs from introducing as evidence at trial the photograph labeled BD011552 ("the photograph"), which is also included in Plaintiffs' Exhibits PX10 and PX29. The photograph appears to show a retail store aisle where a boxed "Rockwell" brand power tool is surrounded by shelves of boxed "DeWalt" brand power tools. Defendants argue that Plaintiffs will be unable to authenticate the photograph at trial because they do not know who took the photograph, where the photograph was taken, or when the photograph was taken.

The Court agrees that Plaintiffs have failed to show that they will have any way to authenticate the photograph at trial. The authentication requirement is satisfied if the proponent produces evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901 only "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). "When a party attempts to admit a photograph into evidence, it must make an attempt to show 'when, where, by whom, and under what circumstances the picture was taken.'" *Moffett v. Sandoval*, 2012 WL 2526624, at *4 (N.D. Ill. June 28, 2012) (quoting *Dillon v. Evansville Ref. Co.*, 127 F.2d 13, 17 (7th Cir. 1942)). "A sufficient foundation is laid for a still photograph by testimony of any person or group of persons with *personal knowledge* at a time relevant to the issues of the subject matter depicted in the photograph sufficient to support a finding that the photograph is a fair and accurate representation of the subject matter depicted at that time." 2 Handbook of Fed. Evid. § 401:7 (7th ed.) (emphasis added). The photographer is not required to testify. *Id.*

In this case, Plaintiffs assert that the photograph was taken by an unidentified sales representative in "the field" at an unidentified time; that the sales representative sent the photograph to Plaintiffs' employee Kristin Ohm at some point in 2009; and that the photographs were somehow transmitted from Ohm to Plaintiffs' Director of Marketing (Helen Fischer) and Plaintiffs' Patent Counsel when they began preparing for this litigation. See [158] at 1-2. Plaintiffs apparently intend to introduce the photograph through the testimony of Fischer. They claim that "Fischer has personal knowledge of the layout of accused Rockwell products and yellow and black DeWalt products in retail stores, including Home Depot," and therefore will be able to authenticate the photograph. [158] at 4 (citing *Snyder v. Tiller*, 2010 WL 3522580, at *5 (N.D. Ind. Aug. 30, 2010)). But this is not sufficient for purposes of Rule 901. In the case on which both parties rely, *Snyder*, the plaintiff in an excessive force lawsuit was allowed to authenticate *part* of a video of a town council meeting from which he was ejected, since he "ha[d] personal knowledge of the events that transpired at the meeting because he was present." 2001 WL 3522580 at *7. However, the plaintiff could not authenticate a portion of the video that had been altered to add slow-motion replay, because he did not personally alter the video. *Id.* In this case, Plaintiffs' proposed witness Fischer does not have "personal knowledge" of the scene depicted in the photograph; the best she can do is guess, based on the "heavy orange" coloring appearing in the photo, that it was taken at a Home Depot. Anyone who has been to a

Home Depot might be able to make a similar claim, but that does not mean that they have "personal knowledge" of the particular scene depicted in the photograph.

Defendants also assert, in a footnote, that the photograph should be excluded on the basis of the "best evidence rule" because Plaintiffs have never produced the original of the photograph. [132] at 4 n.4. Under the best evidence rule, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. However, a "duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. Also, "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith; (b) an original cannot be obtained by any available judicial process; (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or (d) the writing, recording, or photograph is not closely related to a controlling issue." Fed. R. Evid. 1004. Plaintiffs respond that the best evidence rule does not apply, because they are not offering the photograph to "prove its content"; instead, they intend to have Fischer adopt the picture as her testimony and use the picture to illustrate her testimony. [158] at 3. The problem with Plaintiffs' proposal is that Fischer does not have personal knowledge of the scene depicted in the photograph. *Snyder* makes clear that, in order for a witness to adopt a photograph as her testimony—and thus avoid the best evidence rule—the witness must be able to testify that the photograph is "a correct representation of events which he saw or of a scene with which he is familiar." 2010 WL 3522580 at *5-6 (quoting advisory committee's note to Fed. R. Evid. 1002). Therefore, to the extent that Plaintiffs plan to use the photograph to prove its contents, the photograph is subject to the best evidence rule. The Court does not have sufficient information concerning the photograph to determine at this time whether a duplicate would be admissible under Fed. R. Evid. 1003 or 1004.

Finally, Plaintiffs assert that, because their expert showed the photograph to respondents to his likelihood of confusion survey, the photograph "must be admitted to show the jury the protocol, methodology and implementation of" the survey. [158] at 4. Expert testimony is subject to Rule 703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. This rule was amended in 2000 to "emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted." *Id.*, Advisory Committee Notes to 2000 Amendments. "[A] trial court applying this Rule must consider the information's

probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other." *Id.* "The information may be disclosed to the jury, upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect." *Id.* "If the otherwise inadmissible information is admitted under this balancing test, the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes."

Since the first pre-trial conference, the parties have filed supplemental memoranda ([186] and [188]) addressing this very point and providing additional case citations. The Court will discuss this issue with counsel at the September 23 final pre-trial conference to get a better picture of the full panoply of photographs and other testimony or exhibits relating to the placement of the parties' products at retail outlets so that the Court may apply as accurately as possible the balancing test referenced in the Advisory Committee Notes. Accordingly, at present, the Court reserves its ruling on this motion *in limine*.

I.      **Defendants' Motion to Preclude Evidence as to Certain Matters Involving Their Expert Dr. Jeffrey Stec [134]**

Defendants move to preclude Plaintiffs from questioning defense expert witness, Dr. Jeffrey Stec, about the opinions he rendered and the outcomes obtained in other matters in which he served as an expert witness. Defendants argue that this line of questioning, which Plaintiffs' attorney pursued at Stec's deposition, has no relevance at trial and would confuse and mislead the jury. Plaintiffs are "willing to agree to this motion so long as all parties, Plaintiffs and Defendants, are precluded from offering evidence or asking questions about all other cases for all experts in the case." [153] at 1. Otherwise, Plaintiffs assert, the motion should be denied and objections to particular questions asked of experts should be ruled on in the context of the trial.

The Court will provisionally grant this motion *in limine* and preclude all parties from questioning expert witnesses concerning the opinions rendered and outcomes obtained in other matters on which they have served as experts. Based on the limited briefing on this motion, there is no apparent relevance of such opinions or outcomes to this case.

J.      **Plaintiffs' Motion to Exclude Supplemental Expert Report of Defendants' Expert Michael E. Tate and Related Documents [140]**

Plaintiffs move to exclude the supplemental expert report of Defendants' damages expert, Michael E. Tate, and related documents concerning Defendants' advertising costs, which have been marked by Defendants as trial exhibits DX-92 through DX-96. Plaintiffs assert that the supplemental report and related documents should be excluded because they were not timely disclosed. For the reasons set forth in this section, the Court denies Plaintiffs' motion.

### 1.    Background

A successful plaintiff in a Lanham Act challenge is entitled to recover the defendant's profits. 15 U.S.C. § 1117(a). "In assessing profits the plaintiff [is] required to prove defendant's sales only," and the "defendant must prove all elements of cost or deduction claimed." *Id.* If the defendant "fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales." *WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 609 (7th Cir. 2008).

In 2012, Plaintiffs served discovery requests asking Defendants to identify the profits they made and costs they incurred selling products that infringed on Plaintiffs' patent and trademark rights. See [140] at 1 (identifying Document Requests 55, 56, 65-68, 96; Interrogatories 1, 10). According to Defendants, in June 2012, they produced documents showing their cumulative total spend for advertising their "Accused Patent Products" and their "accused JawHorse products" between 2006 and 2012. See [149] at 3 & Ex. 1 (sealed). Before the close of fact discovery on October 23, 2013, Defendants supplemented their production to provide financial information related to products they sold that allegedly infringed on Plaintiffs' "sunburst" packaging. This production included data showing Defendants' "advertising spend" for products sold in the "starburst" packaging from 2009 to 2013. [149] at 4 & Ex. 4 (sealed).

On November 26, 2013, Plaintiffs' damages expert, Joseph Gemini, disclosed his expert report. He opined on the profits that Defendants made from selling the products that allegedly infringed on Defendants' patents, trademarks, and trade dress. Defendants' damages expert, Tate, submitted a rebuttal expert report on January 15, 2014. Tate critiqued Gemini's report and calculated the costs that should be deducted from Defendants' gross revenues for three products/product lines: (1) the JawHorse brand workstation; (2) the RK7137 Miter Saw; and (3) products sold in "sunburst" packaging. Plaintiffs deposed Tate in February 2014.

On May 13, 2015, Plaintiffs filed a Motion to Compel Updated Sales and Financial Information from Defendants. [112] Plaintiffs asserted that "defendants have produced no sales or financial information regarding the accused products since September 2013—nearly two years ago." *Id.* at 1. According to Plaintiffs, "[i]t is customary for defendants to provide current sales documentation so that plaintiffs can update their damage claim, for the draft Pre-Trial Order, the trial itself, and any potential settlement discussions between the parties prior to trial." *Id.* Defendants agreed to produce the requested documentation and Plaintiffs' motion was denied as moot on May 19, 2015. [116] Defendants produced the documentation later that month. See [140] at 1. The documentation included not only the updated financial information Plaintiffs sought for September 2013 through April 2015, but also included advertising costs from 2009-2013 that were not shown on the schedules attached to Tate's expert report. See [149] at 6.

On July 14, 2015, Gemini disclosed a supplemental expert report. Gemini updated his opinions to reflect his consideration of additional data received since his original report, including Defendants' updated financial information. On July 22, 2015, Tate disclosed his supplemental report. He updated his calculations, to April 2015, of the costs that should be deducted from Defendants' gross revenues for the three products/product lines: (1) the JawHorse brand workstation; (2) the RK7137 Miter Saw; and (3) products sold in "sunburst" packaging.

Tate also updated his calculations by adding additional advertising costs for 2009-2013. Defendants contend that, although this advertising cost data was not reflected in Tate's original report, this was "simply the result of an understandable oversight," as "neither Mr. Tate, Mr. Gemini, nor the parties previously realized that the advertising spend numbers for the accused JawHorse products were omitted from the numbers set forth in" the data Defendants produced on October 23, 2013 showing their advertising spend on products Defendants sold in the "starburst" packaging. [149] at 1, 6.

## 2. Analysis

### a. Tate's supplemental expert report

Tate's supplemental expert report was timely disclosed and will not be excluded. Expert reports must be supplemented "when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). Under Rule 26(e), a party "must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is *incomplete* or *incorrect*, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1) (emphasis added). "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). "Unless the court orders otherwise, [pretrial] disclosures must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B). See also *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005) ("Supplementation of expert testimony must be disclosed no later than 30 days before trial, unless otherwise directed by the court.").

In this case, the parties made their pretrial disclosures in their final pretrial report, which was due July 23, 2015. See [122] (agreed motion requesting deadline of July 23, 2015 for pretrial report), [124] (minute order granting motion). Defendants timely disclosed the supplemental expert report on July 22, 2015, one day before the July 23, 2015 deadline. The supplemental report both completed and corrected information contained in Tate's original report, as allowed by Rule 26(e)(1). See Fed. R. Civ. P. 26(e)(1). Tate updated his calculations to take into account Defendants' sales and expenses for more recent years up to and including April 2015. Plaintiffs' damages expert, Gemini, did the same in the supplemental expert report he filed just one week earlier. Tate also corrected his original report. According to Defendants, this was necessary because Tate's original expert report had erroneously omitted costs from 2009-2013 associated with the JawHorse brand workstation, which Tate realized when preparing his supplemental report. See [149] at 6. Tate's supplemental report corrects his earlier omissions, but does not change Defendants' theory of the case or introduce new opinions. Cf. *Talbert v. City of Chicago*, 236 F.R.D. 415, 424 (N.D. Ill. 2006) (explaining that "[i]t is no surprise that supplemental expert opinions that threaten to belatedly send the case on a wholly different tack are excluded" and citing cases). Given that the corrections were made more than two months before trial, both sides had adequate time to incorporate the additional information into their trial outlines. To the extent that Plaintiffs are doubtful of the basis or accuracy of

Tate's revised cost calculations, these are proper topics to pursue during cross-examination. For these reasons, Plaintiffs' motion in *limine* [140] is denied as to Tate's supplemental expert report.

### b. DX-92 through DX-96

Defendants will not be precluded from introducing Exhibits DX-92 through DX-96 on the basis that Defendants failed to produce them prior to the fact discovery cut-off in October 2013. The "preference in the federal system" is for "trials be determined on the merits" rather than on "constructions of the Federal Rules of Civil Procedure that operate needlessly in a given case to deprive a party of its right to have a merits-based determination of a claim." *Talbert*, 236 F.R.D. at 419. Therefore "[j]udges have vast discretion in supervising discovery and in declining to impose discovery sanctions and exclude evidence." *Id.* Under Rule 26(e), "[a] party * * * who has responded to an interrogatory, request for production, or request for admission * * * must supplement or correct its disclosure or response * * * in a timely manner if the party learns that in some material respect the disclosure or response is *incomplete* or *incorrect*, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. Pro. 26(e) (emphasis added). If a party fails to provide information in compliance with Rule 26(e), the party "is not allowed to use that information * * * to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

For the most part, DX-92 through DX-96 consist of information that was disclosed in a timely manner. Plaintiffs have provided no reason to exclude DX-96, which is Positec's Income Statement for year-to-date ending April 30, 2015. This document is of so recent a vintage that it could not have been produced prior to the close of fact discovery in 2013, and Defendants properly produced it in response to Plaintiffs' May 2015 request to Defendants to provide updated financial records. The majority of Exhibits DX-92 through DX-95 are unobjectionable as well. Most of the information contained in Exhibits DX-92 through DX-95 was either: 1) already timely disclosed to Plaintiffs before the close of fact discovery; or 2) created after the close of fact discovery and requested by Plaintiffs in May 2015. The only information in Exhibits DX-92 to DX-96 that should have been disclosed prior to the discovery cut-off is the advertising cost information from 2009-2013 for the JawHorse products.

Therefore, the question is whether Defendants' disclosure of the advertising expense data for the JawHorse products for 2009-2013 was a "timely" supplement to Defendants' discovery responses. The Court concludes that Defendants' supplement was made in a timely manner to correct and complete Defendants' prior discovery responses concerning the expenses they incurred selling products that infringe on Plaintiffs' trademark or trade dress rights. See Fed. R. Civ. Pro. 26(e). Defendants explain that their 2006-2012 advertising costs for the JawHorse products were reflected in a document that they timely produced in June 2012 showing their cumulative advertising spend for the "Accused Patent Products" and the "accused JawHorse products." See [149] at 3 & Ex. 1 (sealed). Defendants further explain that their failure to produce a more detailed breakdown of advertising expenses for the JawHorse products prior to the end of discovery was a mistake, because Defendants thought those expenses were already reflected in their timely October 2013 production of financial information related to products they sold that allegedly infringed on Plaintiffs' "sunburst" packaging. See [149] at 4 & Ex. 4 (sealed). When Defendants supplemented their production of sales and financial data in May

2015, as Plaintiffs requested, they excluded information related to the Accused Patent Products (which are no longer at issue) and provided updated sales and expense data from 2009 to April 2015 for *both* the accused JawHorse products and the accused "sunburst" packaging products. [149] at 6. Defendants only realized that the expense data was different than the data on which Tate relied in his original report after Tate reviewed the new data to prepare his supplemental report. There is no evidence that, after realizing their mistake, Defendants purposely waited to disclose the new cost data; instead the facts suggest that Defendants produced the new cost data before they realized it was "new." Moreover, since this data appears to help Defendants, there is little reason to suspect that Defendants delayed in supplementing their production. Under these facts, the Court finds that Defendants' supplementation of its production with DX-92 through DX-96 was timely.

The Court further notes that even if Defendants' production of DX-92 through DX-95 could not be considered a timely supplement to Defendants' discovery responses, Defendants would nonetheless be allowed to introduce the exhibits at trial if their failure to timely supplement was "substantially justified" or "harmless." Fed. R. Civ. Pro. 26(e). "District courts have broad discretion to determine whether [a] failure to comply with Rule 26(e) is substantially justified or harmless." *Sys. Dev. Integration, LLC v. Computer Sciences Corp.*, 2012 WL 2953063, at *2 (N.D. Ill. July 19, 2012). "The Seventh Circuit has indicated that the following factors are relevant to a court's determination: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* at *2-3 (quoting *Tribble v. Evangelides*, 670 F.3d 753, 759 (7th Cir. 2012)).

Although it is unnecessary to reach the issue, the Court finds that these equitable factors also would weigh in favor of admitting DX-92 through DX-95. The main prejudice Plaintiffs have identified is that, when Tate corrected his report to take into account the expense data that had been inadvertently omitted from his original report, this reduced Tate's damages estimate by a significant amount. See [140] at 3-4. Although Plaintiffs understandably would rather that Defendants be bound by Tate's original, higher damages estimate, this is not the type of "prejudice" that is typically cited to justify the exclusion of otherwise relevant and admissible evidence. Plaintiffs cite three cases for the proposition that courts routinely find unfair prejudice under similar facts. But none involved the situation, present here, where a party supplemented its production and expert report pursuant to Rule 26(e) to correct a disclosure that the party recently discovered was "incomplete" or "incorrect." Fed. R. Civ. Pro. 26(e). See *Sys. Dev. Integration*, 2012 WL 2953063 at *2 (precluding defendant from using documents and witnesses disclosed three months prior to trial, where defendant asserted only that the documents and witnesses were discovered after the cut-off of fact discovery two years prior and not that the documents were produced in a timely manner after they were discovered); *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, 1996 WL 680243, at *8 (N.D. Ill. Nov. 21, 1996) (precluding defendants from asserting at trial a defense that they failed to raise in their interrogatory responses or in supplemental responses to those interrogatories, where defendants' failure to timely supplement was not substantially justified or harmless); *Ablan v. Bank of Am. Corp.*, 2014 WL 6704293, at *3 (N.D. Ill. Nov. 24, 2014) (precluding plaintiffs from opposing summary judgment based on documents contained on eight CD-ROMS that plaintiffs produced

after the close of discovery, where "[p]laintiffs do not argue that their production * * * after the close of discovery complied with Rule 26," and plaintiffs' failure to comply with Rule 26 was not substantially justified or harmless). Any minimal prejudice to Plaintiffs from the belated corrections to Tate's analysis can be dealt with fairly and adequately through cross-examination and Plaintiffs' own expert testimony on damages.

Finally, there is no indication that the trial will be disrupted if Defendants are allowed to introduce DX-92 through DX-95. Plaintiffs have not indicated that they need time to conduct additional discovery or prepare for trial on the issues raised by Defendants' new expense data. Defendants have also offered to make a corporate representative available for deposition "at once and in Chicago," should Plaintiffs "wish to obtain additional testimony * * * as to the financial documents at issue." [149] Finally, there is no evidence that Defendants acted in bad faith or willfully by failing to provide a breakdown of advertising expenses for the JawHorse products for 2006-2013. Also, to the extent that the data was reflected in Defendants' earlier cumulative advertising spend total for "Alleged Infringing Products" and JawHorse products, this suggests that Defendants' failure to produce more detailed data on its JawHorse advertising expenses prior to the close of discovery was inadvertent rather than willful. On balance, the Court finds that these equitable factors weigh in favor of admitting DX-92 through DX-95.

For these reasons, Plaintiffs' motion in *limine* [140] is denied as to DX-92 through DX-96.

## III. *Daubert* Motions

### A. Defendants' Motions to Exclude Testimony of Plaintiffs' Expert James T. Berger

Plaintiffs propose to call James T. Berger to present expert opinion testimony that: (1) Defendants' yellow and black trade dress has achieved secondary meaning; and (2) Rockwell's use of trade dress that is arguably similar to Plaintiffs' is causing a likelihood of confusion in the power tool marketplace. Defendants move pursuant to Rule 702 and *Daubert* to exclude Berger from testifying as to either of his opinions.

#### 1. Legal Standard

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. See *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 requires that the district court act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.,* 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-49 (1999); *Daubert,* 509 U.S. at 589.

In assessing a motion to exclude testimony under Rule 702, the Court must consider whether the proposed opinion witness (1) is qualified to offer opinion testimony under Rule 702, (2) has employed a reliable methodology, (3) proposes to offer opinions that follow rationally from the application of his "knowledge, skill, experience, training, or education," and (4) presents testimony on a matter that is relevant to the case at hand, and thus helpful to the trier of fact. See *Kumho Tire*, 526 U.S. at 151-53; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert*, 509 U.S. at 589-93; see also *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co.*, 522 U.S. at 141-43 (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

In trademark cases, parties frequently employ experts to conduct consumer surveys to establish that the plaintiff's mark has acquired a secondary meaning or that the defendant's mark is confusingly similar to the plaintiff's mark. "Courts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003). A court assessing whether a survey employs a reliable methodology will examine whether: "(1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise, and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (2009) (quoting *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y.1990)) (internal quotation marks omitted). "Although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *Id.* Nonetheless, only in "rare" situations will a proffered survey be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

## 2. Testimony Concerning Secondary Meaning [101]

Berger's secondary meaning report and the two surveys discussed in the report address "whether DeWalt's distinctive yellow and black trade dress has achieved secondary meaning in that a large portion of buyers in a marketplace perceive that power tools with a black and yellow trade dress come from a single source." [101-3] at 7. The two surveys were double-blind surveys administered over the internet. Berger randomly selected the survey respondents using e-Rewards, Inc., an internet research organization. To qualify, a prospective respondent had to be at least eighteen years old and be a professional tradesman or serious Do-It-Yourselfer, defined as owning at least $1,000 worth of power tools. A prospective respondent could not have anyone in their household who worked for an advertising agency, market research firm, or any business involved in the sale of power tools. Respondents needing eyeglasses were required to view the

computer screen using their glasses. There were no gender or geographic restrictions. Each survey was given to 200 individuals. In survey A, the respondents were provided with a photograph of a DeWalt miter saw and asked a series of questions concerning whether they have seen the product and if they know who puts out the product. In Survey B, the respondents were asked: "If you were shopping at a Home Depot, Lowes or some other retailer that sells power tools and you saw a power tool that was yellow and black, would you have a belief as to who or what company makes or manufacturer[s] it?" In his report, Berger opined that the results of the two surveys "clearly indicate that Black & Decker's DeWalt brand has clearly achieved an extremely high level of secondary meaning for its yellow and black trade dress."

Defendants identify four types of flaws in Berger's methodology, which they say render the surveys and Berger's testimony so unreliable as to be inadmissible. Alternatively, Defendants ask the Court to exclude the testimony on the basis of prejudice or limit it in scope. For the reasons discussed below, the Court denies Defendants' motion [101].

a.     survey universe

Defendants argue that Berger chose a faulty universe of respondents. "The probative value of a survey depends in large part upon the 'universe' of respondents, and the reliability of the survey is diminished if the universe of desired respondents is erroneous or undefined." *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010). In a trademark case, the proper universe usually is potential purchasers of the junior users' products or services." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 2010 WL 1687883, at *6 (N.D. Ill. Apr. 26, 2010) (citing *LG Electronics*, 661 F. Supp. 2d at 953).[5] The Court agrees that Berger's defined universe is overinclusive, because it includes all professional tradesman and serious Do-It-Yourselfers but does not "use threshold questions to measure the preferences or purchasing inclinations of the participants," in other words, whether they are currently in the market for Defendants' products. *Bobak Sausage*, 2010 WL 1687883 at *6. The survey universe is also underinclusive because it would miss potential purchasers who are not themselves professional tradesmen or serious Do-It-Yourselfers—such as office managers who buy tools used by professional tradesmen. Nonetheless, the Court finds that Defendants' criticisms concerning the sample universe used in the Berger secondary meaning surveys go to the weight, but not the admissibility of Berger's testimony. Survey evidence need not be perfect to be admissible under Rule 702. Although the universe could be better defined, it is not "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d at 618. It would not be unreasonable for the trier of fact to conclude that at least some professional tradesmen and serious Do-It-Yourselfers would be in the market for Defendants' products. *Cf. Univ. of Kan. v. Sinks*, 2008 U.S. Dist. LEXIS 23763, at *17-19 (D. Kan. Mar. 19, 2008) (accepting Berger survey and expert report and explaining that "while there are significant flaws in the methodology of this survey"—including selecting an

---

[5] Plaintiffs assert that the Court held on summary judgment that "the relevant consumers here are serious [do-it-yourselfers] and professionals." [183] at 4 (quoting [93] at 66). But the Court was not discussing the proper universe for the secondary meaning survey; instead it was considering the likelihood of customer confusion—a relevant factor of which is "how sophisticated and deliberative buyers are as well as how expensive and accessible the products are." [93] at 66.

"overinclusive" universe of respondents and using close-ended and leading questions—"they go to the weight and not the admissibility of the survey").

This case is distinguishable from the two cases in which, according to Defendants, Berger's "surveys have been excluded on similar grounds." [101-1] at 8. In *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006), the plaintiff Powerhouse Gym alleged that the defendant Impex, a manufacturer of fitness products, infringed its "Powerhouse" trademarks by selling fitness equipment under the name "Powerhouse." *Id.* at *1. The court precluded the introduction of a survey Berger conducted to test whether "Impex's use of the POWERHOUSE name creates a likelihood of confusion among consumers." *Id.* Berger limited his survey universe to respondents who said they lived within a twelve-mile radius of three or more Powerhouse fitness centers and worked out in a fitness center within the last five years. *Id.* at 2. The court found that the survey should have tested potential buyers of Impex's products, instead. The court explained that, "in a case where the plaintiff alleges that the defendant's use of the plaintiff's marks causes customers to mistakenly think that the defendant's goods or services are from the same source as or are connected with the plaintiff's goods or services, the proper universe to survey is the potential buyers of the *junior user's* [i.e. defendant's] goods or services." *Id.* at *3 (internal quotation marks and citation omitted). "By choosing to conduct his survey only at locations within a twelve mile radius of three or more Powerhouse fitness centers and selecting only interviewees who had worked out at a fitness center, club, or gym within the last five years, Berger surveyed a population more likely to be familiar with Powerhouse's marks than the general population." *Id.* In this case, by contrast, Berger's survey did focus on potential users of Defendants' products: professional tradesmen and serious Do-It-Yourselfers, with no geographic restrictions. More importantly, unlike the parties in *Powerhouse*, who had different customer markets, Plaintiffs and Defendants "sell competing products" such that their customer markets are the same or very similar. *Vista Food Exch., Inc. v. Vistar Corp.*, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005).

Defendants also compare this case to *Vista Food*, in which plaintiff Vista was a wholesale food distributor and defendant Vistar was both a wholesale food distributor and a distributor of food directly to restaurants. 2005 WL 2371958 at *1. Berger conducted a customer confusion survey that used as its universe customers with certain characteristics who lived in the Milwaukee, Wisconsin suburb of Brookfield. *Id.* at *6. "Milwaukee was chosen because neither party distribute[d] products in that market" and "[n]o effort was made to include individuals who f[e]ll within [Vistar's] target market." *Id.* The universe Berger chose in that case was obviously flawed because it was geographically limited to a market in which the defendant did not do business. Berger's survey in this case, by contrast, was not limited geographically.

In addition, Defendants criticize the samples that Berger took from the potential universe of respondents, because they included only internet users who were randomly selected from the e-Rewards internet research organization. But Defendants do not explain why this would make the sample biased or unreliable. Defendants' criticism goes to the weight but not the admissibility of the survey.

### b.     leading questions

Defendants argue that both of Berger's secondary meaning surveys contain leading questions. In survey A, the respondents were provided with a photograph of a DeWalt miter saw – with no name marks on it – and asked a series of questions concerning whether they have seen the product and if they know who puts out the product. The first question was whether they have ever seen the product before. Defendants assert that this is a "leading yes/no question" that "impl[ies] that there is a single company that puts out the product." [101-1] at 10. However, "don't remember" is also an option. This is one way that "[r]eliable surveys" address the problem of respondents guessing as to the "right" answer. *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 2012 WL 12281609, at *5 (N.D. Ind. Feb. 21, 2012). Moreover, the question does not suggest anything about who puts out the product or whether more than one company could put out the same product. Defendants also assert that, "[e]ven if the respondent indicated that they had not seen the product before, they were asked follow up, leading questions about who put out the product" and were "provided with a list of power tool manufacturers from which to choose." [101-1] at 10. But again, respondents were actually given the choice of "don't know."

In survey B, the respondents were asked: "If you were shopping at a Home Depot, Lowes or some other retailer that sells power tools and you saw a power tool that was yellow and black, would you have a belief as to who or what company makes or manufacturer[s] it?" Defendants assert that this is "exactly the type[] of yes/no questions that are called into question by the courts." [101-1] at 11. Defendants ignore, however, that respondents were also given the choice of "don't know," and that respondents who answered "yes" were asked a series of open-ended follow up questions about why they chose that response. These survey features may "sufficiently mitigate[]" concerns about respondents guessing the correct answer. *LG Electronics*, 661 F. Supp. 2d at 955. At most, Defendants' criticisms of Berger's questions go to the weight but not the admissibility of the surveys.

### c.     survey control

Defendants argue that Berger failed to use a control or control group for his surveys and therefore that "there is simply no way to determine whether the respondent guessed or answered solely based on a manufacturer who was familiar to them." [101-1] at 12. "Surveys typically use a control group or a control question." *Bobak Sausage*, 2010 WL 1687883 at *7. "Trademark surveys measure how the trademark influences participants' 'perceptions or understanding of a product.'" *Id.* (quoting FJC Reference Manual at 256). "Therefore, a control group or control question is used to measure the origins of the perceptions in order to assure that the participants are not basing their answers on preconceptions." *Id.* Plaintiffs and Berger take the position that controls were unnecessary in this case. Although Plaintiffs offer very little explanation for their position, the surveys' lack of a control is not so obviously fatal as to render Berger's testimony inadmissible. While Berger did not use controls, the surveys do contain "further probing" into the basis for the respondents' belief as to who makes the pictured or described product. Cf. *Nat'l Football League Properties, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999) (excluding as unreliable trademark dilution plaintiff's expert's survey evidence, in which respondents were asked what, if anything, they thought of when they saw allegedly diluting shirts, where respondents were not shown a "control" shirt and the survey did

not further probe into the basis for the respondents' belief).  Additionally, Defendants have not explained what type of control or control group they think would be appropriate, or cited to cases involving controls for trade dress colors or color combinations.  The Court concludes that while these are all appropriate issues to explore at trial, they do not justify excluding the surveys altogether on the basis that they lacked a control.  See, *e.g.*, *Ironclad, L.P. v. Poly-Am., Inc.*, 2000 WL 1400762, at *8 (N.D. Tex. July 28, 2000) ("[A] Court need not exclude the survey due to the lack of control, as generally, technical deficiencies go to the weight rather than admissibility.").

### d.    analysis of survey responses

Defendants argue that Berger did not properly analyze the survey data in accordance with accepted principles.  According to Defendants, "not a single respondent surveyed indicated that the color combination of yellow and black was the reason why they associated the product pictured (or described) as being a DeWalt product."  [101-1] at 14.  Therefore, Defendants assert, Berger "has overstated any potential secondary meaning attributed to the alleged trade dress." *Id.*  However, Defendants misread Berger's surveys and their results.  In Survey B, the question posed was whether the respondent would know who makes "a power tool that was yellow and black" if they saw it in a store.  And in Survey A, some survey respondents specifically stated that they believed the miter saw pictured was put out by DeWalt because "DeWalt has yellow and black tools," and others referred more generally to the "colors" belonging to DeWalt.  [183] at 11.  This criticism as well goes only to the weight of the surveys.

### e.    scope of Berger's testimony

Defendants argue in the alternative that, if Berger is allowed to testify, his testimony should be limited to the secondary meaning of Plaintiffs' yellow and black *products*, rather than Defendants' yellow and black product *packaging*.  Defendants explain that Berger's surveys focused solely on the products themselves and not the packaging and, therefore, there is no basis for Berger's conclusion that the product packaging has achieved secondary meaning.  The Court rejected the same argument in its order [93] granting in part and denying in part Defendants' motion for summary judgment.  The Court explained:

> Defendants argue that the Berger report is flawed because the surveys only asked respondents about yellow and black tools, not yellow and black packaging. They argue that this flaw is fatal because Plaintiffs allege that their trade dress appears on both products and packaging. The Berger report may well have been stronger if the surveys had tested the secondary meaning of Plaintiffs' trade dress as it appeared on both products and packaging. But it is not the job of the Court to weigh evidence on motion for summary judgment, nor is this claimed defect so egregious as to be fatal.   A reasonable trier of fact could infer that if respondents associate Plaintiffs with yellow and black products—a conclusion supported by the Berger report—consumers also associate Plaintiffs with tools and accessories in yellow and black packaging.

[93] at 57-58. Defendants have not provided any new rationale for limiting Berger's testimony to the secondary meaning of Plaintiffs' yellow and black products. Although Berger's report would have been stronger if he had tested both yellow and black products and yellow and black packaging for secondary meaning, this goes to the weight rather than the admissibility of Berger's testimony.

### f.      prejudice

Defendants argue in the alternative that even if Berger's testimony is not so flawed as to be inadmissible, it should be excluded under Rule 403 because it will be "unfairly prejudicial to Positec and will have a tendency to mislead the jury into believing that there is a likelihood of confusion." [103-1] at 14. "The court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). The Court finds, on balance, that the probative value of Berger's testimony is not substantially outweighed by the danger that the jury will be misled by the testimony. Defendants will have the opportunity at trial to cross-examine Berger and explore the alleged flaws in his survey design. Defendants have also retained their own expert, Gemini, who can elaborate on these alleged flaws. There is no reason to believe that a jury could not follow such testimony and come to its own conclusions regarding the weight, if any, to give to Berger's surveys.

In sum, as Professor McCarthy has observed in his leading treatise, "there is no such thing as a 'perfect' survey." 6 McCarthy on Trademarks and Unfair Competition § 32:178 (4th edition). Here, as noted above, Defendants have pointed out several respects in which Berger's survey can be said to fall short of the unattainable mark of perfection. But the Court cannot conclude that Berger's work is so flawed as to fail the test of admissibility, especially in view of the Seventh Circuit's admonition that a "proffered survey" should be excluded only on "rare" occasions. *AHP Subsidiary Holding*, 1 F.3d at 618. In these circumstances, another observation of the Seventh Circuit comes to mind, in which the court stressed the vital role that "'[v]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof' * * * are to play in the trier of fact's ultimate evaluation of admissible but shaky evidence." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) (quoting *Daubert*, 509 U.S. at 596). For all of these reasons, Defendants' motion to exclude Berger's testimony regarding secondary meaning [101] is denied.

### 3.      Testimony Concerning Likelihood of Confusion [103]

In addition to the two secondary meaning surveys, Berger conducted one survey designed to test whether Rockwell's use of trade dress that is arguably similar to Plaintiffs' is causing a likelihood of confusion on the part of consumers as to the source of the goods. Respondents were shown a photograph, taken in a retail store, of two rows of boxed products. All products in the photo were DeWalt products, except one, which was a Rockwell product. Respondents were asked if they believed the products were put out by the same company, and, if so, why. Forty-seven percent of respondents said they believed that all the products pictured were put out by the same company.

Defendants assert that Berger's likelihood of confusion survey is "so rife with methodological flaws that it must be deemed inadmissible" and Berger must be precluded from testifying at trial. [103] at 1. Defendants identify six alleged flaws, and also ask the Court to limit the scope of Berger's testimony if he is allowed to testify. The Court addresses each argument in turn below.

### a. universe of survey respondents

Defendants raise all the same arguments about the universe of respondents to the likelihood of confusion survey as they did about the universe of respondents to the secondary meaning surveys. Therefore, for the same reasons stated above, the Court finds that, although the universe could have been better defined, it is not so flawed as to render the survey completely unhelpful of inadmissible.

### b. replication of market conditions

Defendants argue that the likelihood of confusion survey failed to replicate market conditions. The Court already addressed the same criticisms at the summary judgment stage, finding that they, at most, "reveal triable issues concerning the credibility and the weight that should be given to Berger's report." [93] at 62. Defendants have not identified any new issues that would warrant reconsideration. Defendants claim that the photo "fails to faithfully replicate the packaging colors at issue." [103-1] at 8. But this is not clear from the exhibits that Defendants have provided. If the packaging colors in the photo are so noticeably different from the true packaging colors, Defendants can easily demonstrate this flaw at trial. Defendants also argue that the photo fails to replicate market conditions because Berger cropped the photo that Plaintiffs gave him to show only two rows of boxed products and not the products sitting on a shelf above the boxes. This does not render the survey inadmissible. The cropped photo is, nonetheless, a photo taken in the market. The survey respondent is able to see the full product packaging, like the customer in the store would.

This case is not like the ones that Defendants cite in which surveys have been found inadmissible for failing to replicate market conditions. In *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 U.S. Dist. LEXIS 951 (N.D. Ill. Jan. 22, 2003), Sears claimed that Menard infringed on its service marks in radio and television advertisements. The court found that a customer confusion survey was inadmissible where "respondents were exposed to only 8- or 9-second portions of the parties' 30-second television commercials and 10-second radio advertisements." *Id.* at *5. The court explained that "[t]he relevant material is that which Menard actually introduced into the marketplace, which consisted of 30-second television commercials and 10-second radio advertisements—not discrete portions of that material containing certain content." *Id.* at *6. The survey "improperly distorted marketplace conditions by lifting portions of the commercials out of context." *Id.* In *Vista Food*, the court found that a survey was insufficient to create a material issue of fact as to the likelihood of confusion, where the brochure used to perform the survey did not display the plaintiff's mark as it was shown in commerce, but instead eliminated the plaintiff's logo, part of its name, the proper font and stylized first letter, and the proper colors. *Vista Food*, 2005 U.S. Dist. LEXIS 42541 at *15-16. Unlike in those cases, Berger used a photo that at least "attempt[ed] to replicate the thought processes of consumers encountering the

disputed mark or marks as they would in the marketplace." *Simon Prop. Group L.P. v. mySimon, Inc.,* 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000).

### c.  leading questions

Defendants argue that Berger used an improper leading question by asking respondents viewing the photo whether they thought all of the products were made by the same company? Like the secondary meaning surveys, however, the likelihood of confusion survey gave respondents choices of "yes," "no," and "don't know," and respondents who answered "yes" were asked why they chose that response.  These survey features help to "mitigate[]" concerns about respondents guessing the correct answer.  *LG Electronics*, 661 F. Supp. 2d at 955.  The jury "will be free to weigh the utility, if any, of the closed-ended question along with the open-ended question and the survey as a whole."  *Id.*

### d.  survey control

Defendants argue that the likelihood of confusion survey contained inadequate controls, because Berger did "not test whether the images and text and other designs on the packaging had an effect on the survey."  [103-1] at 12.  Plaintiffs argue that a control was unnecessary.  The Court already resolved this dispute at summary judgment: "the likelihood of confusion analysis focuses on the total image of a product; the key question is whether consumers might be confused when they see Defendants' trade dress as a whole, not how much relative confusion the various parts of Defendants' trade dress cause."  [93] at 63.  The Court finds no reason to revisit its decision.

### e.  analysis of survey responses

Defendants argue that Berger failed to properly analyze the survey data in accordance with accepted principles because he did not consider the reason why survey participants formed their opinion that all the products were put out by the same company. [103-1] at 13.  However, in the next sentence Defendants admit that Berger did ask questions designed to capture this information; "14 of the 95 respondents who indicated a belief that the products were put out by the same company identified reasons for this belief that could be attributed to the claimed yellow-and-black trade dress."  *Id.*  Defendants have not raised a legitimate challenge to Berger's survey analysis.

### f.  scope of Berger's testimony

Defendants contend that, if Berger is allowed to testify, his testimony and conclusions should be limited to packaging, rather than the products themselves, because the photo used in the likelihood of confusion survey showed only the product packaging and "did not test whether the trade dress on the tools themselves caused a likelihood of confusion."  Nonetheless, a reasonable trier of fact could infer that if there is confusion between the parties' yellow and black packaging, then there is also confusion between the parties' yellow and black power tools.  In fact, the product packaging includes illustrations of the products contained inside.

Defendants also argue that the likelihood of confusion survey is inadmissible to prove confusion between any trade dress used in connection with other products of Plaintiffs, beyond the specific product pictured. [103-1] at 15. The fact that Berger did not conduct separate tests using photos of all of Plaintiffs' and Defendants' packaging does not render his survey so unreliable as to warrant exclusion. Defendants are free to challenge Berger's assumption at trial, for instance by showing other product packaging used by Plaintiffs that is not similar to the packaging shown in the image.

**B.     Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Joseph Gemini on the Issue of Damages [136]**

Defendants move pursuant to Rule 702 and *Daubert* to exclude the report and testimony of Plaintiff's expert, Joseph Gemini, on damages. Defendants assert that the report is deficient because Gemini's calculation of Plaintiffs' damages "consists of one amalgamated number without allowing for consideration of individual products," such that "there is no way for a finder of fact to properly determine damage in the event that some (but less than all) of Positec's alleged infringing products are found to infringe Positec's rights, and further no way to separate out online sales from retail outlets." [136] at 1.

The Court denies Defendants' motion. Defendants' argument is not a proper *Daubert* challenge. Defendants do not challenge Gemini's qualifications; the reliability of his methodology; whether his opinions follow rationally from his application of knowledge, skill, experience, training or education; or the relevance of his opinions. *Kumho Tire*, 526 U.S. at 151-53. Instead, Defendants criticize the level of granular detail Gemini provides in his damages calculation. Defendants do not cite any case law that would allow for the exclusion of an expert on this basis. The two cases Defendants cite stand for the unremarkable proposition that "a single observation does not provide a sufficient basis for calculating an average." *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013). Here, Gemini's damages figure was not based on a "single observation" but instead was based on detailed sales and profits data that Defendants provided. To the extent that Defendants are concerned about the jury being able to award damages if they find infringement as to only some of Defendants' products, Defendants can both argue that the jury should reject (or at least reduce) Gemini's proposed damages amount and offer their own damages calculations to clarify the issue for the jury.

In addition, Defendants misread Gemini's report when they state that he provided "one amalgamated number" for damages. [136] at 1. In Section B of his report, Gemini calculated damages for trademark infringement (Count II), unfair competition and false designation of origin (Count III); trade dress infringement (Count IV); and state common law trademark infringement and unfair competition (Count VI). Gemini used sales data provided by Defendants to calculate damages under two alternative scenarios: First, he assumed that infringement was found as to all of the products Defendants sell under the alleged infringing "sunburst" trade dress. Second and alternatively, he assumed that infringement was found only as to Defendants' miter saw product RK7137 and three "Jawhorse" products, RK9000, RK9002, and RK9192. For each Defendant, Gemini provided separate schedules with damages numbers for: (1) gross sales

of all products in "sunburst" packaging; and (2) gross sales of the three accused Jawhorse products, broken down by specific product.

The Court therefore denies this motion [136].

## IV.    Conclusion

For the foregoing reasons, the Court provisionally grants motion *in limine* [134]; grants in part and denies in part motions *in limine* [127] and [128]; denies motions *in limine* [126], [129], [130], [131], [133] and [140]; and denies the three *Daubert* motions, [101], [103] and [136]. Finally, the Court reserves ruling on Defendants' motion *in limine* [132] and will discuss the motion and the pertinent authorities with counsel at the September 23 final pre-trial conference.

Dated:  September 22, 2015

_____
United States District Judge