**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, | ) | Case No. 1:11-cv-05426 |
| BLACK & DECKER INC. and BLACK & | ) | |
| DECKER (U.S.) INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| vs | ) | |
| | ) | Magistrate Geraldine Soat Brown |
| POSITEC USA INC. and RW DIRECT, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | ORAL ARGUMENT REQUESTED |

# DEFENDANTS' MOTION TO SET PROFITS AWARD PURSUANT TO 15 U.S.C. § 1117(a) AND ALTERNATIVE MOTION FOR REMITTITUR

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ……………………………………………………………………………..1

STATEMENT OF RELEVANT FACTS ……………………………………………………...4

    A.    Plaintiffs' Evidence of Profits Presented at Trial ………………………………..4

    B.    Defendants' Evidence of Unrebutted Costs, Expenses
        and Other Deductions Presented at Trial ………………………………………5

    C.    There Was No Evidence of Confusion Presented at Trial ………………………10

    D.    There Was No Evidence of Willfulness or Bad Faith Presented at Trial ……….11

    E.    Plaintiffs' Attempted to Influence the Jury with
        Prejudicial and Inflammatory Evidence ………………………………………11

    F.    The Jury Verdict ………………………………………………………........12

ARGUMENT ……………………………………………………………………………13

    I.    THE JURY'S AWARD OF PROFITS SHOULD BE DISREGARDED
        OR REDUCED………………………………………………………………..13

    A.    The Court Has Broad Discretion to Reduce Profits Awards Pursuant to the
        Lanham Act, 15 U.S.C. § 1117(a) ……………………………………………13

    B.    Irrefutable Evidence of Costs and Deductions Were
        Presented by Defendants at Trial ……………………………………………..18

    C.    Irrefutable Evidence Was Presented at Trial Confirming That Most,
        if not All, of the Profits Made by Defendants From the Sale of Alleged
        Infringing Products Could be Attributed to Factors Other than the
        Use of the Allegedly Infringing Trade Dress …………………………………21

    D.    Other Equitable Considerations Allow for Profits to be
        Eliminated or Further Reduced ………………………………………………28

    II.    IF THE COURT DOES NOT EXERCISE ITS DISCRETION UNDER THE
        LANHAM ACT IT MAY ISSUE A REMITTITUR OF THE EXCESSIVE
        DAMAGES OR ORDER A NEW TRIAL …………………………………….32

CONCLUSION ……………………………………………………………………………34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
No. CV 01-1655-KI, 2008 U.S. Dist. LEXIS 69260 (D. Or. Sept. 12, 2008) ..........................19

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
999 F.2d 1 (1st Cir. 1993) ...................................................................29

*Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092,
2000 U.S. Dist. LEXIS 5238 (N.D. Ill. Mar. 23, 2000) ..........................................15, 16

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 7
6 F. Supp. 2d 868 (N.D. Ill. 1999) ...........................................................29

*Badger Meter, Inc. v. Grinnell Corp.*,
13 F.3d 1145 (7th Cir. 1994) ...........................................................16, 17, 32

*BASF Corp. v. Old World Trading Co.*,
41 F.3d 1081 (7th Cir. 1994) ...........................................................16, 17, 32

*Best v. Taylor Mach. Works*,
179 Ill. 2d 367 (Ill. 1997) .................................................................33

*Bishop v. Equinox Int'l Corp.*,
154 F.3d 1220 (10th Cir. 1998) ...........................................................29

*Chao v. Tyson Foods, Inc.*,
568 F. Supp. 2d 1300 (N.D. Ala. 2008) .......................................................32

*Dial One of the Mid-South, Inc. v. BellSouth Telcomms., Inc.*,
269 F.3d 523 (5th Cir. 2001) ...........................................................14, 28

*D&A Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
692 F.2d 1245 (9th Cir. 1982) .............................................................33

*Doctor's Assocs., Inc. v. Subway.SY LLC*,
733 F. Supp. 2d 1083 (D. Minn. 2010) .......................................................30

*EEOC v. AIC Sec. Investigations, Ltd.*,
55 F.3d 1276 (7th Cir. 1985) ..............................................................33

*Ellington v. Harbrew Imports Ltd.*,
812 F. Supp. 2d 186, 195 (E.D.N.Y. 2011)...................................................30

*Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv.*,
2015 U.S. Dist. LEXIS 33691 (N.D. Ill. Mar. 18, 2015) ........................................22

*Farfaras v. Citizens Bank & Trust Co.*,
No. 01 C 8720, 2005 U.S. Dist. LEXIS 17245 (N.D. Ill. Mar. 21, 2005) .........................33

*Fenner v. Dependable Trucking Co.*,
716 F.2d 598 (9th Cir.1983) ...............................................................33

*Georgia-Pac. Consumer Products LP v. von Drehle Corp.*,
781 F.3d 710 (4th Cir. 2015) ..............................................................14

*Go Medical Indus. Pty., Ltd. v. Inmed Corp.*,
471 F.3d 1264 (Fed. Cir. 2006) ............................................................22

*Grand River Enters. Six Nations v. VMR Prods. LLC*,
N. 13-cv-104, 2014 U.S. Dist. LEXIS 73418 (W.D. Wis. May 29, 2014)....................  11, 30

*Gronholz v. Sears, Roebuck and Co.*,
836 F.2d 515 (Fed. Cir. 1987) ............................................................ 25

*Hard Rock Cafe Int'l, Inc. v. Hard Rock Cafe Int'l, Inc.*,
951 F.2d 684 (5th Cir. 1992) ……………………………………………………………21
*Healthport Corp. v. Tanita Corp. of Am.*,
563 F. Supp. 2d 1169 (D. Or. 2008) …………………………………………………...17, 32
*Hipsaver Co. v. J.T. Posey Co.*,
497 F. Supp. 2d 96 (D. Mass. 2007) …………………………………………………17
*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998) ……………………………………………………………22
*JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*,
28 Fed. Appx. 207 (4th Cir. 2002) …………………………………………………20
*Kodiak Indus., Inc. v. Black & Decker Corp.*,
No. 92 C 6760, 1994 U.S. Dist. LEXIS 8918 (N.D. Ill. June 30, 1994) ………………………30
*Larsen v. Terk Techs. Corp.*,
151 F.3d 140 (4th Cir. 1998) …………………………………………………………14
*Libman Co. v. Vining Indus., Inc.*,
69 F.3d 1360, 1362 (7th Cir. 1995) …………………………………………………23
*Lincoln Diagnostics, Inc. v. Panatrex, Inc.*,
No. 07-CV-2077, 2009 U.S. Dist. LEXIS 84904 (C.D. Ill. Sept. 16, 2009) ……………16, 17, 32
*Lippo v. Mobil Oil Corp.*,
776 F.2d 706 (7th Cir. 1985) …………………………………………………………15
*Lurzer GMBH v. Am. Showcase, Inc.*,
75 F. Supp. 2d 98 (S.D.N.Y. 1998) …………………………………………………...19
*Mercado v. Ahmed*,
974 F.2d 863 (7th Cir. 1992) …………………………………………………………15
*Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*,
316 U.S. 203 (1942) …………………………………………………………………21
*Monsanto Co. v. Ralph*,
382 F.3d 1374 (Fed. Cir. 2004) ………………………………………………………33
*Pebble Beach Co. v. Tour 18 I Ltd.*,
155 F.3d 526 (5th Cir. 1998) …………………………………………………………29
*Qwest Corp. v. Elephant Butte Irrigation Dist.*,
616 F. Supp. 2d 1110 (D.N.M. 2008) ………………………………………………...31
*Rolex Watch USA Inc. v. Meece*,
158 F.3d 816 (5th Cir. 1998) …………………………………………………………29
*Roulo v. Russ Berrue & Co.*,
886 F.2d 931 (7th Cir. 1989) …………………………………………………………31
*Sands, Taylor & Wood*,
978 F.2d 947 (7th Cir. 1992) …………………………………………………………29
*Sands, Taylor & Wood v. Quaker Oats Co.*,
34 F.3d 1340 (7th Cir. 1994) …………………………………………………………15
*Simon Property Grp., L.P. v. mySimon, Inc.*,
No. IP 99-1195-C H/G, 2001 U.S. Dist. LEXIS 852 (S.D. Ind., Jan. 24, 2001) ………………22
*Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*,
392 F.3d 248 (7th Cir. 2004) …………………………………………………………28
*Tri-G, Inc. v. Burke, Bosselman & Weaver*,
222 Ill. 2d 218 (Ill. 2006) …………………………………………………………32

iii

*Ty Inc. v. Softbelly's, Inc.*,
517 F.3d 494 (7th Cir. 2008)………………………………………………………………30
*Unisplay S.A. v. Am. Elect. Sign Co*.,
69 F.3d 512 (Fed. Cir. 1995) …………………………………………………………………33
*Watec Co., Ltd. v. Liu*,
403 F.3d 645 (9th Cir. 2005) …………………………………………………………………33
*Zenith Elecs. Corp. v. Exzec, Inc.*,
182 F.3d 1340 (Fed. Cir. 1999) ………………………………………………………... 24

## Statutes

15 U.S.C. § 1117(a) …………………………………………………………...1, 3, 4, 13, 14, 18, 28, 34
28 U.S.C. § 1338(a) …………………………………………………………………………………24
Fed. R. Civ. P. 59(a) ……………………………………………………………………………1, 33
Fed. R. Evid. 702 ……………………………………………………………………………………31

## Secondary Material

3-14 Gilson on Trademarks § 14.03[6][d] ………………………………………………….…14

Defendants, Positec USA Inc. and RW Direct, Inc. (collectively "Defendants" unless specifically referenced herein), by counsel, hereby move the Court to set the profits amount to be awarded to Plaintiffs, The Black & Decker Corporation, Black & Decker Inc., Black & Decker (U.S.) Inc. (collectively "Plaintiffs"), pursuant to 15 U.S.C. § 1117(a), and, in the alternative, move for remittitur pursuant to Fed. R. Civ. P. 59(a). In support thereof Defendants state as follows:

## **INTRODUCTION**

As ultimately acknowledged by Plaintiffs, the only substantive liability issue raised in this case was whether Defendants' "sunburst" packaging was likely to cause confusion with the unregistered trade dress in Plaintiffs' DeWalt packaging. At the conclusion of trial the Jury found Defendants liable for both trademark and trade dress infringement and awarded damages of $54,074,815. The Court should exercise its broad discretion under 15 U.S.C. § 1117(a) to eliminate or substantially reduce that damages award for at least the following reasons:

1. Plaintiffs presented no evidence that they have lost a ***single sale*** as a result of Defendants' alleged infringement, and in fact the uncontroverted evidence showed that Plaintiffs' sales rose during the relevant ***six year*** time period;

2. Aside from one highly questionable survey (discussed in detail in Defendants' accompanying Motion for New Trial and Motion for Judgment as a Matter of Law), Plaintiffs presented ***zero evidence of actual confusion*** despite ***six years of contemporaneous sales*** by the parties;

3. $54,074,815 seemingly approximates Defendants' ***entire gross profits*** for sales of all of their power tools sold in the "sunburst" packaging from 2009 forward, despite compelling and uncontroverted evidence that:

1

a. Defendants offered unrebutted evidence that they collectively incurred significant ($55,066,728 for all "sunburst" packaged products) expenses in addition to the costs of goods sold (*e.g.*, costs related to product distribution, warranty, selling and marketing) that are directly related to the products at issue in the case;

b. Approximately $40,000,000 of Positec USA's gross sales of the products at issue and 100% of RW Direct's gross sales were made *via* internet channels (*e.g.*, Amazon.com, Target.com for Positec USA) in which the allegedly infringing packaging was not even shown and thus could not have driven the consumers decision to purchase the products;

c. $151,715,870 of Defendants' gross sales (roughly 52% of all sales) involved products (oscillating tools and the Jawhorse) for which Plaintiff sold no corresponding competing products; and

d. Product packaging does not drive sales of the tools at issue, and instead sales are driven by other factors such as price and the ergonomics and performance of the tools themselves;

4. Plaintiffs presented no evidence that Defendants intended to pawn off of Plaintiffs' alleged goodwill in the DeWalt packaging (the real standard for determining intent), and instead merely presented evidence that Defendants were aware of Plaintiffs' trademarks and use of the yellow and black packaging (insufficient to demonstrate intent);

2

5. Even if Plaintiffs' intentionally deceptive confusion survey were credited as fully reliable and authoritative (it was not), the majority of all Defendants' sales occurred in circumstances were no consumer was confused in any way; and

6. There is no way to determine if the damages awarded by the Jury were for purported infringement of Plaintiffs' registered trademarks (which Plaintiffs ultimately agreed were not infringed), for purported infringement of Plaintiffs' unregistered product packing trade dress, or for some combination of the two.

In view of these and other compelling considerations[1], there can be no legitimate dispute that the Jury's verdict was unsupported and may have resulted from prejudice and passion stemming from Plaintiffs' introduction of inflammatory and misleading "evidence" that had no purpose other than to paint Defendants as billionaire thieves from China and to persuade the Jury to overlook and disregard the merits of the case. As discussed herein, many courts have exercised their broad discretion to eliminate or substantially reduce damages awards under 15 U.S.C. § 1117(a) when faced with similar circumstances. Subject to principles of equity, and the discretion afforded under the Lanham Act, Defendants respectfully submit that the Court should

---

[1] At a maximum, the Jury could have awarded Plaintiffs a total of $7,659,138, which represents the total operating profits for Positec USA, alone. When one factors in RW Direct, then the maximum amount the Jury could have awarded was $4,486,805, which is the combined operating profits number for both Defendants. This does not end the analysis, however. Undisputed testimony established that 76% of the total gross revenues for both Defendants were driven by advertisements where the packaging was not shown to consumers at all. With that percentage in mind, the maximum operating profits for both entities would have been $1,076,833.44. Even further still, undisputed evidence established that none of the Defendants' sales were driven by the packaging. In other words, not a single sale could be attributed to the alleged acts of infringement. This is not to mention that there are several equitable considerations the Court may take into account which should further reduce the profits award entered by the Jury. Therefore, it would be within the Court's considerable discretion to award Plaintiffs no profits at all and limit the relief afforded to Plaintiffs to the issuance of a permanent injunction if that is warranted in this case.

3

do the same here in order to avoid providing Plaintiffs with an undeserved windfall and Defendants with an inappropriate penalty.

**STATEMENT OF RELEVANT FACTS**

**A. <u>Plaintiffs' Evidence of Profits Presented at Trial</u>**

The trial began in this case on September 28, 2015. During their case in chief, Plaintiffs presented evidence and testimony from their damages expert, Mr. Joe Gemini, as to the gross revenues received by Defendants for the sale of all products sold by Defendants under the alleged infringing "sunburst" packaging and/or any sales of the alleged infringing Jawhorse product (Plaintiff's Trial Exhibit <u>PX-74</u>, attached hereto as **<u>Exhibit 1</u>**). *See* Trial Transcripts ("TR"), Day 3, pp. 558-559.[2] Mr. Gemini did nothing but parrot the undisputed gross profits numbers provided to him by Defendants and provided no independent analysis or calculations to create the numbers to which he testified. In essence, he did nothing more than repeat the numbers that were given to him by Defendants. TR, Day 3, pp. 575-578. The total gross profits for Positec USA outlined by Mr. Gemini, based solely on the numbers provided by Defendants, were $53,960,014.[3] *See* TR, Day 3, p. 569; *see also* <u>PX-47A.004</u>, attached hereto as **<u>Exhibit 3</u>**.

On cross examination Mr. Gemini admitted that he did not consider any other factors that might be involved with a purchasing decision, such as (a) whether consumers were actually exposed to the "sunburst" packaging when purchasing products online; (b) the effect of packaging on a consumer's decision to purchase a product; and/or (c) the role the tool itself, rather than its packaging, plays in the purchasing decision. *See* TR, Day 3, pp. 584-587, 594-

---

[2] Cited portions of the trial transcripts are attached hereto as collective **<u>Exhibit 2</u>**.
[3] The total gross profits for RW Direct based on products typically sold in the "sunburst" packaging were $5,593,518. Though, as will be discussed herein, consumers do not see the "sunburst" packaging for online sales at the point of purchase.

595.  Aside from the testimony of Mr. Gemini and Defendants' financial records, Plaintiffs presented no other evidence related to calculation of Defendants' profits in this case.

**B.  Defendants' Evidence of Unrebutted Costs, Expenses and Other Deductions Presented at Trial**

Defendants, by contrast, presented the testimony of their Chief Financial Officer, Paul Tellefsen, the expert witness testimony of Mr. Mike Tate, and the detailed financial records of the companies to support two contentions: (1) the costs legitimately incurred by Defendants relating to the accused products; and (2) the portion of the profit numbers that could accurately reflect the amount of profits, if any, that could be attributed to the alleged acts of infringement.

After explaining how the various costs and expenses can be factored into a profits analysis, Mr. Tellefsen ultimately confirmed that Defendants' financial records[4] were accurate since they were audited by an outside accounting agency on an annual basis (*Id*., p. 794), and had been audited by both the Internal Revenue Service and the U.S. Customs and Border Protection Agency (*Id*., p. 803).  These are the same records that were produced in this case and which form the basis for the numbers relied upon by both parties.  Mr. Tellefsen testified that the Defendants' general ledger, which was provided to Plaintiffs in connection with this case, details every transaction that has ever been conducted by the Defendants, including all costs Defendants incurred.  *Id*. at 813-14; *see* DX-96.[5]

Mr. Tellefsen further confirmed that:

---

[4] *See e.g*., DX-80 (attached hereto as **Exhibit 4**) and DX-91 (attached hereto as **Exhibit 5**), which consist of Defendants' financial statements.  TR, Day 4, 2015, p. 815.  These documents set forth the net sales, costs of goods sold, gross margins, and breaks out selling, general and administrative costs, and operating income and after tax income.  *Id*. at 816.
[5] DX-96 is too large to attach to this pleading.  Though the Court has an electronic version of DX-96, Defendants will provide a thumb drive containing the entire general ledger if requested.

1. Nearly $40 million of the gross sales/revenues of Positec USA originated from online sales (such as sales through Amazon.com, Target.com, and/or HomeDepot.com, to name a few), where consumers never see the accused packaging. TR, Day 4, p. 819; and

2. Positec USA, for example, made over $130 million in gross sales with respect to their oscillating tools prior to DeWalt ever selling an arguably similar or competing product. *Id*. at 820. That roughly $130 million figure represents nearly half of all of Defendants' gross revenues.[6]

What Mr. Tellefsen testified to was the fact that Defendants' financial records were accurate and that there were other expenses that should have been factored into the profits award.

Defendants' expert, Mr. Tate, in contrast to Mr. Gemini, reviewed all the Defendants' financial records, including the general ledger. TR, Day 4, p. 845. Using this information, he provided a summary of the <u>maximum</u> profits made by Defendants ("damages"), in the event the Jury found Defendants liable for infringement under the Lanham Act. *Id*. at 846-47. Mr. Tate's calculations confirmed that:

1. The total operating profits for Positec USA for the sale of the alleged infringing "sunburst" packaging products were $7,659,138 after deducting all costs incurred by the Defendants. *Id*. at 846-47. *See also*, Defendants' Trial Exhibit <u>DX-64</u>, attached hereto as **<u>Exhibit 6</u>** (and including the updated schedules to Mr. Tate's expert report used as a demonstrative exhibit at trial).

---

[6] To put this in context, these are $130 million in gross sales of products where it would be virtually impossible for a consumer to go to a display and accidently purchase a Rockwell product thinking they were purchasing a DeWalt product.

6

2.  RW Direct actually lost profits (nearly $3.2 million) from the sale of the alleged infringing product packaging.  In considering this loss, the total operating profits, or the <u>maximum</u> profits amount, for <u>both</u> Defendants combined was determined to be **$4,486,805**.  TR, Day 4, pp. 847, 856; *see also* <u>DX-64</u>.

3.  With respect to the net profits for the sales of the Jawhorse products only, the total operating profits number for both Defendants was $1,860,127.[7]  *Id*. at 857; *see also* <u>DX-64</u>.

In making his maximum net profit calculations, Mr. Tate specifically deducted Defendants' direct costs related to product distribution, warranty, sellling, and marketing.  TR, Day 4, p. 854.  According to Mr. Tate, those total costs were $24,640,872.[8]  *Id*.  *See also* <u>DX-64</u>.  Additionally, the total advertising direct costs were $30,425,856.[9]  *Id*.  Because it would be impossible for Defendants to track the specific advertising costs by product (the numbers are tracked by advertising campaign instead), Mr. Tate testified that he allocated the expenses pursuant to generally accepted accounting principles and created an advertising cost allocation based on his review of the relevant financial information and his significant experience in the industry.  *Id*. at 855.  Mr. Tate verified the various factors that go into calculating net profits – including costs of purchasing the product, costs of rebates and coupons, manufacturing costs, sale costs, costs of goods sold, marketing costs, sales commissions, sales collateral, distribution costs, freight costs, warranty costs, advertising costs, and general and administrative expenses (general and administrative expenses were not included as deductions through Defendants' calculations).  *Id*. at 849-853.  All of these costs stand unrebutted in the record – no expert or fact

---

[7] $1,768,930 for Positec USA and $91,196 for RW Direct.
[8] Including $21,353,737 for Positec USA.
[9] Including $24,947,139 for Positec USA.

7

witness contested the validity or application of these numbers.  It is critical to note that Mr. Tate did not include the general and administrative expenses in calculating the "maximum" award of net profits.  The Defendants' business records, as kept in the normal course of business, included such costs and, if accounted for, show that neither Defendant had earned any profit on the accused products – which is not surprising for what is essentially a start-up company.

Even taking these "maximum" profit numbers into account, Mr. Tate testified that the profits number could be further reduced based on a number of factors including:

1. There is no evidence of actual confusion and no evidence of lost sales (*Id*. at 858);

2. The parties market to different consumers (*Id*. at 858-59);

3. A significant amount of Defendants' sales are online sales where consumers are not exposed to the packaging at all (*Id*. at 859); and

4. Packaging does not influence a consumer's purchasing decision (*Id*. at 859).

In criticizing Mr. Gemini's "opinions", Mr. Tate took issue with the fact that he concluded that every single sale made by Defendants was directly attributed to the "sunburst" packaging and nothing else.  There was no evidence addressed at trial supporting the contention that every single sale by Defendants was caused by the packaging and indeed the evidence discussed herein shows that numerous consumers never saw the packaging when making a purchasing decision concerning the accused products.  For example, Defendants also presented the testimony of their head of marketing, Craig Taylor, who provided extensive testimony as to the typical purchasing process with respect to Defendants' (and Plaintiffs') products.  Among other things, Mr. Taylor indicated that packaging plays no role in a consumer's decision to purchase the products at issue.  TR, Day 3, pp. 652-53.  He also testified that product packaging

is not part of the online purchasing process at all (including sales made by Positec USA through Amazon.com, Target.com, and HomeDepot.com, for example).  TR, Day 4, p. 695.

As to the purchasing process, Mr. Taylor indicated that the tools are almost universally displayed outside of the packaging at the point of purchase, that a majority of purchasers make the purchasing decision based on the product itself – its ergonomics and physical features; that the consumer then goes on to review the information and specifications provided on the place card below the product; they then go down and look at the picture of the tool on the packaging as well as the label/sticker by the packaging to see if it matches up with the product, and then pick up the matching product and go to the check-out counter to make the purchase.  *Id*. at 691-694. Again, reiterating that packaging plays no role in the consumers' purchasing decision.[10]

Mr. Taylor further testified that:

1.  A majority – over 76% – of Defendants' customers purchase products after viewing either television or online ads.  These are advertisements where the product packaging is not shown or referenced at all.  The focus is always on the unique product.  *See* TR, Day 4, pp. 736-37.

2.  No other competitors sell anything like Defendants' Jawhorse product.  TR, Day 3, pp. 622-23.  The same holds true for Defendants' Sonicrafter[11], Versacut, and Bladerunner. *Id*.  In other words, these are all unique products with no truly competing products in the market – making it less likely that consumers would ever purchase one of these products thinking they were purchasing a DeWalt product.

---

[10] The purchasing process outlined by Mr. Taylor was further confirmed by Plaintiffs' own internal documents/marketing studies.  *See* DX-50 (attached hereto as **Exhibit 7**) and DX-51 (attached hereto as **Exhibit 8**).

[11] Eventually other companies such as Dremel, Bosch, Porter Cable and recently, DeWalt, started selling a similar product.

3. The Rockwell logo is featured prominently on Defendant's products and the product packaging at issue – further reducing any likelihood of purchase being made solely because of the alleged similarities between the respective trade dress. *Id*. at 658-59.

4. The television advertising done by Defendants has been very successful in driving sales and creating consumer recognition of the Rockwell brand and products. *Id*., pp. 654-55.

None of these facts were refuted by Plaintiffs.

Finally, Defendants presented the deposition testimony of Plaintiffs' former head of marketing, Therese Rakosky, who confirmed that a consumer would never make a purchasing decision based on the product packaging (TR, Day 3, p. 592), that consumers would typically focus on the features of the tool itself when purchasing (*Id*., pp. 592-593), and that consumers like to handle the actual tools before making a purchasing decision (*Id*., p. 593).

The evidence presented by Defendants was unrebutted and proved up significant reductions from "gross profit" figures that need to be made in order for the Jury to derive an accurate net profits number in the event of a finding of liability. Finally, the evidence presented by Defendants unequivocally proved that most, if not all, of the sales made by Defendants were not attributed to the alleged acts of infringement.

**C. There Was No Evidence of Confusion Presented at Trial**

As set forth in detail in Defendants' Motion for New Trial and Motion for Judgment as a Matter of Law, no evidence of actual consumer confusion was presented at trial aside from Mr. Berger's likelihood of confusion survey (to the extent that the survey could be said to somehow show actual confusion) or Ms. Fischer's self-serving testimony. The fatal flaws with Mr. Berger's survey and Ms. Fischer's testimony are fully set forth in those motions. Outside of those two issues, both Plaintiffs and Defendants confirmed there was no evidence that consumers

have ever been confused. *See e.g.*, the testimony of Ms. Fischer, TR, Day 2, pp. 282, 285, 366-68 (admitting that she had never heard of any confusion and that Plaintiffs had no evidence of actual confusion); and testimony of Mr. Taylor, TR, Day 4, pp. 720-722 (there were no calls that were made to the call center by confused customers, no returns by customers thinking they were returning a DeWalt product, no calls to customer hotline indicating confusion, no confusion referenced in online product reviews, no online comments showing confusion among purchasers or prospective purchasers, no direct customer feedback indicating confusion, and no comments from retailers whereby confusion was expressed).

### D. There Was No Evidence of Willfulness or Bad Faith Presented at Trial

As set forth in detail in Defendants' Motion for Judgment as a Matter of Law, Plaintiffs failed to present any evidence supporting a finding of willfulness under the Lanham Act. Plaintiffs only presented facts showing that Defendants were aware that Plaintiffs were claiming trade dress rights to a yellow and black color scheme in some undefined form. Defendants' knowledge of Plaintiffs' alleged rights, standing alone, does not support a willfulness finding. *See Grand River Enters. Six Nations v. VMR Prods. LLC*, No. 13-cv-104, 2014 U.S. Dist. LEXIS 73418 (W.D. Wis. May 29, 2014) (refusing to find willfulness where the only evidence presented by plaintiff was that the defendant had knowledge of plaintiff's trademarks).

### E. Plaintiffs Attempted to Influence the Jury with Prejudicial and Inflammatory Evidence

As more fully set forth in Defendants' Motion for a New Trial, a significant amount of evidence was presented to the Jury which may have improperly influenced the Jury and which resulted in a substantial violation of Defendants' rights. This evidence includes (1) the surveys and testimony of Mr. Berger, (2) the prior rulings and judgments of other cases, (3) the

Plaintiffs' approximately fifty (50) trademark registrations, and (4) the Plaintiffs' arguments invoking foreign bias.

### F. __The Jury Verdict__

The Jury returned its verdict on October 5, 2015 and ultimately found that the Defendants infringed Plaintiffs' alleged family of registered trademarks featuring the yellow and black color scheme and infringed Plaintiffs' alleged family of yellow and black trade dress.  The Jury further held that the infringement was willful (though that finding was advisory in nature) and ultimately awarded Plaintiffs all gross profits/sales made by Defendants from any and all products ever sold in the "sunburst" packaging.[12]  In so holding, the Jury effectively determined that every sale of a product in the "sunburst" packaging could be attributed solely to the fact that Defendants infringed Plaintiffs' trademarks and/or trade dress to the yellow and black color scheme despite the fact that neither Defendants' products (outside of the Jawhorse[13]) do not incorporate a yellow and black color scheme).  It is further problematic that there is no way to determine if the profits were awarded for purported infringement of Plaintiffs' registered trademarks, for purported infringement of Plaintiffs' unregistered product packing trade dress, or for some combination of the two.

---

[12] It is not clear whether the Jury determined that the one product at issue sold by Defendants which Plaintiffs alleged to infringe the yellow and black color scheme trade dress and/or trademark, the Jawhorse, infringed upon either Plaintiffs' registered trademarks or their unregistered trade dress.
[13] Defendants' dispute that the color scheme of the Jawhorse infringes any rights of Plaintiffs.

## ARGUMENT

I. **THE JURY'S AWARD OF PROFITS SHOULD BE DISREGARDED OR REDUCED**

### A. THE COURT HAS BROAD DISCRETION TO REDUCE PROFITS AWARDS PURSUANT TO THE LANHAM ACT, 15 U.S.C. § 1117(A)

If the Court determines that the profits issue was properly before the Jury[14], the Judge still has wide discretion under the Lanham Act to reduce that award. Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), controls this Court's ability to adjust the Jury's verdict, which awarded Plaintiffs <u>all</u> of Defendants' gross profits. The relevant provision of § 1117 provides as follows:

> **(a) Profits; damages and costs; attorney fees**
> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and *subject to the principles of equity, to recover (1) defendant's profits*, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. *In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed*. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. *If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty*. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

---

[14] Defendants have filed concurrently herewith a renewed motion to strike the Plaintiffs' jury demand in this case. The grounds for this motion are fully set forth therein and incorporated herein by reference. If granted, the Court would be free to disregard the jury verdict and make its own determination on the remedies, if any, the Plaintiffs are entitled to recover.

*See* 15 U.S.C. § 1117 (a) (emphasis added). Regarding an award of profits, courts have considerable leeway to increase or decrease a jury's award. Moreover, there is broad judicial discretion to award or withhold monetary relief according to the equities and circumstances of the case. *See e.g., Dial One of the Mid-South, Inc. v. BellSouth Telcomms., Inc.*, 269 F.3d 523, 527 (5th Cir. 2001) (holding that "§ 1117 of the Lanham Act gives the district court broad discretion over the amount of damages"). Furthermore, the trial court is accorded great latitude in awarding damages, and the reviewing court will not set aside an award unless it is clearly inappropriate or inadequate. *See Larsen v. Terk Techs. Corp*., 151 F.3d 140, 149-50 (4th Cir. 1998) ("Section 35 confers a great deal of discretion on a district court in fashioning a remedy for Lanham Act violations.").

The discretion afforded to the Court under the Lanham Act allows the Court to consider the specific circumstances of the case, determine whether the profits award entered by the jury was excessive, and then make its own determination of a profits amount that the Court deems just. *See* 15 U.S.C. § 1117(a); s*ee e.g., Georgia-Pac. Consumer Products LP v. von Drehle Corp*., 781 F.3d 710, 718 (4th Cir. 2015), as amended (Apr. 15, 2015) ("Under [§ 1117(a)], when a plaintiff seeks recovery based on a defendant's profits, the court may adjust the jury's verdict up or down, but only if it finds the amount of recovery to be either 'inadequate or excessive,' and then only insofar as the adjustment is determined to be just and compensatory, not punitive."). Where the jury verdict creates a "harsh result and leads to a windfall for a plaintiff, disproportionate to defendant's actions, the court may increase or decrease the profits award and 'enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.'" *See* 3-14 Gilson on Trademarks § 14.03[6][d] (*quoting* 15 U.S.C 1117(a)). Further, where there is "no rational connection between the evidence on damages and the verdict" then a

14

jury's damages award may be overturned. *See Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992) (*quoting Lippo v. Mobil Oil Corp*., 776 F.2d 706, 716 (7th Cir. 1985)).

In *Alexander Binzel Corp. v. Nu-Tecsys Corp*., No. 91 C 2092, 2000 U.S. Dist. LEXIS 5238 (N.D. Ill. Mar. 23, 2000) (Judge Pallmeyer), for example, the jury issued a verdict in favor of the plaintiff and awarded the plaintiff $4 million in damages based on the defendant's violations of the Lanham Act. The jury's verdict in that case reflected a decision whereby the jury determined that every single sale by the defendant was made as a direct result of the alleged unlawful conduct. The defendant argued that the damages awarded by the jury were excessive and not supported by the evidence presented at trial.

In analyzing the profits provision of the Lanham Act, the *Binzel* court recognized that an award of profits can be made "on three different bases: compensation, unjust enrichment or deterrence." *Id*. at *40 (*citing Sands, Taylor & Wood v. Quaker Oats Co*., 34 F.3d 1340, 1349 (7th Cir. 1994)). In looking at the unjust enrichment theory, the court held that "an award of the wrongdoer's profits must bear some relationship to the unlawful conduct - e.g., grounded in the benefit accruing to [the defendant] as a result of its unlawful conduct." *Id*. at *41. The court ultimately held that, based on the evidence presented at trial, no reasonable jury could have found that the defendant was unjustly enriched by every single sale it made since the evidence showed that not every sale was made as a direct result of the unlawful conduct at issue. *Id*. at *41. The court then turned to whether the jury's profits award was proper under theories of either compensation or deterrence. *Id*. at *41-42. In looking at the amount awarded, the court agreed with the defendant that the resulting profit award resulted in an undue windfall to the plaintiff. *Id*. at *42. As such, according to the court, the jury award exceeded mere compensation to the plaintiff for its alleged injuries. *Id*. As to deterrence, even though the

15

plaintiff presented evidence of bad faith that would justify an award of profits based on a theory

of deterrence, the court refused to disgorge all of defendant's profits since doing so would

constitute an excessive penalty.  *Id.* at *42-43.  Consequently, the court exercised its discretion

and, rather than hold a new trial on damages, entered judgment for a sum it found just according

to the circumstances of the case – a total of $1.63 million.  *Id.* at *44.

In another illustrative example, in *Lincoln Diagnostics, Inc. v. Panatrex, Inc.*, No. 07-

CV-2077, 2009 U.S. Dist. LEXIS 84904 (C.D. Ill. Sept. 16, 2009), the Central District of Illinois

conducted a bench trial on plaintiff's claims that defendant violated the Lanham Act and, as

such, the plaintiff was entitled to an award of defendants profits of just over $1 million.  The

plaintiff was not seeking actual damages because it could not prove lost sales or that it otherwise

suffered any damages from the defendant's conduct.  *Id.* at *31.  Ultimately, the court found that

the defendant was liable to plaintiffs.  In analyzing the remedies available, the court recognized

that the profits remedy under the Lanham Act was designed to make violations of the Act

unprofitable, but not to serve as a penalty.  *Id.* at *32 (*citing BASF Corp. v. Old World Trading

Co.*, 41 F.3d 1081, 1092 (7th Cir. 1994)).  The court held that the "benchmark for determining

whether an award constitutes compensation or is a penalty 'is the likely benefit accruing to the

defendant on account of its' violation of the Lanham Act."  *Id.* at *33 (*quoting Badger Meter,

Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994)).

During the trial in *Lincoln Diagnostics*, the defendant produced its tax returns and other

financial records which showed that it had actually incurred losses during its business operations.

*Id.* at *34.  The owner of the defendant also testified that neither he nor his family members

actually received any money from the company for the years of its operation.  *Id.*  Based on this

evidence, the court determined that "there is no basis for concluding that a benefit accrued to

16

Defendant from its violation of the Lanham Act." *Id*. at *35. What is more, according to the court, the plaintiff failed to show that it suffered any harm from the unlawful actions of the defendant. *Id*. Therefore, according to the court, any award of profits to the plaintiff would be a penalty as opposed to compensation. *Id*. at *36. As a result, the court refused to award plaintiff any profits despite defendant's violation of the Lanham Act, and the court ultimately determined that the issuance of a permanent injunction was the most appropriate relief. *Id*. at *36-37, and *at 26-27 (*citing BASF Corp*., 41 F.3d at 1095-96) (district court did not abuse its discretion in refusing to award disgorgement of profits even where the defendant's evidence regarding costs did not relate solely to the infringing products and district court made no specific finding as to the amount of profits); *see also Badger Meter, Inc*., 13 F.3d at 1157-58 (district court did not abuse discretion in refusing to award damages based upon the defendant's profits where the evidence showed that the defendant derived no benefit from its violation of the Lanham Act so that any award would be an impermissible penalty); *Healthport Corp. v. Tanita Corp. of Am*., 563 F. Supp. 2d 1169, 1182 (D. Or. 2008) (damages not warranted where no evidence was presented that the counterdefendant profited from its misrepresentations); *Hipsaver Co. v. J.T. Posey Co*., 497 F. Supp. 2d 96, 106 (D. Mass. 2007) (Lanham Act not intended to provide a windfall so equitable factors should be considered to avoid "windfall" to plaintiff).

In this case, the Court should exercise its discretion and reduce or outright eliminate the profits award entered by the Jury. The Jury verdict of roughly $54 million should not stand and the profits amount should be reduced or eliminated altogether based on the following grounds:

1. Unequivocal and undisputed evidence of deductions were presented at trial by Defendants which showed that the profits are lower than the amount awarded by the Jury;

2. Unequivocal and undisputed evidence that the packaging plays no role in the purchasing decision and/or that most, if not all, of the Defendants' sales were not attributed to the alleged infringement were presented at trial; and

3. Other equitable considerations compel a further reduction, such as the lack of actual confusion, the lack of actual damages, the lack of evidence of bad faith, the Plaintiffs' presentation of improper and/or prejudicial evidence and testimony.

### B. IRREFUTABLE EVIDENCE OF COSTS AND DEDUCTIONS WERE PRESENTED BY DEFENDANTS AT TRIAL

The present motion asks the Court to consider the evidence that was presented to the Jury and to determine whether it supports the Jury's award of roughly $54 million damages or whether, based on the evidence, that award was excessive and should be reduced or eliminated pursuant to the "cost or deduction" language of the Lanham Act, 15 U.S.C. 1117(a) and/or the Court's equitable powers.

Defendants do not dispute that a successful plaintiff under the Lanham Act may be entitled to recover, subject to the principles of equity, a defendant's profits from the sale of alleged infringing products. Defendants further do not dispute that under the plain language of the statute, a plaintiff is only required to prove the defendant's sales and that it then becomes a defendant's burden to prove any costs or deductions. However, there is nothing to indicate that the Jury accounted for Defendants' costs and deductions when rendering the verdict.

Here, using only the undisputed numbers and records provided by Defendants, Plaintiffs presented a gross profits number of approximately $54 million for the sale of all products sold by Defendants under its alleged infringing "sunburst" packaging. The Jury awarded Plaintiffs the entirety of the roughly $54 million number presented by Plaintiffs. The Jury made such a

18

determination despite the Plaintiffs' presentation of undisputed evidence of costs and/or deductions presented at trial.

As discussed above, Defendants presented unrefuted evidence, through the testimony of its CFO and expert witness as well as through the entire financial record of the companies, as to further deductions and/or costs that were legitimately incurred that must be reduced from gross profits. Specifically, Defendants demonstrated, at least, that (1) advertising expenses and (2) distribution, warranty, selling, and marketing expenses, must be deducted to come up with the actual operating profits from the sale of the alleged infringing products. Defendants provided those numbers through Mr. Tellefsen and Mr. Tate and reinforced those figures with the verified and audited financial records of the company, including Defendants' trial exhibits DX 80, 91 and 96. Defendants explained how those numbers were calculated using generally accepted accounting principles. What is more, the Plaintiffs did not dispute the testimony of these witnesses nor the accuracy of the data provided in Defendants' financial documents. Plaintiffs offered no evidence or testimony to refute the evidence of costs and/or deductions presented at trial.

The types of costs and deductions presented to the Jury by Defendants are commonly accepted evidence in Lanham Act cases. *See Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655, 2008 U.S. Dist. LEXIS 69260, at *33-36 (D. Or., Sept. 12 , 2008) (granting judgment as a matter of law, reducing $137 million damages award based on defendant's profits to $19.7 million where jury failed to take into account proper cost deductions, also finding that the award was so excessive it was "punitive rather than compensatory"); *Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 104-05 (S.D.N.Y. 1998) (reducing jury's damages award by fifty percent as excessive where it did not consider deductible expenses or appropriately

19

apportion the infringement to the defendant's total sales); *JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 28 Fed. Appx. 207, 215-16 (4th Cir. 2002) (reversing district court's award of the defendant's gross revenues as damages because it failed to consider evidence of defendant's net profits after a deduction of costs).

The evidence presented by Defendants, in the least, establishes that for the total of $54 million in gross profits for Positec USA there were roughly $25 million in advertising expenses and an additional $21 million in distribution, warranty, sales, and marketing expenses.  These undisputed costs establish a <u>maximum</u> profits award of exactly **$7,659,138** for Positec USA alone.[15]  When you combine the two Defendants, the results show a total of approximately $60 million in gross profits from which around $25 million in distribution, warranty, selling, and marketing expenses must be removed as well as $30 million in advertising expenses.  Therefore, using the exact numbers for both entities combined, **the total, <u>maximum</u> amount of profits award should have been $4,486,805**.[16]  Assuming both entities are held liable, which they were according to the Jury, the evidence dictates that the maximum amount of profits a jury could reasonable find would be the roughly $4.5 million number outlined by Defendants.[17]  This

---

[15] Approximately $40 million of the gross sales for Positec USA originated from online sales – or 14% of the total sales.  If the Court determines that gross profits number for Positec USA alone is the starting point for the profits award then then factoring in this reduction would give the court a total operating profits number of approximately $6,586,859.54 – based on gross profits equaling roughly $46,405,612.90.

[16] If the Court were to find that <u>just</u> Positec USA was liable based on the undisputed evidence presented at trial demonstrating that consumers who purchase from RW Direct are not exposed to product packaging at the point of purchase, then the maximum total profits award for Positec USA would be $7,659,138.  Along these lines, if it is determined that Positec USA was liable for profits of all "sunburst" products while RW Direct was only liable for the sale of the alleged infringing Jawhorse products then the maximum total profits would be $7,750,334 ($7,659,138 for Positec USA plus $91,196 in Jawhorse operating profits for RW Direct).

[17] Alternatively, the <u>maximum</u> total profits number for both entities, assuming a finding of liability for RW Direct based solely on its sale of the Jawhorse products, as opposed to the "sunburst" packaging products, would be **$7,750,334** ($7,659,138 for Positec USA plus $91,196 in Jawhorse operating profits for RW Direct).

operating profits number reflects the justifiable costs and deductions based on advertising expenses as well as distribution, warranty, selling, and marketing expenses.[18]

Based on the evidence, however, granting Plaintiffs a profits award comprising this maximum number (i.e. the operating income number) would still be excessive in this case because the evidence presented and equities involved compel further reductions to be made.

### C. IRREFUTABLE EVIDENCE WAS PRESENTED AT TRIAL CONFIRMING THAT MOST, IF NOT ALL, OF THE PROFITS MADE BY DEFENDANTS FROM THE SALE OF ALLEGED INFRINGING PRODUCTS COULD BE ATTRIBUTED TO FACTORS OTHER THAN THE USE OF THE ALLEGED INFRINGING TRADE DRESS

In awarding the roughly $54 million in gross profits demanded by Plaintiffs, the Jury effectively held that every single sale ever made by Defendants of products in the "sunburst" packaging was <u>only</u> made because of the packaging. In other words, the Jury essentially said that had it not been for the Defendants' packaging, not a single consumer would have ever purchased the Defendants' products. This ruling directly contradicts the evidence presented at trial establishing that, in essence, <u>none</u> of the sales made by Defendants could be attributed to their "sunburst" packaging. This ruling further contradicts longstanding Supreme Court precedent that a plaintiff is not entitled to profits "demonstrably not attributable to the unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206 (1942); *see also Hard Rock Cafe Int'l, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 696 (5th Cir. 1992) ("Hard Rock 'would have sold just as many pig sandwiches by any other name' and…'there is no basis for inferring that any of the profits received by [Hard Rock] from the sale

---

[18] If the Court were to find that <u>just</u> Positec USA was liable based on the undisputed evidence presented at trial demonstrating that consumers who purchase from RW Direct are not exposed to product packaging at the point of purchase, then the maximum total profits award for Positec USA would be $7,659,138. Along these lines, if it is determined that Positec USA was liable for profits of all "sunburst" products while RW Direct was only liable for the sale of the alleged infringing Jawhorse products then the maximum total profits would be $7,750,334 ($7,659,138 for Positec USA plus $91,196 in Jawhorse operating profits for RW Direct).

of pig sandwiches are attributable to infringement.'"); *Simon Property Grp., L.P. v. mySimon, Inc.*, No. IP 99-1195, 2001 U.S. Dist. LEXIS 852, at *68-70 (S.D. Ind., Jan. 24, 2001) (granting judgment as a matter of law for defendant, vacating the jury's award of $11.5 million based on the defendant's profits where the amount could not be attributed to trademark infringement); *Go Medical Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006) (affirming district court's reversal of jury verdict based on the defendant's profits where it did not take into account that the success of the defendant's brand could have been attributable to the defendant's marketing efforts and product superiority rather than the trademark); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72-73 (2d Cir. 1998) (reversing district court's award of the defendant's profits because it did not consider evidence of deductible costs and where it did not consider whether some of the defendant's sales could be attributable to its own reputation and well-known brand); and *Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv.*, No. 13 C 7342, 2015 U.S. Dist. LEXIS 33691, at *21 (N.D. Ill. Mar. 18, 2015) (recognizing that profits not attributed to the infringing activity must be removed from the profits calculation under the Lanham Act but refusing to reduce amount since defendant did not provide support to allow for the deductions to be made).

The evidence presented at trial supports awarding no profits of Defendants because there is overwhelming testimony on the record related to the fact that packaging plays no role in a consumer's decision to purchase the products at issue or in the purchasing process at all. For those consumers who do actually see the packaging before making their respective purchases, the undisputed evidence demonstrated that consumers do not make their purchasing decisions based on that packaging. Instead, consumers research their purchase, come to the store and handle the products, look at information on the product provided in the store, and then pair up the photo and

other identifying information on or around the package to the desired product. Plaintiffs offered no evidence to refute these facts. Indeed, Plaintiffs' own former head of marketing and their own internal marketing studies confirmed these facts to be true. *See* TR, Day 3, pp. 592-593; *see also* DX-50 and DX-51.

While Plaintiffs claimed at trial that Defendants' sunburst packaging infringed its trade dress rights, there was no evidence adduced or theory proffered as to how a consumer could possibly be confused when purchasing Defendants' product online, where consumers do not (and indeed cannot) see any packaging in an online purchase until after the product arrives at their doorstep. In fact, the Seventh Circuit has specifically *rejected* a district court's finding of likely confusion where a plaintiff claims that a consumer would buy a product, take it home, unwrap the product and thereafter be exposed to an allegedly infringing color combination and think it came from the Plaintiff. In *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir. 1995), the Seventh Circuit was presented with a scenario in which a consumer might buy a broom with color contrasting bristles that were covered up in the store but visible once the product was taken home. The plaintiff's theory was that a likelihood of confusions existed "because the consumer might, upon removing the opaque wrapper from the Vining broom when she brought the broom home, think that she had bought a Libman rather than a Vining." *Id.*

The Seventh Circuit reversed the District Court's conclusion of likely confusion as a matter of law because:

> Libman's narrative of possible confusion cannot be regarded as better than a hypothesis, and a hypothesis that has not been tested. It should not have been very hard for Libman to find some satisfied owners of its brooms and confront them with the Vining broom and see whether they thought it was the same brand of broom. Without such evidence it would be pure speculation to conclude that anyone, let alone a significant fraction of the broom-buying public, could have been misled into believing that the Vining broom and the Libman broom were one and the same brand. *Libman Co.*, 69 F.3d at 1364.

23

At the trial, of this matter, there was no evidence presented (or even argument by the Plaintiffs) as to how a consumer could be confused making an online purchasing decision when the complained of trade dress is not shown to any consumer during the buying process.   The fact that Plaintiffs offered no evidence as to how the online buying scenario could possibly lead to a likelihood of confusion when the accused packaging is not present in the online environment means that none of the profits attributable to online sales can be recovered here and should be excluded from any award of profits.  *See id.* at 1363 (Reversing a trial court's finding of likely confusion:  "our point is only that a finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof.").

In the end, there was no evidence that any sale made by the Defendants can be attributed to the alleged infringement.  Instead, Defendants' sales can be attributed to their unique products and their extensive advertising – facts which have not been refuted by Plaintiffs.   With that in mind, the Court may exercise its discretion and refuse to award any profits to Plaintiffs at all and should just issue a permanent injunction if the Court finds that such relief is warranted here. Such a finding would be amply supported by the record and would likely be upheld on the potential appeal of this case to the U.S. Court of Appeals for the Federal Circuit.[19]

---

[19] The Federal Circuit will have exclusive jurisdiction over an appeal from an action where the original claims in the district court included a patent claim that was later dismissed with prejudice.  *See Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999) (holding that the Federal Circuit had appellate jurisdiction on appeal of the district court's denial of the plaintiff's motion to dismiss the defendant's Lanham Act and related counterclaims even though all patent claims had been dismissed with prejudice, stating that the dismissal constituted an adjudication of the patent claims on the merits).  In *Zenith*, the Federal Circuit retained jurisdiction because the "path of appeal is determined by the basis of jurisdiction in the district court, and is not controlled by the district court's decision or the substance of issues that are appealed." *Id.*  Because the complaint contained a patent claim, the district court had jurisdiction under 28 U.S.C. 1338(a), and the Federal Circuit had exclusive jurisdiction over any appeal.  *Id.*  In our case, the Seventh Circuit would only have jurisdiction if the patent claims had been dismissed without prejudice because such a dismissal is effectively an amendment to the complaint— meaning that the patent claim is treated as if it never existed and depriving the Federal Circuit of

Here, while Defendants maintain that no profits should be awarded to the Plaintiffs at all, there are a myriad of ways the total operating profits could be calculated based on the evidence presented at trial.

The preferred calculation method, if the Court determines that a permanent injunction alone is not sufficient, would be to adopt the measure of profits based on the evidence that Defendants spent a great deal of time and money in advertising and promoting their products through television advertisements such as infomercials wherein the packaging was never featured and/or even shown to consumers. Indeed, the focus of these commercials has always been the unique nature of the tools sold by Defendants. According to the evidence, the infomercials and/or TV advertising drove over seventy-six percent (76%) of Defendants' gross sales. *See* TR, Day 4, pp. 736-37. If the Court were to take into consideration the fact that 76% of the total gross revenues for both Defendants combined were driven by advertisements where the packaging was not shown to consumers, then the maximum total operating profits for the sale of products in the "sunburst" packaging that could theoretically be attributed to the alleged infringement would be **$1,076,833.44**.[20] This is the measure of profits that should be adopted by this Court in calculating profits if profits are warranted at all.

As an alternative, Plaintiffs' own evidence, including the report and testimony of Mr. James Berger, further supported additional deductions that were not considered by the Jury. For example, Mr. Berger's likelihood of confusion survey indicated that 47% of consumers were confused. Using this number as a bottom line, one reasonable measure of profits would be for only forty-seven percent (47%) of the gross revenues to be attributed to the alleged infringement.

---

jurisdiction. *See Gronholz v. Sears, Roebuck and Co.*, 836 F.2d 515, 518 (Fed. Cir. 1987) (holding that the regional circuit had jurisdiction over the remaining claims in the case where the patent claims had been dismissed without prejudice).

[20] Combined, the gross profits would be $14,292,848.16.

When taking this into consideration, then the total operating profits for alleged infringing sales of the "sunburst" packaging products would be $2,108,798.82. Similarly, the total operating profits for just the sale of the Jawhorse products by both entities, if based on Mr. Berger's conclusions, would be $874,259.69.

The Court may also take into account that Defendants offer unique products not sold by Plaintiffs (or many other competitors for that matter). Only recently have Plaintiffs offered products, such as oscillating tools, for example, that arguably compete with Defendants' products. In fact, Defendants sold millions of dollars of their products before the Plaintiffs' products entered the market. As a profits calculation alternative, with respect to the specific sale of the oscillating tool by Defendants prior to Plaintiffs offering a competing product, there were approximately $130 million in such gross sales – or 44% of the total gross revenues of "sunburst" products sold by Defendants – made by Defendants prior to Plaintiffs ever offering their competing product on the market. The total operating profits for both Defendants from the sale of all other "sunburst" products than the oscillating tools sold <u>prior</u> to the Plaintiffs' entry into that market are $2,512,611.36. This is not to mention the fact that Plaintiffs have <u>never</u> sold a product that competes with the Jawhorse. Therefore, there are $151,715,870 in total gross sales by Defendants for products which have never competed with products sold by Plaintiffs at all – or 52% of all gross sales. With this in mind, the total operating profits for the sale of only competing products at a maximum are $2,153,667.44.

Finally, assuming the Jury did find that the Jawhorse was the only <u>product</u> sold by Defendants which either infringed Plaintiffs registered trademarks or unregistered trade dress (as indeed none of Defendants' other tools even have yellow on them), then only the sale of those products should be factored into the profits analysis since those would be the only infringing

"products and packaging" as required by the jury instructions.  In other words, in reading the final jury instructions, the Jury was ultimately tasked with answering the question of whether Plaintiffs successfully proved that <u>both</u> Defendants' products <u>and</u> packaging infringed the trademarks/trade dress at issue.  *See* Final Jury Instructions, Docket Entry ("DN") 216.  As discussed in these post-trial motions, the only product alleged to have been infringed in this case is the Jawhorse.  If the Jury would have followed the exact instructions charged to it then it could not possibly have found infringement based on anything other than for the sale of the Jawhorse since that is the <u>only product</u> alleged to have infringed either the trademarks or the trade dress at issue.  With that in mind, the total profits awarded to Plaintiffs could appropriately be fixed as $1,860,127, which is the total operating profits number for both Defendants from the sale of the Jawhorse.[21]

If the Jury had returned a verdict awarding profits based on any of the foregoing alternative methods for calculating profits, or awarding no profits at all, the verdict would have at least been in part supported by evidence presented at trial.  Instead, the Jury entered an award of roughly $54 million – a number which could not be based on the evidence presented at trial since there was no evidence presented supporting the argument that Plaintiffs were entitled to recover that amount.  Since this award could not have been based on the evidence presented or in line with the statutory "cost or deduction" language of the Lanham Act, it must have been based on some other, improper factor such as one of the grounds supporting the ordering of a new trial as set forth in Defendants' accompanying motions.[22]

---

[21] Considering the total operating profits for just the sale of the Jawhorse products by both entities, if based on a further reduction resulting from Mr. Berger's conclusions as to the % of confusion, would result in a total profits amount equaling $874,259.69.

[22] For example, one of the primary themes of Plaintiffs' case was that this was an American company versus a Chinese, billionaire cheater.  That this was a case where a hard working American company developed this successful brand and a Chinese company came along and ripped it off.  When you couple this theme, designed to invoke foreign bias, with the fact that the Jury was presented with an unreliable survey designed to trick consumers into being confused, was presented with prior judgments where

### D. OTHER EQUITABLE CONSIDERATIONS ALLOW FOR PROFITS TO BE ELIMINATED OR FURTHER REDUCED

Any award for a Lanham Act violation is "subject to the principles of equity." 15 U.S.C. § 1117(a) (emphasis added). As the Seventh Circuit has held, the district court has broad discretion under § 1117 to fashion a remedy for trademark infringement based on equitable considerations. *Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 259 (7th Cir. 2004). *See also, e.g., Dial One of the Mid-South, Inc. v. BellSouth Telcomms., Inc.*, 269 F.3d 523, 527 (5th Cir. 2001) (holding that "§ 1117 of the Lanham Act gives the district court **broad discretion** over the amount of damages") (emphasis added). In addition to the fact that the Jury's verdict awarding gross profits to Plaintiffs is not supported by the evidence presented and the fact that evidence established that none of the Defendants' sales could be attributed to the product packaging at issue, there are other equitable considerations the Court may take into account in reducing the profits award.

For example, and as is set forth in Defendants accompanying post-trial motions, no rational jury could have viewed the evidence presented at trial and determined that Defendants infringed any registered trademarks owned by Plaintiffs or that there was a likelihood of confusion between Defendants products and packaging and Plaintiffs' products and packaging.

What is more, Plaintiffs could not establish a single lost sale nor definitely establish that it has been harmed in any way by the actions of Defendants. To the contrary, even in closing Plaintiffs introduced a graph depicting Plaintiffs' sales during the years Defendants were selling the alleged infringing products and the graph showed that Plaintiffs' sales were steadily

---

Plaintiffs had successfully assert rights to yellow and black against unrelated third parties in the past, and was presented with nearly 50 trademark registrations giving an heir of credibility to Plaintiffs claims (despite the registrations truly not being at issue), then you have a basis for an excessive jury verdict that is not based on the evidence or the law.

increasing during this same time period.  *See* Plaintiffs' Closing Graph, attached hereto as

**Exhibit 9**.  Thus, Plaintiffs wholly failed to show any actual damages.  *See B. Sanfield, Inc. v.*

*Finlay Fine Jewelry Corp.*, 76 F. Supp. 2d 868, 873 (N.D. Ill. 1999) (declining to disgorge

defendant's profits where there was no evidence that the plaintiff lost sales during the period of

infringement); *Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1223 (10th Cir. 1998) (stating that

a finding of actual damages is an "important factor" in determining whether profits should be

awarded); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998) (no award of

profits where no actual damages, no diverted sales and "injunctive relief satisfies the equities in

this case"); and *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993)

(holding that factors such as lack of actual damages, parties' competition and defendant's

culpability are relevant to award of profits).

The Court should also consider the fact that the evidence established that over the course

of over six (6) years Defendants have sold nearly seven (7) million products, many of which

were sold in the same stores as Plaintiffs' products, yet there has been not a single instance of

consumer confusion.  Not one.  *See Rolex Watch USA Inc. v. Meece*, 158 F.3d 816, 828 (5th Cir.

1998) (no award of profits where plaintiff and defendant coexisted for ten years, very little

evidence of palming off).

As discussed in greater detail in the other post-trial motions filed herewith (all

incorporated by reference herein), the Court may also consider the fact that Plaintiffs failed to

present any evidence establishing willful intent or bad faith on the part of Defendants in this

case.  *See Sands, Taylor & Wood*, 978 F.2d 947, 962-63 (7th Cir. 1992) (reversing district court's

award of $24 million in defendant's profits as inequitable and remanding for a new damages

calculation where evidence of the defendant's bad faith was marginal and weak, stating that the

award would be a windfall to plaintiff and the "award of profits bears no relationship to [the defendant's] enrichment."); *Kodiak Indus., Inc. v. Black & Decker Corp.*, No. 92 C 6760, 1994 U.S. Dist. LEXIS 8918, at *3-9 (N.D. Ill. June 30, 1994) (rejecting plaintiff's request for award of the defendant's profits, finding that a lack of bad faith or willfulness weighed against such an award).[23] In *Grand River Enters. Six Nations v. VMR Prods. LLC*, No. 13-cv-104, 2014 U.S. Dist. LEXIS 73418 (W.D. Wis. May 29, 2014), for example, the court refused to find willfulness where the only evidence presented by plaintiff was that the defendant had knowledge of plaintiff's trademarks. The court noted that plaintiff failed to present any authority for the position that "mere knowledge of another mark, without more, constitute[ed] willful infringement" under the Lanham Act. *Id.* at *35. The court in *Six Nations* recognized prior cases in which willfulness was found and drew sharp distinctions between those cases and the situation where the only evidence of willfulness was the fact that the defendant may have known of plaintiff's trademark rights. *See Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 501 (7th Cir. 2008) (finding of willfulness was upheld where the infringer made sales using an infringing mark after attempting to register the mark and being turned down by the PTO because the mark was potentially confusing); *Ellington v. Harbrew Imports Ltd.*, 812 F. Supp. 2d 186, 195 (E.D.N.Y. 2011) (a defendant was found to have acted willfully when it engaged in negotiations to use the mark properly but then proceeded to use an infringing mark without authorization after those negotiations proved unsuccessful); *Doctor's Assocs., Inc. v. Subway.SY LLC*, 733 F. Supp. 2d 1083, 1088 (D. Minn. 2010) (a defendant was found to have acted willfully in continuing to operate his website, despite a prior ruling that it infringed, and also representing to the court that he had taken it down). None of these situations exist in the present case. To the contrary,

---

[23] While the Jury ultimately held that Defendants' infringement was willful, such a finding was advisory and against the weight of the evidence presented.

Defendants made a sufficient showing that it made a good faith effort to "create elements of dissimilarity" between the trade dress at issue. *Roulo v. Russ Berrue & Co.*, 886 F.2d 931, 942 (7th Cir. 1989). Moreover, Defendants have presented testimony that they in good faith believed that the "sunburst" packaging was distinct from Plaintiffs' packaging and that they continued to use the packaging, despite Plaintiffs' objections, because they in good faith believed they did not infringe upon any rights of Plaintiffs and also, in part, because Plaintiffs were broadly claiming rights which it did not legally have. Evidence was presented demonstrating that Defendants were purposefully trying to distinguish themselves from Plaintiffs and offer their own unique packaging in the market. *See* TR, Day 3, p. 633; TR Day 4, pp. 714-15.

Finally, based on the Jury's verdict, it may be the case that the Jury placed undue emphasis on improper evidence presented at trial, including the Berger surveys, the evidence of prior judgments, the trademark registrations, and the statements involving foreign bias. In addition, the Jury may have placed undue reliance on the testimony of Mr. Gemini, who did nothing more than parrot the gross profit numbers provided to him directly by Defendants. Mr. Gemini performed no independent calculations and simply assumed that every sale by Defendants resulted solely from the fact that the products were sold in infringing packaging. *See* Fed. R. Evid. 702 (an expert may testify his/her testimony if it "will help the trier of fact to understand the evidence or to determine a fact at issue" and "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently…the particular issue without [the assistance of an expert]."[24]); *Qwest Corp. v. Elephant Butte Irrigation Dist.*, 616 F. Supp. 2d 1110, 1116-1117 (D.N.M. 2008) (holding witness did not qualify as an expert where they offered nothing

---

[24] *See* Fed. R. Evid. 702 advisory committee's notes.

more than simple mathematical analysis that could have been presented without the assistance of an expert); *Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1325-26 (N.D. Ala. 2008) (holding that expert testimony that consisted of not much more than simple arithmetic was not properly the subject of expert testimony, but nonetheless allowing witness to testify as a lay witness).

In this case, if the Court grants Defendants' renewed motion to strike the jury demand based on the fact that Plaintiffs failed to show actual damages and/or that Plaintiff failed to demonstrate how the profits award serves as a "proxy" for actual damages, then the Court may disregard the jury verdict altogether and fashion its own remedy. Even if not, the Court has the discretion under the Lanham Act and under the principles of equity to fashion a just remedy based on the circumstances of the case. In this regard, any award of profits made in this case would serve as a penalty and not as compensation for any alleged harm suffered by Plaintiffs. Plaintiffs wholly failed to show that they suffered any harm or damages as a result of the actions of Defendants. In fact, Plaintiffs proved quite the opposite when they indicated that profits for the DeWalt brand steadily increased during the time period in which the alleged infringing products were sold. *See* Exhibit 1 hereto. A permanent injunction, if entered, would serve as a viable remedy in this case. *See Lincoln Diagnostics, BASF, Badger Meter* and *Healthport, supra*.

## II.     IF THE COURT DOES NOT EXERCISE ITS DISCRETION UNDER THE LANHAM ACT IT MAY ISSUE A REMITTITUR OF THE EXCESSIVE DAMAGES OR ORDER A NEW TRIAL

Under the law, "a remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages and to accept the sum which has been judicially determined to be properly recoverable damages." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253 (Ill. 2006). The practice of remittitur has long been acknowledged as a way to promote "both the administration of justice and the

conclusion of litigation." *Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 412 (Ill. 1997). Under the federal rules, when an award of damages justifies a new trial, the trial court may, within its discretion, "grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir.1983). "If the prevailing party accepts remittitur, judgment must be entered in the lesser amount." *Id*. This allows the "parties to avoid the delay and expense of a new trial when the jury's verdict is excessive in relation to the evidence found in the record." *Unisplay S.A. v. Am. Elect. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995).

Under Fed. R. Civ. P. 59 the Court may order a new trial or grant a remittitur when the damages award is "monstrously excessive"; where there is "no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas"; and the award is not comparable to awards made in similar cases. *Farfaras v. Citizens Bank & Trust Co.*, No. 01 C 8720, 2005 U.S. Dist. LEXIS 17245, at *10 (N.D. Ill. Mar. 21, 2005) (quoting *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1985)); *see also Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (granting remittitur where the award is "grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork."). A trial court granting a motion for remittitur does not substitute its judgment for that of the jury, but instead reduces the judgment to the maximum amount sustainable by the proof. *D&A Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982); *see also Watec Co., Ltd. v. Liu*, 403 F.3d 645, 655 (9th Cir. 2005) (remittitur appropriate in trademark infringement case where damages award not supported by the evidence).

In this case, as argued above, the Jury's profits award is grossly excessive and not supported by the evidence presented at trial. The evidence dictates that the proper calculation of Defendants profits is that either (1) there are no profits that should be awarded based on various factors outlined herein; or (2) the profits equal at most the total operating profits for the sale of alleged infringing products by both entities ($4,486,805) – and this would be the <u>maximum</u> number permitted based on the evidence; or (3) the profits equal the total operating profits for both Defendants when considering that 76% of those sales are generated through advertisements where the product packaging is not depicted ($1,076,833.44); or (4) the profits equal some other amount the Court feels is just based on the circumstances of the case and evidence presented at trial (including but not limited to one of the alternative numbers presented herein).

As such, the Court should remit the profits award to one of these numbers and tender the remitted number to Plaintiffs for acceptance. Should the Plaintiffs refuse to agree to the remitted amount, then a new trial should be ordered.

## <u>CONCLUSION</u>

Because the damages award set forth by the Jury in this case was excessive and not supported by the evidence, the Court may exercise its discretion under 15 U.S.C. § 1117(a) and enter a profits award that it deems just under the circumstances. In this case, the evidence supports a finding by the Court that no profits should be awarded and that the issuance of a permanent injunction is the most appropriate form of relief. In the alternative, the evidence presented at trial supports a significant reduction of the profits amount by this court as outlined herein.

Respectfully submitted,

*/s/ Brian McGraw*
Dennis D. Murrell
Robert J. Theuerkauf
Brian P. McGraw
MIDDLETON REUTLINGER
401 S. Fourth Street, Suite 2600
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (fax)
Counsel for Defendants

- and -

J. Aron Carnahan (IL. Bar 6242642)
HUSCH BLACKWELL LLP
120 South Riverside – 22d Floor
Chicago, Illinois 60606
Phone: (312) 665-1500
Facsimile: (312) 655-1501
Local Counsel for Defendants


## CERTIFICATE OF SERVICE

The undersigned certifies that on this 2d day of November 2015, the foregoing Motion was filed according to the rules of Electronic Court Filing (ECF) in effect for the Northern District of Illinois – Eastern Division, which ECF system will provide a copy of same to all persons registered to receive service in this case.

*/s/ Brian McGraw*
*Counsel for Defendants*

35