**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, | ) | Case No. 1:11-cv-05426 |
| BLACK & DECKER INC. and BLACK & | ) | |
| DECKER (U.S.) INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| vs | ) | |
| | ) | Magistrate Geraldine Soat Brown |
| POSITEC USA INC. and RW DIRECT, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | ORAL ARGUMENT REQUESTED |

# DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO <u>FED. R. CIV. P. 59(a)</u>

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................5

I.      THE AWARD WAS EXCESSIVE ..........................................................5

II.     THE TRIAL WAS FUNDAMENTALLY UNFAIR BASED ON THE ADMISSION OF UNRELIABLE AND HIGHLY PREJUDICIAL SURVEY EVIDENCE AND OTHERWISE INADMISSIBLE EVIDENCE..........................6

A.  The Evidence of Trademark Registrations was Unfairly Prejudicial ........................6

B.  The Admission of the Prior Judgments was Unfairly Prejudicial.............................8

C.  The Berger Surveys and Testimony Should Not Have Been Presented to the Jury – The Surveys were Unreliable and Unfairly Prejudicial .................................13

     1.  Survey evidence must be reliable, relevant, and must not be unfairly prejudicial ...................................................................................15

     2.  Mr. Berger's surveys were not conducted based on reliable methodologies or principles ........................................................................16

           a.  The results of Mr. Berger's likelihood of confusion survey are not relevant to the issue of whether consumers were confused based on the alleged infringing trade dress ...................................17

           b.  Mr. Berger failed to incorporate a control in connection with his surveys ...................................................................................20

           c.  Mr. Berger's surveys were non-probability surveys ...................21

     3.  Mr. Berger's likelihood of confusion survey was based entirely on a fabricated photograph depicting a staged retail scene .................................22

     4.  Additional reasons Mr. Berger's surveys and related testimony were highly prejudicial ...................................................................................24

D.  The Repeated References to China were Unfairly Prejudicial ...............................24

E.  The Instructions Provided to the Jury Were Confusing, Misleading, and Inadequate ...................................................................................................27

     1.  The Instructions as a whole were confusing and misleading.......................28

     2.  The Instructions on trademark infringement were improper ......................30

     3.  The Instructions on a "family" were incomplete and did not adequately state the law.........................................................................................30

F.  The Verdict Was Against the Weight of the Evidence .............................................33

G.  The Case Should Not Have Been Given to the Jury .................................................35

CONCLUSION....................................................................................................................35

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Torpharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002)......................................................................................10

*Abbott Labs. v. Torpharm, Inc.*,
No. 97 C 7515, 2003 U.S. Dist. LEXIS 19294 (N.D. Ill. Oct. 28, 2003) ............................. 9-10

*Abernathy v. Superior Hardwoods, Inc.*,
704 F.2d 963 (7th Cir. 1983) ......................................................................................4, 6

*Adams Labs., Inc. v. Jacobs Eng. Co.*,
761 F.2d 1218 (7th Cir. 1985) ........................................................................................4

*AM Gen. Corp. v. Daimlerchrysler Corp.*,
311 F.3d 796 (7th Cir. 2002) ...................................................................................7, 31

*Badger Meter, Inc. v. Grinnell Corp.*,
13 F.3d 1145 (7th Cir. 1994) ..........................................................................................9

*Bd. of Trs. of Univ. of Arkansas v. Prof'l Therapy Servs., Inc.*,
873 F. Supp. 1280 (W.D. Ark. 1995).............................................................................8-9

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.*,
No. 07 C 4718, 2010 U.S. Dist. LEXIS 40737 (N.D. Ill. Apr. 26, 2010)............................ 16-17

*Boyle v. Mannesmann Demag Corp.*,
No. 91-3909, 1993 U.S. App. LEXIS 8682 (6th Cir. 1993) ....................................................27

*Cefalu v. Vill. of Elk Grove*,
211 F.3d 416 (7th Cir. 2000) ..........................................................................................5

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002) ...................................................................................15, 20

*Competitive Edge, Inc. v. Staples, Inc.*,
763 F. Supp. 2d 997 (N.D. Ill. 2010) ...............................................................................16

*Evory v. RJM Acquisitions Funding L.L.C.*,
505 F.3d 769 (7th Cir. 2007) ........................................................................................16

*FMS, Inc. v. Volvo Constr. Equip. N. Am., Inc.*,
No. 00 C 8143, 2007 U.S. Dist. LEXIS 19517 (N.D. Ill. March 20, 2007) ...............................5

*FS Servs., Inc. v. Custom Farm Servs., Inc.*,
471 F.2d 671 (7th Cir. 1972) ........................................................................................19

*Fuesting v. Zimmer, Inc.*,
421 F.3d 528 (7th Cir. 2005) ........................................................................................14

*Gaston's White River Resort v. Rusch*,
8 U.S.P.Q.2d 1209 (W.D. Ark. 1988)................................................................................9

*GE v. Joiner*,
522 U.S. 136 (1997)......................................................................................................21

*Gen. Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*,
695 F.2d 281, 288 (7th Cir. 1982) ...................................................................................5

*Gruca v. Alpha Therapeutic Corp.*,
51 F.3d 638 (7th Cir. 1995) .................................................................................28

*Hong v. City of St. Louis*,
698 F. Supp. 180 (E.D. Mo. 1988).........................................................................27

*Jordan v. Binns*,
712 F.3d 1123 (7th Cir. 2013) ................................................................................4

*Kirschner v. Broadhead*,
671 F.2d 1034 (7th Cir. 1982) ..............................................................................30

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
661 F. Supp. 2d 940 (N.D. Ill. 2009) ............................................................. 19-20

*McClain v. Owens-Corning Fiberglas Corp.*,
139 F.3d 1124 (7th Cir. 1998) ..............................................................................33

*McMahon v. Bunn-O-Matic Corp.*,
150 F.3d 651 (7th Cir. 1998) ................................................................................21

*Merritte v. Ingram*,
No. 11-cv-0871-SCW, 2015 U.S. Dist. LEXIS 131299 (S.D. Ill. Sept. 29, 2015)....................33

*Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*,
100 F.3d 1353 (7th Cir. 1996) ............................................................................ 4-6

*NFL Props. v. N.J. Giants, Inc.*,
637 F. Supp. 507 (D.N.J. 1986) ............................................................................16

*O'Conner v. Commonwealth Edison Co.*,
13 F.3d 1090 (7th Cir. 1994) ................................................................................16

*Pappas v. Middle Earth Condo. Ass'n*,
963 F.2d 534 (7th Cir. 1992) .......................................................................... 26-27

*Sara Lee Corp. v. Am. Leather Prods., Inc.*,
1998 U.S. Dist. LEXIS 11914 (N.D. Ill. July 27, 1998)...........................................9

*Schmidt v. Klinman*,
No. 05 C 2134, 2005 U.S. Dist. LEXIS 31206 (N.D. Ill. Dec. 2, 2005) ...................16

*Schultz v. Thomas*,
832 F.2d 108 (7th Cir. 1987) .......................................................................... 11-12

*Shick v. Ill. Dep't. of Human Servs.*,
307 F.3d 605 (7th Cir. 2002) ................................................................................14

*Simon Prop. Group L.P. v. mySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000) ..................................................................14

*Spanish Action Comm. v. City of Chicago*,
766 F.2d 315 (7th Cir. 1985) ................................................................................33

*THOIP v. Walt Disney Co.*,
690 F.Supp.2d 218 (S.D.N.Y. 2010)................................................................ 20-21

*Thomas & Betts Corp. v. Panduit Corp.*,
138 F.3d 277 (7th Cir. 1998) ..................................................................................9

*Thomas v. Stalter*,
20 F.3d 298 (7th Cir. 1994) ..................................................................................33

iii

*Ty, Inc. v. Softbelly's Inc.*,
2006 U.S. Dist. LEXIS 100736 (N.D. Ill. April 7, 2006) ............................................................9

*U.S. v. Pansier*,
576 F.3d 726 (7th Cir. 2009) ...................................................................................15

*U.S. v. Miles*,
207 F.3d 988 (7th Cir. 2000) ...........................................................................13, 16

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
746 F.2d 112 (2d Cir. 1984)...................................................................................24

*Whitehead v. Bond*,
680 F.3d 919 (7th Cir. 2012) ...................................................................................33

*Winters v. Fru-Con Inc.*,
498 F.3d 734 (7th Cir. 2007) ...................................................................................15

**Statutes**

15 U.S.C. § 1114.................................................................................1, 6, 7, 33
15 U.S.C. § 1125.................................................................................................18
Fed. R. Civ. P. 59(a) ..........................................................................................1, 4
Fed. R. Evid. 702 ...............................................................................................13
Fed. R. Evid. 702 advisory committee's note to 2000 amendments .........................21

**Secondary Materials**

11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND
PROCEDURE § 2809 (3d ed. 2012)..............................................................................27

12 MOORE'S FEDERAL PRACTICE, § 59.13[2][c][i][C] (Matthew Bender 3d ed.) ......................27

G. Kip Edwards, *The* Daubert *Revolution and Lanham Act Surveys*, in TRADEMARK AND
DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND
DESIGN 329 (Shari Seidman Diamond & Jerre B. Swann eds., 2012) ....................................20

Defendants, Positec USA Inc. and RW Direct, Inc. (collectively "Defendants" unless specifically referenced herein), by counsel, hereby move, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 59(a), for the Court to order a new trial in this case. In support thereof, Defendants state as follows:

<u>**INTRODUCTION**</u>

The Jury's $54 million verdict establishes, first and foremost, why this case must be retried. It confirms that the Jury acted based on passion and prejudice, not on the evidence actually submitted. That manifestly unfair result is, moreover, the product of Plaintiffs' litigation tactics. They should reap what they have sown and a complete new trial should be ordered to forestall this apparent injustice.

To start with, Defendants moved the Court to exclude references to other cases involving Plaintiffs' trade dress believing Plaintiffs would use such information to improperly influence the Jury. *See* Defendants' Motion *in Limine*, Docket Number ("DN") 130. The Court denied the motion (*see* Memorandum Opinion and Order, DN 192) based on Plaintiffs' representations of the purported admissibility of such prior cases. With this ruling in hand, Plaintiffs quickly prejudiced Defendants by informing the Jury that a prior judge, after considering "all the evidence," had found that Plaintiffs' trade dress was not functional and had acquired secondary meaning. *See* Trial Transcripts ("Tr."), Day 1, pp. 126-28.[1] Then, Plaintiffs informed the Jury that this Court had already denied Defendants attempts to "get this case thrown out". *Id.*, p. 135.

Next, in another prejudicial effort to bolster its position, Plaintiffs allowed the Court to believe that their trademark registrations were relevant to the issues being tried and that they had a viable claim under 15 U.S.C. § 1114. *See* Plaintiffs' Response to Motion *in Limine*, DN 156. Consequently, the Court denied (*see* Memorandum Opinion and Order, DN 192) Defendants'

---

[1] Cited portions of the trial transcripts are attached hereto as <u>**Exhibit 1**</u>.

*motion in limine* on the subject (DN 129). Plaintiffs took this position on the eve of trial despite having previously convinced the Defendants and the Court that such registrations were not at issue. *See e.g.*, DN 9 (Notice to USPTO that registered trademarks were not at issue), and DN 93, p. 59 (Order on Defendants' Motion for Summary Judgment) ("**Plaintiffs do not allege a registered trade dress**. Rather, they allege trade dress infringement under 15 U.S.C. § 1125(a)") (emphasis added).

Nonetheless, at trial the Plaintiffs failed to introduce any evidence to support their registered trademark infringement claim, admitting that Plaintiffs were not aware of any tools that infringed the registrations and that Plaintiffs "have no problem with [Defendants'] tools." Tr., Day 2, p. 347, and Day 5, p. 1002. However, the prejudice to Defendants was already inflicted as Plaintiffs paraded the approximately fifty trademark registrations in front of the Jury, trumpeting them as being "one-of-a-kind," having a "seal from the United States Patent and Trademark Office," that such were "examined and determined to be in compliance with the requirements of the law," and that such registrations were "incontestable." Tr., Day 1, p. 124. Without any evidence that Defendants infringed such registrations, the Jury was left confused as to the purpose and applicability of the registrations and the jury instructions relating thereto.

It got worse. Plaintiffs' only so-called evidence of consumer confusion (the overriding factor of this case) was a grossly flawed survey by their expert, Mr. James Berger, utilizing an unauthenticated photograph. Not only did Mr. Berger lose the photograph after having conducted his survey, but the photo was shown at trial to be fabricated. What is more egregious, however, is that Mr. Berger admitted that his confusion survey was purposefully designed to "trick" the survey respondents:

2

> Q:     Okay.  So what you did [in the likelihood of confusion survey] was similar
>        then to how you trick your students with your "I love Paris in the the
>        springtime"?
> A:     Exactly, yes.

Tr., Day 3, p. 497.  And, the survey was <u>not</u> conducted to determine the cause of the supposed

confusion:

> Q:     So you weren't concerned if it was the trade dress that caused the
>        confusion?
> A:     No.  The confusion was caused by the tendency to overlook the obvious,
>        this idea of putting the same packages together and somebody just
>        thinking that they're the same without looking carefully at them.

*Id.*

The prejudice was apparent.  There was no other evidence of consumer confusion even

though the parties have been coexisting in the marketplace for over six years with Defendants

having sold more than seven (7) million products during this time.  TR, Day 4, pp. 808-809.

Closing argument produced the most severe prejudicial effect of all.  Plaintiffs painted

Defendants as a front for their owner, a "Chinese billionaire," and then asked the Jury in closing

whether they thought this was "an acceptable [or fair] way to do business <u>in this country</u>."  Tr.,

Day 5, p. 1016 (emphasis added).  Defendants anticipated that such an inappropriate theme

might emerge and requested the Court to preclude such foreign bias references.  The Court

denied the motion, at least in part, based on Plaintiffs' representation that it would present such

information in a business-like, non-inflammatory manner, but warned that Plaintiffs should not

invoke an "American-versus-non-American" theme.  DN 192, p. 3.  Plaintiffs failed to comply.

In fact, one of the primary themes of Plaintiffs entire case was that this was a case about an

American company who had, over the years, built up a valuable brand and then along came a

Chinese billionaire who did nothing more than knock off that valuable American brand.

3

The result the Plaintiffs invited and urged came to pass. Without regard to the evidence or instructions, the Jury inflicted a $54 million punishment on Defendants under circumstances where insufficient evidence even existed for a finding of liability. There is no evidence in this case establishing actual lost sales, actual market confusion, or any facts regarding purported infringement that conceivably could sustain an award of this magnitude. The excessiveness of the award reveals the profound prejudicial effect suffered by Defendants and that alone justifies a complete new trial. *See Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971-73 (7th Cir. 1983).

Beyond that, when Plaintiffs' litigation tactics are considered in the aggregate, the prejudicial effect warrants a new trial. *See Adams Labs., Inc. v. Jacobs Eng. Co.*, 761 F.2d 1218, 1227 (7th Cir. 1985) (cumulative effect of errors when viewed in the context of the entire trial warranted a new trial); *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013) (where several errors are found to be harmless, a new trial can still be granted if cumulative effect of those errors deprives litigant of fair trial). Even setting the above aside, a new trial must be granted because the verdict was, at the very least, against the overwhelming weight of the evidence and the Jury was given confusing, misleading and/or inadequate instructions based on Plaintiffs' phantom registered trademark infringement claim and the complex nature of a "family" of trade dress.

Fed. R. Civ. P. 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." A motion for a new trial under Rule 59 should be granted when "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *See Mid-America Tablewares,*

*Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1367 (7th Cir. 1996) (internal quotation marks

omitted). Moreover, "[t]he test to be applied in determining whether a motion for a new trial

should be granted is whether 'the verdict is against the weight of the evidence, that the damages

are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Gen. Foam

Fabricators, Inc. v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir. 1982) ("The district

court correctly applied this standard and granted the defendant a new trial when it stated: 'the

court believes that there was sufficient evidence supporting a claim to go to a jury but . . . the

verdict was against the clear weight of the evidence and was excessive, and it resulted in a

miscarriage of justice.'"); *see also FMS, Inc. v. Volvo Constr. Equip. N. Am., Inc.*, No. 00 C

8143, 2007 U.S. Dist. LEXIS 19517, at *6-7 (N.D. Ill. March 20, 2007) (citations omitted) ("A

new trial may be ordered when the court erred in admitting evidence such that a party's

substantial rights were violated; when the jury was confused or misled because the jury

instructions did not adequately state the law; when the jury's verdict was against the manifest

weight of the evidence; or when the damages awarded were 'monstrously excessive' or lacking

rational connection to the evidence."). "[T]he district court, having seen the presentation of the

evidence and observed the course of the trial, is in a unique position to rule on a new trial

motion." *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000) (internal quotation

marks omitted) (citing *Valbert v. Pass*, 866 F.2d 237, 239 (7th Cir. 1989)).

## ARGUMENT

## I.      THE AWARD WAS EXCESSIVE

Defendants have filed, concurrently herewith, a motion to reduce the profits award

pursuant to the Lanham Act, 15 U.S.C. § 1117(a), or in the alternative a motion for remittitur

pursuant to Fed. R. Civ. P. 59(a). In that motion, which Defendants incorporate herein by

reference, Defendants set forth how, in awarding the Plaintiffs nearly $54 million in Defendants'

damages, the Jury failed to consider significant, unrebutted evidence of costs and deductions that

were legitimately incurred and should have been subtracted from any gross profits number.

Moreover, unrebutted evidence of apportionment was also submitted which showed that a vast

number of Defendants' sales occurred online or direct to consumers through television where the

"sunburst" packaging cannot be seen by a consumer, and moreover, the packaging present on

retail shelves was not driving consumer purchasing in any event. For the reasons discussed in

that motion, the Jury's award was against the weight of the evidence at trial and was monstrously

excessive. Such an excessive verdict shocks the conscious and a new trial is warranted on that

basis alone. *See Abernathy*, 704 F.2d at 971-73.

## II.    THE TRIAL WAS FUNDAMENTALLY UNFAIR BASED ON THE ADMISSION OF UNRELIABLE AND HIGHLY PREJUDICIAL SURVEY EVIDENCE AND OTHERWISE INADMISSIBLE EVIDENCE

One of the fundamental grounds for ordering a new trial is the issue of fairness. Indeed,

the district court has the discretion and authority to order a new trial where fairness so dictates.

*See Mid-America Tablewares,* 100 F.3d at 1367. Here, a significant amount of evidence was

introduced at trial that should not have been admitted, the admission of which resulted in an

unfair trial in substantial violation of Defendants' rights. This evidence includes (1) the

Plaintiffs' approximately fifty trademark registrations, (2) the prior rulings and judgments

against third parties, (3) the surveys and testimony of Plaintiffs' expert, Mr. James Berger, and

(4) the Plaintiffs' arguments invoking foreign bias.

### A.   THE EVIDENCE OF TRADEMARK REGISTRATIONS WAS UNFAIRLY PREJUDICIAL

As set forth in Defendants' accompanying motion for judgment as a matter of law (as

well as in the motion to reduce the profits award under the Lanham Act), Plaintiffs' position on

its registered trademark infringement claim under 15 U.S.C. § 1114 changed and evolved over

the course of the litigation. Despite the fact that the Plaintiffs' complaints in this case contained a count for registered trademark infringement, Plaintiffs took the position with the Court, the Trademark Office, and the Defendants that this case was solely about Defendants' alleged infringement of Plaintiffs' unregistered yellow and black trade dress. DN 9 (Notice to USPTO) and DN 93, p. 59 (Memorandum Opinion and Order on Motion for Summary Judgment) ("Plaintiffs do not allege a registered trade dress. Rather, they allege trade dress infringement under 15 U.S.C. § 1125(a)"). Then, on the eve of trial, Plaintiffs sought to maintain a claim for registered trademark infringement, likely in an attempt to confuse and mislead the Jury into believing that their claimed "family" of trade dress was somehow protected by the federal trademark registrations.[2]

A claim for infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1)(a), requires for liability to be found "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation **of a registered mark** in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." (emphasis added). As the trial played out, it became readily apparent that Plaintiffs had no evidence to support a position that Defendants in any way used any reproduction, counterfeit, copy, or colorable imitation of **a registered mark or a "family" of registered marks**. This is unsurprising because the

---

[2] In denying Defendants' motion *in limine* on this subject, the Court cited to *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002) as recognizing a claim for infringement of a "family" of registered trademarks. DN 192, pp. 7-8. However, as with Plaintiffs' unregistered trade dress claim, as further discussed in Defendants' motion for judgment as a matter of law, Plaintiffs failed to introduce at trial that such "family" of trademark registrations was infringed by Defendants. Moreover, to the extent the trademark registrations are part of Plaintiffs' alleged "family" of trade dress claim, the separate instructions to the Jury regarding both a claim for registered trademark infringement and unregistered trade dress infringement was confusing and irreconcilable. Memorandum Opinion and Order on Motion to Reconsider, DN 121, p. 10 (The Court noted its concern about impermissibly collapsing the Lanham Act's separate causes of action for registered and unregistered trademarks and trade dresses).

trademark registrations introduced at trial apply to the colors yellow and black as used on specific components of power tools or power tool accessories, or in connection with the "DeWalt" word logo, and there is no evidence that the Defendants power tools or power tool accessories are confusingly similar to any of the products depicted in the registered trademarks or that Defendants have ever used the DeWalt logo. Indeed, even Plaintiffs' corporate representative, Ms. Helen Fischer, admitted that Plaintiffs were not aware of any registered trademark that had been infringed and that Defendants' tools "look nothing like" Plaintiffs' tools. Tr., Day 2, pp. 343-44, 347, and 366. The fact that the Jury found that Plaintiffs' registered trademarks were infringed (in circumstances where Plaintiffs' corporate representative testified that the registered marks were not infringed) highlights the fact that the verdict is inaccurate.

Nonetheless, the prejudice to Defendants had been done in that Plaintiffs had already paraded the approximately fifty registered trademark certificates around the courtroom informing the Jury that such registrations been found to be "in compliance with the requirements of the law" – no doubt influencing the Jury's decision. Tr., Day 1, p. 124.

### B. THE ADMISSION OF THE PRIOR JUDGMENTS WAS UNFAIRLY PREJUDICIAL

In denying Defendants' motion *in limine* on this issue, the Court first reasoned that Plaintiffs could introduce the prior judgments as relevant evidence of the strength of their mark. DN 192, p. 10. The cases cited by the Court, however, do not stand for the proposition that the holdings or findings in prior litigation on the ultimate issues to be decided in the present action are relevant. In *Bd. of Trs. of Univ. of Arkansas v. Prof'l Therapy Servs., Inc.*, 873 F.Supp. 1280 (W.D. Ark. 1995), the court merely states that that evidence of "the owner's actions to protect its mark through the successful use of cease and desist letters and litigation" is indicia of the mark's

strength.[3]  *Id.* at 1285.  The "litigation" discussed was related to opposition and cancellation proceedings before the USPTO, not Article III court decisions.  *Id.* at 1288.  Nonetheless, nowhere does the court hold that the specific findings or holdings from other juries or judges on the ultimate issues being currently tried are relevant.  Further, in *Ty, Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 U.S. Dist. LEXIS 100736 (N.D. Ill. April 7, 2006), the court only noted that cease and desist letters (not prior court decisions) were admissible to show policing efforts by the trademark owner.  *Id.* at *22 n.4.  Again, however, nowhere does the court hold that the holdings or findings of other juries or judges on the ultimate issues being currently tried are relevant.

The Court further reasoned that such evidence was relevant to whether Plaintiffs' trade dress has acquired secondary meaning.  However, neither *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994), nor *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998), hold that prior findings or holdings of other judges or juries on an ultimate issue being decided, i.e., secondary meaning, are relevant to whether a plaintiff has established secondary meaning in a current case.  Further, in *Sara Lee Corp. v. Am. Leather Prods., Inc.*, No. 97 C 4158, 1998 U.S. Dist. LEXIS 11914 (N.D. Ill. July 27, 1998), the court in deciding a motion for a preliminary injunction described actions taken by the trademark owner, such as issuing cease and desist letters and initiating lawsuits, as evidence of policing its mark.  *Id.* at *14.  However, the court did not discuss the outcomes or findings of any of those lawsuits.  The court did not hold that evidence of how prior judges or juries found on the ultimate issues, such as secondary meaning or functionality, is relevant to a court's or jury's determination in a current case.

Finally, in the patent case *Abbott Labs. v. Torpharm, Inc.*, No. 97 C 7515, 2003 U.S. Dist. LEXIS 19294 (N.D. Ill. Oct. 28, 2003), wherein there was a bench and not a jury trial, the court

---

[3] It should be noted that the case cited by the *Board of Trustees* court for this proposition, *Gaston's White River Resort v. Rusch*, 8 U.S.P.Q.2d 1209 (W.D. Ark. 1988), does not make such a holding.

9

held, without citing any authority, that the "existence" of a certain prior court decision was relevant to the issue of willfulness. *Id.* at *76. However, the facts surrounding the *Abbott* court's decision on a motion *in limine* and the facts in this case are starkly different. The *Abbott* case arose when the defendant attempted to introduce a generic version of the plaintiff's drug, which was listed with the Food and Drug Administration as being patented. *Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1370 (Fed. Cir. 2002). The defendant submitted an abbreviated new drug application ("ANDA") to the FDA seeking approval of the generic drug. *Id.* at 1371. As part of that process, the defendant certified to the FDA, as required, that the plaintiff's "listed drug's patent 'is invalid or . . . it will not be infringed by the manufacture, use, or sale of the new drug' covered by the ANDA." *Abbott Labs.*, 2003 U.S. Dist. LEXIS 19294, at *54 (alteration in original). Under these circumstances, the court ruled that the existence of the prior litigation regarding validity and infringement of the same patents may weigh on whether the defendant acted willfully "when it filed its ANDA in 1997 and continued to prosecute its ANDA." *Id.* at *76. The facts of this case are not remotely similar. The Defendants here did not certify to the government that there is no infringement or that the trade dress at issue is invalid, nor have the Defendants done so in light of a court decision that may be to the contrary. Consequently, unlike the unique scenario in *Abbott*, there was no just reason here for Plaintiffs to present such highly prejudicial information to the jury.

What is different from all of the cases cited by the Court in denying Defendants' motion *in limine* and what occurred at trial, is that Plaintiffs used the prior decisions to effectively inform the Jury that many of the issues in this case had already been decided by the legal system. In Plaintiffs' opening they informed the Jury that a prior judge after "consider[ing] all the witnesses, all the evidence, all the arguments of the lawyers . . . held that Black & Decker's

10

yellow and black trade dress for its **DeWalt line of power tools satisfied the non-functionality requirement**," found that "Black & Decker's considerable marketing efforts caused the distinctive yellow and black color scheme on the DeWalt line **to achieve consumer recognition soon after its initial launch**," found that the "yellow and black color scheme on the DeWalt line had **achieved secondary meaning** in the minds of professional power tool users by May 1992," and that the judge "**awarded monetary damages and entered an injunction**." Tr., Day 1, pp. 126-28 (emphasis added). Regardless of any reasons why the prior decisions might have been admissible, such reasons were outweighed by Plaintiffs' highly prejudicial argument that only served to improperly influence the Jury into believing that several of the issues presented at trial had already been decided.

Plaintiffs should have been precluded from introducing evidence of other Court's findings relating to functionality, secondary meaning, and infringement of Plaintiffs' alleged rights because the admission of such evidence unavoidably usurps a jury's role in deciding the issues. In an analogous situation, the Seventh Circuit reversed a district court for admitting evidence of a previous finding by a judge that a witness was not credible. In *Schultz v. Thomas*, 832 F.2d 108 (7th Cir. 1987)*,* a plaintiff sued two police officers for violation of his civil rights. *Id.* at 109. The defendant officers had previously been involved in a related disorderly conduct hearing, where a Judge "made seven specific findings that the testimony of [the officers] was unbelievable or that their statements were lies." *Id.* The civil rights plaintiff was permitted to introduce to the jury the Judge's findings and credibility determination from the disorderly conduct hearing. *Id.* at 110. In reversing on the grounds that the admission of such evidence was "clear error," the Seventh Circuit concluded that the evidence was "irrelevant and tended to

11

usurp the jury's function in assessing the credibility of testifying witnesses." *Id.* at 111. The

Seventh Circuit explained:

> In determining whether the defendants violated Schultz's civil rights by falsely
> arresting him and then giving willfully false testimony in order to secure his
> conviction, the jury was required to observe and listen to many of the same
> witnesses giving the identical testimony as that which formed the basis for Judge
> Flynn's disorderly conduct decision. Indeed, the aforequoted excerpts from Judge
> Flynn's opinion so unavoidably overlapped the jury's role in assessing the
> credibility of the key witness as to unfairly prejudice the defendants by denying
> them the right to have a jury decide the facts which formed the claims against
> them.

*Id.* at 110. The same logic applies to bar Plaintiffs from using a Court's conclusion of

infringement and the protectability of the trade dress in a very different case that did not involve

the Defendants here. Such evidence invited the Jury to replace its own independent analysis of

the facts with that of the previous Court that considered the issue, which impermissibly usurps

the Jury's function in this trial.

To be clear, Plaintiffs did not focus on the prior judgments to solely show that they have

policed their trademarks and trade dress, or to simply show strength by their actions to protect

the marks, but instead took advantage of the Court's motion *in limine* order to tell the Jury that

prior courts had already held that Plaintiffs' yellow and black trade dress for their products and

packaging was not functional and had obtained secondary meaning.[4] Plaintiffs did not stop

there, however, but went on to inform the Jury that "**Judge Dow issued an opinion denying the**

**defendant's attempts to get this case thrown out of court**…." Tr., Day 1, p. 135 (emphasis

added). Counsel all but told the Jury that it did not need to decide anything in this case because

---

[4] None of the cases wherein the prior consent judgments and/or judicial decisions were issued involved
allegations or claims that Plaintiffs owned trade dress rights with respect to packaging. Yet, Plaintiffs
tried to persuade the Jury by including language in the parties' stipulation indicating that the defendants in
those case agreed to cease and desist from any further use of the yellow and black color combination in
connection with both tools and packaging.

everything had already been decided in Plaintiffs' favor through prior cases and this Court's previous ruling.

Evidence is unfairly prejudicial if it will, as it did in this case, "induce the jury to decide the case on an improper basis rather than on the evidence presented." *U.S. v. Miles,* 207 F.3d 988, 992 (7th Cir. 2000) (alterations and internal quotation marks omitted). At trial, the Jury was placed in the unfair position of having to disagree with a judge in another case who had already considered the same issues. Further, the Jury was placed in an impossible position of having to disagree with this Court, who, according to counsel for Plaintiffs, had already ruled in Plaintiffs' favor.

Defendants should at least have the opportunity to try this case without the Jury being told that a previous judge and this Court has already decided that Plaintiffs' trade dress is non-functional and has acquired secondary meaning – two issues that this Jury was supposed to have decided on their own. Therefore, to the extent the Court does not enter judgment as a matter of law in favor of Defendants, a new trial should be granted.

### C. THE BERGER SURVEYS AND TESTIMONY SHOULD NOT HAVE BEEN PRESENTED TO THE JURY – THE SURVEYS WERE UNRELIABLE AND UNFAIRLY PREJUDICIAL

An expert is allowed to testify only if, among other things, "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The opinions and testimony of Mr. Berger failed miserably to meet the above threshold and should have been excluded.

For example, as will be discussed, the entire likelihood of confusion survey to which Mr. Berger testified was, by his own admission, designed to trick the survey respondents into finding a "likelihood of confusion" regardless of whether the so-called confusion was based on the trade

dress at issue in the case. Mr. Berger's survey was nothing more than a ***ruse*** and as such his testimony to the Jury that 47% of professionals or serious do-it-yourselfers would be confused was highly prejudicial to the Defendants. *See Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1039 (S.D. Ind. 2000) ("The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.") (citations omitted). There could not be a survey created in the trade dress context that would be any more unreliable or prejudicial than what was presented to the Jury by Mr. Berger.

Moreover, the prejudice of Mr. Berger's testimony was compounded by the fact that the trial overwhelming demonstrated that there was no evidence of any actual consumer, retailer, or anyone else being confused in the marketplace despite over seven (7) million of the Defendants' products being sold over a six year period. Indeed, Mr. Berger's inadmissible survey and the self-serving conclusory testimony of Ms. Fischer, were Plaintiffs' only "counter" to the overwhelming weight of evidence against a finding of a likelihood of confusion. *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 537 (7th Cir. 2005) (finding district court's decision to admit expert testimony error where such testimony on causation "stack[ed] up quite poorly against most all indicia of reliability…."). The admission of Mr. Berger's surveys and testimony, standing alone, is sufficient to warrant a new trial. *See Shick v. Ill. Dep't. of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002) (new trial granted where error in the admission of evidence had a "significant chance" of affecting outcome of trial).

14

1. **Survey evidence must be reliable, relevant, and must not be unfairly prejudicial.** [5]

Mr. Berger was the centerpiece of Plaintiffs' case because Plaintiffs had no other evidence that during the six year time period in which the parties have coexisted in the market that a single consumer has been confused. What is extraordinary, however, is that to present any "evidence" Mr. Berger had to concoct a survey that defies all notions of professionalism and reliability. Mr. Berger's surveys were not conducted in accordance with any accepted methods or principles. And, through Mr. Berger's own admissions, his likelihood of confusion survey was shown to have no relevance to the issue being tried. Thus, Mr. Berger's opinions and testimony were severely prejudicial to the Defendants and should have been excluded.

Rule 702 requires that the district court act as a "gate-keeper" who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotations marks omitted). To determine reliability, "the court should consider . . . the methodology used to arrive at a particular conclusion." *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). The *Daubert* gate-keeping requirement involves a two-step process. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). First, "the court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). Second, the court must determine "'whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.'" *Id.* (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 616 (7th Cir. 1993)). In other

---

[5] *See also* Motion to Exclude the Report and Preclude the Testimony of James T. Berger on the Issue of Secondary Meaning (DN 101) and Motion to Exclude the Report and Preclude the Testimony of James T. Berger on the Issue of Likelihood of Confusion (DN 103), which are incorporated herein by reference.

words, "the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Id.* (quoting *Porter*, 9 F.3d at 616); *see also O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994).

Where, as in this case, the expert testimony at issue relies and/or is based upon the admission of survey evidence, the Seventh Circuit holds that such evidence must comply with principles of professional survey research. *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007); *see also Competitive Edge, Inc. v. Staples, Inc.*, 763 F.Supp.2d 997, 1007-08 (N.D. Ill. 2010). "The proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research." *NFL Props. v. N.J. Giants, Inc.*, 637 F.Supp. 507, 513 (D.N.J. 1986). Finally, evidence is unfairly prejudicial if it will "induce the jury to decide the case on an improper basis rather than on the evidence presented." *U.S. v. Miles*, 207 F.3d 988, 992 (7th Cir. 2000) (alterations and internal quotation marks omitted); *see also Schmidt v. Klinman*, No. 05 C 2134, 2005 U.S. Dist. LEXIS 31206, at *7 (N.D. Ill. Dec. 2, 2005) (internal quotation marks omitted).

### 2. Mr. Berger's surveys were not conducted based on reliable methodologies or principles.

It is telling that Plaintiffs did not introduce any evidence to show that the methods used by Mr. Berger are acceptable in his field. Notwithstanding this fact, Plaintiffs will likely argue that Mr. Berger followed "accepted methods" by conducting a "double-blind" study utilizing an internet consumer panel with each survey having been validated. However, none of this goes to the substance of the methodology, such as how the survey universe was defined, the questions asked of the survey respondents, whether the survey replicated market conditions, whether the data was analyzed with accepted statistical principles, or what was causing the confusion or, in the context of secondary meaning, what was causing the source identification. *See, e.g.*, *Bobak*

16

*Sausage Co. v. A & J Seven Bridges, Inc.*, No. 07 C 4718, 2010 U.S. Dist. LEXIS 40737, at *12-13 (N.D. Ill. Apr. 26, 2010).

With respect to Mr. Berger's likelihood of confusion survey, instead of conducting and testifying to a generally accepted survey, such as one following the *Eveready* or *Squirt*[6] methodologies, Mr. Berger conducted an "observational" experiment which took advantage of a marketing "phenomenon" where people "ignore" or "overlook the obvious." Tr., Day 2, p. 421; Tr., Day 3, pp. 496-97. The photograph used by Mr. Berger contained a single Rockwell package surrounded by **ten (10)** DeWalt packages and as Mr. Berger testified, the survey respondents simply "ignored" the Rockwell package when asked whether the products were put out by the same company. *Id.* Defendants have been unable to find any authority where such a biased survey method has been accepted as being relevant or having any probative value in a likelihood of confusion case. This is unsurprising because as Mr. Berger testified, his likelihood of confusion survey was structured in such a manner as to "trick" the survey respondents:

> Q:      Okay. So what you did [in the likelihood of confusion survey] was similar
>          then to how you trick your students with your "I love Paris in the the
>          springtime"?
> A:      Exactly, yes.

Tr., Day 3, p. 497. As such, Mr. Berger's confusion survey fails to satisfy the prerequisite of being reliable.

### a.   The results of Mr. Berger's likelihood of confusion survey are not relevant to the issue of whether consumers were confused based on the alleged infringing trade dress.

Additionally, Mr. Berger's methodology provided no insight as to whether or not consumers in the marketplace would actually confuse the Rockwell package with the DeWalt

---

[6] Mr. Berger did conduct a *Squirt*-type survey as part of his engagement, but did not include that survey in his expert report or opinions. Conveniently, Mr. Berger could not remember the results of the survey, nor could he produce the original survey for inspection. Tr., Day 3, pp. 533-38.

package because of their <u>trade dresses</u>.  In other words, Mr. Berger's survey, rather than legitimately test for whether there was a likelihood of confusion and, if so, what caused such confusion, was structured to obtain the results Plaintiffs desired:

> Q:  And what did you do with the original survey [referencing the Squirt survey Mr. Berger withheld from his opinions]?
> A:  I don't know.  It wasn't relevant to the assignment at that point.
> Q:  And the assignment being to try to come up with a test that would show likelihood of confusion?
> A:  **To try to come up with a test that would show likelihood of confusion, yes**.

*Id.*, p. 538 (emphasis added).

The entire trial was about whether or not Defendants' **trade dress** is likely to **<u>cause</u> confusion**.  As set forth in 15 U.S.C. § 1125(a)(1)(A), a person is only liable if they "in connection with any goods or services . . . use[] in commerce any word, term, name, symbol, or device . . . which is likely to cause confusion . . . ."  The Jury was also so instructed, "Plaintiffs must prove . . . Defendants used their accused Rockwell branded trade dresses in a manner that is likely to cause confusion. . . ."  DN 216, p. 20.  In other words, the confusion <u>must</u> be because of the Defendants' trade dress and not for any other reason, for liability to exist.  However, Mr. Berger admitted that his survey was <u>not</u> conducted to determine what was "causing" the confusion:

> Q:  Let's go to – try to start off where we left off yesterday, but there was a comment I think that you made toward the end of your testimony yesterday about the likelihood of confusion survey and it not being a causal test but just an observational test; is that correct?
> A:  Yes.
> Q:  Isn't that exactly what a likelihood of confusion survey is supposed to do is test the cause of confusion?
> A:  Surveys can do lots of different things.
> Q:  But if the confusion isn't caused by the trade dress at issue here, then what's the purpose[] of the survey?
> A:  It's an observation.

We showed them a picture and we asked them a question based on what we showed in the picture. **We didn't ask them what caused it.**

Q:   **So you weren't concerned if it was the trade dress that caused the confusion?**

A:   **No.** The confusion was caused by the tendency to overlook the obvious, this idea of putting the same packages together and somebody just thinking that they're the same without looking carefully at them.

Q:   Okay. So what you did was similar then to how you trick your students with your "I love Paris in the the springtime"?

A:   Exactly, yes.

…

Q:   [] We were talking about observational and causational. Your testimony was that this wasn't a causational survey. You weren't testing whether or not the trade dress at issue was causing the confusion, correct?

A:   No. I just gave them a photo, a very simple survey. I gave them a picture and I asked them a question. That's all.

Tr., Day 3, pp. 496-97, 519 (emphasis added); *see also id.*, p. 528 ("I'm not admitting to you that this is a causal survey. I don't believe it's a causal survey."). Consequently, Mr. Berger's "likelihood of confusion" survey had absolutely <u>no</u> relevance to the issue being tried because Defendants could only have been found liable if their <u>trade dress</u> and not some "marketing phenomenon" was the cause of confusion. *See FS Servs., Inc. v. Custom Farm Servs., Inc.*, 471 F.2d 671, 675 (7th Cir. 1972) ("A new competitor is not held to the obligations of an insurer against all possible confusion. He is not obligated to protect the negligent and inattentive purchaser from confusion resulting from indifference." (quoting *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 8 (7th Cir. 1950))).

It was prejudicial to allow Mr. Berger to testify that Defendants are causing a high likelihood of confusion based on Mr. Berger's "observational" research that simply tested the survey respondents' ability or willingness to "overlook" or "ignore" the "obvious" instead of whether the trade dress was actually causing confusion. *See LG Elecs. U.S.A., Inc. v. Whirlpool*

*Corp.,* 661 F.Supp.2d 940, 951-52 (N.D. Ill. 2009) ("To meet Rule 702 and *Daubert*'s standard

of reliability, a survey offered to establish the likelihood of consumer confusion must 'have been

fairly prepared and its results directed to the relevant issues.'" (quoting *Weight Watchers Int'l,*

*Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 (S.D.N.Y. 1990))); *Chapman*, 297 F.3d at 687

("[T]he suggested scientific testimony must 'fit' the issue to which the expert is testifying."

(quoting *Porter,* 9 F.3d at 616)).  Therefore, because the confusion survey had no probative

value as to what was supposedly causing the confusion, Mr. Berger's testimony, at most, only

served to mislead or confuse the Jury as to the real issues to be decided and, thus, was severely

prejudicial to the Defendants.

> **b.  <u>Mr. Berger failed to incorporate a control in connection with his surveys</u>.**

Despite having only conducted irrelevant "observational" research, Mr. Berger

additionally testified that "control groups are really, really significant" when conducting causal

surveys.  Tr., Day 2, p. 422.  To the extent it is argued that Mr. Berger's likelihood of confusion

survey has any relevance to the ultimate issue in this case (i.e., whether there is confusion caused

by the trade dress), his results are nonetheless completely unreliable because, as Mr. Berger

testified, had he "done the control or the other kind of survey, it might have come out

differently."  *Id.*, p. 423; *see also* G. Kip Edwards, *The* Daubert *Revolution and Lanham Act*

*Surveys*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE,

AND DESIGN 329, at 374 (Shari Seidman Diamond & Jerre B. Swann eds., 2012) (discussing

that a survey without a control cell or with a fundamentally inadequate control stimulus is flawed

and should lead to survey exclusion without extensive analysis or data); *THOIP v. Walt Disney*

*Co.*, 690 F.Supp.2d 218, 240 (S.D.N.Y. 2010) ("A survey designed to estimate likelihood of

confusion must include a proper control."). Regardless, Mr. Berger's "I love Paris in <u>the the</u> springtime" experiment is unreliable and irrelevant.

### c. **Mr. Berger's surveys were non-probability surveys**.

Additionally, Mr. Berger's surveys for both likelihood of confusion and secondary meaning were non-probability surveys. There are no standard statistical tests that can be used on a non-probability sample to accurately project the results of the survey onto the entire relevant target population. Tr., Day 3, p. 521. In other words, there is no reliable statistical analysis that can be conducted in order to be able to affirmatively state that the results from a non-probability survey would be representative of the entire target market. As Mr. Berger and Ms. Fischer testified, non-probability surveys such as those conducted by Mr. Berger are only "snapshots," nothing more and therefore cannot be reliably projected onto the target population. *Id.*, pp. 514, 542. Consequently, Mr. Berger's opinion that a substantial portion of the relevant target market was likely to be confused or that Plaintiffs' trade dress had acquired secondary meaning was unfounded.

Methodologically flawed surveys such as those by Mr. Berger have no probative value and Mr. Berger's testimony only served to mislead or confuse the Jury and prejudice the Defendants. *See GE v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657-58 (7th Cir. 1998) (holding that a "bare conclusion" offered without explanation or empirical support fails the reliability requirement of Rule 702); Fed. R. Evid. 702 advisory committee's note to 2000 amendments (listing "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" as a relevant factor in determining reliability of expert testimony).

Additionally, two of Mr. Berger's secondary meaning surveys employed "imagination-type questions" wherein the respondents were only given a written description of a "yellow and black" tool and not given an image of the actual trade dress. Tr., Day 2, p. 399. As with Mr. Berger's likelihood of confusion survey, Defendants have been unable to find any authority where such a survey method has been accepted as being relevant or having any probative value in showing secondary meaning. This is again unsurprising in that trade dress refers to the "total image" of a product or packaging, not a written description of the stimuli you hope the respondents identify as being from a single source. Plaintiffs failed to introduce any evidence that such a methodology was appropriate.

### 3. Mr. Berger's likelihood of confusion survey was based entirely on a fabricated photograph depicting a staged retail scene.

While none of the surveys conducted by Mr. Berger were based on reliable principles or methods, his likelihood of confusion survey was further prejudicial because it was based entirely on an inadmissible photograph proven at trial to be fabricated. What is most egregious, however, is that Plaintiffs, in an attempt to rehabilitate Mr. Berger, presented the photograph to the Jury as being authentic of the retail environment and not staged. Over Defendants' objections, Plaintiffs' counsel quizzed Defendants' representative, Mr. Taylor, about the photograph and how such represented an actual scene at Home Depot. Tr., Day 4, pp. 738-40. What Mr. Taylor realized during trial, which was later confirmed by Defendants' COO and CFO, Paul Tellefsen, was that the photograph was fake because Rockwell products had never been sold to Home Depot to be resold in stores. *Id.*, pp. 817-18. In other words, the evidence showed that the photograph had been staged. Oddly, Plaintiffs claimed from the outset of this litigation that they did not know who took the photograph, when it was taken, where it was taken, or what had happened to the original photograph despite it supposedly being "ground zero" for the dispute.

Nonetheless, in an attempt to legitimize Mr. Berger's survey, the Plaintiffs mislead the Jury by suggesting that the photograph was a real scene at Home Depot. At the very least, Plaintiffs used a fabricated photo in an attempt to color Defendants as being deceitful with respect to the stores in which their products are sold.

Further, instead of designing his own stimuli or mock-up his own retail environment to test, Mr. Berger was directed by Plaintiffs' counsel to test the fabricated photograph. Tr., Day 2, pp. 425-26. Additionally, over Defendants' objections to exclude the photograph and the testimony of Mr. Berger, Mr. Berger testified that the photograph was representative of legitimate pictures taken by Ms. Fischer, which Mr. Berger did not use for his survey. *Id.*, pp. 410-11. This again was unfairly prejudicial to Defendants. Had Mr. Berger testified that the picture he relied upon was a mock-up or simply fabricated for the purpose of recreating the retail environment that would have been one thing, but here the Jury was led to believe the photograph was of a <u>real</u> retail environment and invited to find that Defendants' witnesses were lying when they testified that they do not sell products in Home Depot stores.

It is unknown whether Plaintiffs knowingly used a fabricated photo or not. However, what was presented at trial was that the picture is of a Home Depot shelf, Defendants have never sold its products at retail in Home Depot, and Mr. Berger and Plaintiffs conveniently had no idea who took the photograph, when the photograph was taken, or what happened to the original photograph. Defendants should have the opportunity to try this case without the Jury being exposed to fabricated "evidence," especially where that fabricated evidence could have been used by the Jury to find that Defendants were lying when they testified about their products not being sold in Home Depot.

23

### 4. Additional reasons Mr. Berger's surveys and related testimony were highly prejudicial.

In addition to the remarkable methodological failures of Mr. Berger highlighted above, other evidence at trial illustrated why Mr. Berger's opinions and testimony were unreliable and unfairly prejudicial to the Defendants:

- Unlike a true independent expert, Mr. Berger did not design his own likelihood of confusion survey and instead allowed Plaintiffs' counsel to dictate to him the relevant target population to be surveyed and the stimuli (a fabricated photograph) to be presented to the survey respondents for testing. Tr., Day 2, pp. 425-26; Tr., Day 3, pp. 508-10;
- Mr. Berger did not, contrary to accepted principles, replicate market conditions for his likelihood of confusion survey. Tr., Day 2, pp. 430-33;
- Mr. Berger did not know whether the survey respondents for any of his surveys were purchasers or potential purchasers of the products at issue, which is necessary to obtain reliable results. *See* Tr., Day 3, p. 515; *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) ("[T]he survey utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease.");
- Mr. Berger conveniently lost the original photograph used for his likelihood of confusion survey. Tr., Day 2, pp. 433-34;
- Mr. Berger did not test whether the products themselves cause confusion (only packaging), nor did he test whether DeWalt's packaging had achieved secondary meaning. *Id.*, pp. 424-25, 429-30; and
- With respect to one of his secondary meaning surveys, Mr. Berger only surveyed 17 people, which he admitted would lead to a "huge" error in the survey results. Tr., Day 3, p. 542-43.

The inclusion of Mr. Berger's testimony warrants a new trial.

### D. The Repeated References to China were Unfairly Prejudicial

Despite Defendants' motion *in limine* and the Court's warning to Plaintiffs not to evoke national origin prejudice, Plaintiffs apparently were willing to "win at all costs" by utilizing the unwarranted theme that the Defendants were "cheaters" owned by a billionaire "Chinese businessman," i.e., that Defendants are nothing more than a Chinese knockoff company. Tr., Day 1, p. 114, 129-130. Plaintiffs made continual references to China stating that Defendants were owned by a "Chinese billionaire," that Defendants were consulting with Chinese attorneys, and

that the product and packaging designs all emanated from outside the United States, all for the

purpose of evoking foreign prejudice. The national origin references by Plaintiffs were not made

simply to describe the relationship between the Defendants and their related companies. After

having explained that the Defendants were owned by a Chinese company (which the Court had

determined was fair), the Plaintiffs further argued:

> And the Positec Group is actually owned by a **Chinese businessman** named Don Gao, G-a-o. He's on Forbes List of **billionaires**. And Mr. Gao's company initially manufactured power tools for companies like Bosch and actually made DeWalt tools for a while. His manufacturing plant **in China** was making tools for these companies. And eventually, he went off and started making his own tools and selling them directly to the retailers in competition with DeWalt and with Bosch and with these other folks.
>
> So when this was going on, Mr. Gao, the **Chinese businessman**, teamed up with a former Bosch employee named Tom Duncan who was the president of Positec USA. And that's when they formed the company, Positec USA, because Mr. Gao wanted a **U.S. presence**. He wanted to get into the **U.S. market** with his new tools and start making money **from the U.S. consumers**.

*Id.*, pp. 129-30 (emphasis added). At the very least, this suggests the "us-versus-them,

American-versus-non-American" theme that this Court warned the Plaintiffs to avoid. DN 192,

p. 3. Nonetheless, the clear, but unwarranted, suggestion by Plaintiffs to the Jury was that a

Chinese, billionaire businessman is attempting to cheat and unfairly take U.S. business at the

expense of the U.S. consumer.

To further elicit such a prejudicial response from the Jury, Plaintiffs continued the theme

with its damages expert, Mr. Gemini[7], wherein he opined that there "could be profits that are

going to China." Tr., Day 3, p. 572. As was suggested in Plaintiffs' opening, Mr. Gemini

---

[7] The "America v. China" theme was further developed during the direct examination of Ms. Fischer wherein there was continued questioning on the location of all of Plaintiffs' offices, facilities, and/or manufacturing plants and a focus on those facilities being in the United States. Tr., Day 2, pp. 241, 244.

inflamed the scenario by insinuating that the Defendants were sending U.S consumers money to

the Chinese businessman.  And, if that was not enough, in the cross-examination of Defendants'

corporate representative, Plaintiffs continued to drive home the unwarranted, prejudicial

suggestion that this case was about a rich, Chinese businessman versus the U.S.:

> Q:   And you understand that a man named Don Gao is the owner of all
>      the Positec entities –
> A:   Yes.
> Q:   -- correct? Mr. Gao works **in China**, right?
> A:   Yes.
>      ….
> Q:   And Mr. Gao has ultimate authority to make all the final decisions
>      for the Positec companies, correct?
> A:   Yes.
>      ….
> Q:   And he's a **billionaire**?
> A:   As far as I know, yeah.  He's –
> Q:   Not millions or tens of millions or hundreds of millions, he's on
>      Forbes list of billionaires; is that right?
> A:   Yeah, but, I mean, when he started out making power tools, he
>      actually had to get people to extend terms for him so he could
>      make the payments.  I mean –
> Q:   But now he's one of the **wealthiest, most powerful businessmen
>      in China**, the owner of your company, right?

Tr., Day 4, pp. 727-28, 762 (emphasis added).  Again, the Plaintiffs were implying the "China v.

U.S." theme and to make sure the Jury was not persuaded that maybe this was indeed a dispute

between U.S. entities, Plaintiffs made clear, as shown above, that the Chinese businessman, Mr.

Gao, had the "ultimate authority" over the Positec entities.

In closing, and in continuation of the Plaintiffs' theme, counsel for Plaintiffs further

inflamed the Jury by twice posing the question of whether the Jury thought this was "an

acceptable [or fair] way to do business <u>in this country</u>"?  Tr., Day 5, p. 1016 (emphasis added).

To the Plaintiffs, this case was about the "us-versus-them" or the "Americans v. Chinese."[8]

---

[8] It should be noted that a well-recognized ground for a new trial under Rule 59(a) is improper conduct of
counsel in closing argument.  In *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (7th Cir. 1992), the

The concern by Defendants that such a prejudicial theme would arise at trial, as it did, was the impetus for Defendants' motion *in limine* on the subject. Plaintiffs cannot seriously contend that such statements and questions regarding Mr. Gao and the characterizations of him as a Chinese, billionaire businessman have any relevance to the issues decided by the Jury. Consequently, the remarks and questions by Plaintiffs so tainted the proceedings that Defendants should be granted a new trial. *See Boyle v. Mannesmann Demag Corp.*, No. 91-3909, 1993 U.S. App. LEXIS 8682, at *8-9 (6th Cir. 1993) (finding that "[a]ny relevance of the exchange rate evidence was outweighed by similar jury prejudice and confusion based on the repeated references to defendant's Germanic origins."); *Hong v. City of St. Louis*, 698 F.Supp. 180, 183 (E.D. Mo. 1988) (granting a new trial where counsel's cross-examination questions and closing argument referenced, for example, the plaintiff being "high up in the [Chinese] government," that plaintiff would take money "back to China with him," and that China was a "Marxist country," where such statements were improper and irrelevant to the issues in the case).

### E. THE INSTRUCTIONS PROVIDED TO THE JURY WERE CONFUSING, MISLEADING, AND INADEQUATE

The Jury was given confusing, misleading, and inadequate instructions based on Plaintiffs' phantom registered trademark infringement claim and the complex nature of the "family" trade dress claim. In particular, the jury instructions were flawed because: (1) the instructions as a whole were confusing due to the inconsistent references to trademarks, trade dress, and "family" of trademarks and trade dresses; (2) the instructions on the elements for registered trademark infringement mislead the Jury and/or caused confusion as to what was at

---

Seventh Circuit stated that "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted." *Id.* at 540; *see also* 12 MOORE'S FEDERAL PRACTICE, § 59.13[2][c][i][C] (Matthew Bender 3d ed.); 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2809 (3d ed. 2012).

issue since there was no evidence on this claim; and (3) the instructions failed to adequately instruct the Jury on the law with respect to the requirements for the Plaintiffs to establish a "family" of trade dress. These deficiencies or flaws severely prejudiced the Defendants.

Another Rule 59(a) ground for a new trial is the use of incorrect or confusing jury instructions. As stated in *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638 (7th Cir. 1995), "an incorrect jury instruction is reversible error if, considering all the instructions, the evidence and the arguments that the jury heard, it appears that the jury was misled or did not have a sufficient understanding of the issues and its duty to determine them." *Id*. at 644 (internal quotation marks omitted) (citing *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 856 (7th Cir. 1992)). Such is the case here.

Defendants maintained their objections to the proposed jury instructions throughout trial – foreseeing that the instructions as finally composed might confuse the Jury and/or inadequately apprise them of the issues to be decided. While the jury instructions may have mostly followed the Seventh Circuit Model Rules, those model instructions were not designed to address the myriad of unique and complex factual and legal issues associated with the present case.

### 1. The Instructions as a whole were confusing and misleading.

The instructions as a whole were confusing in that they (1) repeatedly, but inconsistently referenced both Plaintiffs' trademarks and trade dress and did so when there was no evidence that the Plaintiffs' trademarks had been infringed, and (2) inconsistently referred to the trademarks and trade dress as consisting of a "family." In the introduction to the liability instructions, the infringement issues are confusingly referred to in three different ways – initially stating that Plaintiffs claim "trademark and trade dress" infringement, then stating that Plaintiffs claim infringement of its "trade dress and family of registered trademarks," and then that

28

Defendants deny infringing the "trade dress" and the "yellow and black color trademarks." Jury Instructions, DN 216, p. 19.

Thereafter, the liability instructions continue with the inconsistencies, stating in some parts that Plaintiffs claim a "'family' trade dress of a 'yellow and black color scheme'" (without mentioning "trademarks") (*Id.*, pp. 20, 22), but then confusingly define "family" as consisting of a "group of trademarks or trade dresses." *Id.*, p. 21.

Further, the instructions state that a "valid trade dress" (without mentioning "trademarks") must have acquired distinctiveness and be nonfunctional, but misleadingly fail to address that it is the "family" trade dress that is to be evaluated. *Id.*, p. 23. Similarly, with respect to the elements for secondary meaning and functionality, the instructions reference "trade dress" (again without mentioning "trademarks"), but misleadingly fail to address that it is the "family" trade dress that is to be evaluated. *Id.*, pp. 24-25. Additionally, the instructions reference a "yellow and black color combination" and "yellow and black color trademarks" with respect to determining likelihood of confusion, but only mention "family" in the registered trademark instruction. DN 216, pp. 26-29.

The above inconsistencies illustrate the confusion the Jury encountered when trying to determine the issues in this case. It is impossible to decipher from the instructions what the differences are between the Plaintiffs' claims of trademark and trade dress infringement; what the Plaintiffs had to prove for each claim with respect to functionality and secondary meaning; and whether Defendants had to be found to infringe a "family" of trade dress, a "family" of trademarks, or simply a trade dress or trademark. The instructions were doomed through Plaintiffs' legally flawed, and unsupported, claim of infringement of a family of registered trademarks and family of trade dress.

### 2. The Instructions on trademark infringement were improper.

Further, the instructions related to Plaintiffs' claim for registered trademark infringement (*Id.*, pp. 28-29) should have been excluded in their entirety, along with any other references to trademarks. As stated in more detail in Defendants' motion for judgment as a matter of law, which is incorporated herein by reference, Plaintiffs expressly disclaimed the fact that registered trademarks were involved in the litigation, then apparently resurrected the claim but failed to present any evidence at trial that Defendants infringed any registered trademark or "family" of registered trademarks. *See Kirschner v. Broadhead*, 671 F.2d 1034, 1040 (7th Cir. 1982) ("It is prejudicial error for a trial court to give instructions which find no support in the evidence, unless the records shows the error is clearly harmless.").

It was confusing or misleading to the Jury and prejudicial to Defendants to include instructions for Plaintiffs' registered trademark infringement claims – especially where those instructions were crafted such that there was significant overlap between the instructions on registered trademark infringement and unregistered "family" trade dress infringement and further where the instructions caused the confusing inconsistencies discussed above. Moreover, in light of the Plaintiffs' arguments that the trademarks were "examined and determined to be in compliance with the requirements of the law," that such are "incontestable," and that such registrations were part of the "family", the Jury was misled and confused as to validity and protectability of Plaintiffs' alleged "family" of trade dress.

### 3. The Instructions on a "family" were incomplete and did not adequately state the law.

The instructions relating to the definition and ownership of a "family" of trade dress (DN 216, pp. 21-22) were incomplete and did not adequately state the law. As has been argued since Defendants' motion for summary judgment (DN 65), and as set forth in further detail in

Defendants' accompanying motion for judgment as a matter of law, the law does not provide for protection of colors in the abstract – especially where a party is claiming color as part of a family of trade dress. Consequently, without a complete instruction the Defendants were unfairly prejudiced because the Jury could not rightfully determine if the Plaintiffs owned a valid and protectable "family" of trade dress.

The Seventh Circuit holds that "if a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly infringing 'does not exist'. . . . One claiming family trade dress protection must articulate a specific trade dress and demonstrate that it has consistently used that trade dress, and even then, 'courts consider these broader product line claims with an 'acute' concern for protecting competition given that any remedy could potentially cover a wide range of products." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814-15 (7th Cir. 2002). "Unless the trade dress for which protection is sought is specifically defined with a stable visual appearance, the party seeking protection might obtain a right to monopolize a variety of dress far beyond what the plaintiff might ever use." *Id.* at 815 n. 6 (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2nd Cir. 1997); *Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp.*, 667 F.Supp. 1221, 1228-30 (N.D. Ill. 1987)). Instructions should have been included, as proposed by Defendants, to allow the Jury to determine whether Plaintiffs own a protectable "family" of trade dress. DN 196, pp. 22-26, 36-37. At the very least, the instructions should have included the Seventh Circuit law on "family" trade dress as set forth in *AM Gen. Corp.*, 311 F.3d at 814-15.

The critical flaws in the instructions are highlighted by the Courts' prior opinions. As the Court previously recognized, "a plaintiff's inability to explain to a court exactly which aspects of

31

its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea." DN 93, p. 55 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 117 (2d Cir. 2001)). Further, as the Court previously noted, "[c]ourts will . . . be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Id.* (quoting *Yurman Design,* 262 F.3d at 117). This is exactly the situation we are in now because the Plaintiffs have not asserted, and the Jury was unable to determine whether Plaintiffs were asserting, a protectable "family" of trade dress. [9]

Because the Jury was not instructed on the Seventh Circuit legal requirements of a "family" trade dress, they did not have a sufficient understanding of the issue to make a determination as to whether Plaintiffs own a specifically defined trade dress that they consistently use with a visually stable appearance. Without such an instruction and in light of Plaintiffs' generalized evidence and arguments of a "yellow and black color scheme" (without any precise expression of what that means), the Jury was either misled into believing Plaintiffs could generally own the colors "yellow and black" or their verdict was based on inconsistent findings. In other words, the Defendants were severely prejudiced because the Jury had no ability to, or guidance in, determining whether the Plaintiffs' own a protectable "family" of trade dress.

---

[9] The Court previously stated that "should injunctive relief prove warranted, the Court need not – and in all likelihood would not – grant an injunction prohibiting the use of '*any and all* uses of yellow and black *in any manner* on power tools, accessories, and packaging,' as such an injunction would extend well beyond the scope of the trade dress visually depicted by Plaintiffs." DN 121, p.8, fn. 2. However, because the Jury was not given the ability to determine whether Plaintiffs were asserting a protectable trade dress, this is effectively what the Plaintiffs are now asking the Court to do.

### F.  THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

A new trial should be ordered when the district court determines that the jury's verdict is against the weight of the evidence.  *See McClain v. Owens-Corning Fiberglas Corp.*, 139 F.3d 1124, 1126 (7th Cir. 1998) (upholding trial court's grant of new trial under Rule 59(a)).  As set forth by the Seventh Circuit in *Whitehead v. Bond,* 680 F.3d 919 (7th Cir. 2012), "[w]hen considering whether the verdict was against the manifest weight of the evidence, 'the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial.'"  *Id.* at 928 (quoting *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011)); *see also Thomas v. Stalter*, 20 F.3d 298, 304 (7th Cir. 1994) (in deciding whether to order a new trial, the court was entitled to weigh the evidence for itself and assess the witnesses' credibility); *Spanish Action Comm. v. City of Chicago*, 766 F.2d 315, 321 (7th Cir. 1985).

As noted, Defendants have filed, concurrently herewith, a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50.[10]  Many of the issues and arguments outlined in that motion overlap with those herein.  Therefore, Defendants incorporate herein by reference their motion for a judgment as a matter of law.  To summarize, however, to the extent judgment as a matter of law is not entered in favor of Defendants, a new trial should be granted because the Jury's verdict on both Plaintiffs' registered trademark and unregistered trade dress claims were against the overwhelming weight of the evidence.

A claim for infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1)(a), requires for liability to be found "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation **of a registered mark** in connection with the sale, offering for sale,

---

[10] Under Rule 50, a motion for judgment as a matter of law "should be granted where the evidence is not legally sufficient for a reasonable jury to return a verdict."  *Merritte v. Ingram*, No. 11-cv-0871-SCW, 2015 U.S. Dist. LEXIS 131299, at *5 (S.D. Ill. Sept. 29, 2015).

distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." (emphasis added). There was no evidence at trial that Defendants have used any reproduction, counterfeit, copy, or colorable imitation of **a registered mark or "family" of registered trademarks**. This is unsurprising since the trademark registrations introduced at trial apply to the colors yellow and black as used on specific components of power tools or power tool accessories, or in connection with the "DeWalt" word logo, and there is no evidence that the Defendants' power tools or power tool accessories are confusingly similar to any of the products depicted in the registered trademarks. In fact, the Jury's finding that Defendants somehow infringe the registered trademarks demonstrates the Jury's confusion on the issues.

As to Plaintiffs' unregistered "family" trade dress claim, the jury instructions required a finding that "Defendants have used power tool products and packaging in a manner that is likely to cause confusion as to the source, origin, sponsorship and/or affiliations of Defendants' products and associated packaging." DN 216, p. 26 (emphasis added). Similar to the discussion above, there was no proof at trial that any of Defendants' Rockwell power tools infringe the unregistered "family" trade dress of a "yellow and black color scheme." The only testimony from Plaintiffs' fact witness, Ms. Fischer, was that she believed the Rockwell packaging was confusingly similar to the Plaintiffs' trade dress. Tr., Day 2, pp. 231-78. Plaintiffs acknowledged that the Rockwell tools do not look anything like the DeWalt tools. Tr., Day 2, pp. 347, 366. Further, even assuming Mr. Berger's testimony was properly admitted at trial, which it was not, he only opined as to the Rockwell packaging and did not provide any opinion as to whether or not the Rockwell tools themselves were confusing. *Id.*, pp. 429-30 (emphasis added). This is again unsurprising because Defendants' power tools are military-green (or bright

34

green) and black – they do not have a "yellow and black" color scheme.  Therefore, the weight of the evidence was overwhelming against the Jury's verdict that the Defendants' <u>products and packaging</u> infringe Plaintiffs' unregistered trade dress and, thus, a new trial should be granted.

### G.  THE CASE SHOULD NOT HAVE BEEN GIVEN TO THE JURY

Defendants have also filed concurrently herewith a renewed motion to strike the jury demand.  In that motion, which the Defendants incorporate herein by reference, the Defendants set forth how the Plaintiffs failed to prove its "profits as a proxy for damages" theory.  Plaintiffs introduced no evidence of having been damaged but instead demonstrated that its sales have continually increased even during Defendants' time in the market.  Plaintiffs only surmise that their oscillating business, which entered the marketplace several years after Defendant, is challenged.  *Id.*, p. 280.  Mr. Berger's survey, which should have been excluded, does not provide reliable evidence of actual confusion to infer actual lost sales.  The undisputed fact is that the parties have coexisted in the market for over 6 years without any evidence of an actual consumer being confused.  Therefore, in light of the fact that there is no connection between Defendants' actions and any damage suffered by Plaintiffs, the profits award was purely equitable in nature.

For the reasons discussed in Defendants' renewed motion to strike, the Court should order a new trial to be held without a jury.

### <u>CONCLUSION</u>

The Court should grant Defendants' motion for a new trial because the trial was unfair based on inadmissible and highly prejudicial evidence and testimony being presented to the Jury, based on the fact that the Jury was given confusing and/or inadequate jury instructions as they pertained to the unique circumstances of this case, based on the fact that Jury's verdict was

35

against the weight of the evidence, and based on the fact that the case should never have been presented to the Jury in the first place as this was strictly an equitable matter.

Respectfully submitted,

*/s/ Brian McGraw_____*
Dennis D. Murrell
Robert J. Theuerkauf
Brian P. McGraw
MIDDLETON REUTLINGER
401 S. Fourth Street, Suite 2600
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (fax)
Counsel for Defendants

- and –

J. Aron Carnahan (IL. Bar 6242642)
HUSCH BLACKWELL LLP
120 South Riverside – 22d Floor
Chicago, Illinois 60606
Phone: (312) 665-1500
Facsimile: (312) 655-1501
Local Counsel for Defendants

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 2d day of November, 2015, the foregoing Motion was filed according to the rules of Electronic Court Filing (ECF) in effect for the Northern District of Illinois – Eastern Division, which ECF system will provide a copy of same to all persons registered to receive service in this case.

*/s/ Brian McGraw____*
*Counsel for Defendants*