IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., | Case No. 1:11-cv-05426 |
| Plaintiffs, | Judge Robert M. Dow, Jr. Magistrate-Judge Geraldine Soat Brown |
| v. | |
| POSITEC USA INC. and RW DIRECT, INC. | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED
MOTION TO STRIKE PLAINTIFFS' JURY DEMAND**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    THE LAW SUPPORTS THE COURT'S EARLIER DECISION
THAT A JURY RIGHT EXISTS IN THIS CASE ............................................ 1

III.   THE EVIDENCE SHOWS THAT THE PARTIES ARE
DIRECT COMPETITORS ............................................................................. 3

    A.     The Parties Target the Same Types of Purchasers ................................. 3

    B.     The Parties' Products are Intermingled and Lay
           Side-By-Side in the Same Retail Stores ................................................ 6

    C.     The Parties Sell the Same or Similar Power Tool
           Products and Accessories ..................................................................... 12

    D.     The Parties' Advertising Means Substantially Overlap ........................ 15

IV.   THE EVIDENCE SHOWS THAT PLAINTIFFS SUFFERED
ACTUAL LOSS ............................................................................................ 16

V.    CONCLUSION ............................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*,
No. 11 C 02242, 2013 WL 6839815 (N.D. Ill. Dec. 27, 2013) ................................................ 15

*Archer Daniels Midland Co. v. Narula*,
No. 99 C 6997, 2001 WL 804025 (N.D. Ill. July 12, 2001) .................................................... 14

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
76 F. Supp. 2d 868 (N.D. Ill. 1999) ................................................................................. 18, 19

*BASF Corp. v. Old World Trading Co.*,
41 F.3d 1081 (7th Cir. 1994) .................................................................................................... 2

*Dairy Queen Inc. v. Wood*,
369 U.S. 469 (1962) ................................................................................................................ 17

*Libman Co. v. Vining Indus., Inc.*,
69 F.3d 1360 (7th Cir. 1995) .................................................................................................. 11

*Oxford Indus., Inc. v. Hartmarx Corp.*,
No. 88 C 0322, 1990 WL 65792 (N.D. Ill. May 2, 1990) ......................................................... 2

*Roulo v. Russ Berrie & Co.*,
886 F.2d 931 (7th Cir. 1989) .................................................................................................... 3

*Rust Env't & Infrastructure, Inc. v. Teunissen*,
131 F.3d 1210 (7th Cir. 1997) ................................................................................................ 16

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
978 F.2d 947 (7th Cir. 1992) .................................................................................................. 14

*United States v. Halliday*,
672 F.3d 462 (7th Cir. 2012) .................................................................................................. 17

*Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*,
906 F.2d 1202 (7th Cir. 1990) ................................................................................................ 16

**Statutes**

15 U.S.C. § 1117(a) .............................................................................................................. 1, 2

## I.    INTRODUCTION

Before trial, the Court denied Defendants' motion to strike Plaintiffs' jury demand (Dkt. #99) in a thoughtful and well-reasoned 17-page Opinion.  (Mem. Op. and Order, Dkt. #147.)  In so ruling, the Court explained that Plaintiffs had a constitutional jury right in this case if their evidence at trial "ma[de] a plausible case under the 'profits as a proxy for damages'" theory recognized by the Seventh Circuit and other courts.  (*Id.* at 13, 15, n.17.)  At trial, Plaintiffs presented compelling evidence in support of their "profits as proxy" claim.  Specifically, the evidence showed that "(1) the parties are direct competitors; (2) their products lay side-by-side in the same retail stores; and (3) a substantial percentage of customers may be confused as to the source of the parties' products."  (*Id.* at 15.)  These facts fully support Plaintiffs' profits claim and the jury's profits award.  They also confirm that the Court got it right when it submitted Plaintiffs' profits claim to a jury.  Defendants' renewed motion to strike the jury demand should be denied.

## II.    THE LAW SUPPORTS THE COURT'S EARLIER DECISION THAT A JURY RIGHT EXISTS IN THIS CASE

In denying Defendants' motion to strike the jury demand, the Court identified "three categories" of case law addressing "whether a plaintiff demanding an infringer's profits [under § 1117(a)] has a Seventh Amendment right to a jury": (1) "a right to a jury trial exists regardless of the theory behind profits"; (2) "where profits are a proxy for damages, a jury right exists, but where profits are premised on unjust enrichment, a jury right does not exist"; and (3) disgorgement is equitable, not legal.  (*Id.* at 7-8.)

Despite the Court's prior analysis of this exact issue, Defendants renew their motion to strike Plaintiffs' jury demand, maintaining their position that a profits award falls under the third category, and thus is "equitable and not legal regardless of the theory proposed to support the remedy."  (Dkt. #229 at 11, n.9.)  Not surprisingly, Defendants retreat and confine their motion to

1

Plaintiffs' alleged failure to support the elements of the Court's "proxy for damages" theory (*id.* at 2, n.1) – this Court clearly stated that it was "unpersuaded by the third view" and systematically distinguished the case law Defendants relied on in support of their motion to strike. (Dkt. #147 at 11-16.) The Court reasoned that "[a]s to precedent, the weight of authority supports the first or second view more than the third. Consistent with these views, ***numerous*** courts in [the Seventh Circuit] have tried demands for profits before juries." (*Id.* at 9 (emphasis added); *see also id.* at 9, n.11 (citing cases finding right to jury where trademark plaintiff sought infringer's profits).)

With respect to the second view, the Court recognized that "courts in this circuit and others have accepted the proposition that profits may function as a 'proxy for damages.'" (*Id.* at 6 (citing *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994)).) In its Opinion, this Court frequently cited *Oxford Industries* with approval, which explained,

> [a]s a practical matter, an award of profits is really a ***surrogate for damages***. Unless he can show diversion of sales, a trademark owner will be hard pressed to prove damages, and even if he shows confusion of the marks and diversion of customers it is difficult to show how many customers bought the infringer's product who would have bought the trademark owner's but for the deception. (Few purchasers of cheap "knockoffs" of expensive goods would have bought the genuine article.) ***The damage caused by the dilution of the owner's goodwill when the infringer's goods are of inferior quality is virtually impossible to quantify***. At least in some circumstances the infringer's profits may be a rough measure of the owner's damages, and an award of profits affords some compensation to the trademark owner.

*Oxford Indus., Inc. v. Hartmarx Corp.*, No. 88 C 0322, 1990 WL 65792, at *7 (N.D. Ill. May 2, 1990) (emphasis added) (parentheses in original). The Court in *Oxford Industries* specifically held that a trademark owner has a right to a jury trial on a claim of an infringer's profits under § 1117(a). *Id.* at *7-8.[1]

---

[1] Oddly, Defendants rely heavily on *Oxford Industries* (Dkt. #233, Parties' Joint Status Rep. at 8, 10, 12) in support of their argument that judgment should not be entered on the verdict until the profit award

Thus, the law supports Plaintiffs' jury right and the Court's Order denying Defendants' motion to strike the jury demand.  As discussed below, the evidence adduced at trial supports the same result.

## III.  THE EVIDENCE SHOWS THAT THE PARTIES ARE DIRECT COMPETITORS

This Court has repeatedly recognized that Plaintiffs and Defendants are competing power tool manufacturers. (Dkt. #192 at 24 ("Plaintiffs and Defendants 'sell competing products' such that ***their customer markets are the same or very similar***.") (emphasis added); Dkt. #147 at 1 (Plaintiffs and Defendants are "competing power tool sellers."); Dkt. #93 at 3; Dkt. #121 at 1). Although "there is no express requirement that the parties be in direct competition … to justify an award of profits," *Roulo v. Russ Berrie & Co*., 886 F.2d 931, 941 (7th Cir. 1989), substantial evidence of that fact was presented at trial in this case.

### A.  The Parties Target the Same Types of Purchasers

Defendants argue that they don't target professionals and serious do-it-yourselfers ("DIY").  Yet ***Defendants themselves*** advertise that "Rockwell power tools are engineered to meet the demanding needs of ***professional users and serious do-it-yourselfers***":

---

is determined, yet assert that there is no jury right in the first place.  Defendants will cite to any case that fits their particular needs at the moment.



(PX084-003 (emphasis added).) Ms. Fischer testified to the same point: "It says right on [Defendants'] website that [their products are] geared towards professionals and serious do-it-yourselfers. And, again, they're available in the same outlets that we are. You know, a lot of the times, side by side in Lowe's, it's going to be the … same user." (Trial Tr. at 201:10-14, Ex. A.) Ms. Fischer added that Defendants' statement on their website is "absolutely" consistent with her own observations in the marketplace. (*Id.* at 222:24 – 223:1.) Plaintiffs' survey expert, Mr. Berger, also testified:

> Q. [] How did you screen for or validate that the respondents were part of the relevant consuming public?
>
> A. Well, we made sure that the panel company limited the survey to the two main target markets: ***The professional tradesperson and the serious do-it-yourselfer***…***These are the same target markets, relevant target markets that both plaintiff and defendant direct their marketing*** to as you saw this morning.

(*Id.* at 391:13-22 (emphasis added).) Mr. Berger further testified that "[i]n most cases, consumers of the senior brand and the alleged infringer are the same, and it turned out in testimony that they are exactly the same" in this case. (*Id.* at 513:15-17.)

4

Defendants' own witness, Mr. Taylor, recognized that Defendants' websites identify professionals and DIY as purchasers of Defendants' products:

> Q. So do you agree with Ms. Fischer that your own website, both the Positec website and the Rockwell website both say that the Rockwell products are designed for professionals and serious do-it-yourselfers?
>
> A. Yeah….

(*Id*. at 747:14-18.) Mr. Taylor even admitted that "[p]rofessional tool users trust Rockwell" when questioned about the following excerpt from Defendants' website: "The Rockwell brand has been trusted by professional tool users for generations, and we intend to continue that for many generations to come." (*Id*. at 749:7-14; *see also id*. at 757:4-7 (passage from Rockwell's website: "The addition of Rockwell's patented Vibrafree counterweight technology means that each cut is not only quick but also smooth and precise, making the Sonicrafter a ***must-have for pros and DIY enthusiasts*** alike.") (emphasis added).) Although Mr. Taylor testified that Defendants use black packaging, rather than their infringing yellow and black packaging, for their oscillating tools geared to professionals, he was mistaken. (*Id*. at 757:8-758:22.) As Ms. Fischer noted, "[O]n [Defendants'] website, regardless of what level of oscillating tool they have for the corded oscillating tools, they all say they are for the professional or serious D[IY]er." (*Id*. at 222:9-11.)

Ms. Fischer further testified that Plaintiffs' and Defendants' tools are available at retail stores where *any* customer, whether a professional or not, can purchase the parties' products:

> Q. [] [Defendants' counsel] indicated that Rockwell's primary target is the consumer, not the professional. He said their target is the weekend warrior. Is that consistent or inconsistent with your own understanding in the marketplace?
>
> A. It's inconsistent. As I mentioned, you know, these tools are available at the Lowe's store, which is, you know, anybody can go in there and purchase a tool, whether you're a weekend warrior or professional or not.

***

> Q. Defendants' counsel said that in his opening that DeWalt's target is the professional and what they call the serious do-it-yourselfer, someone who owns over $1,000 in power tools; that is why you were asked the voir dire question. He said that's their target audience. And he is saying that for the defendant they have different customers walking into Lowe's looking for different products for different purposes than we have. It's a different customer base with a different goal. Is that correct or incorrect?
>
> A. That's incorrect. A tool does a job. Right? It doesn't matter who is doing the job and what level they are, whether they do it as their profession or whether they are, you know, completely overhauling their bathroom for their own personal home. It's a tool that does a job.

(*Id*. at 221:21-222:3; 223:2-15.) Ms. Fischer explained that while Plaintiffs design their products for the professional, they "cast a broad net," and that "[a]nybody is welcome to buy [Plaintiffs'] tools." (*Id*. at 288:18-20 (stating that Plaintiffs "had a number of just regular guys that admitted they weren't serious DIYers that had DeWalt products"); 289:5-7 (testifying that Plaintiffs "have a website that anybody is allowed to access, whether they want to buy a tool for … just hanging pictures").)

Mr. Taylor's testimony that only 3.2% of people buying Defendants' products are professional users was unsupported by any documents at trial:

> Q. [] Now, the 3.2 percent number you've thrown out, do you have a document that you could show us that has that 3.2 percent?
>
> A. No….
>
> Q. Is that an exhibit in the trial that we can present to the jury –
>
> A. No –

(*Id*. at 758:24-759:5; *see also id*. at 688:9-11.)

## B. The Parties' Products are Intermingled and Lay Side-By-Side in the Same Retail Stores

Incredibly, Defendants argue that Plaintiffs' "side-by-side in retail" evidence "lacks value," yet concede that "Plaintiffs submitted some evidence that … the parties' products [are]

sold-by-side….” (Dkt. #229 at 10-11.)  Defendants' counsel even stated in closing argument that

the parties' power tool products are sold in “similar stores, without question,” that Lowe's is

Defendants' “biggest account,” and that Plaintiffs “sell in Lowe's” – all of which “weighs in

[Plaintiffs'] favor.”  (Trial Tr. at 978:19-21, Ex. A.)

Plaintiffs have submitted abundant evidence that the parties' directly competing products

are sold not only in the **same stores**, but often commingled together on the **same shelves**:



(PX028.)  Ms. Fischer testified that she could not get her “head around how [Plaintiffs' and

Defendants' tools] are ***intermingled sitting right next to each other***.  The boxes are the same size.

You know, looking so very similar.”  (Trial Tr. at 263:8-10 (emphasis added), Ex. A.)  Below is

another photograph taken at a Lowe's store that shows the parties' products sold side-by-side:



(PX006-005.)  Ms. Fischer explained that this photograph depicts a "national plan-o-gram" such that "this particular set-up is going to be in most of the Lowe's stores that you might walk into across the country … And right there you can see ***both*** DeWalt oscillating blades and Rockwell oscillating blades.  And also tucked down at the bottom there are some Rockwell circular saw blades."  (Trial Tr. at 265:2-8 (emphasis added), Ex. A.)  The following photograph (also from a Lowe's store) was entered into evidence:



(PX006-004.)  Ms. Fischer testified:

> Q. And did you take this photograph?
>
> A. Yes, I did.
>
> Q. What's shown here?
>
> A. This is a picture I took, you know, a little bit further out, so you could see a little bit more of the visual context. And, again, ***the accessories are intermingled***, and then down below you can see that ***the Rockwell product is sandwiched directly between two DeWalt products***, and then there's more Rockwell products on the bottom.
>
>                              ***
>
> Q. Did you jimmy these things around to set them up on the shelf or is this the way you saw it when you walked into the store?
>
> A. No. It's how I walked into the store. You can see by the price tags underneath, you know, this is the location that they're supposed to be in on the shelves.

(Trial Tr. at 265:19-266:2; 266:17-22 (emphasis added), Ex. A.)  Still further, the jury was shown

the following photograph:

9



(PX005-002.) Ms. Fischer stated that the photograph showed "a selection of yellow and black boxes, and it has the Rockwell tools **right next to** the DeWalt tools." (Trial Tr. at 269:23-25 (emphasis added), Ex. A; *id*. at 268:6-10 (describing PX008-006: "it shows the DeWalt **right next to** the Rockwell product.") (emphasis added).) (*See also id*. at 500:16-17 (Mr. Berger testifying that PX006-007 depicts "intermingling of the different brands" of power tools, including Plaintiffs' and Defendants' products, on the shelf).)

Defendants argue that the parties are not direct competitors because they sell "their tools online or direct to the consumer," and that "there was no evidence at trial that Plaintiffs sell direct to consumers." (Dkt. #229 at 9.) Not only do Defendants fail to cite any authority supporting their contention that the parties cannot be direct competitors if Plaintiffs do not sell directly to consumers, but the evidence overwhelmingly shows that the parties' power tool products and accessories are **consistently intermingled** together **on the same shelves in the same stores** throughout the country, *supra*. To argue that the parties are not in direct competition in light of this evidence is illogical. Regardless, Plaintiffs also sell their tools online; Ms. Fischer testified that Plaintiffs "have a website that anybody is allowed to access." (Trial Tr. at 289:5, Ex. A.)

10

Furthermore, whether the parties' products are displayed outside of their packaging is immaterial, contrary to Defendants' argument. (Dkt. #229 at 10.)  The fact that Plaintiffs' and Defendants' power tools are commingled underscores the likelihood of a consumer accidently grabbing a Rockwell product thinking they were grabbing a DeWalt product.  Defendants' reliance on *Libman* (*id*. at 10-11) is misplaced.  The issue on appeal in *Libman* was whether the district judge erred in finding that consumers were likely to confuse plaintiff's product for defendant's. *Libman Co. v. Vining Indus., Inc*., 69 F.3d 1360, 1361 (7th Cir. 1995).  The *Libman* Court did not assess whether the parties were "direct" competitors or whether a jury trial was proper – the lower court was a bench trial.  *Id*.  Moreover, no survey was "conducted in an effort to determine the likelihood of confusion."  *Id*.  Here, however, Mr. Berger conducted a likelihood of confusion survey and testified that 47% of respondents mistook Defendants' yellow and black packaging for Plaintiffs' – 47% is "very high" and "more than twice as much as what you need" to show confusion.  (Trial Tr. at 413:24 – 414:17, Ex. A.)  Thus, unlike plaintiff in *Libman*, Plaintiffs' "narrative of possible confusion" here *has* been tested.  *See Libman*, 69 F.3d at 1364.  In other words, in light of Plaintiffs' survey evidence, it was not "pure speculation" for the jury to conclude that consumers mistake the parties' power tool products and accessories.  *See id*.  Moreover, contrary to the disputed products in *Libman*, in this case "it is obvious just from comparing the [parties' trade dresses] that consumers are likely to be confused as to their source," *id*. at 1363, as set forth in Plaintiffs' Response to Defendants' Motion for Judgment as a Matter of Law (Section III(A)(1)-(2)), which is incorporated herein by reference (and filed concurrently herewith).

### C. The Parties Sell the Same or Similar Power Tool Products and Accessories

Defendants argue that they do not sell "typical" power tools and identify allegedly "unique" tools that Plaintiffs purportedly do not sell. (Dkt. #229 at 8.)[2] At trial, however, Plaintiffs submitted ample evidence that both parties sell several power tool products that are ***identical*** to one another, including, for example: drills, saws, drivers, grinders, and sanders. (Chart of Parties' Tools, Ex. B.) Importantly, Plaintiffs also sell tools that compete directly with Defendants' apparent "unique" tools. (*Id*.)[3] That Defendants give their power tool products a "unique product ***name***" (Trial Tr. at 662:7 (emphasis added), Ex. A) is of no consequence to this case, where the issue before the jury was whether Defendants' trade dress, <u>not</u> word marks, was confusingly similar to Plaintiffs' trade dress and family of trademarks. Defendants even implicitly assert (which Plaintiffs dispute herein and in their responses to Defendants' other post-trial motions, incorporated herein by reference (and filed concurrently herewith)) that ***almost 50%*** of their gross sales are attributable to products that compete with power tool products sold by Plaintiffs. (Dkt. #227 at 26.)

Indeed, Plaintiffs introduced evidence that Defendants' President, Mr. Duncan, admitted that Plaintiffs sell a product that is a "substitute" for Defendants' allegedly "unique" JawHorse tool:

> Q. So are you aware of any companies that do make or sell a product that you consider to be a ***reasonable substitute*** [for the JawHorse]?

---

[2] Defendants' assertion misses the mark – the agreed Seventh Circuit Model jury instruction instructed the jury to consider "whether [D]efendants and [P]laintiffs use the yellow and black color combination on the ***same or related*** products and packaging." (Trial Tr. at 1029:16-18 (emphasis added), Ex. A.) It is undisputed that Plaintiffs and Defendants sell power tools and accessories – Ms. Fischer testified that Plaintiffs manufacture "about 5,000 individual power tools or accessories" that incorporate the DeWalt "yellow and black" color scheme (*id*. at 184:6-186:3), and Mr. Taylor stated that Defendants "sell power tools, power tool accessories" (*id*. at 622:6.) (*See also* Dkt. #192 at 24 ("Plaintiffs and Defendants 'sell competing products' such that their customer markets are the same or very similar").) At a minimum, the parties sell *related* products.

[3] *Compare, e.g.*, Plaintiffs' "Oscillating Multi-Tool" (PX004-002, Ex. B) and Defendants' "Sonicrafter Oscillating Multi-Tool" (PX185, Ex. B).

A. Yes.

Q. And who is that?

A. Well, **B & D I know makes one – a product that would be comparable** [to the JawHorse].

(Trial Tr. at 490:5-10 (emphasis added), Ex. A.)  Mr. Taylor also acknowledged that Defendants' JawHorse product is "a sawhorse with a jaw on it" (*id*. at 662:9), and on cross-examination, Ms. Fischer testified that Plaintiffs sell a yellow and black sawhorse (*id*. at 303:9-16.)

Furthermore, Mr. Tellefsen admitted that Defendants' power tool accessories, which represent a large portion of Defendants' sales, are compatible with competing products sold by other power tool manufacturers, including Plaintiffs:

Q. You mentioned that a large part of Rockwell sales, at least in terms of unit volume, is through accessories –

A. Yes.

Q. – is that right?

A. Yes.

Q. Like the Rockwell Sonicrafter accessory I'm holding in my hand?

A. Yes.

Q. **And this Rockwell accessory, these are universal items, they fit other people's tools; is that right**?

A. **That's correct**.

Q. **You can use these accessories with a DeWalt tool or anyone else's tool, correct, they're universal**?

A. **That's my understanding, yes**.

(*Id*. at 834:9-22 (emphasis added).)

Clearly, Defendants' contentions that "Plaintiffs submitted **no** evidence at trial that they sell tools which compete directly with the tools sold by Defendants" and that "Defendants' tools are <u>not</u> **substitute products** for Plaintiffs' DeWalt tools" (Dkt. #229 at 8; emphasis added), are patently false.

Defendants also assert that their oscillating tool entered the marketplace prior to Plaintiffs' introduction of their oscillating tool (*id*. at 11.)[4] Defendants' argument is unavailing in light of the jury instructions that Plaintiffs' rights extend to the "same" products as well as "related" products (Trial Tr. at 1029:16-18, Ex. A), which is set forth in case law recognizing that a "senior user's rights may extend into uses in 'related' product … markets." *Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025, at *13 (N.D. Ill. July 12, 2001). The Seventh Circuit has held that "[o]ne of the reasons courts have given for protecting trademark owners against the use of confusingly similar marks on **closely related products** is to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947, 958 (7th Cir. 1992) (emphasis added). Here, it is undisputed that Plaintiffs are the senior user of yellow and black power tool products and packaging. Plaintiffs have consistently maintained the yellow and black color scheme on their DeWalt tools and associated packaging from 1992 to the present day (Trial Tr. at 253:12-21, Ex. A), and Defendants are the junior user – they did not introduce their infringing packaging into the marketplace until 2009 (*id*. at 728:13-23, 559:17-20.) Considering the breadth of power tool products Plaintiffs have sold in yellow and black since 1992

---

[4] In actuality, Defendants were <u>not</u> the first company to offer an oscillating tool to the consumer market – Mr. Taylor testified on *direct examination* that this tool had already "existed on the professional side of the business. A company called Fein marketed it under the MultiMaster [brand name]." (Trial Tr. at 623:14-25, Ex. A.)

(*see, e.g.*, PX061, Ex. C; PX062, Ex. D), Plaintiffs "might reasonably be expected to expand" their product line to include an oscillating tool "in the future," *Sands*, 978 F.2d at 958, and in fact, Plaintiffs *did* expand their market and currently sell an oscillating tool that directly competes with Defendants' equivalent Sonicrafter tool, *supra*. (*See* PX004-002, PX185, Ex. B.) Moreover, "because the parties' products do overlap and because they overlap in the same retail-sales markets, it is reasonable to expect that consumers would be confused about the source of Defendants'" power tools. *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc*., No. 11 C 02242, 2013 WL 6839815, at *4 (N.D. Ill. Dec. 27, 2013).

### D. The Parties' Advertising Means Substantially Overlap

Defendants assert (incorrectly) that the parties' advertising approaches are "polar opposite." (Dkt. #229 at 9.) Defendants conveniently ignore the fact that the parties' respective corporate representatives testified that Plaintiffs and Defendants conduct in-store merchandising (Trial Tr. at 246:24-248:10, 635:9-13, Ex. A) and print advertising (*id*. at 252:7-25, 635:14-17.) Incredibly, Defendants contend that they primarily advertise on television, whereas Plaintiffs "do not advertise on television" (Dkt. #229 at 9), yet Ms. Fischer confirmed that DeWalt generates about *50 billion television impressions per year*:

> Q. And do you track the number of impressions that are made from those paid sponsorship efforts for DeWalt?
>
> A. Yeah. We absolutely do.
>
> Q. And what is an impression, I guess, first of all?
>
> ***
>
> A. When the, you know, let's call it the outfield signage appears on television. Suppose somebody is going to make a catch and they're running at the sign; so it's a formula where they take the amount of time that that logo is on television, and then they – based on the number of people that they have viewing that event, they have a calculation. So *an impression is a person that has seen the -- they anticipate has seen that logo on television*.

15

Q. And how many impressions are generated, I guess, through that activity on television per year for DeWalt?

A. *Just for DeWalt it's about 50,000,000,000 impressions*. And that's actually gone up this year. The English Premier League is being shown on cable right now, so that's gone up 20 percent just this year through that sponsorship.

(Trial Tr. at 245:5-24 (emphasis added), Ex. A.) Moreover, DeWalt has spent around $50 million over the past 20 years for their Nascar sponsorship (*id*. at 235:8-10), a sporting event which is highly publicized year-round on television.[5]

## IV.    THE EVIDENCE SHOWS THAT PLAINTIFFS SUFFERED ACTUAL LOSS

At trial, Plaintiffs presented a simple and straightforward survey designed by their survey expert, Mr. Berger, that demonstrated a substantial 47% confusion rate. (*Id*. at 408:23; 413:24-414:17.) This Court previously held that Mr. Berger's survey evidence supports a "proxy for damages" theory:

Parties have used such survey evidence to show not only a likelihood of confusion but also actual confusion. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997). Actual confusion, in turn, may support a plaintiff's theory of actual loss. *Web Printing Controls*, 906 F.2d at 1204–05. And actual loss supports a theory of profits as a proxy for damages….

(Dkt. #147 at 15.) For the reasons discussed in Plaintiffs' Response to Defendants' Motion for Judgment as a Matter of Law (Section III(A)(6)), which is incorporated herein by reference (and filed concurrently herewith), Defendants' contention that Mr. Berger's likelihood of confusion survey is insufficient to show actual confusion is unavailing. Thus, Plaintiffs' evidence at trial overwhelmingly shows that "a substantial percentage of customers may be confused as to the source of the parties' products." (*Id*.)

---

[5] In evaluating whether there was a likelihood of confusion between the parties' products and packaging, the jury was instructed to consider "whether [P]laintiffs's and [D]efendants's products and associated packaging are likely to be … advertised in *similar media*." (*Id*. at 1029:19-21) (emphasis added) (quoting the agreed upon Seventh Circuit Model Instruction). Unquestionably, the parties advertise their power tools in *similar* media.

Defendants argue that Plaintiffs' evidence "reinforced their unjust enrichment" theory by citing to *two* statements from the trial transcript (which is over 1,000 pages long) made by Plaintiffs' counsel in opening and closing arguments. (Dkt. #229 at 11-12.) Arguments made during counsels' "opening and closing statements are not evidence." *United States v. Halliday*, 672 F.3d 462, 471 (7th Cir. 2012). Thus, Defendants cite no testimony or evidence presented at trial that Plaintiffs seek Defendants' profits under an unjust enrichment theory. More importantly, Defendants raise the ***same arguments*** that were ***thoroughly considered and rejected*** by the Court in denying Defendants' motion to strike Plaintiffs' jury demand:

> Defendants argue that Plaintiffs cannot contend that profits are a proxy for damages because the amended complaint includes language suggesting a theory of unjust enrichment. While the amended complaint does include such language, it is ***not mutually exclusive*** with a theory of profits as a proxy for damages. ***When parties are competitors selling similar products, it may well be that the defendant's sale of infringing products causes its own unjust enrichment while simultaneously causing the plaintiff a loss. To the extent that both theories may apply and one theory is equitable while the other is legal, the equitable relief does not negate Plaintiffs' jury right as to the legal theory.*** *Dairy Queen*, 369 U.S. at 472-73 (1962).

(Dkt. #147 at 16-17) (emphasis added). Plaintiffs and Defendants sell their competing power tools and accessories in the same stores, on the same shelves, to the same consumers, *supra*. This "suggest[s] that the [D]efendants' gain correlated with the [P]laintiffs' loss." (*Id*. at 16.) The jury could easily infer that Plaintiffs suffered actual loss under these circumstances, and Ms. Fischer confirmed in her testimony that she is certain Plaintiffs are losing sales to Defendants. (Trial Tr. at 272:11 – 273:5, 368:15-22, Ex. A.) In other words, Plaintiffs' evidence demonstrates that "by infringing Plaintiffs' trademark-related rights, Defendants[] caused consumers to purchase

17

Defendants' products instead of Plaintiffs'," thus, Defendants' "profits serve as a proxy for [Plaintiffs'] damages." (Dkt. #147 at 15.)[6]

The fact that Plaintiffs' sales have increased during the period that Defendants sold their adjudicated infringing tools is inconsequential; a company the size of DeWalt can suffer actual loss at the hands of an infringer, yet still see an overall increase in gross sales worldwide. Defendants' reliance on *Finlay* is misplaced (Dkt. #229 at 4.) In *Finlay*, the court held that disgorgement of profits was unavailable, in part because "there were ***numerous*** other competitors for sales of [the products at issue] in the market," and the parties "did not compete exclusively with each other." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp*., 76 F. Supp. 2d 868, 873 (N.D. Ill. 1999) (emphasis added). Here, however, Ms. Fischer testified:

> Q. [] So I guess other than, you know, the companies that -- other companies that may have been infringing that you had to police the market against, has there been anyone else that used yellow and black next to DeWalt over the last 20 years since introduction?
>
> A. ***Other than Rockwell, no***.

(Trial Tr. at 254:6-11 (emphasis added), Ex. A); (*see also id*. at 272:23-24 (Plaintiffs "have ***policed the marketplace so aggressively*** that ***nobody else*** [other than Defendants] ***is out there***") (emphasis added); 822:20-23 (Mr. Tellefsen admitted that he was unaware of any company other than Plaintiffs that sold yellow and black power tools in the marketplace).) Contrary to plaintiff in

---

[6] The evidence at trial revealed that Defendants' gross infringing sales were about $290 million (Trial Tr. at 563:17-20, 809:22-24, 824:2-3, Ex. A), and Plaintiffs' standard gross margins on their DeWalt power tools and power tool accessories is around 40% (*id*. at 243:22-24.) The Court can confirm that the jury's $54 million award of Defendants' profits coincides with Plaintiffs' actual loss through a simple mathematical calculation: $290 million (Defendants' gross sales) x 0.47 (Berger's survey confusion rate) x 0.40 (Plaintiffs' gross margins) = **$54.5 million**. An award of Defendants' profits here is decidedly a surrogate for Plaintiffs' actual injury.

*Finlay*, Plaintiffs here have presented "evidence that [Defendants] profited at [Plaintiffs']

expense." *See* 76 F. Supp. 2d at 873.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' renewed motion to strike

Plaintiffs' jury demand.

Respectfully submitted,

*/s/ Kyle D. Wallenberg*
Raymond P. Niro, Jr.
Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLC
200 W. Madison St., Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
rnirojr@niro-mcandrews.com
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 18, 2015 the foregoing

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED
MOTION TO STRIKE PLAINTIFFS' JURY DEMAND**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification
of such filing to the following counsel of record.

J. Aron Carnahan
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, 22nd Fl.
Chicago, IL 60606
aron.carnahan@huschblackwell.com

Henry S. Alford
Scot A. Duvall
Brian P. McGraw
Dennis D. Murrell
Robert J. Theuerkauf
MIDDLETON REUTLINGER
401 S. Fourth Street
2500 Brown & Williamson Tower
Louisville, KY 40202
HAlford@MiddletonLaw.com
SDuvall@MiddletonLaw.com
BMcGraw@MiddletonLaw.com
DMurrell@MiddletonLaw.com
RJT@MiddletonLaw.com

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

*/s/ Kyle D. Wallenberg*
Attorney for Plaintiffs
NIRO McANDREWS, LLC