IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., <br><br> Plaintiffs, <br><br> v. <br><br> POSITEC USA INC. and RW DIRECT, INC. <br><br> Defendants. | Case No. 1:11-cv-05426 <br><br> Judge Robert M. Dow, Jr. <br> Magistrate-Judge Geraldine Soat Brown |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ III

II.    A TRIAL COURT MUST NOT SUBSTITUTE ITS OWN VIEW
       OF THE EVIDENCE IN PLACE OF THE JURY'S ....................................... 1

III.   THE JURY VERDICT OF LIKELIHOOD OF CONFUSION IS
       SUPPORTED BY AN AVALANCHE OF EVIDENCE .................................. 1

       A.     The Seven Factor Test ................................................................. 3

              1.     Similarity of Trade Dress ................................................. 4

              2.     Similarity of Products ..................................................... 10

              3.     Area and Manner of Concurrent Use ............................... 16

              4.     Degree of Care ................................................................ 19

              5.     Strength of Plaintiffs' Trade Dress ................................. 21

                     a.     Amount and Manner of Advertising ........................... 23

                     b.     Volume of Sales ....................................................... 25

                     c.     Length and Manner of Use ....................................... 25

                     d.     Survey Evidence ...................................................... 28

                            (1)     Mr. Berger is a Highly-Qualified,
                                    Reputable Survey Expert ............................... 28

                            (2)     Mr. Berger's Survey Results ......................... 29

                     e.     Weighing Secondary Meaning Factors to Decide
                            Strength of Plaintiffs' Trade Dress .......................... 30

              6.     Actual Confusion ............................................................ 32

                     a.     The Survey Properly Replicated the Retail Environment ........... 33

                     b.     The Survey Correctly Focused-in on the Accused
                            "Sunburst" Packaging .............................................. 35

                     c.     The Survey Results Apply to All of the Defendants'
                            Products in the Accused Sunburst Packaging ................ 36

                     d.     The Survey Results Show a Strong Likelihood of Confusion ...... 37

      e.   A Control Was Not Necessary for This Particular Survey ........... 37

      f.    The Court's Limiting Instructions Remove Any
        Lingering Complaints About the Survey Photo ............................ 39

    7.   Defendants' Intent ..................................................................... 42

    8.   Balance of Likelihood of Confusion Factors ............................................ 48

IV.  THE EVIDENCE PRESENTED AT TRIAL SUPPORTS A VERDICT
   OF TRADEMARK INFRINGEMENT ............................................................. 49

V.  SUBSTANTIAL EVIDENCE SUPPORTS THE JURY VERDICT
   OF WILLFUL INFRINGEMENT ..................................................................... 49

VI.  CONCLUSION ............................................................................................. 49

## TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C 02242,
2013 WL 6839815 (N.D. Ill. Dec. 27, 2013)................................................................ 11, 32, 42

*Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025
(N.D. Ill. July 12, 2001)...................................................................................................... 11

*Artus Corp. v. Nordic Co., Inc.*, 512 F. Supp. 1184 (W.D. Pa. 1981) ......................................... 10

*AutoZone, Inc. v. Strick*, 543 F.3d 923 (7th Cir. 2008).......................................... 4, 11, 22, 42, 44

*Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994) ........................................... 32

*Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901
(W.D. Wis. 2003)................................................................................................................ 27

*CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660 (7th Cir. 2001)......................................... 11, 48

*Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307 (11th Cir.1999).............. 11

*Chattanoga Mfg., Inc. v. Nike, Inc*., 140 F. Supp. 2d 917 (N.D. Ill. 2001) ................................. 25

*E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280 (9th Cir. 1992) ................................... 48

*Eazypower Corp. v. ICC Innovtaive Concepts Corp*., No. 98 C 3189, 2002 WL 31369516
(N.D. Ill. Oct. 18, 2002)................................................................................................ 24, 25

*Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764 (N.D. Ill. 2011) ........................... 32

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc*., 846 F.2d 1079 (7th Cir. 1988)............... 9

*Lally v. City of Chicago*, No. 10 C 5011, 2013 WL 1984422 (N.D. Ill. May 13, 2013)
(Dow, J.)............................................................................................................................... 2

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111 (7th Cir. 1997) ............ 4, 9, 48

*Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046
(Fed Cir. 2012).................................................................................................................... 33

*Munters Corp. v. Matsui Am., Inc.*, 730 F. Supp. 790 (N.D. Ill. 1989) ....................................... 32

*Packman v. Chicago Trib. Co*., 267 F.3d 628 (7th Cir. 2001)....................................................... 3

*Poulter v. Cottrell, Inc*., 50 F. Supp. 3d 953 (N.D. Ill. 2014).................................................... 40

*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174,
   2004 WL 1613563 (N.D. Ill. July 19, 2004) ..................................................... 1, 3, 19

*Reed-Union Corp. v. Turtle Wax, Inc.*, 869 F. Supp. 1304 (N.D. Ill. 1994) .................... 24, 25, 27

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ........................................ 17

*Richardson v. Suzuki Motor Co.*, 868 F.2d 1226 (Fed. Cir. 1989) ................................. 42

*Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931 (7th Cir. 1989) ................................... 2, 9, 32, 47

*Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992) ............. 12, 32

*Sands, Taylor & Wood v. Quaker Oats Co.*, No. 84 C 8075, 1990 WL 251914
   (N.D. Ill. Dec. 20, 1990) *aff'd in part, rev'd in part on other grounds*, 978 F.2d 947
   (7th Cir. 1992) .................................................................................................. 47

*Tdata Inc. v. Aircraft Tech. Publishers*, 2:03-CV-264, 2008 WL 2169353 (S.D. Ohio May 21,
   2008) ............................................................................................................... 40

*Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213 (7th Cir. 1978) .................................... 32

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998) ......................... 27, 42

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001) ........................................ 48

*Ty, Inc. v. Softbelly's, Inc.*, No. 00 C 5230, 2007 WL 734394 (N.D. Ill. Mar. 6, 2007)
   *aff'd*, 517 F.3d 494 (7th Cir. 2008) ..................................................................... 44

*U.S. v. Walsh*, 627 F.2d 88 (7th Cir. 1980) ............................................................. 42

*United States v. Danford*, 435 F.3d 682 (7th Cir. 2006) ............................................ 39

*V & S Vin & Sprit Aktiebolag v. Cracovia Brands, Inc.*, No. 01 C 9923, 2004 WL 42375
   (N.D. Ill. Jan. 5, 2004) ....................................................................................... 33

*VMG Enters. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648 (D.P.R. 1992) ................. 9, 10

*W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269 (10th Cir. 2005) .......... 47

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502 (7th Cir. 1994) ................ 44

*WMH Tool Group, Inc. v. Woodstock Intern., Inc.*, No. 07-CV-3885, 2009 WL 6825247
   (N.D. Ill. Dec. 9, 2009) ....................................................................................... 23

*X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577
   (E.D. Va. 2001) ................................................................................................... 9

<u>Statutes</u>

15 U.S.C. § 1117(a) ............................................................................................ 3

<u>Treatises</u>

3 R. Callman, Unfair Competition and Trade-Marks § 82.1 (2d ed.) ......................................... 32

4 McCarthy on Trademarks § 23:12 ..................................................................... 32

4 McCarthy on Trademarks and Unfair Competition § 24:20 (4th ed.) ...................................... 11

## I.    INTRODUCTION

This case was tried to the jury with almost no objections from Plaintiffs' counsel or Defendants' counsel throughout the entire 1,000-page transcript.  Disputed evidentiary issues were largely resolved by agreed stipulations, which had to be separately numbered due to their size. Defendants were afforded several opportunities to dismiss this case entirely and received considerable attention from this Court prior to trial, including a 77-page ruling on Defendants' massive summary judgment motion on virtually every conceivable issue in the case (Dkt. #93), a 17-page ruling on Defendants' motion to reconsider (Dkt. #121), a 31-page, single-spaced ruling on Defendants' 10 motions *in limine* and 3 *Daubert* motions (Dkt. #192), and more.

Then, at the close of the case, the jury was charged with instructions that were taken almost *verbatim* from the Seventh Circuit Model.

Defendants' post-trial motion now raises objections to Plaintiffs' counsels', Plaintiffs' fact witnesses', Plaintiffs' expert witnesses', this Court's numerous evidentiary rulings, and the jury's ability to follow the Court's instructions and determine the highly-fact intensive issues presented at trial.   According to Defendants, everyone seemingly got everything wrong except for Defendants.

However, when the proper standard for post-trial review is applied along with the controlling decisions from the Seventh Circuit and substantial evidence presented by Plaintiffs to the jury, it is clear that Defendants' motion must be denied in its entirety.

## II.    A TRIAL COURT MUST NOT SUBSTITUTE ITS OWN VIEW OF THE EVIDENCE IN PLACE OF THE JURY'S

The Seventh Circuit has repeatedly cautioned district courts not to substitute their view of the evidence for the jury's determination. *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174, 2004 WL 1613563, at *1 (N.D. Ill. July 19, 2004) ("[w]e cannot second-guess

the jury's view of the evidence"); *Lally v. City of Chicago*, No. 10 C 5011, 2013 WL 1984422, at *1 (N.D. Ill. May 13, 2013) (Dow, J.) ("the Court is not to substitute its view of the contested evidence in place of the jury's determination").

It is particularly important that the Court leave "issues of credibility and weight of evidence to the jury." *Id.* at *1. As set forth in the agreed portion of the Seventh Circuit Model jury instructions in this case: "You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You must decide what weight, if any, you give to the testimony of each witness." (Trial Tr. 1021 (emphasis added).)[1] The jury was instructed to "decide the facts from the evidence in this case. **This is your job and yours alone**." (Trial Tr. 1017) (emphasis added).)

The eight-member jury in this case was attentive and diligent – taking notes, asking witnesses to speak louder or slow down so the jury could understand every part of the testimony, and more. (Trial Tr. 473-474.) Defendants' counsel praised the jury for having "been very attentive" throughout the trial. (Trial Tr. 955.) So, too, for Plaintiffs' counsel. (Trial Tr. 929.)

The jury was an impressive group of conscientious citizens, including an insurance adjuster, a mortgage underwriter, a product manager, a retired civil engineer, and a former construction clerk for Cook County – even though **Defendants** systematically struck every potential juror that had any experience with power tools (Trial Tr. 30; 46-51; 95.) This was not a runaway jury either. Instead of rushing to a verdict on Friday afternoon, the jury thoughtfully decided to reconvene deliberations after the weekend on Monday morning. And, they did not award the full amount requested by Plaintiffs, but rather made careful multimillion-dollar reductions to arrive at $54 million in profits on Defendants' $290 million of willfully infringing

---

[1] Cited portions of the trial transcript are attached hereto as Ex. A.

sales. *See Roulo*, 941-42 ("The jury's verdict of $4.3 million rather than the entire $5 million proposed by the plaintiff is evidence that the jury either apportioned the award or accepted some of [defendant's] other deductions.") (affirming profits award of 75% of gross revenue under § 1117(a) of the Lanham Act).

At bottom, the Court "must view the evidence in the light most favorable to [Plaintiffs], drawing all reasonable inferences in [their] favor." *R.J. Reynolds*, 2004 WL 1613563 at *1. The standard of review impels the Court to uphold the jury's verdict.

## III. THE JURY VERDICT OF LIKELIHOOD OF CONFUSION IS SUPPORTED BY AN AVALANCHE OF EVIDENCE

### A. The Seven Factor Test

In the Seventh Circuit, the question of likelihood of confusion is an ultimate issue of fact, based upon seven highly fact-intensive underpinnings: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another." *Packman v. Chicago Trib. Co.*, 267 F.3d 628, 643 (7th Cir. 2001). As the jury was instructed: "The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion." (Trial Tr. 1030); *Packman*, 267 F.3d at 643 ("No single factor is dispositive, and [the fact-finder] may assign varying weights to each of the factors….").

Defendants argue that there is "no evidentiary basis for the jury's verdict when considering the evidence presented at trial as to the various likelihood of confusion factors." (Defs.' Mot. for Judgment as a Matter of Law, Dkt. #230.) To make this argument, Defendants improperly cite only to the evidence favorable to their position, while omitting all of the evidence favorable to

Plaintiffs.  (Defs.' Mot., Dkt. #230, PageID #: 6883-6886, constituting Defendants' entire 4-page analysis of the likelihood of confusion factors).

### 1.    Similarity of Trade Dress

To determine if the accused trade dress is similar to Plaintiffs', the fact-finder should consider the trade dresses "as a whole."  *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997) (the court must not "focus on minor stylistic differences to determine if confusion is likely") (*See* Court's S.J. Opinion, Dkt #93, Page ID #: 3262.)

The evidence at trial overwhelmingly showed the confusingly similar overall impression between Plaintiffs' and Defendants' trade dress:



(PX028.)  The Court instructed the jury: "You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life."  (Trial Tr. 1020.)  The jury was free to apply their own common sense to conclude that these products are confusingly similar in overall appearance.  (Trial Tr. 1017-1022.)

As the Court held on summary judgment, a "reasonable trier of fact could find that the trade dresses are confusingly similar on the basis of the photographs [presented]" (Dkt #93, PageID #: 3262), including specifically the Costco photo above (*id.* at PageID #: 3224), submitted to the jury as PX028.[2] Ms. Fischer likewise testified:

> Q. Could you describe what's depicted here?
>
> A. Yes. So this is in the Costco Warehouse store. And as I came up on it, I actually was very confused. You could see the DeWalt packaging, you know. I was looking for the bank of yellow and black. And I see the bank of yellow and black, and as I come up upon it, you know, I was confused.
>
> You know, I'm the brand manager, and I'm looking at this thing, and I just can't get my head around how these things are intermingled sitting right next to each other. The boxes are the same size. You know, ***looking so very similar***.

(Trial Tr. 263) (emphasis added). During questioning by Defendants' counsel on cross-examination, Ms. Fischer confirmed again that the accused Sunburst "package looks yellow and black." (Trial Tr. 364.) "It looks yellow and black." (Trial Tr. 365.) "I'm a consumer. I'm also a brand expert. I was confused. When I walked up on that Costco store, I was confused as to what I was looking at." (Trial Tr. 368.)

Here are more photographs (from a Lowe's store) entered into evidence at trial:

---

[2] Defendants' own witness, Mr. Taylor, testified that "[p]ictures are worth a thousand words." (Trial Tr. 627.)

 

(PX006-004 and PX006-005.) These photographs represent a "national plan-o-gram" so "this particular set-up is going to be in most of the Lowe's stores that you might walk into across the country." (Trial Tr. 265, 271.) Ms. Fischer's impression upon seeing this display at Lowe's – which the jury was entitled to accept – is "[t]hat it was absolutely confusing." (Trial Tr. 265.) In fact, "the Lowe's buyer had come to [Plaintiffs] very concerned that there would be confusion, so, you know, right from the beginning of the inception of the national plan-o-gram, the Lowe's buyer was – did have those very, very concerns." (Trial Tr. 282.) As Ms. Fischer testified further:

Q. And did you take this photograph?

A. Yes, I did.

Q. What's shown here?

A. This is a picture I took, you know, a little bit further out, so you could see a little bit more of the visual context. And, again, the accessories are intermingled, and then down below you can see that the Rockwell product is sandwiched directly between two DeWalt products, and then there's more Rockwell products on the bottom.

\*\*\*

- 6 -

Q. And both of the circled images I have there, those are both DeWalt products?

A. Both DeWalt products, yes.

Q. And sandwiched in between -- what -- whose products are those?

A. That's the Rockwell product.

(Trial Tr. 265-266.)  Ms. Fischer described another photograph taken at a Lowe's store showing "a selection of yellow and black boxes, and it has the Rockwell tools right next to the DeWalt tools" (Trial Tr. 269-270):



(PX005-002.)  The photo on the front of the sunburst package has "a tool that looks yellow and black."  (Trial Tr. 363.)  Ms. Fischer testified that "as similar as these products are," there is no question that confusion is "happening in the marketplace either through [consumers] thinking that it was licensed or somehow they're affiliated."  (Trial Tr. 283.)  Because the products "looked so similar on the shelf … [p]eople likely are picking this [sunburst package] up thinking there is some sponsorship, licensing, some kind of affiliation with the DeWalt that is allowing this package to be in the marketplace."  (Trial Tr. 368.)  Ms. Fischer confirmed that not only is there a likelihood

of confusion, but "I am *sure* that people are confusing these products." (Trial Tr. 367) (emphasis added); (*see also* Trial Tr. 285: "[a]bsolutely. I think [confusion] probably is happening").[3]

Even Defendants' own document describes their infringing packaging as "yellow" and "black" – no other colors mentioned (DX-076.0003, Ex. B), which is consistent with the testimony of Defendants' witnesses:

> Q. And what you're saying is distressed green is actually under the pantone system called black PMS7M, you're aware of that?
>
> A. I am now.
>
> Q. Okay. So the yellow and black sunburst packaging, you understand that's -- those are the accused products in this case?
>
> A. Yes.
>
> Q. And you calculated gross sales in the United States of this yellow and black Rockwell packaging, which you showed to the jury, right?
>
> A. Yes.
>
> Q. And what was the gross sales number, roughly?
>
> A. 290 million, I believe.

(Trial Tr. 823-824.)

---

[3] Defendants assert (incorrectly) that Ms. Fischer's testimony on secondary meaning and likelihood of confusion lacks foundation. (Dkt #230, PageID #: 6876.) At no point did Defendants' counsel object, move to strike, or request a limiting instruction as to her testimony on these issues. Moreover, on cross-examination, Defendants' counsel repeatedly questioned Ms. Fischer, and elicited testimony from Defendants' own witness, Mr. Taylor, on these same matters. (*See, e.g.*, Trial Tr. 284-285, 367-368, 659 (Defendants' counsel asked Mr. Taylor: "As the VP of marketing, what is your opinion as to the level of recognition of the Rockwell brand among consumers?"), 720-721.) In any event, Ms. Fischer's testimony on consumer impressions is "based on a proper foundation" because she testified "in terms of [her] belief or understanding." (Dkt #192, PageID #: 5622.) Ms. Fischer also had a "rational basis" for her belief (Dkt #192, PageID #: 5622) – she has worked in graphic design and brand marketing with respect to DeWalt for more than a decade (Trial Tr. 180-181), and personally visited and observed the retail layout of the parties' products and packaging in several stores across the country, *infra*. Further, Defendants' contention that Ms. Fischer's testimony was "obviously bias" and "self-serving" (Dkt #230, PageID #: 6876-6879) is meritless considering they had *two* live employee witnesses that testified for Defendants, and credibility is for the jury to decide in any event.

Aside from pointing to minor stylistic differences, which is improper as a matter of law, *Meridian*, 128 F.3d at 1115, Defendants argue that the trade dresses are dissimilar because each party labels its packaging with "DeWalt" or "Rockwell." (Dkt #330, PageID #: 6884-88.) When two trade dresses are otherwise very similar, such an argument has been soundly rejected in the case law. *Roulo*, 886 F.2d at 937 (defendant pointed to a number of "dissimilarities" between the products in appearance, including defendant's brand name on its products; but "[a] side-by-side comparison, however, reveals that these differences are easily overlooked…"). *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc*., 846 F.2d 1079, 1088 (7th Cir. 1988) (use of a house mark in conjunction with an allegedly infringing mark is "a smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's name" because consumers "would necessarily believe that the [plaintiff] had licensed, approved or otherwise authorized the defendants' use of the [plaintiff's] name"); *VMG Enters. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 660 (D.P.R. 1992) ("The fact that the company name is in the package does not generally excuse infringement and might even increase confusion by linking a different house mark to plaintiff's good will, since consumers might think there is a relationship between the parties … [T]he use of the [defendant's] name in the package may actually *add* to the confusion." (emphasis in original)); *X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 624 (E.D. Va. 2001) ("[i]f having a company name on the package were dispositive, there could be no packaging trade dress claims").

"In fact, labeling may increase confusion where trade dresses are otherwise similar because consumers might infer a relationship between the parties; for example, they might infer that a plaintiff has purchased a defendant or that a plaintiff has licensed, approved or otherwise authorized the defendant's use of its trade dress." (Dkt #93, PageID #: 3263-3264 (holding that "[h]ere, a reasonable trier of fact … could conclude that purchasers who notice the different labels

would infer a relationship between" Plaintiffs and Defendants), citing *VMG Enters.*, 788 F. Supp. at 660); *Artus Corp. v. Nordic Co., Inc.*, 512 F. Supp. 1184, 1191 (W.D. Pa. 1981) ("A dissimilarity in names will often prove ineffective in preventing confusion caused by the general similarity in appearance of the product").

In all, the striking similarity of the trade dresses <u>alone</u> presents compelling evidence supporting the unanimous jury verdict of likelihood of confusion.

## 2. Similarity of Products

Quoting with approval the Seventh Circuit's *AutoZone* decision, this Court held that the: "inquiry in comparing the two products is not whether they are interchangeable, but whether the parties' products are the kind the public might very well attribute to a single source (the plaintiff)." (Dkt #93, PageID #: 3264.) The agreed Seventh Circuit Model Jury instruction given to the jury likewise stated that the issue is "whether Defendants and Plaintiffs use the yellow and black color combination on the same ***or related*** products and packaging." (Trial Tr. 1029) (emphasis added).

DeWalt has thousands of different power tools and accessories, and the jury was correct in finding that all of Defendants' power tools and accessories are either "the same" or "related" to the expansive DeWalt line – often times interchangeably:

> Q. You mentioned that a large part of Rockwell sales, at least in terms of unit volume, is through accessories --
>
> A. Yes.
>
> Q. -- is that right?
>
> A. Yes.
>
> Q. Like the Rockwell Sonicrafter accessory I'm holding in my hand?
>
> A. Yes.
>
> Q. And this Rockwell accessory, these are universal items, they fit other people's tools; is that right?

A. That's correct.

Q. You can use these accessories with a DeWalt tool or anyone else's tool, correct, they're universal?

A. That's my understanding, yes.

 (Trial Tr. 834.)  Many of Defendants' accused power tools and accessories (sold in yellow and black sunburst packaging) are identical to Plaintiffs' 5,000 DeWalt power tools and accessories (sold in yellow and black DeWalt packaging), and all of Defendants' products are at least "related" to Plaintiffs', thereby supporting the jury's finding of likelihood of confusion under the Model Instructions' reference to the "same or related products and packaging" (Trial Tr. 1029) as explained in *AutoZone*, *supra*.  Defendants' argument that their JawHorse or oscillating tools are not <u>identical</u> to Plaintiffs' products finds no support in logic or the controlling authority, and it reads the word "related" right out of the jury instructions and case law.  *Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025, at *13 (N.D. Ill. July 12, 2001) ("the senior user's rights may extend into uses in 'related' product or service markets.") (quoting *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310-1312 (11th Cir.1999) ("raw shrimp is certainly different from seafood gumbo and shrimp cakes, crawfish cakes, lobster cakes, and crab cakes; on the other hand, all of these are food products and are related to seafood. The very existence of the 'related goods' or 'natural expansion' doctrine contemplates that the goods need not be exactly alike, and that the senior user may reasonably expand into related goods.")); 4 McCarthy on Trademarks and Unfair Competition § 24:20 (4th ed.) ("The senior user's use of the mark CAE on testing and measuring equipment could be naturally expanded into the junior user's field of air pollution testing and monitoring services.") (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660 (7th Cir. 2001));  *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C 02242, 2013 WL 6839815, at *4 (N.D. Ill. Dec. 27, 2013) ("[B]ecause the parties' products do

overlap and because they overlap in the same retail-sales markets, it is reasonable to expect that consumers would be confused about the source of Defendants' furniture."); *Sands, Taylor & Wood Co. v. The Quaker Oats Co*., 978 F.2d 947, 958 (7th Cir. 1992) (it is important to protect the trademark "owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future").

For almost 20 years before Defendants even existed, Plaintiffs were selling drills, saws and a multitude of different power tools and accessories in DeWalt's yellow and black color scheme, then Defendants launched scores of drills, saws and other power tools and accessories – the same as DeWalt's – in yellow and black sunburst packaging, for example:

| Name | DeWalt 20V Lithium-Ion Brushless Drill/Driver | Rockwell 20V Lithium-Ion Brushless Drill & Driver |
|---|---|---|
| Exhibit # | PX152 | PX207 |
| Photo |  |  |
| Name | DeWalt Hammer Drill | Rockwell Hammer Drill |
| Exhibit # | PX154 | PX193 |
| Photo |  |  |

- 12 -

| Name | **DeWalt 18V Cordless Circular Saw** | Rockwell 18V Cordless Circular Saw |
|---|---|---|
| Exhibit # | PX002 | PX232 |
| Photo |  |  |
| Name | **DeWalt 18V Cordless Impact Driver** | Rockwell 18V Cordless Impact Driver |
| Exhibit # | PX019 (zoomed in tool) | PX203 |
| Photo |  |  |
| Name | **DeWalt 4-1/2-inch Angle Grinder** | Rockwell 4-1/2-inch Angle Grinder |
| Exhibit # | PX151 | PX235 |
| Photo |  |  |

| Name | DeWalt 5-inch Random Orbit Sander | Rockwell 5-inch Random Orbit Sander |
|---|---|---|
| Exhibit # | PX061-005 (zoomed in tool) | PX233 |
| Photo |  |  |
| Name | DeWalt Battery 2-Packs | Rockwell Battery Pack |
| Exhibit # | PX017-004 | PX249 |
| Photo |  |  |
| Name | DeWalt 18V 1/2-inch Cordless Drill/Driver | Rockwell 18V 1/2-inch Cordless Drill Driver |
| Exhibit # | PX061-002 (zoomed in tool) | PX195 |
| Photo |  |  |

| Name | **DeWalt Saw Blade** | **Rockwell Circular Saw Blade** |
|---|---|---|
| Exhibit # | PX008 | PX008 |
| Photo |  |  |
| Name | **DeWalt Cordless Jigsaw** | **Rockwell Cordless Jigsaw** |
| Exhibit # | PX061-006 (zoomed in tool) | PX222 |
| Photo |  |  |
| Name | **DeWalt 20V Hammer Drill/Impact Driver Combo Kit** | **Rockwell 20V Drill/Impact Driver Combo Kit** |
| Exhibit # | PX153 | PX219 |
| Photo |  |  |

- 15 -

| Name | DeWalt Reciprocating Saw | Rockwell Reciprocating Saw |
|------|--------------------------|----------------------------|
| Exhibit # | PX061 (zoomed in tool) | PX226 |
| Photo |  |  |

These are just a few examples of identical tools for all accused products. For the few tools that are not identical, the jury correctly resolved in favor of Plaintiffs that they are clearly "related" to DeWalt's line. This factor weighs heavily in Plaintiffs' favor.

### 3. Area and Manner of Concurrent Use

Plaintiffs and Defendants sell their products in the <u>same</u> stores, in the <u>same</u> section, on the <u>same</u> shelves, to the <u>same</u> customers:

> Q. Okay. And are you familiar with the purchasers that Rockwell gears its products towards?
>
> A. It says right on their website that it's geared towards professionals and serious do-it-yourselfers. And, again, they're available in the same outlets that we are. You know, a lot of the times, side by side in Lowe's, it's going to be the same -- same user.

(Trial Tr. 201.) With respect to just the Lowe's stores, Ms. Fischer further testified, without objection:

> Q. Now, based on your marketing experience in viewing those photographs and the layouts at Lowe's, do you have a belief as to whether consumers are likely to be confused as to the source, sponsorship or affiliation between the two companies?
>
> A. Absolutely.
>
> Q. And what's your view?
>
> A. That they are confusing. You know, we spend a lot of money on our yellow and black billboard to get people to our DeWalt areas of the store. If something happens to be sitting right next to our product that is dressed in yellow and black, the assumption would be that these products may be affiliated in some way.
>
> You know, we have policed the marketplace so aggressively that nobody else is out there. So the fact that these tools are sitting next to each other, we must have in

- 16 -

some way, shape or form, allowed this to happen. Whether it's through licensing, whether we maybe manufacture this tool for Rockwell and brand it as one of DeWalt's other brands. The assumption would be yellow and black is DeWalt. This is yellow and black, it must be somehow related to DeWalt.

(Trial Tr. 272-273.)  Mr. Berger also visited Lowe's stores throughout the Chicagoland area and confirmed that Defendants' yellow and black products are "intermingled" with DeWalt products on the same shelves.  (Trial Tr. 408-411, 430, 497, 500-507.)

Again, the agreed upon Seventh Circuit Model Instruction given to the jury identified this factor as "whether [P]laintiffs['] and Defendants['] products and associated packaging are likely to be sold *in the same or similar stores* or outlets *or advertised in similar media*."  (Trial Tr. 1029) (emphasis added).  Far beyond being sold in "similar stores," Plaintiffs' and Defendants' products at issue are sold on the same shelves – often mixed together and interspersed on the same shelves.  (Trial Tr. 263, 265-266.)

As this Court held on summary judgment with respect to Plaintiffs' and Defendants' products in this case:

> Common sense also suggests that stores would display similar products in the same general area, regardless of their brand name, as a convenience to their customers. **When similar products with similar trade dresses are sold in the same retail stores, let alone on the same shelves, a trier of fact could find likelihood of confusion**.

(Dkt #93, PageID #: 3265) (emphasis added).[4]  That is ***exactly*** what the trier of fact found in this case.

---

[4] As Defendants acknowledge, the "standard for granting judgment as a matter of law mirrors that standard for the granting of summary judgment," making this Court's summary judgment decision particularly applicable here.  (Defts' Mot. for JMOL, Dkt #230, PageID #: 6874), citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 137 (2000).

As to the advertising portion of this factor, both Plaintiffs and Defendants advertise in the same channels, including print, trade shows, in-store merchandising and more, further supporting a finding of likelihood of confusion. (Trial Tr. 635, 638, 642, 645.)

Defendants' motion ignores <u>all</u> of this evidence, and merely points to the fact that Plaintiffs do not specifically conduct <u>paid</u> television advertising, but even on that small point the testimony conflicted; for example, Ms. Fischer explained how DeWalt achieves ***50 billion impressions on television each year*** just through DeWalt's sports promotions:

> A. When the, you know, let's call it the outfield signage appears on television. Suppose somebody is going to make a catch and they're running at the sign; so it's a formula where they take the amount of time that that logo is on television, and then they – based on the number of people that they have viewing that event, they have a calculation. So an impression is a person that has seen the -- they anticipate has seen that logo on television.
>
> Q. And how many impressions are generated, I guess, through that activity on television per year for DeWalt?
>
> A. Just for DeWalt it's about 50,000,000,000 impressions. And that's actually gone up this year. The English Premier League is being shown on cable right now, so that's gone up 20 percent just this year through that sponsorship.

(Trial Tr. 245.) The DeWalt yellow and black NASCAR constantly appears on television too. (Tr. 321.) As Ms. Fischer explained during cross-examination:

> [A.] Whether you're a professional, a DIYer, weekend warrior or a consumer, you watch television.
>
> So to say that our audience doesn't watch television, if they didn't watch television, we wouldn't sponsor NASCAR. I mean, that's where those 50 billion impressions come from.
>
> Q. I'm not saying that they don't watch television. I'm saying you don't use television because you don't think it's the best way to reach your particular customers.
>
> A. ***We do have our brands on television***.

(Trial Tr. 321) (emphasis added). Based on the above testimony, it is clear that a consumer sitting at home watching television will likely be exposed to both Plaintiffs' and Defendants' products.

As Defendants' counsel was forced to concede: "Now, we are sold in similar stores, without question, some different stores, but Lowe's is our biggest account, and [Plaintiffs] sell in Lowe's. That's one [factor] that weighs in [Plaintiffs'] favor." (Trial Tr. 978.) Indeed, the "Area and Manner of Concurrent Use" heavily favors Plaintiffs, particularly since the products are sold in the same retail stores intermingled on the same shelves, *supra*. (Dkt #93, PageID #: 3265: "When similar products with similar trade dresses are sold in the same retail stores, let alone on the same shelves, a trier of fact could find likelihood of confusion.").

### 4. Degree of Care

There was conflicting evidence on the degree of care, which required the jury to weigh the evidence and the credibility of the witnesses and resolve this fact issue for themselves. This cannot be the subject of second-guessing post-trial. *R.J. Reynolds*, 2004 WL 1613563 at *1.

Specifically, Ms. Fischer testified that Plaintiffs' customers are often rushed, making the yellow and black color of DeWalt's packaging a "big trigger" for their customers:

> A. ***Yeah. Absolutely. In fact, this is a big trigger for our shopper, because what happens is when you see in the retail store, and you're in a hurry, you tend -- or you're a brand loyalist***, so, you know, you already are either a Milwaukee guy or a DeWalt guy. ***You tend to come in and quickly scan for the brand color.*** So these billboards, again, that you see at retail are strongly aligned with the colors that most of the major tool manufacturers use, you know, on their tools, on their packaging, reinforcing their identity, and making the shopping experience much easier for people at retail.

(Trial Tr. 231) (emphasis added); (*see also* Trial Tr. 338: "Well, I do a lot of accessories research and the packaging is extremely key in that."). Mr. Berger likewise testified based on his marketing experience and his own observations that for consumers approaching a store shelf, "the way the eye would see it" is by focusing in on the packaging alone. (Trial Tr. 508.)

Defendants introduced the accused packaging in "late 2009 or early 2010 … because Positec was seeking a visually brighter package that incorporated an eye-catching sunburst

background…." (Trial Tr. 597.) A number of different purchasing scenarios were presented at trial: some consumers in the marketplace might "just look[] at the packaging" when making a purchase (Trial Tr. 429); construction crews could send a laborer to a store to quickly replace the "yellow and black" DeWalt tool on the jobsite (Trial Tr. 431); Defendants' attorney in opening presented a scenario of a husband buying the tool as a gift for his wife (Trial Tr. 156-157); "the lady that was going out to buy her brother a DeWalt power tool, did she research it? No…" (Trial Tr. 336); "[d]oes somebody, you know, that's doing a job on their house have a tool that breaks down and they need to get a replacement in a hurry? Absolutely." (Trial Tr. 329); "[d]oes a weekend warrior have all weekend to spend researching the tool, or do they need to get the job done?" (Trial Tr. 329.)

Defendants' own witness admitted that a "vast majority" of Defendants' sales of infringing products occur over the 4-6 week Christmas selling season (Trial Tr. 645-646), indicating that the products are bought as gift items, creating a "hockey stick" effect on their financial charts:

> [Q.] A significant portion of your customers buy your products at Christmastime as a gift to give to someone else, is that fair, a significant portion?
>
> A. Yes.
>
> Q. And that happens at Christmastime and also at Father's Day, correct?
>
> A. Yes.

(Trial Tr. 734); (*see also* Trial Tr. 732: the Christmas period is a "very important time" for Defendants.) The degree of care by a Christmas shopper – who is likely in a rush with a cart full of items – or a child buying a gift for their father on Father's Day is extremely low, favoring a finding of likelihood of confusion.

Defendants pointed to a single piece of research from over 5 years ago to argue (throughout the trial) that professional power tool users go through a list of steps and an entire process –

including researching the product, handling and inspecting a physical tool in the store and the like, but the only witness actually involved with the research (Ms. Fischer) strongly questioned the methodology as too clinical and **not** reflecting the real world. (Trial Tr. 324, 327-336, 365-366, 339-340.) The degree of care was a hotly contested factual issue that was argued to the jury and presented to them for decision. Notably, Defendants claim that only 2-3% of their products are purchased by professionals, allowing the jury to disregard the 2010 study altogether. (Defs.' Ex. 4, Dkt #230-5.)

Nonetheless, even assuming for the sake of argument "that this factor weighs in favor of Defendants," which it doesn't, this court has already found that "the trier of fact still could find in favor of Plaintiffs [on likelihood of confusion] based on an assessment of the remaining factors." (Dkt #93, PageID #: 3265-3266.)

### 5.    Strength of Plaintiffs' Trade Dress

The **only** marketing expert to testify at trial, Mr. Berger, stated without qualification that Plaintiffs' yellow and black trade dress is "more than famous, it's almost iconic, at least among its own target market, iconic meaning similar to the McDonald's golden arches or Nike Swoosh. I mean, [there's] really big-time, big-time notoriety there." (Trial Tr. 404.) This evidence is not disputed. In fact, Mr. Berger has been following the DeWalt yellow and black "phenomenon" for the past 20 years and expressed the opinion (independent of his surveys) that Plaintiffs' trade dress is beyond strong, beyond famous. (Trial Tr. 404, 419.) In connection with his general marketing experience and work on the DeWalt case in 1996, Mr. Berger has been knowledgeable about this "for a long time" and "knew that this sudden impact was just an amazing thing," with consumers associating yellow and black with DeWalt "quickly after its launch" in 1992. (Trial Tr. 407-408, 419.) Since that time, DeWalt has maintained and even "increased" the strength of its trade dress (Trial Tr. 406-408), to the point where Mr. Berger has "never seen anything like [it]" – the

predominance of Plaintiffs' trade dress is "strictly off the charts, incredibly high." (Trial Tr. 403.) Mr. Berger's description of the tool aisles at the Lowe's stores he visited further underscores the strength of Plaintiffs' trade dress in the market:

> Q. So when you visited the retail location, I think you said you went to several Lowe's, describe what you saw when you got to the tool aisle.
>
> A. Well, you see this, when you get into the tool department and you see this **big wave of yellow and black**, yellow primarily and that's the Black & Decker and it **shows the dominance of Black & Decker to the industry**, generally in the store, the amount of shelf space is dependent on the market, on the market share. So you've got a lot of yellow in that store.
>
> And then you start looking at the shelves and you see, you know, shelf after shelf of products in yellow, in yellow and the yellow and the black. **So you see a major presence in these stores of Black-- of DeWalt**.

(Trial Tr. 418-419) (emphasis added).

Defendants presented no marketing expert of their own to rebut any of this evidence or provide any conflicting opinion for the jury to consider. In fact, Defendants' Vice President of Marketing, Mr. Taylor, candidly admitted that yellow and black packaging is DeWalt's "**iconic look**." (Trial Tr. 714-715) (emphasis added).

In addition to this direct testimony about the strength of Plaintiffs' trade dress, the jury was instructed to consider the following secondary meaning elements, which also weigh **heavily** in Plaintiffs' favor: (a) amount and manner of advertising; (b) volume of sales; (c) length and manner of use; and (d) consumer surveys. (Trial Tr. 1027.) *See also AutoZone*, 543 F.3d at 933 (the stronger the trade dress, "the more likely it is that encroachment on it will produce confusion"); *WMH Tool Group, Inc. v. Woodstock Intern., Inc*., No. 07-CV-3885, 2009 WL 6825247, at *7

(N.D. Ill. Dec. 9, 2009) (secondary meaning is "highly fact intensive, requiring consideration of multiple factors"). [5]

### a. Amount and Manner of Advertising

Since the formal launch of the yellow and black DeWalt line in 1992, Plaintiffs' advertising and promotion has been sweeping, continuous and massive in scope. (Trial Tr. 193-201, 227-252.) Specifically, the yellow and black family of DeWalt products has been advertised and promoted by Plaintiffs in many ways, including:

- Swarm teams of sales representatives from 1992 through the present, wearing yellow and black clothing and driving yellow and black vans with yellow and black tools, performing DeWalt demonstrations on job sites and at retail stores (Trial Tr. 193-201, 227) (*see* PX108-115, Ex. C);

- Sponsorship of the DeWalt NASCAR racing team, with the DeWalt yellow and black car and pit crew, at a cost of $50 million of the past 20 years (Trial Tr. 234-236) (*see* PX088, Ex. D);

- Standard advertising, merchandising and promotional giveaways (Trial Tr. 236);

- Media events (Trial Tr. 239-241) (DeWalt video shown during trial, PX104);

- Sponsorship of Major League Baseball teams, Professional Bull Riding, and FC Barcelona soccer, at a cost of $6-8 million per year for DeWalt alone, ***creating 50 billion television impressions per year*** (Trial Tr. 245-246);

- Print ads, in-store merchandising, boxing promotions, DeWalt yellow and black payback promotion, specifically featuring DeWalt's yellow and black packaging, consisting of over 6,000 separate promotions (per year) with hundreds of thousands of individual flyers per promotion (PX017-PX022, Ex. E; PX061-PX062, Ex. F) (Trial Tr. 252.) Below is a representative example of just one promotional item from 2003:

---

[5] To limit the already substantial amount of redundancy in the post-trial briefing, this section addresses Defendants' arguments regarding secondary meaning and the strength of Plaintiffs' trademarks/trade dress for likelihood of confusion. (Dkt. #230, PageID #: 6880 – 6881, 6885, 6902 – 6904.)



(PX017, Ex. E);

- Premium Program with distribution of numerous yellow and black promotional items beginning in 1992 (Trial Tr. 227-228) (PX105, Ex. G);

- Free recognition in Business Week, May 10, 1998, referencing "DeWalt's bold yellow and black color scheme for its packaging" (Trial Tr. 238), and the 1995 Harvard business school case study on Operation Sudden Impact – a "ground-breaking launch that got a lot of attention in the business community" (Trial Tr. 238); and

- The extensive advertising and promotion over many years rendering the DeWalt yellow and black colors as "priceless" – equaling the golden arches to McDonald's and the swoosh to Nike (Trial Tr. 238-239) – and achieving an overall net promoter score of 69 percent for DeWalt products, which rivals the 65-70 percent for Apple products (Trial Tr. 239).

For context, the Northern District of Illinois denied summary judgment where plaintiff had $1 million in advertising and $3.9 million in sales, even though plaintiff had no consumer survey. *Eazypower Corp. v. ICC Innovtaive Concepts Corp.*, No. 98 C 3189, 2002 WL 31369516, at *6-7 (N.D. Ill. Oct. 18, 2002); *see also Reed-Union Corp. v. Turtle Wax, Inc.*, 869 F. Supp. 1304, 1309 (N.D. Ill. 1994) (fifteen years of advertising "with expenditures of over one million dollars each of those years" contributed to finding of secondary meaning). The amount and manner of DeWalt advertising shatters the legal requirements for a very strong trade dress.

### b.    Volume of Sales

Again, to provide some factual and legal context for this issue, total sales volumes of $16 million have been held sufficient circumstantial evidence to support a finding of secondary meaning. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 924 (N.D. Ill. 2001); *see also Eazypower*, 2002 WL 31369516 at *6-7 ($3.9 million in sales); *Reed-Union Corp.*, 869 F. Supp. at 1309 (finding that "remarkable growth" in sales after product's introduction contributed to finding of secondary meaning).

In comparison, DeWalt's sales volumes of yellow and black power tools, accessories and packaging support not only secondary meaning, but a level of strength appropriately characterized as famous or iconic:

- In 1992, DeWalt achieved $120 million in sales of yellow and black power tools in the United States. (Trial Tr. 242-243.) The line consisted of 33 separate power tool products. (Trial Tr. 189, 242-243.)

- By 2003, DeWalt's yellow and black power tools and accessories surpassed the $1 billion mark annually. (Trial Tr. 243.)

- Currently, DeWalt has $3 billion worldwide (with $1.5 billion in the U.S.) for yellow and black DeWalt power tools and accessories. (Trial Tr. 185, 243.) This amounts to 12-14 million actual, physical yellow and black tools "coming off the line every year." (Trial Tr. 185-186.) With accessories, that number grows exponentially larger. (Trial Tr. 186.)

As far as different DeWalt SKU's, there are "about 5,000 individual power tools or accessories that go to market under the DeWalt brand." (Trial Tr. 186.) Unsurprisingly, DeWalt has become the "flagship brand" of the entire Stanley, Black & Decker organization. (Trial Tr. 182).

### c.    Length and Manner of Use

In early 1992, Plaintiffs launched their new line of DeWalt power tools having a distinctive yellow and black color scheme. (Trial Tr. 188-194.) This was a unique look that gave DeWalt a "clear distinction in the marketplace," as no other company in the entire industry had yellow and

black colors for any power tools, power tool accessories, or packaging. (Trial Tr. 188, 236-237, 254.) From the outset, DeWalt has used a consistent yellow and black color scheme for all of its power tools, power tool accessories and packaging. (Trial Tr. 185, 232.) In fact, Plaintiffs' internal documentation from September 1992 references DeWalt's "quickly-becoming-famous color" and the plan to "build awareness quickly and consistently" in the yellow and black color scheme. (Trial Tr. 228.) The DeWalt launch was called "Operation Sudden Impact" with the yellow and black colors being a core aspect of the overall marketing strategy. (Trial Tr. 189-191.) From the beginning, "the strategy [was] to create packaging that reinforces the user's purchase decision[s]" with yellow packages having "black type and illustrations." (Trial Tr. 191.) Indeed, the consistent yellow and black color scheme is "part of [DeWalt's] core" and "part of [DeWalt's] DNA" that runs through "absolutely everything that [DeWalt does] as an organization." (Trial Tr. 192.) This "includes packaging, swag, trucks, advertising…." (Trial Tr. 192, 227.)[6]

DeWalt has gone from 33 yellow and black power tool products and $120 million in sales in 1992 to over 5,000 yellow and black power tools and accessories with $3 billion in sales currently. (Trial Tr. 186, 189, 242-243.) Most notably, Plaintiffs' use of yellow and black has been ***exclusive*** in the marketplace for power tools, power tool accessories and packaging due to Plaintiffs' extensive policing efforts:

> [Q.] Has Black & Decker's use of yellow and black colors been exclusive in the marketplace for power tools and power tool accessories? The use of yellow and black?

---

[6] Defendants raise the exact same "articulation" requirement (Defs.' Mot, Dkt. #230, PageID #: 6895 – 6902) already ***considered*** and ***rejected twice*** by this Court, holding that Plaintiffs have consistently described their trade dress as "a yellow and black color combination appearing on power tools, power tool accessories, and … packaging," which is "far more specific than the elements of the trade dress" at issue in Defendants' Second Circuit case law. (Dkt. #93, PageID #: 3255); (*see also* Dkt. #121 (denying Defendants' motion for reconsideration).) The evidence at trial was fully consistent with this Court's prior ruling on this issue.

A. Yes. Yes. We've had to police it. Right? You know, if you're going to assert rights to a color, you know, you need to go out there and make sure that you are taking care of it.

*** 

[Q. H]as there been anyone else that used yellow and black next to DeWalt over the last 20 years since introduction?

A. Other than Rockwell, no.

(Trial Tr. 253-254); (*see also* Trial Tr. 272: "[w]e have policed the marketplace so aggressively that nobody else is out there….")  These extensive (and successful) policing efforts were presented to the jury largely by stipulation.  (Trial Tr. 255-260.)  (Dkt #198.)  Defendants' own witness, Mr. Tellefsen, confirmed that "other than DeWalt" he was not aware of any yellow and black power tool products or packaging in the marketplace.  (Trial Tr. 822-823.)  This is significant testimony because Mr. Tellefsen worked in the tool industry as the "marketing controller" or "controller for [the] marketing group" at Irwin Industrial Tools, beginning in 2002 until he joined Positec in July 2009, yet he couldn't identify any yellow and black power tools or packaging in the market during that timeframe other than DeWalt.  (Trial Tr. 784-789, 821-823.)

Plaintiffs' twenty-plus years of continuous nationwide, exclusive use of yellow and black colors on its DeWalt power tools, accessories and packaging heavily favors a finding of secondary meaning and an incredibly strong trade dress.  *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295-96 (7th Cir. 1998) ("Under the Lanham Act, five years' use weighs strongly in favor of secondary meaning.  This evidence has some bearing on the issue of secondary meaning, and it should have been considered by the district court.") (citations omitted); *Reed-Union Corp.*, 869 F. Supp. at 1309 (finding that marketing of product over eighteen years contributed to finding of secondary meaning); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, 910 (W.D. Wis. 2003) ("[Plaintiff's] nine-year use is important. Proof of continuous

and exclusive use of a mark for five or more years establishes prima facie evidence of secondary meaning….").

### d. Survey Evidence

#### (1) Mr. Berger Is A Highly-Qualified, Reputable Survey Expert

Defendants presented Mr. Berger as an incompetent, unscrupulous survey expert, incapable of designing a single admissible survey from any of the surveys conducted in this case. The jury, however, was instructed to consider Mr. Berger's credentials in determining the weight, if any, to give his testimony. (Trial Tr. 1021-1022.)

Contrary to Defendants' assertions, Mr. Berger is a highly skilled marketing consultant with degrees from the University of Michigan, Northwestern, and the University of Chicago, where Mr. Berger obtained a Masters in business administration with concentrations in marketing and finance. (Trial Tr. 379.) He has 32 years of experience in the marketing field. (Trial Tr. 378.) Mr. Berger teaches marketing courses at the undergraduate and graduate level (Trial Tr. 380-381) and co-authored a book on trademark surveys published by Oxford University Press (Trial Tr. 381.) Mr. Berger has been found qualified to testify in federal courts across the country and has performed well over 100 surveys in his career. (Trial Tr. 384.) Mr. Berger's extensive Curriculum Vitae was entered into evidence as PX034 (Ex. H). (Trial Tr. 382.)

At trial, Defendants did not challenge Mr. Berger's qualifications as a survey expert, and by agreement of the parties, they did not attack his credentials or use any prior opinions against him. (Trial Tr. 371-372.) As for Defendants' survey expert, Mr. Stec, Defendants' counsel told the jury in opening statement that he would take the witness stand to rebut the testimony of Mr. Berger (Trial Tr. 163-164), but Mr. Stec abandoned the courtroom on the day he was scheduled to testify. (Trial Tr. 741-743.) Not only did Defendants fail to stand behind the statement of their

counsel in opening, but they left Mr. Berger's testimony uncriticized, unchallenged and unrebutted by any marketing expert, survey expert or other witness at trial.

### (2)    Mr. Berger's Survey Results

Plaintiffs conducted two secondary meaning surveys with a total of 400 respondents, showing "an extraordinarily high level" of association of yellow and black with DeWalt.  (Trial Tr. 388.)  Defendants performed no survey (Trial Tr. 420), nor did they call any witnesses to challenge the design, methodology, procedure or implementation of Mr. Berger's surveys. (Trial Tr. 420.)  Mr. Berger's surveys and testimony stand <u>unrebutted</u> in the record.

In Survey A, 200 pre-screened respondents were shown a yellow and black power tool with "absolutely no company indicias or logos or anything on it.  It's just [a] straight yellow and black [product]."  (Trial Tr. 393.)  The respondents were asked a straightforward, unaided, non-leading question: "Who do you believe puts out this product?" with a blank box to fill-in the answer.  (Trial Tr. 393.)  An impressive "43 percent of those respondents identified DeWalt or Black & Decker by name, unaided recall."  (Trial Tr. 394) (*see also* Trial Tr. 393: unaided recall is "a very, very powerful kind of research").  Several respondents answered DeWalt or Black & Decker "because of the [yellow and black] color" scheme.  (Trial Tr. 394.)  A simple, non-leading follow up question was asked with a rotating multiple choice list of companies to choose from, along with a "don't know" option.  (Trial Tr. 396-397.)  Combining the aided and unaided, a "respectively high" 58 percent of respondents correctly identified DeWalt or Black & Decker, which is above the standard 50 percent threshold.  (Trial Tr. 397-398.)

In Survey B, respondents were asked an even more straightforward question:

> For Professional Tradespeople: "If you were at a job site and you saw a power tool that was yellow and black, would you have a belief as to who or what company manufactures it?"

> For Serious DIYers: "If you were shopping at a Home Depot, Lowe's, or other retailer that sells power tools and you saw a power tool that was yellow and black, would you have a belief as to who or what company makes or manufactures it?"

(Trial Tr. 399-400.)  A staggering 85 percent of DIY respondents correctly identified DeWalt or Black & Decker, with 90 percent total for the entire survey. (Trial Tr. 400-402.)[7]  From this statistical evidence – unrefuted by any survey from Defendants and unchallenged by any testimony of a survey expert of Defendants – Mr. Berger testified: "Well, you've got a situation where there is a very, very high degree of secondary meaning, high enough to certainly say that Black & Decker has got a famous trade dress…." (Trial Tr. 404.)

Defendants incorrectly assert that "as to the secondary meaning surveys presented by Mr. Berger, again, he admitted that those surveys **did not relate to the product packaging**.  TR, Day 2, pp. 424-426."  (Defs.' Mot, Dkt. 230, PageID #: 6904) (emphasis in original).  The trial transcript pages cited by Defendants (pp. 424-426) do not come close to supporting Defendants' statement.  Mr. Berger unmistakably testified that his secondary meaning surveys absolutely apply to packaging, without question.  (Trial Tr. 405, 407-408.)  As the party trying to overturn a jury verdict, it is telling that Defendants were forced to overstate the factual record to support their position.

### e.     Weighing Secondary Meaning Factors To Decide Strength Of Plaintiffs' Trade Dress

The secondary meaning factors above unanimously point to an extraordinarily strong trade dress for Plaintiffs' yellow and black DeWalt color scheme.  The tens of millions in advertising

---

[7] Defendants incorrectly state that Mr. Berger performed a survey with only 17 respondents.  (Dkt #230, PageID #: 6866.)  This survey (showing 90 percent association of yellow and black with DeWalt) actually had *200 respondents* with a breakdown of 183 DIYers and 17 Professionals.  (Trial Tr. 400-402.)  Given Defendants' argument that the majority of purchasers of their accused products are DIYers – with only 2-3% Professionals – this breakdown actually makes the survey more applicable to Defendants' own definition of the relevant consumer.

each year, billions of dollars in sales each year, 20-plus years of continuous exclusive use, and 90 percent recognition in Plaintiffs' secondary meaning survey B, all support a finding that the strength of Plaintiffs' trade dress is "off the charts." (Trial Tr. 403.) As Ms. Fischer testified:

> [Q.] So I guess the point of all of this, based on all of these sales, promotional expenditures, impressions, and everything else, do you have an understanding and belief as to whether your consumers associate the colors yellow and black with DeWalt?
>
> A. Oh, absolutely. I know that they do.
>
> Q. And what year do you think that that started happening?
>
> A. Almost simultaneous with the launch.
>
> Q. When was that?
>
> A. Back in 1992.
>
> Q. And is it your belief that that association of yellow and black with DeWalt has been consistent from shortly after the launch in 1992 through the present day?
>
> A. Yeah, absolutely. I have never seen anything that is not yellow and black.
>
> Q. And just to be clear, do you think -- is it your belief, based on everything that we've gone through, that consumers associate yellow and black with both the packaging and the product of DeWalt?
>
> A. Without a shadow of a doubt.

(Trial Tr. 253.) Defendants did not object to these questions or this testimony, nor did they move to strike or request a limiting or curative instruction, and the testimony stands unrebutted and unchallenged by any testimony or evidence from Defendants.

Mr. Berger confirmed the same thing: DeWalt's yellow and black trade dress is at the highest end of the strength category; "Black and Decker has got a famous trade dress." (Trial Tr. 404.) Again, no objection from Defendants. No marketing or survey expert of their own to challenge Mr. Berger's testimony and conclusions. They are unrebutted.

The powerful, high level of secondary meaning supports a finding that the yellow and black DeWalt trade dress is "off the charts" strong. *See, e.g., Munters Corp. v. Matsui Am., Inc.*, 730 F. Supp. 790, 797 (N.D. Ill. 1989) (referring to secondary meaning as "an evidentiary demonstration of recognition of the mark's strength"); *Telemed Corp. v. Tel-Med, Inc*., 588 F.2d 213, 219 (7th Cir. 1978) ("[T]he trade-mark has the advantage of strength where its owner has invested a considerable amount in advertising or can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business.") (quoting 3 R. Callman, Unfair Competition and Trade-Marks § 82.1 (2d ed.)).

### 6.    Actual Confusion

Despite Defendants' improper arguments to the jury, which they continue post-trial, it is hornbook law in the Seventh Circuit that the plaintiff "need not show actual confusion in order to establish **likelihood** of confusion." *Sands, Taylor*, 978 F.2d at 960 (emphasis in original); *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 781 (N.D. Ill. 2011) ("the absence of actual confusion is not fatal to an infringement claim"); *Am. Eagle Outfitters*, 2013 WL 6839815, at *8 ("evidence of actual confusion is 'almost impossible to secure' because 'confusion often go[es] unreported or unrecorded' and because '[p]ersons who are truly confused will often never be aware of the deception'" ) (quoting 4 McCarthy on Trademarks § 23:12); *Roulo*, 886 F.2d at 938 ("even absent the difficult-to-acquire evidence of actual confusion, there was adequate evidence for the jury" to find likelihood of confusion).

Survey evidence is ***not required*** either.  *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1153 (7th Cir. 1994) ("[F]ailure to introduce any market survey evidence of likely consumer confusion" goes to the weight, and not the sufficiency, of likelihood of confusion evidence); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed Cir. 2012) (citing several appellate court holdings as support for its conclusion that survey

evidence is not required to show likelihood of confusion). Nonetheless, although not required, Plaintiffs presented a "very, very simple survey" demonstrating a 47 percent confusion rate. (Trial Tr. 408-409, 414.)[8] Since actual confusion evidence can be presented by "either direct evidence or by survey evidence," *V & S Vin & Sprit Aktiebolag v. Cracovia Brands, Inc.*, No. 01 C 9923, 2004 WL 42375, at *3 (N.D. Ill. Jan. 5, 2004), this is yet another factor in support of the jury verdict of likelihood of confusion.

### a. The Survey Properly Replicated The Retail Environment

Mr. Berger's survey used "a photograph of a store environment very similar to what Ms. Fischer showed … with all the different products intermingled." (Trial Tr. 408.) In Mr. Berger's expert analysis, unchallenged and unrebutted by any testimony from any defense expert, the photo used in his survey is a "fair and accurate representation" of the store shelves Mr. Berger encountered himself in visiting Lowe's throughout the Chicagoland area. (Trial Tr. 411.) As Mr. Berger testified:

> Q. Now, is the shelving display at the stores that you visited consistent or inconsistent with what we're seeing in the photograph that appears at the bottom of PX 035-003 and that appeared in second generation format in the online survey for respondents?
>
> A. Yes, it's very similar to all the photos that Ms. Fischer showed this morning.
>
> Q. Is it a fair and accurate representation of -- let me back up. There's two issues there. Is it a fair and accurate representation of what you saw when you visited Lowe's retail stores yourself?
>
> A. Yes.

---

[8] In support of their contention that Mr. Berger's testimony and surveys were unreliable and prejudicial (*see* Defts' Mot. for JMOL, Dkt #230, PageID #: 6879-6881; Defts' Mot. for New Trial, Dkt #228, PageID #: 6644-6655), Defendants again raise the **same arguments** that the Court **thoroughly considered** and **rejected** in denying Defendants' motions to exclude Mr. Berger's testimony regarding secondary meaning and likelihood of confusion. (*See* Dkt #192, PageID #: 5634-5643.)

> Q. You were in the courtroom when Mr. Niro took Ms. Fischer through a number of retail -- strike that -- photographs taken at retail locations in her, I think we called it, her five-state tour?
>
> A. Yes.
>
> Q. Do you believe this to be a fair and accurate representation of the photographs that Ms. Fischer shared with us?
>
> A. Yes.

(Trial Tr. 411.)  On cross-examination, Mr. Berger confirmed ***again*** that he properly replicated market conditions:

> Q. Okay. So is it fair to say then that you weren't trying to or didn't care about trying to replicate the actual market conditions in your survey?
>
> A. No, not true. I did try to replicate the market conditions.
>
> ***
>
> [Q.] Going back to replicating the market conditions, other than just being provided a photo and told to test it, you didn't do anything, did you?
>
> A. I visited the store to make sure that this is the way the products indeed look, yeah.
>
> Q. When did you visit that store?
>
> A. Sometime before I did the survey.

(Trial Tr. 501-502; 506-507); (*see also* Trial Tr. 497: Mr. Berger "tried to replicate packag[ing] on the shelf.  In that way, it was a market condition, yes.").

Retail stores display these products "a number of different ways," sometimes "they're displayed in the packaging" other times "outside the packaging."  (Trial Tr. 430.)  The photograph used by Mr. Berger was the "most accurate and proper way of showing the products on the shelf…."  (Trial Tr. 508.)  Moreover, as this Court previously recognized, the survey photograph was "taken in the market" and the "survey respondent[s] [were] able to see the full product packaging, like the customer in the store would."  (Dkt #192, PageID #:5641.)

- 34 -

### b. The Survey Correctly Focused-In On The Accused "Sunburst" Packaging

When Defendants' attorneys were first presented with the Home Depot photograph in March 2010 (PX032, Ex. I), they complained that the shot was too far away, whereas actual consumers (supposedly) would be closer to the packages to see the "Sunburst" design up-close, as well as the Rockwell logo, the product image, and the like. (DX079, Ex. J.)

Accordingly, Mr. Berger "wanted to eliminate the extraneous elements of the photograph and focus on the packaging," which he testified in his unrebutted expert opinion "was the best way to do it." (Trial Tr. 412-413.) "[T]he packaging was what I wanted to test in the questionnaire." (Trial Tr. 429.) Indeed, Mr. Berger wanted to test whether "the packaging caused a likelihood of confusion because of the similarity, so [he] focused on the packaging." (Trial Tr. 429.)

The Rockwell name and logo on the package were clearly visible and legible on the Berger survey photograph:



(PX029 (zoomed in)); (Trial Tr. 410. In his survey, Mr. Berger made sure to zoom-in to focus specifically on the accused packaging up close, which Mr. Berger believed "was the most accurate and proper way of showing the products on the shelf," thereby making the scene "as realistic as [he] possibly could *as the way the eye would see it*." (Trial Tr. 508) (emphasis added).

### c. The Survey Results Apply To All Of Defendants' Products In The Accused Sunburst Packaging

The hypothesis tested in Mr. Berger's survey is as follows:

[Q.] You say here, 'This double-blind survey, which was given over the Internet, was designed to test whether there exists a likelihood of confusion between DeWalt's distinctive yellow and black trade dress and Rockwell brand products that make use of similar yellow and black trade dress. The scientific survey[] seeks to test if the defendants' trade dress is likely to cause confusion or mistake or deception with the use of the trade dress by DeWalt.'

***

Q. So did you determine what was in your hypothesis? Mr. Berger, I hate to belabor the point, but did you test your hypothesis or not?

A. I did.

(Trial Tr. 527-528.) Indeed, Mr. Berger reviewed hundreds of images of different Rockwell products in the accused Sunburst packaging, and he confirmed that his survey results apply to all of them:

Q. So it applies to any of the Rockwell products that are in the accused sunburst --

A. Yes.

Q. -- yellow and black?

A. Yes.

(Trial Tr. 412.) As Mr. Berger testified on cross-examination:

Q. Okay. So your results don't apply to anything other than just a photograph, right, a bad photograph at that?

A. No. They apply to an environment that was presented to this courtroom this morning [by Ms. Fischer] of how products are displayed and it was very, very obvious the way that they were done. This is another different type of rendition of an environment.

(Trial Tr. 433.)

### d. The Survey Results Show A Strong Likelihood Of Confusion

The question asked of the 200 survey respondents could hardly have been more straightforward: "Do you believe that the products pictured are put out by the same company" (Trial Tr. 413), to which 47% of respondents mistakenly said "yes." (Trial Tr. 413-414.) Given the standard threshold for likelihood of confusion of 20 percent, the confusion level is "very high," more than "twice as much as what you need." (Trial Tr. 414.) Many verbatim answers specifically revealed that the confusion was because of the yellow and black color scheme. (Trial Tr. 414.) According to Defendants' argument to the jury during trial (and to this Court post-trial), every survey respondent should have immediately recognized the Rockwell logo and that the package was "Sunburst" and "military green," but the actual survey results belie Defendants' theory of the case.

### e. A Control Was Not Necessary For This Particular Survey

Defendants say Mr. Berger's survey should be disregarded because he didn't use a control group, but they cite *no* case law supporting such an extreme position. (Dkt #230, PageID #: 6866, 6879.) Worse, Defendants presented no testimony from a marketing or survey expert suggesting how or why a control would be necessary or applicable here.

Mr. Berger testified that while he has "used controls a lot in surveys in the past," in his expert opinion he determined that a "control was [not] necessary in this survey." (Trial Tr. 520.) In fact, if you replaced the Rockwell product in PX029 with "something in a Bosch product in blue, then it would [have] stood out like a sore thumb," not proving anything. (Trial Tr. 423.) Respondents probably would have answered yes if the control "was yellow and black. If it was a different color, they probably would not have." (Trial Tr. 422.) As Mr. Berger testified:

> Q. Okay. And so you don't believe that people taking this survey might not have some preexisting beliefs or notions or anything that might skew how they answer?

A. No, because the questions were so straightforward and it was a very short survey, and there really was no room for anybody to have any bias in either the secondary meaning, nor the likelihood of confusion surveys.

(Trial Tr. 524.) With over 100 pages of Mr. Berger's testimony (67 of which were cross-examination), Defendants seize on two questions that slipped in the word "trick" to argue that Mr. Berger created a faulty survey. First, the survey was so straightforward and simple it obviously was not designed to be surreptitious. Second, Mr. Berger referenced the Paris in the Springtime as a class exercise, not a trick (Trial Tr. 538) then, in frustration by the cross-examiner, said fine, if you say it's a trick, then it's a trick. (Trial Tr. 538.) The jury was entitled to view Mr. Berger's demeanor and weigh his credibility for themselves. Finally, if Defendants believed it is tricky for consumers to view their sunburst package intermingled on a retail shelf surrounded by DeWalt products – as shown in multiple photographs submitted to the jury in evidence – then, yes, Plaintiffs agree, the likelihood of confusion is unmistakable.

On cross-examination, Defendants' counsel suggested that as a control, if Mr. Berger would have "taken that same picture and taken out the Rockwell product and … put a Porter Cable product in there, … people might have still answered yes, they're put out by the same company." (Trial Tr. 422.) The jury was probably mystified by this question, as they were previously informed that Porter Cable is another brand of Plaintiffs' products (Trial Tr. 181-182), so the survey respondents in Defendants hypothetical control would have been correct in answering "yes," that they were not confused. How would this suggested "control" have improved Mr. Berger's survey? It wouldn't. In fact, Defendants' proposed "control" using a Porter Cable product (Trial Tr. 422) merely confirms that putting a different logo from DeWalt on your product does not eliminate confusion as to source, sponsorship or affiliation; as both "Porter Cable" and "DeWalt" are put out by the same company (i.e., Plaintiffs), so too "Rockwell" and "DeWalt"

could be put out by the same company, as 47% of confused survey respondents mistakenly indicated.  (Trial Tr. 414-415.)

In any event, all of these issues were properly resolved by the jury in deciding the credibility of witnesses and weight of evidence.  (Trial Tr. 1021: "You should decide how much weight to give any evidence"; *id.* at 1036: "[y]ou are impartial judges of the facts.")

### f. The Court's Limiting Instructions Remove Any Lingering Complaints About The Survey Photograph

Before PX029 was shown to the jury during Mr. Berger's direct examination, this Court told the jury:

> So before I ask Mr. McAndrews to put the photo up, I'm going to read what's called a limiting instruction for you. So the jury is not to consider the photograph you're about to see as substantive evidence. The jury may only consider this photograph in order to illustrate and explain how Mr. Berger formulated and conducted his survey as to the issue of likelihood of confusion.
>
> Okay. So with that, you can go ahead and publish the photo.

(Trial Tr. 409.)  This same limiting instruction was ***emphasized again*** by the Court during the jury charge:

> You will recall that during the course of this trial, I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted.
>
> *** 
>
> The photograph used by Mr. Berger to formulate his survey as to the likelihood of confusion is not to be considered as substantive evidence and is to be considered by you only and for no other purpose other than to explain how Mr. Berger formulated and conducted his likelihood of confusion survey.

(Trial Tr. 1020.)  In light of the Court's limiting instructions to the jury, Defendants' contention that Mr. Berger's "survey served to prejudice the Defendants and confuse or improperly influence the Jury" is unavailing (Dkt #230, PageID #: 6881.)  *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) ("jurors are presumed to follow limiting and curative instructions…");

*Poulter v. Cottrell, Inc.*, 50 F. Supp. 3d 953, 956, n.1 (N.D. Ill. 2014) ("[A] limiting instruction to the jury defining the relevance of [the disputed] evidence would minimize any unfair prejudice that might otherwise result from improper consideration of the … evidence…."); *Tdata Inc. v. Aircraft Tech. Publishers*, 2:03-CV-264, 2008 WL 2169353, at *6 (S.D. Ohio May 21, 2008) ("A limiting instruction as to the permissible use of the evidence can address any implicit appeal to sympathy or prejudice….").

Defendants conceded that the survey photograph accurately depicts the DeWalt products and the Rockwell product in its Sunburst packaging (Trial Tr. 740) – which the jury could also conclude on its own by comparing survey photo PX029 with PX006-004, PX008-004, for example:



 

(PX029; PX006-004; PX008-004.)

Defendants have also now agreed, as they must, that survey experts frequently arrange their own setup in formulating and conducting their survey. (Mot. for New Trial, Dkt #228, PageID #: 6654; suggesting it would have been acceptable if "Mr. Berger testified that the picture he relied upon was a mock-up or simply fabricated for the purpose of recreating the retail environment"); (*see also* Trial Tr. 504, where Defendants' counsel read from a survey book that "the survey setting is necessarily artificial…"). With that admission, coupled with the multiple limiting instructions given to the jury that the survey photograph was "not to be considered as substantive evidence," all the quibbling over the "fabricated" survey photo is an irrelevant sideshow; Mr. Berger was perfectly entitled to arrange the products on the shelf as he saw fit to create the simulated retail environment of his survey. Of course, in truth, this is an <u>actual</u> photograph taken from an <u>actual</u> Home Depot store showing exactly how the products were being displayed and sold, with no alteration or fabrication of any kind, and Mr. Taylor even testified on *direct examination* that Positec USA "sell[s] to Home Depot." (Trial Tr. 613.)

7.        **Defendants' Intent**

"[P]roof of intent is a 'particularly important' factor in the likelihood-of-confusion analysis." *Am. Eagle Outfitters*, 2013 WL 6839815 at *8 (quoting *AutoZone*, 543 F.3d at 929). The jury found that Defendants' infringement in this case was willful. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989) ("Willfulness of behavior is a classical jury question of intent."); *U.S. v. Walsh*, 627 F.2d 88, 91-92 (7th Cir. 1980) ("[T]he question of willfulness is one of fact for the jury to decide based upon all of the facts and circumstances of the case."); *see Thomas & Betts*, 138 F.3d at 297 (district court's finding on intent was "inappropriate and suggests that the court engaged in weighing of the evidence, which is improper on a motion for summary judgment... The decision of how much weight such evidence should be given is the province of the fact finder, not the court on a motion for summary judgment. Similarly, whether [defendant] did all that it can to prevent confusion is an issue that is not properly decided at present."); *Autozone*, 543 F.3d at 934 (intent is an issue for a trier of fact).  The circumstances here overwhelmingly show that the jury was correct — that Defendants intended to cause confusion in the marketplace.

First, Defendants were well aware of DeWalt's famous yellow and black trade dress since before Positec USA was even created.  Tom Duncan worked for Bosch thirteen years prior to joining Positec USA and was obviously aware of DeWalt at that time.  (Trial Tr. 480.)  Similarly, Don Gao manufactured products for Plaintiffs prior to the formation of Positec USA, and Mr. Taylor worked in the power tool industry his entire life.  (Trial Tr. 614, 620.)  Lest there be any doubt, Mr. Duncan wrote to Mr. Gao saying: "As you know B&D has registered Yellow and black (dewalt)… in power tools."  (PX068, Ex. K.)  Mr. Duncan testified:

> Q. Prior to March 1st, 2010, was Positec aware that Black & Decker had trademarked the colors black and yellow?

A. Trademarked --

Q. Okay.

A. -- yes.

Q. So Positec was aware that the colors black and yellow were used by the DeWalt brand; is that correct?

A. Yes. We were aware that black and yellow was used by the DeWalt brand, yes.

(Trial Tr. 490.)

Second, with full knowledge that DeWalt had trademark and trade dress rights in the yellow and black color scheme and that DeWalt was the market leader in power tools, Defendants introduced their copycat yellow and black packaging to be sold side-by-side with DeWalt at retail:






(PX028; PX004-002; PX002-003.) It is telling that Defendants don't see anything wrong with their products being sold as shown above – either they are completely indifferent to consumer

confusion, or, more likely, they are <u>trying</u> to create confusion so as to trade off of DeWalt's iconic reputation. *AutoZone, Inc.*, 543 F.3d at 934 ("an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety"). Plaintiffs are entitled to such an inference at this stage of the proceedings.

Third, Defendants did not produce a single document for the jury regarding the design of their accused sunburst packaging, nor did they call a single witness who was actually involved in the creation, design, development or introduction of the accused packaging. Mr. Taylor admitted he had no involvement. (Trial Tr. 729-731.) And the only other live employee witness that testified for Defendants was Mr. Tellefsen, who joined the company in July 2009, ***after*** the "sunburst packaging was already designed and established…." (Trial Tr. 823.) Mr. Tellefsen "didn't have anything to do with the design, development or launch of the sunburst packaging…." (Trial Tr. 823.)

Fourth, as Plaintiffs' counsel noted in closing, Defendants produced ***no*** evidence at trial that they had sought or obtained any legal advice or clearance opinion from counsel indicating that their conduct was legally acceptable, or that the accused packaging did not infringe Plaintiffs' trade dress rights. (Trial Tr. 1012, 1016-1017.) Yet they proceeded anyway for several years, accruing $290 million in sales. *Ty, Inc. v. Softbelly's, Inc.*, No. 00 C 5230, 2007 WL 734394, at *2 (N.D. Ill. Mar. 6, 2007) *aff'd*, 517 F.3d 494 (7th Cir. 2008) ("In treating the issue of willfulness, courts have considered whether the defendant intended to trade on the plaintiff's mark and whether, once notified to cease and desist, the infringer responded prudently by seeking advice of counsel or, on the other hand, chose to ignore the owner's claim."); *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 512 (7th Cir. 1994) ("the trier of fact may consider evidence that the defendant ignored the plaintiff's [infringement] notices…, did not seek advice of an attorney, and passed the matter off as a nuisance.").

Fifth, on March 1, 2010 – five-and-a-half years before the trial of this case – Plaintiffs' counsel sent a cease-and-desist letter to Defendants "alleging that Defendants [were] infringing upon Plaintiffs' registered family of trademarks and trade dress rights in the DeWalt yellow and black color scheme" and advising that other parties had previously "acknowledged Black & Decker's rights in the yellow and black color scheme through cease and desist letters[,]" that "still other companies were enjoined [from using yellow and black color schemes] through consent judgment orders[,]" that "the Eastern District of Virginia [had] confirmed the validity of Black & Decker's yellow and black trade dress rights after a full trial on the merits[,]" and that Black & Decker "desire[d] to avoid a legal confrontation if possible and to reach an amicable resolution of the dispute." (Dkt #206, PageID #: 5894-5895, ¶ 4(a).)[9]   Defendants rebuffed Plaintiffs' initial and subsequent written requests that Defendants cease and desist the use of their infringing yellow and black color scheme, and flatly confirmed that "they would not comply with Plaintiffs' demands." (Dkt #206, PageID #: 5895-5896, ¶ 4(b)-(e).)

Sixth, in the four-year period from the August 10, 2011 date of Plaintiffs' Complaint to the September 2015 trial (Dkt #206, PageID #:5896, ¶ 5), Defendants did ***absolutely nothing*** to avoid infringement of Plaintiffs' trademark and trade dress rights.

Seventh, Defendants had a myriad of other colors to choose from – in fact, Defendants themselves <u>are</u> using other colors for some of their products that were not accused of infringement:

---

[9] Notably, Defendants stipulated, without objection or reservation, to this summary of Plaintiffs' cease and desist letter, including the descriptions of other consent judgments and the *Pro-Tech* litigation in the Eastern District of Virginia.



(PX436; PX003-005) (Trial Tr. 754-755.)  Yet Defendants selected yellow and black, and continue

using yellow and black to this day because they are benefitting tremendously from their willful

infringement:

> [Q.] Defendant's counsel in his opening statement said, "Well, gee, all of the colors
> are taken. We had to use yellow and black for our packaging." Is that a fair
> statement or unfair?
>
> A. It's not an accurate statement.
>
> Q. And why not?
>
> A. Well, there are so many colors and color combinations that you could use. You
> know, if you think about it as sports teams, for instance. The Baltimore Ravens are
> purple. You could have used a purple and black tool. You know, if you keep along
> that same line the FC Barcelona has a kind of a burgundy color with -- with blue
> stripes.
>
> In fact, the Rockwell folks themselves are using a number of different packaging
> colors across their various range. They have a black package. They have a mostly
> white package, and then, of course, they have the yellow and black package.
>
> [Q.] This is Plaintiffs' Exhibit 233…. Can you identify this product?
>
> A. That's a Rockwell sander.
>
> Q. Okay. And is this the yellow and black package you referred to?
>
> A. Yes.
>
> Q. And just so the record's clear, based on your marketing experience, do you
> believe or not believe that they had to use that color scheme because there was no
> other colors to use in the marketplace?
>
> A. No. I mean, they're using other colors.

- 46 -

(Trial Tr. 232-233.)   In *Roulo*, the Seventh Circuit held that given "the myriad of artistic expressions which could have been chosen for [Defendants' products], the near identity of their appearance is itself strong evidence of copying."  *Roulo*, 886 F.2d at 937; *See also, Sands, Taylor & Wood v. Quaker Oats Co.*, No. 84 C 8075, 1990 WL 251914, at *18 (N.D. Ill. Dec. 20, 1990) *aff'd in part, rev'd in part on other grounds*, 978 F.2d 947 (7th Cir. 1992) ("Proof that defendant knew of plaintiff's mark at the time defendant chose its mark has often been relied upon as evidence of bad faith and an intention to trade upon another's good will. ***A wrongful intent appears easy to infer where defendant knew of plaintiff's mark, had freedom to choose any mark, and 'just happened' to choose a mark confusingly similar to plaintiff's mark***.") (emphasis added) (citations omitted); *see also W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1277 (10th Cir. 2005).

Finally, the testimony of Defendants' witnesses at trial was not credible.  On direct examination, Mr. Taylor pretended that he was personally and heavily involved in the design of the sunburst packaging, which was revealed on cross-examination to be completely false.  (Trial Tr. 627-631, 729-730.)  Mr. Tellefsen repeatedly referred to Defendants' "yellow and black" sunburst packaging (Trial Tr. 823-824) until redirect when his attorney approached the witness stand, stood over the witness and bellowed, "Are you colorblind?" (Trial Tr. 833) after which the color "black" to Mr. Tellefsen suddenly became "green" – even for physical exhibit PX075 (Ex. L) which Defendants' counsel later said actually was black due to a printing error.  (Trial Tr. 997.)  But Mr. Tellefsen persisted in referring to it as "green" to hold the party line.  Even worse, Defendants did <u>not</u> present live testimony from <u>any</u> of the witnesses who were actually involved in the design, development and launch of the accused sunburst packaging, nor did they call their marketing and survey expert who sat through the entire trial at $425 per hour <u>until</u> it was time for him to testify, at which point he left the courtroom.  Based on the "totality of circumstances," there

is more than sufficient evidence to support the jury verdict of intentional infringement against Defendants, and this factor weighs heavily in favor of likelihood of confusion.

### 8.    Balance of Likelihood of Confusion Factors

Plaintiffs submitted substantial evidence at trial that <u>each</u> of the likelihood of confusion factors supports the jury's verdict, *supra*.  However, the Seventh Circuit has firmly established that a plaintiff need not prevail on every confusion factor, or even a majority of the factors, to prove likelihood of confusion.  *See Meridian*, 128 F.3d at 1120 (finding likelihood of confusion where four factors favored plaintiff – "[w]eighed against the other factors, we believe that the plaintiff has been able to establish that a likelihood of confusion exists…"); *CAE, Inc.*, 267 F.3d at 686-87 (there is no rule that all factors must favor Plaintiffs; the trier of fact should "give appropriate weight to the factors that are particularly important based on the facts of each case," citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 901-02 (7th Cir. 2001) (holding that the magistrate judge did not err in placing greater weight on the similarity of marks, the similarity of products, and the area and manner of concurrent use factors)).  *See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290-91 (9th Cir. 1992) (affirming finding of likelihood of confusion; "the factors are intended to guide the court in assessing the basic question of likelihood of confusion… The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion.").

Here, any combination of the factors more than adequately supports the jury's verdict based on the facts of this case.  Defendants ask this Court to disregard the jury's intensely factual determination of likelihood of confusion, which would require the Court to: re-judge the credibility of each witness, re-determine layers and layers of factual findings on hotly contested evidence for all seven likelihood of confusion factors discussed above (and the four additional sub-factors on "strength" of the trade dress), and then determine the appropriate weight and balancing of each

factor to arrive at the ultimate fact issue of likelihood of confusion. The eight-member jury diligently engaged in this process, and rendered a unanimous verdict of likelihood of confusion in favor of Plaintiffs. This verdict is supported by a massive amount of evidence and is well within the controlling Seventh Circuit case law. The verdict should not be disturbed.

## IV.    THE EVIDENCE PRESENTED AT TRIAL SUPPORTS A VERDICT OF TRADEMARK INFRINGEMENT

As set forth in Plaintiffs' Response to Defendants' Motion for a New Trial, incorporated by reference, Plaintiffs presented more than substantial evidence at trial that its registered trademarks comprise a family of marks having a recognizable common characteristic of DeWalt's yellow and black color scheme. (Plas.' Resp. at pp. 6-9.) Thus, the same likelihood of confusion factors and evidence for DeWalt's yellow and black trade dress apply equally to the yellow and black trademark registrations. The analysis is the same. The jury was correct in finding infringement on both Plaintiffs' trademark and trade dress claims.

## V.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY VERDICT OF WILLFUL INFRINGEMENT

Defendants erroneously contend that there is insufficient evidence establishing that they acted willfully (Dkt. #230, PageID #: 6889 – 6894.) This factor is thoroughly addressed in Section III(A)(7), *supra*, which is incorporated herein by reference.

## VI.    CONCLUSION

For the reasons stated, Defendants' motion for judgment as a matter of law should be denied.

Respectfully submitted,

/s/ Raymond P. Niro, Jr.
Raymond P. Niro, Jr.
Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLC
200 W. Madison St., Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
rnirojr@niro-mcandrews.com
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 18, 2015 the foregoing

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

J. Aron Carnahan
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, 22nd Fl.
Chicago, IL 60606
aron.carnahan@huschblackwell.com

Henry S. Alford
Scot A. Duvall
Brian P. McGraw
Dennis D. Murrell
Robert J. Theuerkauf
MIDDLETON REUTLINGER
401 S. Fourth Street
2500 Brown & Williamson Tower
Louisville, KY  40202
HAlford@MiddletonLaw.com
SDuvall@MiddletonLaw.com
BMcGraw@MiddletonLaw.com
DMurrell@MiddletonLaw.com
RJT@MiddletonLaw.com

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

*/s/ Raymond P. Niro, Jr.*
Attorney for Plaintiffs
NIRO McANDREWS, LLC