IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., <br><br> Plaintiffs, <br><br> v. <br><br> POSITEC USA INC. and RW DIRECT, INC. <br><br> Defendants. | Case No. 1:11-cv-05426 <br><br> Judge Robert M. Dow, Jr. <br> Magistrate-Judge Geraldine Soat Brown |

**PLAINTIFFS' SUPPLEMENTAL STATEMENT
REGARDING MR. BERGER'S LIKELIHOOD OF CONFUSION SURVEY**

## I. INTRODUCTION AND FACTUAL BACKGROUND

This Court correctly decided in numerous pre-trial rulings to allow the testimony of Mr. Berger at trial, subject to Defendants' cross-examination and repeated limiting instructions to the jury that the photograph used in Mr. Berger's likelihood of confusion survey could not be considered as substantive evidence but only for the layout used in his survey. All of the *same arguments* made by Defendants post-trial were already considered and rejected by this Court following Defendants' pre-trial *Daubert* motion (Defts' Motion to Exclude Berger's LOC Survey, Dkt. #103-1, PageID #: 3531-32, 3537-38), after which this Court issued the following rulings: regarding the sample universe,

> [T]he Court finds that Defendants' criticisms concerning the sample universe used in the Berger [likelihood of confusion] survey[] *go to the weight, but not the admissibility* of Berger's testimony. Survey evidence need not be perfect to be admissible under Rule 702. Although the universe could be better defined, it is not "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d at 618. It would not be unreasonable for the trier of fact to conclude that at least some professional tradesmen and serious Do-It-Yourselfers would be in the market for Defendants' products.

(Dkt. #192, PageID #: 5636)[1] (emphasis added); as to the replication of the market conditions and the Home Depot photograph,

> ***The Court already addressed the same criticisms at the summary judgment stage***, finding that they, at most, "reveal triable issues concerning the credibility and the weight that should be given to Berger's report." [93] at 62. ***Defendants have not identified any new issues that would warrant reconsideration.*** Defendants claim that the photo "fails to faithfully replicate the packaging colors at issue." [103-1] at 8. But this is not clear from the exhibits that Defendants have provided. If the packaging colors in the photo are so noticeably different from the true packaging colors, Defendants can easily demonstrate this flaw at trial. Defendants also argue that the photo fails to replicate market conditions because Berger cropped the photo that Plaintiffs gave him to show only two rows of boxed products and not the products sitting on a shelf above the boxes. ***This does not render the survey inadmissible.*** The cropped photo is, nonetheless, a photo taken in the market. The survey respondent is able to see the full product packaging, like the customer in the store would.

(Dkt. #192, PageID #: 5641) (emphasis added); with respect to purportedly asking a leading question,

> [T]he likelihood of confusion survey gave respondents choices of "yes," "no," and "don't know," and respondents who answered "yes" were asked why they chose that response. These survey features help to "mitigate[]" concerns about respondents guessing the correct answer. *LG Electronics*, 661 F. Supp. 2d at 955. ***The jury "will be free to weigh the utility, if any, of the closed-ended question along with the open-ended question and the survey as a whole."*** *Id*.

(Dkt. #192, PageID #: 5642) (emphasis added); regarding a survey control and causation,

> ***The Court already resolved this dispute at summary judgment***: "the likelihood of confusion analysis focuses on the total image of a product; the key question is whether consumers might be confused when they see Defendants' trade dress as a whole, not how much relative confusion the various parts of Defendants' trade dress cause." [93] at 63. ***The Court finds no reason to revisit its decision***.

(Dkt. #192, PageID #: 5642) (emphasis added); and finally, regarding the analysis of survey responses,

---

[1] The Court recognized that the "Defendants raise[d] all the same arguments about the universe of respondents to the likelihood of confusion survey as they did about the universe of respondents to the secondary meaning surveys." (Dkt. #192, PageID #: 5641.)

> Defendants argue that Berger failed to properly analyze the survey data in accordance with accepted principles because he did not consider the reason why survey participants formed their opinion that all the products were put out by the same company. [103-1] at 13. However, in the next sentence Defendants admit that Berger did ask questions designed to capture this information; "14 of the 95 respondents who indicated a belief that the products were put out by the same company identified reasons for this belief that could be attributed to the claimed yellow-and-black trade dress." *Id.* Defendants have not raised a legitimate challenge to Berger's survey analysis.

(Dkt. #192, PageID #: 5642.)

The parties proceeded through a full jury trial and verdict in direct accordance with this Court's comprehensive pre-trial rulings (set forth above), and there are multiple, alternative reasons the jury verdict should stand.

## II. THE COURT WAS CORRECT IN ALLOWING MR. BERGER TO TESTIFY

### A. Mr. Berger's Survey Showed That The Likelihood Of Confusion Was Caused By Defendants' Infringing Trade Dress

At the December 21, 2015 post-trial hearing, Defendants' counsel again argued that Mr. Berger's survey allegedly did not test whether the likelihood of confusion was a result of Defendants' accused trade dress, which is completely contrary to Mr. Berger's actual survey and trial testimony:

> Q. So real quick, this is from your likelihood of confusion report, correct?
>
> A. Yes.
>
> Q. All right. If you could focus in on the hypothesis and rationale there, please.
>
> You say here, "This double-blind survey, which was given over the Internet, was designed to test whether there exists a likelihood of confusion between DeWalt's distinctive yellow and black trade dress and Rockwell brand products that make use of similar yellow and black trade dress. ***The scientific surveys seeks to test if the defendants' trade dress is likely to cause confusion or mistake or deception with the use of the trade dress by DeWalt."***
>
> ***So at least in your hypothesis, this is a causal survey, correct?***
>
> A. ***It's what it is. That's what it says.***

- 3 -

\*\*\*

[A.] And the purpose of that was to determine what I wanted to determine in my hypothesis.

Q. So did you determine what was in your hypothesis?

Mr. Berger, I hate to belabor the point, but *did you test your hypothesis or not?*

*A. I did.*

(Trial Tr. 527-528)[2] (emphasis added.) Mr. Berger confirmed throughout his testimony that the likelihood of confusion survey applies to the accused yellow and black sunburst packaging:

Q. So it applies to any of the Rockwell products that are in the accused sunburst --

A. Yes.

Q. -- yellow and black?

A. Yes.

\*\*\*

A. I wanted to eliminate the extraneous elements of the photograph and focus on the packaging.

Q. And do you think that by cropping that, you corrupted the overall impression as you've compared this in actual visits you've made to retail locations?

A. No, I don't … I thought [this] was the best way to do it.

(Trial Tr. 412-413.) Defendants' selective citations to out-of-context snippets of Mr. Berger's trial testimony,[3] and their post-trial quibbling over their technical definition of "causal survey," is

---

[2] Cited portions of the trial transcript are attached hereto as Ex. 1.

[3] Mr. Berger used a marketing exercise (as a minor component of his overall trial testimony) to explain that people can "overlook the obvious," which is another way of "saying that the human mind does not think in a purely linear fashion." (Trial Tr. 416.) In context, this simply demonstrated one manner in which consumers already familiar with DeWalt's yellow and black products could overlook the Rockwell label and confuse the accused packaging with DeWalt's – however, even for the consumers that perceived the Rockwell label, confusion is still likely as they "would necessarily believe that the Plaintiff had licensed, approved or otherwise authorized the

- 4 -

immaterial in the overall context of Mr. Berger's testimony that it is Defendants' accused packaging creating the likelihood of confusion, *supra*.

### B. The Home Depot Photograph

#### 1. Defendants Sold The Accused Products To Home Depot, Including The Product Depicted In The Photograph

At trial, Mr. Taylor testified on direct examination: "[T]he Positec USA side has the sales force and they go out and they sell to Lowe's. ***They sell to Home Depot***." (Trial Tr. 613:15-16) (emphasis added.) Despite their attempt to smear Plaintiffs, even Mr. Tellefsen admitted that Defendants sold the accused products to Home Depot for sale on Home Depot's website. (Trial Tr. 818.) In closing argument, Defendants' counsel acknowledged a common scenario where a consumer buys a product on HomeDepot.com but returns it to a physical store. (Trial Tr. 991-992.) The jury was presented with all of the evidence and argument and was in the best position to make any necessary credibility determinations.

#### 2. The History Of The Home Depot Photograph

Black & Decker's position – *the truth* – has been unchanged for the past six years, since the first day that Ms. Kristin Ohm ("Ms. Ohm") (the former Senior Brand Manager of DeWalt) received an email from the field with the Home Depot photograph attached. On Thursday, February 25, 2010 at 7:59 a.m., Ms. Ohm forwarded the photograph to Black & Decker's in-house counsel, Mr. Adan Ayala ("Mr. Ayala"), for legal advice on trademark infringement. (Ex. 2 (redacted).)[4] Ms. Ohm left Black & Decker thereafter for another opportunity which made it impossible for Black & Decker to track down the specific sales rep that took the photograph and

---

Defendants' use of the [Plaintiffs' trade dress]." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988).

[4] The unredacted emails will be submitted to the Court *in camera*.

the exact Home Depot location of the photograph. The photograph was then sent from Mr. Ayala to Mr. Niro (*id.*), who attached it to the notice letter sent to Defendants on March 1, 2010. (PX-32.) Defendants' counsel responded by complaining only that the picture was taken from too far away, not that there was anything else wrong with it:

> Lastly, the photos you rely upon to demonstrate potential for marketplace confusion are not only blurry, but are taken from a distance that does not enable the viewer to discern the significant differences between the packaging of Positec and B&D. It is conceivable that any similar photo taken from such a distance could show competing products with apparently similar color schemes. However, consumers do not purchase products from such a distance. They are capable of examining the packaging and products at close range, which will greatly reduce the chances of consumer confusion. The photos shown above demonstrate that consumers will not be confused.

(July 27, 2010 letter, DX-77-79.) Tellingly, Defendants later complained that Mr. Berger zoomed-in on the photograph for his survey, which is ***exactly*** how Defendants' counsel suggested the photograph should have been taken in their July 27, 2010 letter. Mr. Berger correctly testified that Defendants' counsel would have complained regardless of whether he kept the photograph at a distance or whether he zoomed-in. (Trial Tr. 412-413; *see also id.* at 508 ("I wanted to make the picture as realistic as I possibly could as the way the eye would see it. That's all. There would be no problem if I wanted to keep the stuff on top of it. I'm sure the results wouldn't have changed very much, but I wanted to -- it was my thought that that was the most accurate and proper way of showing the products on the shelf for the purpose of that -- for the survey. That's all.").)

Prior to and during the litigation, Defendants represented to Black & Decker and this Court that the Rockwell product depicted in the photograph was a "miter saw." Indeed, in their statement of facts on summary judgment, Defendants stated:

> 113. The ***Positec miter saw*** was no longer sold at the time of the filing of the complaint, and as such, the only picture that depicts the ***miter saw package*** with the representative "sunburst/distressed" product packaging is the picture Mr. Berger used in his likelihood of confusion study; a cropped version of that larger

> photo, depicting only the *Positec miter saw*, is pictured below. (Exhibit AA, Berger's Expert Report).
>
> ***
>
> 126. Mr. Berger's likelihood of confusion survey used a photograph given to him of the product packaging of *Positec's miter saw*, pictured below. (Exhibit BB, Berger Depo., pp. 38-39). Mr. Berger made the decision to crop the photograph so that it would "focus on the two rows of …packaged products." (Exhibit BB, Berger Depo., p. 40). The second picture below depicts the original photograph Mr. Berger subsequently cropped. Mr. Berger did not know whether the products as shown in the photograph were staged that way for the photograph. (Exhibit BB, Berger Depo., p. 82). Mr. Berger testified that the lighting may have affected the coloring of the products as they appeared in the picture. (Exhibit BB, Berger Depo., p. 189).

(Dkt. 66, PageID #: 1147, 1151-52) (emphasis added.) Tellingly, at trial, Defendants changed their story and for the first time in six years, claimed that the Rockwell product was not a miter saw but instead an abrasive cutoff saw (Trial Tr. 739, 817:8-17.)

Defendants also filed multiple motions in limine prior to trial attacking the Home Depot photograph (on the *exact same grounds* now raised post-trial), leading this Court to rule that the photograph could not be submitted as substantive evidence at trial and that severely limiting instructions would be given to the jury in connection with the Berger survey. The parties proceeded through jury selection and trial in accordance with the Court's pre-trial rulings. Defendants have presented nothing new that wasn't already thoroughly considered and decided upon by this Court during the 4 years and hundreds of pages of rulings leading up to trial.

### III. THERE IS SUBSTANTIAL EVIDENCE SUPPORTING THE JURY VERDICT REGARDLESS OF MR. BERGER'S SURVEY

In the Seventh Circuit, the question of likelihood of confusion is an ultimate issue of fact, based upon seven highly fact-intensive underpinnings: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another."

*Packman v. Chicago Trib. Co.*, 267 F.3d 628, 643 (7th Cir. 2001). As the jury was instructed: "The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion." (Trial Tr. 1030); *Packman*, 267 F.3d at 643 ("No single factor is dispositive, and [the fact-finder] may assign varying weights to each of the factors….").

Survey evidence is specifically not required to show likelihood of confusion. *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1153 (7th Cir. 1994) (finding sufficient evidence supporting jury's verdict of likelihood of confusion; holding that "failure to introduce any market survey evidence of likely consumer confusion" goes to the weight, and not the sufficiency, of likelihood of confusion evidence); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed Cir. 2012) (citing several appellate court holdings as support for its conclusion that survey evidence is not required to show likelihood of confusion); *Reynolds Consumer Products, Inc. v. Handi-Foil Corp.*, 1:13-CV-214, 2014 WL 3615853, at *4 (E.D. Va. July 18, 2014) (denying defendant's motions for judgment as a matter of law and for a new trial and upholding jury's finding of likelihood of confusion; even if the testimony and survey of plaintiff's expert were not credible, her "testimony would only weigh against [plaintiff] on the actual confusion factor…[T]he evidence regarding the other relevant likelihood of confusion factors clearly weighed in [plaintiff's] favor.").

When applying the seven factor test, there is a staggering amount of evidence in this case supporting the jury's factual determination of likelihood of confusion, regardless of the survey evidence (*see*, *e.g.*, Dkt. #245, PageID #:7782-7828, incorporated herein by reference). In addition, Defendants continue to improperly put a temporal limitation on the likelihood of confusion analysis, directly contrary to the law and the Seventh Circuit Model Jury Instructions:

> To harm the trademark owner, confusion need not occur at the time of purchase or the point of sale. It may occur prior to or after purchase.... Prior to sale, a ***potential purchaser*** attracted by the infringing mark may be misled into an 'initial interest' in the infringer's product. As a result of exposure to a confusingly similar mark, one might listen to a 'cold call' when otherwise one might not…The infringing mark is the bait for a switch, or the 'foot in the door' to gain 'fraudulent entry'. ***The damage is done by initial confusing similarity*** even though closer examination and comparison would reveal differences in the marks or other information to dispel confusion. Lured into an infringer's store by a confusing mark, consumers may stay to do business as a convenience, even though they realize their mistake.

*Second Chance Body Armor, Inc. v. Am. Body Armor & Equip., Inc.*, No. 94 C 6178, 1999 WL 967521, at *12 (N.D. Ill. Oct. 7, 1999) (emphasis added) (quoting Richard Kirkpatrick, *Likelihood of confusion in Trademark Law*, 569 PLI/Pat 107, 137-38 (1999)). In other words, there exists an initial confusion in violation of the Lanham Act, even if the customer confusion is very brief or where confusion is dispelled prior to the actual purchase. *See, e.g.*, *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) ("Initial interest confusion…occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated…That consumers…are only briefly confused is of little or no consequence."); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 11 C 02242, 2013 WL 6839815, at *5 (N.D. Ill. Dec. 27, 2013) (initial confusion, "even if later dispelled, still harms the trademark owner because it is still the 'misappropriation of [the plaintiff's] good will'"); *Forum Corp. of N.A. v. Forum, Ltd.*, 903 F.2d 434, 442 n.2 (7th Cir. 1990) ("[T]he fact that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred."); *Porsche Cars N.A., Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128, 1131 (N.D. Ill. 1997) ("[E]ven if sophisticated customers eventually discover that [defendant] is not related to plaintiffs, a trademark violation can exist simply from the initial confusion."); *Sara Lee Corp. v. Am. Leather Products, Inc.*, 97 C 4158, 1998 WL 433764, at *17 (N.D. Ill. July 29, 1998) (A "trade dress owner can base an infringement claim upon confusion that creates initial interest in the infringer's products, even though the potential customer or infringer ultimately corrects the confusion… This is

true even if no purchases are actually made….") (citations omitted); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 885-86 (N.D. Ill. 2008) ("Even if customers are sophisticated and generally buy only after extensive negotiations, technical sophistication in a particular industry does not amount to trademark sophistication…The Lanham Act protects against such initial interest confusion, which occurs when a customer takes interest in a product because of the similarity of a mark, even if the customer realizes the actual source of the products before completing a sale…It is irrelevant whether this initial confusion is brief or that the confusion is eventually cured if the trademark infringement has already occurred."); 4 McCarthy on Trademarks and Unfair Competition § 23:6 (4th ed.).

The Seventh Circuit Model Instructions, given to the jury in this case, clearly follow and embody the well-established Seventh Circuit case law set forth above. (Trial Tr. 1029-1032.) For example, agreed Instruction 13.1.2.3 regarding "Infringement-Elements-Likelihood of Confusion-Factors" states that "Plaintiffs must prove…a likelihood of confusion among a significant number of people who buy or use, *or consider buying or using*, the product or similar products." (Trial Tr. 1029) (emphasis added). This is emphasized again in the same instruction, referencing the "degree of care that purchasers *or potential purchasers* are likely to exercise in buying *or considering whether to buy* the products…." (*Id.*) (emphasis added). Moreover, this instruction confirms that Plaintiffs' burden to prove likelihood of confusion has *no temporal limitation* whatsoever (i.e., confusion can occur at any point in the process, not solely at the point-of-sale). *Id*. Thus, in accordance with the Seventh Circuit case law (and the agreed jury instruction to which Defendants had no objection), likelihood of confusion applies not just to actual purchasers of the accused products as they are paying for the product in the checkout line, but also to "potential purchasers" walking up to the display "considering whether to buy the products…." (Trial Tr. 1029-1031.) If not for the initial confusion by Defendants' yellow and black packaging, many of their ultimate customers never would have noticed the Rockwell tool at all:

> It is clear to the Court that, taken as a whole, it was Defendant's intent in appropriating Plaintiff's trade dress…to confuse or "hook" customers at the initial point of contact with the product, thus initially drawing the customers to its product through the similarity in trade dress. That the customer might realize that Defendant's product is not Plaintiff's before he gets to the check-out counter to pay for it is irrelevant. ***Even if the consumer realizes that [Defendant's] product is not the same as [Plaintiff's] brand once he picks the product up off the shelf and reads the label, Defendant has already accomplished what it set out to do, which is to confuse the consumer at the point when he first reaches for the product on the shelf. It is at that point that the damage is done***. Defendant has already succeeded in utilizing the Plaintiff's trade dress to get the customer to consider buying its product.

*McNeil-PPC, Inc. v. Guardian Drug Co., Inc.*, 984 F. Supp. 1066, 1074 (E.D. Mich. 1997) (emphasis added); *see also Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, 81 CIV. 0178, 1982 WL 51044, at *3-4 (S.D.N.Y. Dec. 9, 1982) ("[A]n examination of the shapes of the bottles used by plaintiffs and defendant makes clear the confusion which is likely to result. The court finds that a consumer would be unlikely to note any distinction in the design of these bottles in light of the small differences between the bottles…Even if, due to the different labels and the minor distinctions in the bottle shape, a consumer were able to eventually conclude that the parties were not related, [plaintiffs] would still be injured by the confusing similarity of the bottle designs. The similarity of the bottle designs is likely to attract prospective purchasers to [defendant's] bottle on the basis of the recognition of [plaintiff's bottle] design."). This likelihood of confusion applies with equal force to Defendants' so-called "on-line" sales, as consumers mistakenly approaching Defendants' sunburst products on the shelf at retail could subsequently order the Rockwell product online, which would never have occurred absent the initial confusion in the first place. The jury verdict is supported on multiple levels and many different alternative grounds. It should stand.

    Respectfully submitted,

    */s/ Raymond P. Niro, Jr.*
    Raymond P. Niro, Jr.
    Matthew G. McAndrews
    Kyle D. Wallenberg

                                              NIRO McANDREWS, LLC
                                              200 W. Madison, Suite 2040
                                              Chicago, IL 60606
                                              (312) 755-8575
                                              Fax: (312) 674-7481
                                              rnirojr@niro-mcandrews.com
                                              mmcandrews@niro-mcandrews.com
                                              kwallenberg@niro-mcandrews.com

                                              Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 29, 2016 the foregoing

**PLAINTIFFS' SUPPLEMENTAL STATEMENT**
**REGARDING MR. BERGER'S LIKELIHOOD OF CONFUSION SURVEY**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

| | |
|---|---|
| J. Aron Carnahan<br>HUSCH BLACKWELL LLP<br>120 S. Riverside Plaza, 22nd Fl.<br>Chicago, IL 60606<br>aron.carnahan@huschblackwell.com | Henry S. Alford<br>Scot A. Duvall<br>Brian P. McGraw<br>Dennis D. Murrell<br>Robert J. Theuerkauf<br>MIDDLETON REUTLINGER<br>401 S. Fourth Street<br>2500 Brown & Williamson Tower<br>Louisville, KY 40202<br>HAlford@MiddletonLaw.com<br>SDuvall@MiddletonLaw.com<br>BMcGraw@MiddletonLaw.com<br>DMurrell@MiddletonLaw.com<br>RJT@MiddletonLaw.com |

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

/s/ Raymond P. Niro, Jr.
Attorney for Plaintiffs
NIRO McANDREWS, LLC