# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER INC. and BLACK & DECKER (U.S.) INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 11-cv-5426 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| POSITEC USA INC. and RW DIRECT INC., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Black & Decker Corporation, Black & Decker Inc., and Black & Decker (U.S.) Inc. (collectively, "Plaintiffs") tried to a jury claims against Defendants Positec USA Inc. and RW Direct Inc. (collectively, "Defendants") for trademark infringement under 15 U.S.C. § 1114 (Count II) and trade dress infringement under 15 U.S.C. § 1125(a) (Count IV). Following a jury verdict in Plaintiffs' favor, the parties filed post-trial motions. Before this Court are Plaintiffs' motion for permanent injunction [219]; Plaintiffs' motion for prejudgment interest [220]; Plaintiffs' motion for attorneys' fees [224]; Plaintiffs' motion for increased damages under 15 U.S.C. § 1117(a) [225]; Plaintiffs' motion for supplemental damages pursuant to the parties' pretrial stipulation [226]; Defendants' motion to set profits award under the Lanham Act and alternative motion for remitter [227]; Defendants' motion for a new trial [228]; Defendants' renewed motion to strike Plaintiffs' jury demand [229]; and Defendants' motion for judgment notwithstanding the verdict [230].

For the reasons stated below, Defendants' motion for a new trial [228] is granted; Defendants' motion for judgment notwithstanding the verdict [230] is denied; Defendants' motion to strike jury demand [229] is denied as premature; and Plaintiffs' post-trial motions relating to remedies and damages [220], [224], [225], [226], and Defendants' motion to set profits award [227] are denied as moot. This case is set for status hearing on September 26, 2017 at 10:00 a.m.

I.  **Background**

The background of this trademark case, knowledge of which is assumed, is set forth in the Court's Memorandum Opinion and Order [93] granting in part and denying in part Defendants' motion for summary judgment. Briefly summarized, Plaintiffs allege that Defendants infringed their registered trademarks and trade dress by selling power tools and power tool accessories that used Plaintiffs' "family" of yellow and black registered trademarks and trade dress.

Beginning on September 28, 2015 and concluding on October 5, 2015, Plaintiffs' federal claims for trademark infringement and trade dress infringement were tried before a jury. The jury returned a verdict for Plaintiffs and against Defendants on both claims. The jury awarded Plaintiffs $53,960,014.00 on its claims against Positec and $114,801.00 on its claims against RW Direct. The jury also concluded that Defendants' infringement of Plaintiffs' trademarks and trade dress was willful.

The parties filed numerous post-trial motions, which are discussed below. The Court delayed consideration of these motions while the parties attempted, unsuccessfully, to resolve their dispute through meditation.[1] The Court now turns to the parties' motions.

---

[1] After the verdict, the Court met with counsel to discuss the possibility of settlement [see 267]. The parties subsequently agreed to defer consideration of the post-trial motions and attempted to mediate a

## II. Motion for New Trial

### A. Legal Standard

Rule 59(a)(1)(A) authorizes the Court to order a new trial as to some or all issues that were tried to a jury. See Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). "The ruling on a motion for a new trial is a matter committed to the district court's discretion." *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012). In determining whether a new trial is warranted, the Court "view[s] the evidence in the light most favorable to the prevailing party, leaving issues of credibility and weight of evidence to the jury." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444-45 (7th Cir. 2009). The appellate court reviews the district court's decision to grant or deny a new trial for an abuse of discretion, unless the district court's decision is based on a question of law, in which case it is reviewed *de novo*. See *Wright v. Illinois Dep't of Children and Family Services*, 798 F.3d 513, 527 (7th Cir. 2015).

### B. Analysis

In their timely motion for a new trial, Defendants argue that a new trial is warranted because the jury's damages award was excessive, the verdict was against the weight of the evidence, and the trial was fundamentally unfair due to the admission of unreliable and prejudicial expert testimony and other inadmissible evidence. The Court finds it unnecessary to consider Defendants' first two categories of arguments, because it agrees that fundamental unfairness was injected into the trial through the admission of James Berger's expert survey concerning likelihood of confusion.

---

resolution of the case. Once they reached an impasse, the parties notified the Court [see 273] of their mutual desire to reinstate the prior motions *nunc pro tunc* to their original filing dates and their request that the Court rule on those motions.

To state a claim for trademark or trade dress infringement, "a plaintiff must establish that: (1) the mark at issue is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015). Plaintiffs often employ surveys to show that the defendant's use of a mark causes consumer confusion. See, e.g., *Simon Property Group, L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000). Consumer likelihood of confusion surveys are opinion evidence based on scientific methods or specialized knowledge, and therefore must be presented through expert witnesses. See Fed. R. Evid. 702; *Simon Property Group*, 104 F. Supp. 2d at 1039; *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 2010 WL 1687883, at *2 (N.D. Ill. Apr. 26, 2010). "No survey model is suitable for every case." *Simon Property Group*, 104 F. Supp. 2d at 1038. "At bottom, however, a survey to test likelihood of confusion should attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Id.*; see also *Bobak Sausage*, 2010 WL 1687883, at *5; *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 2010 WL 1334714, at *2 (N.D. Ill. Mar. 31, 2010) ("Surveys testing consumer confusion should mimic market conditions, including the context in which purchases are made."); 5 MCCARTHY ON TRADEMARKS § 32:163 (4th ed. 1999) ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results").

In Mr. Berger's likelihood of confusion survey [103-2], Respondents were shown a photograph of two rows of boxed power tools, which according to Plaintiffs was taken in a retail Home Depot store. All of the products depicted in the photo were Plaintiffs' DeWalt products, except one, which was a Rockwell product sold by Defendants. *Id.* at 30. Respondents were asked if they believed that all the products were put out by the same company, and, if so, why.

*Id*. at 31. Forty-seven percent of respondents said they believed that all the products pictured were put out by the same company. *Id*. at 43. In his report, Berger stated that the survey was designed to test whether Defendants' use of trade dress that is similar to Plaintiffs' caused consumers to mistake the source of Defendants' goods. *Id*. at 7.

Prior to trial, Defendants moved to exclude Mr. Berger's survey based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Rule 702 permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 requires that the district court act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.,* 498 F.3d 734, 741 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-49 (1999); *Daubert,* 509 U.S. at 589. The Court denied Defendants' *Daubert* motion, concluding that Defendants' criticisms of Mr. Berger's expert opinions went to their weight rather than their admissibility.

At trial, the jury was required to decide, among other things, whether "Defendants have used power tool products and packaging in a manner that is likely to cause confusion as to the source, origin, sponsorship and/or affiliation of Defendants' products and associated packaging." [216] at 26. Despite offering the survey as evidence that Defendants' trade dress caused customer confusion, however, Mr. Berger testified at trial that his survey did not test causation, but instead was merely "observational." See Tr. Day 3, pp. 496-497, 519; see *also id.* at 528 (Mr. Berger testifying that he was "not admitting . . . that this is a causal survey" and that he "d[id]n't believe it's a causal survey"). According to Mr. Berger, the survey was not concerned

with whether Defendants' trade dress caused the consumers' confusion, but instead showed "[t]he confusion [that] was caused by the tendency to overlook the obvious"—in other words, the "idea of putting the same packages together and somebody just thinking that they're the same without looking carefully at them." Tr. Day 3, p. 497.

After considering Mr. Berger's pre-trial submissions, his trial testimony, and the parties' post-trial briefing, the Court concludes that this is one of those unusual instances in which a proffered consumer survey was "so informally designed and conducted that it fails key tests of professionalism and reliability" and therefore should have been excluded from trial. 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:158 (4th ed. 1999).

Under Rule 702 and *Daubert*, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "To meet Rule 702 and *Daubert's* standard of reliability, a survey offered to establish the likelihood of consumer confusion must 'have been fairly prepared and its results directed to the relevant issues.'" *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 951-52 (N.D. Ill. 2009) (quoting *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990)) (citations omitted). "The criteria for the trustworthiness of survey evidence are that: (1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise, and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *Weight Watchers,* 744 F. Supp. at 1272 (collecting cases).

Although these criteria generally address the weight that a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant, and thus inadmissible. See, *e.g., Evory v. RJM Acquisitions Funding LLC,* 505 F.3d 769, 776 (7th Cir. 2007) ("survey evidence in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible").

In this case, Mr. Berger's survey did not employ a reliable methodology for measuring likelihood of confusion. See *Kumho Tire*, 526 U.S. at 151-53; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert*, 509 U.S. at 589-93; *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). Mr. Berger admitted at trial that his survey was "observational" and not directed at whether Defendants' trade dress caused the consumer confusion, which is the "relevant issue" in this case. *LG Electronics*, 661 F. Supp. 2d at 951-52. Instead, Mr. Berger acknowledged that the survey was intended to test whether respondents could be induced to "overlook the obvious" through the placement of Defendants' product amidst boxes of Plaintiffs' products. He compared the survey to a test he performed with his students using the following image:

I<br>
LOVE<br>
PARIS IN THE<br>
THE SPRINGTIME

Mr. Berger explained that "my students when I give it to them will always say, at first glance it says, 'I love Paris in the springtime'" and miss the extra "the." Tr. Day 2, p. 416. Mr. Berger stated that the Rockwell package in the survey photo "is the second 'the,'" because "it's ignored." *Id.* at 417.

Mr. Berger chose not to use other survey techniques that have been found acceptable for measuring likelihood of confusion. For instance, in an "Ever-Ready" survey, named after *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366 (7th Cir.1976), "'respondents are generally

7

shown only the [allegedly infringing] product (or brand name) and asked questions such as: (1) Who do you think puts out this product? (2) What makes you think so? and (3) Name any other products put out by the same concern which puts out this product.'" *Black & Decker Corporation v. Positec USA Inc.*, 2015 WL 1543262, at *29 n.12 (N.D. Ill. Mar. 31, 2015) (quoting *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 289 (S.D.N.Y. 1997)). "The '*Eveready*' survey format does not inform respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:173.50 (4th ed. 1999). It has been described as the "gold standard" in cases involving strong marks, *id.*, and is a "widely accepted," though not exclusive, "format to prove the likelihood or non-likelihood of confusion." *Id*. § 32:174. Mr. Berger's survey is not an Ever-Ready survey because it includes both Plaintiffs' product and the allegedly infringing product in the same image.

Mr. Berger's survey is more similar to a "Squirt" survey, named after *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980). The Squirt methodology, which may be appropriate in cases where the defendant's and plaintiff's products are placed side by side in the marketplace, "presents a respondent with both of the conflicting marks," and thus "does not assume that the respondent is familiar with the senior mark." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:173.50 (4th ed.).[2] Mr. Berger admitted at trial that he prepared a Squirt survey but decided not to use it. The survey that Mr. Berger and Plaintiffs ultimately chose to submit into evidence does not use a side-by-side comparison of two products but instead uses a picture showing one of Defendants' allegedly infringing products among ten of Plaintiffs'

---

[2] Some courts have concluded that, "compared with the *Eveready* method, the *Squirt* approach does not properly replicate marketplace conditions because it artificially tells respondents about a mark that they did not know about and then asks about connections with that mark." *Id*. (citing *Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F Supp. 2d 474, 484 (S.D.N.Y. 2002); *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, *8 (S.D. N.Y. 2007).

products.  Mr. Berger acknowledged that this arrangement was designed to and did cause survey respondents to "overlook the obvious"—that Defendants' product was marked "Rockwell" whereas Plaintiffs' were marked "DeWalt."  Tr. Day 3, pp. 497; see also Tr. Day 2, p. 417.

Further, Plaintiffs cannot show that Mr. Berger's survey "mirror[ed] the situation in which the ordinary person would encounter the[ir] trademark" and trade dress.  5 MCCARTHY ON TRADEMARKS § 32:163 (4th ed. 1999).  Although Mr. Berger testified that the photo was "of a store environment," Tr. Day 2, p. 408, Plaintiffs were unable to authenticate the photo on which the survey was based.  Plaintiffs contend that the photo was taken in a Home Depot store, but have been unable to establish who took the photo or where or when it was taken.  Defendants contend that the photo was staged, since Rockwell products have never been sold in Home Deport retail stores.  Plaintiffs point to other photographs in the record in which Plaintiffs' and Defendants' products were sold in the same sections of home improvement stores, but none of them show a single Rockwell product surrounded by DeWalt products.  It was that unique arrangement that, according to Mr. Berger, caused survey respondents to overlook the obvious difference between the Rockwell package and the packages surrounding it—the brand name printed on it in bold letters.

In sum, Mr. Berger's trial testimony convinces the Court his survey was not designed in a manner that reliably measured the likelihood that consumers would be confused about the origin of Defendants' products.  Even if Mr. Berger's survey was not the sole evidence on likelihood of confusion in the trial record, it was the linchpin of Plaintiffs' case on likelihood of confusion— an issue that was hotly contested at trial.  Given that Plaintiffs presented no evidence that any consumers were actually confused about the origin of Defendants' goods, there is a high probability that Mr. Berger's flawed testimony unfairly influenced the jury's verdict.  Therefore,

the Court concludes that the admission of the survey and Mr. Berger's testimony about the survey was fundamentally unfair to Defendants. *Venson*, 749 F.3d at 656. A new trial will be ordered.

The next questions are (1) whether Plaintiffs want an opportunity to present admissible expert testimony on likelihood of confusion and, if so, (2) whether the Court has discretion to permit such a "do over" and, if so, (3) whether the Court should exercise that discretion. The parties should come prepared to discuss this issue at the next status hearing.

The Court will briefly address the remaining "fundamental unfairness" arguments raised in Defendants' motion for a new trial, because they may have an impact on the conduct of the next trial. Defendants argue that it was unfair to admit Mr. Berger's survey concerning secondary meaning because it did not use a control, it was a non-probability survey, and it used too small of a sample size. While the Court does not believe that any flaws in the secondary meaning survey (as opposed to the likelihood of confusion survey) would warrant a new trial, the Court is not in position to issue further guidance on Defendants' criticisms, as it would be premature to opine on any single aspect of any future proposed survey without considering the survey as a whole. To be sure, general acceptance is only one factor in the admissibility analysis and even novel approaches are entitled to full consideration for reliability and relevance. With that said, the more closely that an expert adheres to the settled paths outlined above, the more likely his or her work is likely to generate results that can be presented to a jury.

Defendants also argue that the admission of Plaintiffs' trademark registrations and prior judgments for Black and Decker was unfairly prejudicial. The Court does not believe that these criticisms independently warrant the grant of a new trial. However, after viewing how this evidence was used at trial, if Defendants move to exclude the evidence at the next trial, the Court

may well impose much greater restrictions on the use of such evidence as it considers the probative value of the evidence against its potential prejudice and the likelihood of confusing the jury.

The prior judgments in Black and Decker's favor were relevant to the issues of whether Black and Decker policed its marks and the strength of the marks. Defendants also stipulated as to how they would be described to the jury. Nonetheless, at the new trial, the Court would, at a minimum, prohibit Plaintiffs from using the judgments to argue that the ultimate legal issues in this case have been decided by other courts and to signal to the jury that they should decide the same way.

Plaintiffs' registered trademarks were relevant to establishing the contours of Plaintiff's "family" of marks. However, upon viewing the registered trademarks at trial, it appears that their relevance is limited to any of Defendants' *tools* or accessories that have a yellow and black color scheme (like the JawHorse), and not to Defendants' packaging. Indeed, Plaintiffs appear to acknowledge the distinction between the use of their registered trademarks to establish the common characteristics of Plaintiffs' tools and accessories on the one hand and its packaging on the other. See [244] at 11 ("a reasonable jury easily could find ... that Plaintiffs' registered trademarks comprise a protectable family of marks having a recognized common characteristic in the use of a yellow and black color scheme with respect to power tools"). It would extend the "family" of marks concept too far to say that registered marks that cover components of tools and accessories also cover their packaging. Imagine if Plaintiffs used yellow and black on their tools, but not on their packaging. Under Plaintiffs' "family" theory, competitors still could not use yellow and black on their packaging, because customers associate those colors with Plaintiffs' tools. Plaintiffs have not pointed to any case law that would support extending the

concept of a "family" of registered trademarks so far. This raises the question of whether, at the next trial, Black and Decker's registered trademark claim should be limited to the black and yellow tools or accessories sold by Defendants (namely, the JawHorse).

Relatedly, Defendants argue that they are entitled to a new trial because the jury instructions combined the trademark infringement claims and the trade dress infringement claims in a manner that misstated the law and confused and mislead the jury. Without deciding whether the instructions were sufficiently flawed as to provide an independent basis for granting a new trial, the Court agrees that combining the instructions for the trademark and trade dress claims was not the best way to proceed. The registered trademark infringement claim is based on power tools and power tool accessories; the trade dress claim based on packaging. Combining the instructions for the two types of claims may have confused the jury as to what each relevant "family" encompasses. In hindsight, it seems apparent that the relevant "family" must be different for the two types of claims, because the registered trademarks have nothing to do with Plaintiffs' packaging. If Plaintiffs wish to proceed on both claims at the new trial, the Court will require the parties to provide separate instructions for the two claims, and to do so well in advance of trial so that any disagreements can be resolved before the trial begins.

Finally, Defendants argue that they are entitled to a new trial because Plaintiffs' repeated references to China as the origin of Defendants' products and to the "Chinese billionaire" who founded Defendants (Mr. Gao) was unfairly prejudicial, evoking national origin biases. With the benefit of hindsight, the Court also recognizes the troubling nature of this line of testimony and argument, but does not believe that this alone would warrant a new trial. To be sure, Defendants never explained in their motion in limine on this issue why they sought to bar any references to China, and brought up the origin of their products in their own opening argument. Nonetheless,

at the new trial all parties will be barred from referencing the fact that Defendants' founder is a "Chinese billionaire" or referencing the origin of Defendants' products. As it played out at the first trial, these facts have very limited (if any) relevance to the case and may unfairly lead a jury to conclude that a very large verdict is appropriate against a "Chinese billionaire" who has attempted to pass off his products as American-made.

## III. Motion for Judgment Notwithstanding the Verdict

### A. Legal Standard

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, the Court is authorized "to enter judgment against a party who has been fully heard on an issue during a jury trial if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "The law imposes a high standard for overturning a jury verdict." *Pierson v. HartleyEyeglasses*, 391 F.3d 898, 903 (7th Cir. 2004). Under this "stringent standard," the Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels*, 634 F.3d at 376. "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id*. In sum, the Court "[i]nquires only whether the evidence, viewed in the light most favorable to [Plaintiffs], was sufficient for a jury to find" Defendants liable for trademark infringement and trade dress infringement. *Pierson*, 391 F.3d at 903.

### B. Analysis

Defendants raise several challenges to the jury's verdict in their motion for judgment notwithstanding the verdict. First, Defendants argue that they are entitled to judgment because Plaintiffs presented no evidence that consumers were confused by Defendants' use of black and

yellow trade dress. In the Seventh Circuit, courts examine seven factors to determine the likelihood of confusion: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). Although "[n]o single factor is dispositive," the three that are "especially important" are "the similarity of the marks, the intent of the defendant, and evidence of actual confusion." *Id.* (citing *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 898 (7th Cir. 2001)).

Here, the Court agrees with Defendants that there was no evidence of actual confusion presented to the jury. However, Plaintiffs were not required to present evidence of actual confusion, see *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001); *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1016 (N.D. Ill. 2014), or survey evidence, see *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1153 (7th Cir. 1994). Setting aside Mr. Berger's flawed survey, Plaintiffs presented evidence addressing several of the relevant likelihood of confusion factors. As to the similarity of trade dress, Plaintiffs brought in many samples of their packaging and placed them side-by-side with Defendants' packaging for the jurors to observe and compare. As to Defendants' intent, Plaintiffs presented evidence that other toolmakers match their packaging to their tools, and only Positec used colors on its packaging which did not match its tools. Plaintiffs also presented evidence that when Defendants designed their packaging, their executives knew that Plaintiffs already used a yellow and black color scheme. This evidence supports Plaintiffs' theory that Defendants were trying to create the impression that Rockwell is somehow affiliated with Black and Decker and DeWalt.

Plaintiffs also presented evidence that the parties sell similar products (such as drills, saws and blades, drivers, grinders, sanders, and battery packs) in the same retail settings (including Costco and Lowe's) and that consumers may not use a high degree of care while making purchases, especially for power tool accessories (Ms. Fischer's testimony). A rational jury could find based on this evidence that Defendants' use of the yellow and black color scheme created a likelihood that consumers would mistakenly believe that Rockwell tools came from Plaintiffs.

Next, Defendants assert that there was insufficient evidence for the jury to find that Plaintiffs articulated a protectable "family" trade dress used in a consistent and visually stable manner, since Plaintiffs' yellow and black color scheme "took on at least three different forms" on their packaging. [230] at 47. Trade dress "is the total image or overall appearance of a product, including size, shape, color, texture, and graphics." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (quotation marks and citation omitted). "One claiming family trade dress protection must articulate a specific trade dress and demonstrate that it has consistently used that trade dress[.]" *Id.* at 814-15. "Whether a family of marks" (or trade dress) "exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in [the] party's other marks." *AM Gen. Corp.*, 311 F.3d at 815 (citing *McDonald's Corp. v. McBagel's, Inc.,* 649 F. Supp. 1268, 1271 (S.D.N.Y. 1986)).

The parties entered dozens of their product packages into evidence at trial for the jury to evaluate. The jury could and did determine from this evidence that Plaintiffs used their black and yellow color scheme in a consistent and visually stable manner. Although Plaintiffs used the color scheme in two distinct ways on their packaging, the "consistent overall look" standard does "'not require that the appearance of the series or line of products or packaging be identical.'"

15

*AM Gen. Corp.*, 311 F.3d at 814 (quoting *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172-75 (3d Cir. 2000)). "One or more of the package designs could be recognizable trade dress as long as it had a 'consistent overall look.'" *Id.* (quoting *Rose Art*, 235 F.3d at 172-75). A rational jury could conclude based on the packaging that Plaintiffs entered into evidence that Plaintiffs' two forms of packaging had a consistent overall look—the predominantly yellow package with black in the DeWalt name, tool picture and text; and the predominately black package with yellow side panels and DeWalt name and black text and graphics. (While Defendants assert that Plaintiffs' trade dress comes in three distinct forms, two of the forms identified by Defendants, see [230] at 48-49, look very similar, with both being a predominately black package with yellow side panels and other graphics and text in black on the yellow panels.)

Defendants also attack the sufficiency of the evidence that Plaintiffs' packaging has acquired secondary meaning—*i.e.* that "the family characteristic . . . inform[s] the consumer of the product's source, not simply of its nature." *AM Gen. Corp.*, 311 F.3d at 815. "[A] court may consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Id.* (quotation marks and citation omitted).

Defendants recognize that Plaintiffs introduced evidence of their advertising, promotional activity, and sales, but argue that this is not enough to support a jury finding of secondary meaning because there is no evidence that "the advertising and promotional activity and/or sales presented by Plaintiffs can be attributed and/or relate to product packaging at all." [209] at 8. However, Defendants do not discuss the extensive testimony that Plaintiffs provided at trial concerning their advertising and sales and their relation to Plaintiffs' use of the yellow and black

color scheme. Plaintiffs offered testimony that the yellow and black color scheme is "part of [DeWalt's] core" and "part of [DeWalt's] DNA" that runs through "absolutely everything that [DeWalt does] as an organization." Tr. Day 2, p. 192. For instance, the jury heard not just that Plaintiffs used the color scheme in a few advertisements, but that Plaintiffs had used it extensively for years in its print advertisements, in-store merchandising, and "yellow and black payback program," that Plaintiffs sent out promotional yellow and black "swarm vans" with sales representatives dressed in yellow in black, and that Plaintiffs sponsored a NASCAR team that drove a yellow and black car. Plaintiffs also introduced sales figures showing that their DeWalt sales increased from $120 million in 1992—when they began heavily promoting DeWalt using a yellow and black color scheme—to $1 billion in 2003 and $3 billion in 2015. A rational jury could conclude that Defendants' extensive advertising and promotional activities caused consumers to associate yellow and black trade dress with DeWalt and contributed to DeWalt's substantial growth in sales.

Defendants also argue that Plaintiffs cannot establish secondary meaning because there was not sufficient evidence that Plaintiffs' use of the yellow and black color scheme was exclusive. But in fact, Plaintiffs offered testimony that, other than Rockwell, DeWalt was the only seller of tools that used yellow and black over the last twenty years since DeWalt's introduction. See [245] at 33. In addition, Defendants' own witness, Mr. Tellefsen, testified that to his knowledge only DeWalt used the yellow and black color scheme between 2002 and 2009. This evidence was sufficient to support a rational jury's verdict in Plaintiffs' favor on the exclusivity issue.

Defendants argue further that Mr. Berger's secondary meaning survey does not support the jury's verdict because it asked only about tools, not packaging. The Court previously

17

rejected this argument at the summary judgment and motion in limine stages and is not convinced that its prior decisions were wrong. See [192] at 26 ("A reasonable trier of fact could infer that if respondents associate Plaintiffs with yellow and black products—a conclusion supported by the Berger report—consumers also associate Plaintiffs with tools and accessories in yellow and black packaging." (quoting [93] at 57-58)).

Defendants next argue that they are entitled to judgment on both the registered trademark infringement claim and the unregistered trade dress infringement claim because there was insufficient evidence for the jury to find, as they were instructed, that "Defendants have used 'power tool products <u>and</u> packaging' in a manner that is likely to cause confusion." [230] at 32-33 (emphasis by Defendants). Defendants assert that "that there was no proof presented at trial that any of Defendants' power tools infringe Plaintiffs' rights" because "none of Defendants' power tools even have yellow anywhere on them." *Id*. at 33. Defendants argue further that although their JawHorse product was yellow and black, the JawHorse is not a power tool or power tool accessory and thus not relevant to the jury's verdict.

The Court concludes that the more appropriate procedure for addressing this alleged error is the new trial, which the Court has already determined to be warranted based on the admission of Mr. Berger's likelihood of confusion survey and testimony. Defendants contend in their motion for new trial that the jury instructions erroneously combined the trademark infringement and trade dress infringement claims, resulting in juror confusion. Yet in their motion for judgment as a matter of law they seek to take advantage of that alleged error by contending that Plaintiffs must show that *both* their power tools and their packaging were confusingly similar to Plaintiffs' in order to prove either their trademark infringement claim or trade dress infringement claim. Defendants cannot have it both ways. At the new trial, the parties will be required to

provide separate instructions for the two claims to avoid confusing the jury about what elements Plaintiffs must prove for each claim and what evidence is relevant to each claim. In addition, as discussed above, Plaintiffs should consider whether it is advisable (or perhaps even legally mandated) to drop the trademark infringement claim or limit it to the JawHorse, since (as was made clear at trial) their registered trademarks do not cover any of their packaging.

Finally, Defendants attack the jury's finding that their infringement of Plaintiffs' trademarks and trade dress was willful or intentional, arguing that there is insufficient evidence to support that finding. The Court is not persuaded. As noted above, Plaintiffs presented evidence at trial that Defendants' executives knew prior to selling their allegedly infringing products that Plaintiffs' DeWalt brand used the colors black and yellow on its tools and packaging and that Plaintiffs had trademarks for tools that specified the use of a yellow and black color scheme. Defendants could have but chose not to use other colors. Plaintiffs also presented evidence that Defendants refused to comply with Plaintiffs' cease and desist letter. The evidence was sufficient to support the jury's finding that Defendants' infringement was intentional or willful.

For these reasons, the Court denies Defendants' motion for judgment notwithstanding the verdict [230].

## IV.    Remaining Post-Trial Motions

The Court's decision to grant Defendants' motion for a new trial renders moot Plaintiffs' post-trial motions relating to remedies and damages [220], [224], [225], [226], and Defendants' motion to set profits award [227].

Finally, Defendants have renewed their motion to strike Plaintiffs' jury demand and argue that the case should not have been given to a jury. Any expert testimony on likelihood of

confusion may affect the question of whether the case should be decided by a jury or the Court. See [243] at 19 (argument by Plaintiffs that they showed actual loss by introduction of Mr. Berger's likelihood of confusion survey). The Court concludes that it would be premature to strike Plaintiffs' jury demand until it can determine whether Plaintiffs will be offering another survey on likelihood of confusion. Therefore, Defendants' motion to strike [229] is denied without prejudice. The Court will reassess the judge versus jury issue at the appropriate time prior to the new trial.

## V.     Conclusion

For these reasons, Defendants' motion for a new trial [228] is granted; Defendants' motion for judgment notwithstanding the verdict [230] is denied; Defendants' motion to strike jury demand [229] is denied as premature; and Plaintiffs' post-trial motions relating to remedies and damages [220], [224], [225], [226], and Defendants' motion to set profits award [227] are denied as moot. This case is set for status hearing on September 26, 2017 at 10:00 a.m.

Dated: September 11, 2017

_____
Robert M. Dow, Jr.
United States District Judge